No. 13-7147
**ORAL ARGUMENT NOT YET SCHEDULED**
━━━━━━━━━━━━━━━━━━━━━━━

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**HAN KIM and YONG SEOK KIM,**

*Plaintiffs-Appellants,*

v.

**DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, also known as
NORTH KOREA,**

*Defendant-Appellee*
_____

**On Appeal from the United States District Court
for the District of Columbia**
_____

**BRIEF FOR THE PLAINTIFFS-APPELLANTS**
_____

**ROBERT J. TOLCHIN**
**The Berkman Law Office, LLC**
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
*Attorney for Plaintiffs-Appellants*

**NITSANA DARSHAN-
LEITNER**
**Nitsana Darshan-Leitner & Co.**
10 Hata'as Street
Ramat Gan, 52512 Israel
*International Co-Counsel for the
Plaintiffs-Appellants*

**ASHER PERLIN**
**Florida Professional Law Group,
PLLC**
4600 Sheridan Street, Suite 303
Hollywood, FL 33021
(954) 284-0900 ext. 102
*Attorney for Plaintiffs-Appellants*
*asher@asherperlin.com*

**APPELLANT'S CERTIFICATE AS TO
PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), Appellants Mr. Han Kim and Mr.

Yong Seok Kim certify as follows:

**A.     Parties, Intervenors, and Amici**.

1.     The appellants are Mr. Han Kim and Mr. Yong Seok Kim, the

plaintiffs in the case below.

2.     The appellee is Democratic People's Republic of Korea, also known as

North Korea, the defendant from the case below.

3.     Human Rights First is expected to file an amicus brief in this Court.

Human Rights First did not appear in the district court.

**B.     Rulings Under Review.**

The rulings under review are (a) the June 14, 2013 Memorandum

Opinion and Order (*Appx. 371*) and (b) the September 11, 2013 Order (*Appx.

408*), both entered by the district court (Roberts, J.) in Civil Action No. 1:09-

cv-00648 dismissing plaintiff's action for lack of subject matter jurisdiction.

The official citation of the Opinion under review is 950 F. Supp. 2d 29 (D.D.C.

2013).

**C.     Related Cases.**

The case on review was previously before this Court on Plaintiffs-

Appellants' Petition for Interlocutory Appeal of the June 14, 2013

i

Memorandum Opinion and Order in Case No. 13-8005, *In re: Han Kim and*
*Yong Seok Kim.*  In a *per curiam* order filed on September 11, 2013, this Court
(Circuit Judges Tatel, Griffith, and Kavanaugh) denied the Petition without
prejudice.  *Appx. 407*. Otherwise, and with the exception of the district court
below, this case has not previously been before this or any other court.
Undersigned counsel is not aware of any related cases.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants, Mr. Han Kim and Mr. Yong Seok Kim request that oral argument be allowed pursuant to Fed. R. App. P. 34(a).  Oral argument may significantly assist the Court in deciding the issues in this appeal.

# TABLE OF CONTENTS

*Page*

STATEMENT OF JURISDICTION .............................................................1

STATEMENT OF ISSUES FOR REVIEW .................................................2

PERTINENT STATUTES ..........................................................................3

STATEMENT OF THE CASE ....................................................................5

STATEMENT OF FACTS ...........................................................................9

    A. Reverend Kim relocates to China to work with North Korean
    refugees and disabled Chinese individuals .........................................9

    B. The DPRK State Security Department abducts
    Reverend Kim from China and transfers him to North Korea
    where he is imprisoned and tortured .................................................10

    C. The Kims proffer substantial evidence as to
    the brutal torture systematically inflicted upon
    DPRK political prisoners ..................................................................11

    D. The Kims produce evidence demonstrating that
    North Korean human rights abuses are pervasive
    and rise to the level of systematic crimes against
    humanity and torture .......................................................................12

    E. In the kwan li so prisons sadistic and brutal torture
    is the rule, without any known exceptions ........................................14

    F. Experts testified that Reverend Kim was likely tortured
    more severely than average prisoners because he proselytized
    the Christian faith and assisted North Korean refugees
    escape into China ...........................................................................16

    G. The district court found that the Kims produced insufficient
    evidence to satisfy the evidentiary burden of Section 1608(e) .........19

iv

# TABLE OF CONTENTS
*(continued)*

*Page*

SUMMARY OF ARGUMENT ................................................................23

ARGUMENT...................................................................................27

STANDARD OF REVIEW ..................................................................27

A.   THE DISTRICT COURT ERRED WHEN IT MISAPPLIED THE
     STANDARD FOR ENTRY OF DEFAULT JUDGMENT FOR FSIA
     PLAINTIFFS UNDER 28 U.S.C. § 1608(e), DEMANDING THAT THE
     KIMS PROVIDE DIRECT, FIRST-HAND EVIDENCE OF
     PARTICULAR DETAILS OF THE TORTURE THE DPRK INFLICTED
     UPON REVEREND KIM...................................................................27

1.   The trial court erred in requiring the Kims to produce evidence sufficient to
     establish a prima facie case; Section 1608(e) requires plaintiffs seeking default
     judgment under the FSIA to present only sufficient evidence demonstrating
     that their claim has "some factual basis." ....................................................27

2.   The district court erred when it held the Kims failed to produce details about
     the severity of Reverend Kim's torture.   ...................................................33

3.   The trial court erred when, purporting to follow *Price*, it mechanically insisted
     that the Kims produce direct, first hand evidence of the frequency and duration
     of Reverend Kim's torture, the parts of the body at which the torture was
     aimed, and the implements used to carry out the torture.............................39

4.   The court erred in failing to consider circumstantial evidence and expert
     testimony ......................................................................................................42

B.   THE DISTRICT COURT ERRED WHEN IT REQUIRED THE KIMS TO
     PROFFER IN SUPPORT OF THEIR CLAIM FOR EXTRAJUDICIAL
     KILLING EVIDENCE THAT WOULD SATISFY THE TVPA'S
     DEFINITION OF TORTURE  ............................................................46

# TABLE OF CONTENTS
## *(continued)*

*Page*

C.    THE DISTRICT COURT ERRED WHEN, UPON FINDING THAT THE KIMS HAD FAILED TO PRODUCE EVIDENCE SATISFACTORY TO THE COURT THAT THE DPRK HAD SEVERELY TORTURED REVEREND KIM, IT DISMISSED THEIR CASE FOR LACK OF SUBJECT MATTER JURISDICTION .................................................50

1.  Assuming the Kims failed to produce sufficient evidence to support default judgment under Section 1608(e), which requires satisfactory evidence of a "claim or right to relief," that deficiency did not justify the dismissal for lack of subject matter jurisdiction. ...................................................................................50

2.  Upon determining the evidence was insufficient to support entry of default judgment, the district court should have ordered the Kims to engage in discovery and proceed toward summary judgment or trial. ...................................................................................51

CONCLUSION ........................................................56

CERTIFICATE OF COMPLIANCE.........................................57

CERTIFICATE OF SERVICE................................................58

# TABLE OF AUTHORITIES

*Page*

### CASES

*Alameda v. Secretary of Health, Education and Welfare,*
  622 F.2d 1044 (1st Cir. 1980) .................................................32

*Brayton v. Office of the United States Trade Representative,*
  641 F.3d 521 (D.C. Cir. 2011) ...............................................27

*Commercial Bank of Kuwait v. Rafidain Bank,*
  15 F.3d 238 (2d Cir. 1994)..............................................27, 44,

*Compania Interamericana Export-Import, S.A. v.*
*Compania Dominicana de Aviacion,* 88 F.3d 948 (11th Cir. 1996) ..........32

*FTC v. H.J. Heinz Co.,*
  246 F.3d 708 (D.C. Cir. 2001)...............................................27

*Gates v. Syrian Arab Republic,*
  580 F.Supp.2d 53 (D.D.C. 2008).......................................30, 31

*Giampaoli v. Califano,*
  628 F.2d 1190 (9th Cir. 1980) ....................................31, 32, 54

* *Hill v. Republic of Iraq,*
  328 F.3d 680 (D.C. Cir. 2003) ................................ 42, 43, 44, 46, 54, 55

 *Kickapoo Tribe of Indians v. Babbitt,*
  43 F.3d 1491 (D.C. Cir. 1995) .........................................32, 47

* *Kilburn v. Islamic Republic of Iran*
  699 F. Supp. 2d 136 (D.D.C. 2010)...................................... 30-31, 44-45

*Marziliano v. Heckler,*
  728 F.2d 151(2d Cir. 1983) .................................................32

* Authorities upon which we chiefly rely are marked with asterisks

# TABLE OF AUTHORITIES

## *(continued)*

*Page*

*Peterson v. Islamic Republic of Iran,*
  264 F. Supp. 2d 46 (D.D.C. 2003)...........................................................45

\* *Price v. Socialist People's Libyan Arab Jamahiriya,,*
  294 F.3d 82 (D.C. Cir. 2002) .......................6-8, 20-22, 24, 33-41, 50, 52

*Princz v. Federal Republic of Germany,*
  26 F.3d 1166 (D.C. Cir. 1994) ..............................................................27

*Shapiro v. Republic of Bolivia,*
  930 F.2d 1013 (2d Cir. 1991).................................................................27

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan,*
  262 F. Supp. 2d 217 (S.D.N.Y. 2003) ..............................................45, 46

*United States v. Sumitomo Marine & Fire Insurance Co. Ltd.,*
  617 F.2d 1365 (9th Cir. 1980) ......................................................... 53-54

*Ungar v. Islamic Republic of Iran,*
  211 F. Supp. 2d 91 (D.D.C. 2002)................................................... 29-31

\* Authorities upon which we chiefly rely are marked with asterisks

## TABLE OF AUTHORITIES
### *(continued)*

*Page*

### *STATUTES*

28 U.S.C. § 1291 ................................................................1, 22

28 U.S.C. § 1330................................................................1

28 U.S.C. § 1331................................................................1

*28 U.S.C. § 1350................................................ 3, 4, 20, 25, 48

28 U.S.C. § 1602................................................................5

*28 U.S.C. § 1605A............................................. 1-3, 5-7, 20, 26, 33, 47, 48

*28 U.S.C. § 1608.........2, 3, 5, 6, 19, 22, 24, 26-31, 29, 41, 43-45, 47, 50-55

### *RULES*

Fed. R. Civ. P. 37(b) . ................................................................54

Fed. R. Civ. P. 50(a) ................................................................ 6, 29, 31

Fed. R. Civ. P. 55(a) ................................................................6

Fed. R. Civ. P. 55(d) ................................................................30, 31

Fed. R. Civ. P. 55(e) ................................................................43, 54

\* Authorities upon which we chiefly rely are marked with asterisks

## GLOSSARY

"DPRK" means the Democratic People's Republic of Korea.

"FSIA" means the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et. seq.*

"TVPA" means the Torture Victim Protection Act, 28 U.S.C. § 1350 *note*.

No. 13-7147

———————————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
———————————————————

HAN KIM and YONG SEOK KIM,

*Plaintiffs-Appellants,*

v.

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, also known as
NORTH KOREA,

*Defendant-Appellee.*
———————————————————

On Appeal from the United States District Court
for the District of Columbia
———————————————————

BRIEF FOR THE PLAINTIFFS-APPELLANTS
———————————————————

STATEMENT OF JURISDICTION

The District Court had jurisdiction over this action under 28 U.S.C. §§ 1330 and 1331 and under the Terrorism Exception to the Jurisdictional Immunity of a Foreign State, 28 U.S.C. § 1605A. On September 11, 2013, the District Court dismissed the action for lack of subject matter jurisdiction. A notice of appeal was filed on September 24, 2013. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR REVIEW

1.      Whether the district court misapplied the standard for default judgment under 28 U.S.C. § 1608(e) and the requirements for claims of torture and extrajudicial killing under 28 U.S.C. § 1605A where the court required that the plaintiffs produce direct, first-hand evidence of the specific forms, duration and frequency of the torture to which their decedent was subjected and where the court rejected as insufficient copious circumstantial evidence and expert testimony demonstrating the defendant universally and severely tortures prisoners like the decedent and where the abuse was severe enough to cause the victim's death.

2.      Whether plaintiffs were entitled to a default judgment in an action brought under 28 U.S.C. § 1605A against a designated state sponsor of terrorism where the plaintiffs provided clear, uncontroverted evidence of the victim's disappearance at the hands of a state proven to engage in torture and extrajudicial killing, and where, due to the defendant state's secretive nature, concealment of its crimes, and violent suppression of potential witnesses, the plaintiffs lacked direct first-hand evidence of specific details of the torture and killing, but produced extensive circumstantial evidence and thorough, reliable expert testimony.

3.      Whether the district court erroneously conflated the two separate claims under 28 U.S.C. § 1605A -- for torture and extrajudicial killing – when it

required the plaintiffs to establish their extrajudicial killing claim by proving their decedent was tortured, as the term is defined by the Torture Victims Protection Act, 28 U.S.C. 1350 note.

4.     Whether the district court erred in dismissing for lack of subject matter jurisdiction the plaintiffs' claims under the Terrorism Exception of the Foreign Sovereign Immunities Act, without affording plaintiffs an opportunity to take discovery, where the court found that the plaintiffs had failed to establish their "claim or right to relief by evidence satisfactory to the court" as required for entry of default judgment under 28 U.S.C. 1608(e).

## PERTINENT STATUTES

**28 U.S.C. § 1605A, Terrorism exception to the jurisdictional immunity of a foreign state, provides in relevant part as follow**s:

> (a) In general.
>   (1) No immunity. A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or re-sources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.
>
> ***
>
> (h) Definitions.  For purposes of this section--

3

… (7) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note).

**The Torture Victim Protection Act of 1991, 28 U.S.C. 1350 note, provides in part:**

Sec. 3. Definitions

(a) Extrajudicial killing. For the purposes of this Act, the term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

(b) Torture. For the purposes of this Act--

"(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from--

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

4

**28 U.S.C. § 1608, Service, time to answer; default, provides in relevant part as follows:**

> (e)  No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

## STATEMENT OF THE CASE

Plaintiffs-Appellants, Han Kim and Yong Seok Kim ("Han" and "Yong Seok," respectively, or "the Kims" collectively), are the son and brother of Reverend Dong Shik Kim ("Reverend Kim").  Reverend Kim was abducted on January 16, 2000 by officials, employees and agents of defendant Democratic People's Republic of Korea ("DPRK"), and was then forcibly transferred to North Korea where he was imprisoned, tortured, and then killed by officials, employees and agents of the DPRK.

The Kims filed this action against the Defendant-Appellee, Democratic People's Republic of Korea (the "DPRK"), pursuant to 28 U.S.C. § 1605A, the terrorism exception to judicial immunity under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602, *et seq.*  Section 1605A, or the "Terrorism Exception," provides federal courts with subject matter jurisdiction and carves out an exception to foreign sovereign immunity based upon the commission of certain

5

specified acts, including torture and extrajudicial killing. 28 U.S.C. 1605A(a)(1). Section 1605A also creates a private right of action for personal injury or death caused by any of the specified acts. 28 U.S.C. § 1605A(c).

In the First Amended Complaint (the "Complaint"), Reverend Kim's son and brother sought to hold the DPRK liable for the torture and extrajudicial killing of Reverend Kim. *Appx.* 1. In addition to alleging statutory claims under § 1605A(c), the Kims asserted common law claims for infliction of emotional distress and loss of consortium and solatium. *Appx. 8-11.*

The Plaintiffs properly served the Complaint upon the DPRK pursuant to 28 U.S.C. § 1608. However, the DPRK failed to respond, and the Plaintiffs obtained a clerk's entry of default pursuant to Fed. R. Civ. P. 55(a). *Appx. 12*. The Plaintiffs then moved for default judgment and submitted extensive evidence in support of the factual allegations of the Amended Complaint.

Under the FSIA, a claimant seeking default judgment against a foreign state must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Thus, a plaintiff may not obtain a default judgment based upon the allegations of a complaint alone. Rather, the plaintiff must proffer evidence that is "satisfactory to the court" to prevail.

Relying heavily on a dictum from this Court's decision in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002), the trial court

held that to sustain their claim under Section 1605A, the Kims were required to proffer specific evidence demonstrating the nature, severity, and frequency of torture to which Reverend Kim was subjected, the body parts to which the torture was aimed, and the weapons with which the torture was meted out. *Appx. 390, 392, 395, 398, 402, 403*. Due to the ultra-secretive nature of the North Korean regime, the risk of severe retaliation against witnesses or their relatives, and the fact that most witnesses to the atrocities of the DPRK prison camps are themselves prisoners or guards in the camps, or dead, the Plaintiffs were unable to produce specific, direct evidence of the nature demanded by the trial court.

Instead, the Kims proffered substantial expert testimony discussing the vicious and dehumanizing treatment to which DPRK political prisoners, without exception, are subjected; the pervasiveness of extreme forms of torture, starvation, and summary executions in the DPRK prison camps; and the likelihood, indeed, near certainty, that as a Christian minister and a perceived political opponent of the DPRK regime, Reverend Kim would have been subjected to more brutal forms of torture than other prisoners. Expert witnesses also testified that they had received credible, albeit hearsay, reports that Reverend Kim had in fact been tortured, deliberately malnourished, and killed.

In an order entered June 14, 2013, the trial court held that it was constrained by *Price* from entering the default judgment based upon evidence of DPRK's

7

practices as to political prisoners, generally. *Appx. 371, 403*. The court held that it could not use those facts to draw conclusions as to whether DPRK's treatment of Reverend Kim rose to the level of "torture," as defined under the TVPA. *Appx. 403*. The trial court held that the Kims failed to provide sufficient evidence to support jurisdiction under the FSIA. *Id*.

The court then held that an interlocutory appeal was appropriate because the finding involved a controlling question of law and there was substantial ground for difference of opinion as to whether the plaintiffs "presented the requisite quantum of evidence to show that Reverend Kim was tortured under the FSIA." *Appx. 403-405*. The court certified the case for immediate interlocutory appeal. *Id*.

The Kims filed their petition for interlocutory appeal. But, in an order dated September 11, 2013, this Court denied the petition. *Appx. 407*. This Court held that the trial court's order was a final decision and not an interlocutory order because the trial court concluded it lacked subject matter jurisdiction. On the same day that this Court denied the petition, the district court entered its final order dismissing the Plaintiff's case for lack of subject matter jurisdiction. *Appx. 408*. The Kims now appeal the final order of the trial court dismissing their action for lack of subject matter jurisdiction.

## STATEMENT OF FACTS

**A. Reverend Kim relocates to China to work with North Korean refugees and disabled Chinese individuals**.

Reverend Dong Shik Kim, a South Korean minister, began working in China during the 1988 Special Olympics, when he was invited by the Chinese government to work with disabled athletes. *Appx. 16*. Witnessing the hardships endured by disabled Chinese citizens, Reverend Kim left his position as a community preacher to become a human rights activist in northern China. *Id.* While there, Reverend Kim learned of the horrifying torture, deliberate and extreme malnutrition and other crimes against humanity that the DPRK government inflicted upon its perceived enemies, including North Korean citizens who merely wished to leave the country in the hope of finding a better life elsewhere. *Appx. 16-17*. In 1993, Reverend Kim began working with the North Korean refugee community in China, providing humanitarian and religious services to the refugees, and assisting others to escape to China and third countries. *Appx. 17*, 26, 39-40. Reverend Kim established a number of shelters for the North Korean refugees, and a school (named the "School of Love") for North Korean children and disabled individuals. *Id.*

**B. The DPRK State Security Department abducts Reverend Kim from China and transfers him to North Korea where he is imprisoned and tortured.**

The North Korean State Security Department ("SSD"), the DPRK's primary intelligence gathering body, learned of Reverend Kim's activities on behalf of North Korean defectors, and decided to put an end to his work and deter others from providing similar care and services to the North Korean refugee community. *Appx. 39,48*. The SSD formulated a plan to abduct Reverend Kim and bring him to North Korea. *Appx. 48*.

On January 16, 2000, a group of Chinese agents working for the North Korean SSD abducted Reverend Kim, transferred him across the border to North Korea, and delivered him to a senior SSD officer. *Appx. 49*. Liu Yong Hua, one of the DPRK agents involved in the abduction of Reverend Kim was later tried and, in 2005, convicted by a South Korean court for his role in a number of abductions on behalf of the SSD, including that of Reverend Kim. *Appx. 86, 387*. The South Korean court found that Ji Young Soo, the SSD officer who ordered Reverend Kim's abduction, wanted to eliminate Reverend Kim because he was "a force" "who prayed in a negative way in churches." *Appx. 78*.

The South Korean court found that Hua and his gang abducted Reverend Kim as he left a restaurant in China, handcuffed him, transferred him across the border to North Korea, and turned him over to SSD Director, Ji Young Soo, and

10

Kim Sung Kook, another North Korean Security official. *Appx. 79-84*. The fact of

Reverend Kim's abduction was confirmed by an internal State Department cable

discussing a Chinese newspaper's report that Chinese investigators had "strong

evidence" that Reverend Kim was kidnapped by the SSD. *Appx. 282*.

The South Korean court held that all of those abducted by Hua's gang were

"likely severely harmed in North Korean (sic), and in the case of Reverend Kim,

there is hearsay that he is deceased with no way of confirming whether it is true or

not." *Appx. 86*.

### C. The Kims proffer substantial evidence as to the brutal torture systematically inflicted upon DPRK political prisoners.

The trial court accepted that Reverend Kim was abducted by agents of the

DPRK and was forcibly transferred to North Korea and turned over to officers of

the SSD.  However, the trial court hesitated when it reviewed the evidence of

Reverend Kim's treatment at the hands of the North Koreans.  The trial court

demanded that the Kims produce direct evidence of the severity of Reverend

Kim's beatings, including their frequency, duration, the parts of the body at which

they were aimed, and the weapons used to carry them out. *Appx. 390, 392, 395,

398, 402, 403*.

North Korea is an ultra-secretive and insular regime that spares no effort

to conceal its oppressive and brutal tactics from the outside world. *Appx. 49,*

*133.*  Due to the extreme insularity of the DPRK regime, its closed borders, and

its totalitarian-Stalinist repression, direct evidence of the fate of specific victims

of the North Korean prison camp system is near impossible to obtain. *Appx.*

*127-29, 286.*  Nonetheless, the Kims presented the trial court with extensive

direct and circumstantial evidence from both lay and expert witnesses

demonstrating that the DPRK tortured and murdered Reverend Kim.

**D. The Kims produce evidence demonstrating that North Korean human rights abuses are pervasive and rise to the level of systematic crimes against humanity and torture.**

North Korea is consistently listed among a handful of the most brutal

regimes in the world.  The February 1, 2013 Report of the United Nations' Special

Rapporteur on the Situation of Human Rights in the Democratic People's Republic

of Korea, which was submitted to the District Court (*Appx. 329*), identified nine

patterns representing systematic and widespread violations of human rights that are

endemic to the DPRK.  *Appx. 336.*  The nine patterns identified by the United

Nations include:

> (a) Violation of the right to food, in particular the effect of State-controlled food distribution policies on the nutritional status and health of the population and the restricted entry of international humanitarian aid to deal with the endemic food crisis;
> (b) Torture and other cruel, inhuman and degrading treatment or punishment, including inhuman conditions of detention;
> (c) Arbitrary detention, as a form of persecution and the criminalization of any behaviour deemed threatening or contrary to the

12

official ideology of the Government, the lack of rule of law and the absence of due process or an independent judiciary;

      (d) Violations of human rights associated with prison camps;

      (e) Discrimination and the disproportionate or specific effect of human rights violations on vulnerable groups, in particular women, children, people living with disabilities and returnees. Of particular concern is the fact that society is divided into three distinct groups classified according to their political allegiance to the Government. A person's place in this hierarchy determines the level of access that he or she will have to basic human rights, including access to food, health, education and freedom of movement;

      (f) Extensive violation of freedom of expression and other related freedoms;

      (g) Violation of the right to life, in particular the abusive application of the death penalty and the use of public executions;

      (h) Restrictions on freedom of movement and abusive treatment of citizens forcibly returned;

      (i) Enforced disappearances, including in the form of abductions of foreign nationals.

*Appx. 336.* The Report identifies the DPRK's pervasive violations as "crimes against humanity." *Appx. 341.*

The pervasiveness of these human rights violations cannot be overstated, especially as to those individuals, like Reverend Kim, who have been removed to the "*kwan li so*" prison camps reserved for political prisoners. *Appx. 132, 341-43.* The Report concluded that torture, cruel, inhuman and degrading treatment in prison camps are not merely widespread, but "ubiquitous." *Appx. 347.* And, within the prison camp system, the most flagrant violations were found to have been perpetrated in the *kwan li so* (or "*gwanliso*") prison camps, like the one in which the DPRK imprisoned Reverend Kim. *Appx. 352.* The Report classified the

13

*kwan li so* prisons as "political concentration camps," a name indicating that

torture, other dehumanizing treatment, and murder are being carried out on a grand

scale. *Appx. 352*. In its discussion of the DPRK's violations of the fundamental

right to life, the Report concluded that "in relation to political prisoners, the

Special Rapporteur noted that the lives of inmates are lost too easily to hunger and

slave labor, brutality and atrocity." *Appx. 360*.

### E. In the *kwan li so* prisons sadistic and brutal torture is the rule, without any known exceptions.

Political prisoners removed to *kwan li so* prisons are tortured, starved, and

are very likely to die as a direct result of their abuse. Earnest C. "Chuck" Downs,

a former senior civilian officer in the Pentagon's East Asia Office (*Appx. 270-71*),

provided a declaration in which he confirmed, "I am aware of the testimony of

approximately 1000 former North Korean prisoners who served time in North

Korean prison camps. I do not know of any case in which the former prisoner was

*not* subjected to torture while in the prison camp." *Appx. 307*.

Mr. Downs attached to his supplemental declaration excerpts from *The

Hidden Gulag, Second Edition, The Lives and Voices of Those Who are Sent to the

Mountains*, a pamphlet published by the Committee for Human Rights in North

Korea, and authored by David Hawk, another expert who provided sworn

testimony for the Kims. *Appx. 310-16*. In *The Hidden Gulag*, Hawk writes,

14

… [T]he practice of torture permeates the North Korean prison and detention system.  Because it is so widespread and systematic, it clearly is not the work alone of sadistic elements, but reflects state policy intended to punish, degrade, intimidate and humiliate the prisoners in an effort to root out political disloyalty, connections to South Korea, or belief in banned religions.  At the same time, the practice of torture is intended to help amass widespread confessions that demonstrate threats to state security, thereby rationalizing or making essential constant vigilance, police presence, and the use of torture.

*Appx. 312.*

The exhibit to the declaration of Chuck Downs describes the treatment given to some of the inmates of North Koreas prisons. *Appx. 310-325.*  Prisoners were beaten severely with rifle butts, rifle cleaning rods, wooden staves and other instruments.  These beatings often resulted in permanent disabilities and injuries.

Prisoners were also beaten by other prisoners at the instruction of guards, or ordered to bang their own heads against the bars of their cells. *Doc. No. 35-1 at 8.* One prisoner was deliberately burned with hot coals, stabbed, and had his finger deliberately severed.  *Appx. 317-25.* This same prisoner was forced to sit in the front row to observe the execution of his mother and brother.  *Id.*  Prisoners reported the existence of separate "punishment cells" so small that those confined could not sit, stand, or lie down.  Prisoners are enclosed in punishment cells for extended periods of solitary confinement – often weeks, causing inmates to experience a loss of circulation and atrophy of legs, and often leading to death within several weeks. *Appx. 130.* Prisoners reported being beaten while suspended

15

by their wrists, ankles, or both. *Appx. 320-25*. Others were simply left to hang for hours, sometimes upside-down. *Id*.

In addition to the other forms of torture catalogued, many female prisoners were subjected to sadistic sexual assaults and forced abortions. *Appx. 131-32*. Babies born alive in the *kwan li so* are often murdered by guards or by prisoners at the direction of the prison guards. *Id*.

The Kims presented evidence from the State Department recognizing that North Korea engaged in torture including "severe beatings, electric shock, prolonged periods of exposure in extreme weather conditions, humiliations such as public nakedness, and confinement to small 'punishment cells." *Appx. 290*. The State Department report found that starvation and executions were common in the DPRK prison camps. Former prisoners reported a form of torture involving water forced into a victim's stomach with a rubber hose and pumped out by guards jumping on a board placed across the victim's abdomen." *Id*. One former *kwan li so* guard reported that many deaths were caused by the severe beatings. *Appx.314*.

**F. Experts testified that Reverend Kim was likely tortured more severely than average prisoners because he proselytized the Christian faith and assisted North Korean refugees escape into China.**

Mr. Downs opined based upon his familiarity with the practices of the DPRK, the testimony of former officials and guards, and the actual experiences of survivors of the *kwan li so*, that Reverend Kim was probably subjected to "severe

16

beatings while in stress positions (such as while suspended from the ceiling), near
starvation, and forced physical exertion to the point of absolute physical
exhaustion. *Appx. 307.*

Chuck Downs declared that because of DPRK secrecy, he could not know
with certainty how Reverend Kim died following his abduction and incarceration
in a DPRK prison camp. Mr. Downs observed that typically, credible information
as to the fate of political prisoners like Reverend Kim could be obtained only from
former DPRK officials and other defectors. *Appx. 285-86.*

Unfortunately, these types of witnesses are often unavailable to testify due to
their own fear of retaliation against themselves or their relatives still in North
Korea. *Appx. 119.* Nonetheless, Mr. Downs testified that credible information on
Reverend Kim's treatment in North Korea had, in fact, been obtained from
defectors. *Appx. 286.* Based upon this type of credible information, Mr. Downs
was certain that "[Reverend Kim] was abducted by DPRK agents from China and
forcibly brought to North Korea, after which he was brutally tortured for several
months and then never heard from again." *Id*.

Downs stated in his supplemental declaration that prisoners in North Korean
prisons are "routinely subject to severe punishment that is often fatal. *Appx. 307.*
Downs specified:

8. I am virtually certain that Reverend Kim has been subject to exceptionally painful, brutal, and outrageous treatment while in prison. There is essentially no chance that he has escaped brutal punishment. Punishment in North Korea's prisons is extracted against a prisoner for infractions of the rules of the camps, including proselytizing the Christian faith. Accordingly, it is exceptionally unlikely that any one prisoner— especially a committed Christian minister such as Reverend Kim—would be able to escape severe punishment.

9. The brutal punishment that Reverend Kim was most probably subjected to includes severe beatings while in stress positions (such as while suspended from the ceiling), near-starvation, and forced physical exertion to the point of absolute physical exhaustion.

10. I am aware of the testimony of approximately 1000 former North Korean prisoners who served time in North Korean prison camps. I do not know of any case in which the former prisoner was not subjected to torture while in the prison camp. There is a steady flow of testimony of former prisoners that describe the most severe types of torture.

Like Chuck Downs, David Hawk agreed that Reverend Kim was likely tortured and starved to death. *Appx. 132-33*:

18

While I do not have any firsthand knowledge about Reverend Kim's case specifically, given my extensive experience with the DPRK and the manner in which abductees repatriated from China were usually treated, it is likely that [Reverend Kim] would have been initially held in a ku-ryu-jang, or a DPRK police detention and interrogation facility, before being transferred to a kwan-li-so. It also seems likely to me that Reverend Kim, at a minimum, would have been subjected to the harsh treatment afforded to all of its prisoners. But because Reverend Kim was such a valuable target of the DPRK and so much planning, effort and other resources had gone into his abduction, it is clear to me that Reverend Kim was subjected to additional brutality.

*Id*.  However, due to the extreme secrecy of the North Korean prison system, the Plaintiffs were unable to produce ***direct, first-hand*** evidence demonstrating the specific ways in which the North Korean agents tortured and killed Reverend Kim.

### G.  The district court found that the Kims produced insufficient evidence to satisfy the evidentiary burden of § 1608(e).

The trial court found that the Kims had failed to satisfy their burden under 28 U.S.C. § 1608(e) to produce *evidence satisfactory to the court* demonstrating their claims or rights to relief.  The trial court observed that this Court has held that for FSIA purposes, "the term 'torture' is usually reserved for extreme, deliberate

19

and unusually cruel practices… In order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain." *Appx. 377*, *quoting Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92-93 (D.C. Cir. 2002).  The trial court held that without direct first-hand evidence of specific details of Reverend Kim's torture, the Kims could not satisfy their burden.

The trial court also found that to prove their claim for the extrajudicial killing of Reverend Kim, the Plaintiffs would need to prove that Reverend Kim was tortured to death, extending the definition of torture from the Torture Victims Protection Act ("TVPA"), 28 U.S.C. §1350 note, to the claim of extrajudicial killing.  The court held, "…the plaintiffs' extrajudicial killing claim relies squarely upon an adequate showing that Reverend Kim was tortured." *Appx. 376.* Thus the court held that to prevail on a claim for either torture *or* extrajudicial killing, the Kims would need to prove that Reverend Kim was tortured.  *Appx. 376-80.*

The trial court relied heavily on this Court's decision in *Price*, 924 F.3d 82, and specifically, on the *Price* Court's discussion of the *severity* element of torture. Purportedly following Price, the trial court held that to sustain a claim for torture under Section 1605A, the plaintiffs were required to proffer sufficient evidence of the specific type of torture to which Reverend Kim was subjected.  *Appx. 390, 392, 395, 398, 402, 403.*  The court repeatedly noted the lack of specific details of the

severity of Reverend Kim's beatings, "including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out." *Appx. 390, 392, 395, 398, 402, 403.* Without challenging the validity of the evidence of the DPRK's pervasive practices of torturing political prisoners or the veracity of the conclusions of plaintiffs' experts, and without contesting the severity of the torture to which countless other political prisoners like Reverend Kim were routinely subjected, the court ultimately held,

> Price constrains us from employing discussion about the abuses generally in these camps to show that mistreatment of Reverend Kim occurred that rose to the level of torture under the TVPA.

*Appx. 403.*

In other words, the district court held that the Kims could not prove that Reverend Kim was tortured and killed by his DPRK captors without providing specific direct evidence as to the severity of Reverend Kim's beating, their frequency, duration, the parts of the body at which they were aimed, and the weapons to carry them out. Without these details the trial court held that the Plaintiffs failed to produce sufficient evidence to support a default judgment against the DPRK.

Additionally, the trial court held that Plaintiffs could prevail on their claim for extra-judicial killing only if they could demonstrate that the extra-judicial killing resulted from torture. *Appx. 376.* Therefore, the court found that the

21

extrajudicial killing claim lacked merit because the Kims could not satisfy the high

standards for proving torture under the TVPA and *Price*.

The district court held that the Kims did not produce "evidence satisfactory

to the court" that Reverend Kim had been tortured, and therefore failed to satisfy

their burden for entry of default judgment under Section 1608(e).  The court not

only denied the motion for default judgment, but also held that it lacked subject

matter jurisdiction based upon its finding of insufficient proof to warrant entry of

default judgment for the Kims.  *Appx. 403*.

However, the trial court acknowledged "a substantial ground for difference

of opinion" as to whether plaintiffs presented the requisite quantum of evidence to

show that Reverend Kim was tortured.  *Appx. 404*.  The trial court certified its

decision for immediate interlocutory appeal.  *Appx. 406*.  In an order dated

September 11, 2013, this Court denied the Kims' Petition for Interlocutory Appeal.

*Appx*. 407.  The Court found that in holding that it lacked subject matter

jurisdiction, the district court's order was a final decision, and not an interlocutory

order.  Accordingly, the Court of Appeals held that the Kims could challenge the

district court's holdings in an appeal under 28 U.S.C. § 1291, upon the district

court's entry of final judgment.  On the same day, the district court entered final

judgment for the reasons stated in its June 14, 2013 decision.  *Appx*. 408

## SUMMARY OF THE ARGUMENT

The district court applied the wrong standard for determining whether the plaintiffs satisfied their evidentiary burden to produce evidence satisfactory to the court in support of their motion for entry of default judgment under 28 U.S.C. 1608(e). The district court reviewed numerous decisions discussing the quantum of evidence necessary to satisfy Section 1608(e), and decided that the correct quantum of evidence was evidence necessary to establish a "*prima facie* case." *Appx. 381-83*. However, the district court misunderstood the quantum of evidence required by those courts, and as a result, held the Kims to a higher standard than required under Section 1608(e). Other courts applying the "*prima facie* case" standard required that the plaintiffs produce only sufficient evidence to justify a jury verdict in favor of the plaintiff. Indeed, some courts required that the plaintiff produce only ***some factual basis*** in support of their claims, and that the necessary quantum and quality of evidence is ***less than that normally required***.

Despite saying that it was requiring the plaintiffs to establish only a *prima facie* case, the district court actually required the plaintiffs to proffer "rigorous" evidence in support of their claims. Not only did it demand an incorrect quantum of evidence, it also erred in finding that circumstantial and expert evidence could not satisfy the burden. It required the plaintiffs to produce direct, first-hand evidence of specific details of their claim. The district court abused its discretion

23

in applying the wrong standard of law and to the extent it applied the right standard, the court misapplied that standard.

The district court also erred in its rigid application of *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002). The district court here mechanically adopted language from *Price* that indicated the complaint was lacking because the plaintiffs had failed to allege details of their beatings, "including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out." *Appx. 390, 392, 395, 398, 402, 403.* However, the district court distorted the holding in *Price*. *Price* never held that circumstantial evidence is insufficient. It merely held that whatever evidence there is of torture should demonstrate that the defendant's conduct was sufficiently severe to satisfy the Torture Victims Protection Act ("TVPA") definition of "torture." Under the TVPA, to constitute torture, conduct must be extreme; mere police brutality does not suffice.

In analyzing the Kims' claim for extrajudicial killing, the district court focused on the fact that the Kims alleged that Reverend Kim died as a result of starvation and torture inflicted upon him by DPRK officials. Because the court found inadequate the evidence that Reverend Kim was tortured (as that term is defined under the TVPA), the court held that the Kims failed to provide sufficient evidence in support of their claim for extrajudicial killing. The TVPA's definition

24

of "torture" is only incorporated into the FSIA Terrorism Exception's cause of

action for torture.  28 U.S.C. § 1605A(h)(7), *incorporating* 28 U.S.C. § 1350 *note*.

Contrast the definition of extrajudicial killing, which does not require a plaintiff to

satisfy the TVPA's torture definition.  *Id*.  "Extrajudicial killing" has its own

definition with its own elements.  *Id*.

Therefore, for purposes of their claim for extrajudicial killing, the district

court should have allowed the Kims to show Reverend Kim was killed by torture

with a less demanding understanding of torture that that required by the TVPA.

When they alleged that the DPRK tortured Reverend Kim to death, the Kims

meant that the DPRK severely beat and otherwise abused Reverend Kim, and that

this abuse -- even if it did not rise to the level of "torture" under the TVPA – killed

Reverend Kim.  The district court erred in requiring the plaintiffs to satisfy the

TVPA definition of torture as an element of their claim for extrajudicial killing.

The trial court also erred in dismissing the Complaint merely because it

found that the Kims had failed to produce "evidence satisfactory to the court" in

support of their motion for entry of default judgment.  First, the court incorrectly

interpreted the requirement of 28 U.S.C. 1608(e) that for entry of default judgment,

a FSIA plaintiff must establish ***the claim or right to relief*** by evidence satisfactory

to the court.  This requirement applies to proof of the elements of the substantive

25

cause of action.  It does not apply to the facts necessary to demonstrate subject matter jurisdiction.

Neither does Section 1608(e) provide that a plaintiff's failure to satisfy the evidentiary burden for default judgment may be used to prove that the court lacks subject matter jurisdiction under the FSIA.  The failure to proffer the necessary quantum of evidence for entry of default judgment should not result in dismissal of the action, but rather in affording the plaintiffs an opportunity to develop the required evidence through discovery.  The district court erred when it held that the Kims' purported failure to satisfy the heightened evidentiary standard for entry of default judgment was proof that the court lacked subject matter jurisdiction.

## ARGUMENT

**STANDARD OF REVIEW**

Questions as to whether the district court applied the correct legal standard are reviewed *de novo*. *Brayton v. Office of the United States Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001). Similarly, a district court's conclusions of law regarding jurisdiction under the FSIA are subject to *de novo* review. *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir. 1994); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1016-17 (2d Cir. 1991).

**A.** **The district court erred when it misapplied the standard for entry of default judgment for an FSIA plaintiff under 28 U.S.C. § 1608(e), demanding that the Kims provide direct, first-hand evidence of particular details of the torture the DPRK inflicted upon Reverend Kim.**

1. **The trial court erred in requiring the Kims to produce evidence sufficient to establish a prima facie case; Section 1608(e) requires plaintiffs seeking default judgment under the FSIA to present only sufficient evidence demonstrating that their claim has "some factual basis."**

28 U.S.C. § 1608(e) governs the entry of default judgment in cases brought under the Foreign Sovereign Immunities Act. It provides in pertinent part: "No

judgment by default shall be entered by a court of the United States … against a foreign state … unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  The principal question in the court below and in this appeal is whether the Kims satisfied this evidentiary burden for entry of default judgment.

　　As the district court observed, the meaning of the term "evidence satisfactory to the court" has been addressed by numerous courts.  The trial court held that the term "evidence satisfactory to the court" requires a plaintiff to present evidence sufficient to establish a *prima facie* case of liability.  *Appx. 383*.  The trial court recognized that this articulation of the standard is consistent with a majority of the courts in this Circuit to have considered the question.  *Appx. 382-83*.  However, a close reading of the cases demonstrates that different courts have attached different meanings to the term "*prima facie* case."  The district court here did not explicitly define what it meant when it adopted the "*prima facie* case" standard.  However, from its application of Section 1608(e), requiring the Kims to produce "rigorous" evidence in support of the facts necessary for jurisdiction, *Appx. 302-303, 380*, the district court made clear that it understood the *prima facie* case standard to require evidence of a much greater nature and quality than is warranted under Section 1608(e) and precedents from courts of this circuit and others.  The district court's

28

application of the standard was erroneous, and led the court to incorrectly deny the motion for default judgment and dismiss the case for lack of subject matter jurisdiction.

In *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C. 2002), the court interpreted the term, "*prima facie* case" in the context of a Section 1608(e) motion for default judgment to mean "evidence of a nature and quality to support summary judgment." *Ungar* rejected the summary judgment standard for 1608(e). It favored a less demanding standard – one that required the plaintiffs to proffer "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Id.* This is the quantum of evidence necessary to **withstand**[1] a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a). *See id.*

Although *Ungar* purported to reject the *prima facie* standard, its substantive understanding of the necessary quantum of evidence (as opposed to the label given to it) appears to be similar to the standard that other courts identified as

---

[1] In the instant case, the district court misunderstood *Ungar*'s reference to Rule 50(a). The court explained *Ungar* as requiring sufficient evidence to **prevail** on a motion for judgment as a matter of law rather than as requiring evidence sufficient to **withstand** the motion. *See Appx. 382 note 2.* This misunderstanding is somewhat understandable because the *Ungar* court itself stated the rule differently in two different places. See 211, F. Supp. 2d at 98. However, it is clear that *Ungar* meant to apply the less demanding standard. *See id.*

29

"*prima facie*" evidence.  For example, *Kilburn v. Islamic Republic of Iran*, 699

F. Supp. 2d 136, 150 (D.D.C. 2010), explained:

> To prevail in an FSIA default proceeding, the plaintiffs must present a
>
> legally sufficient *prima facie* case, in other words, ***a legally sufficient***
>
> ***evidentiary basis for a reasonable jury to find for the plaintiff***.  This
>
> standard is identical to that applicable to default judgments against the
>
> United States [under Fed. R. Civ. P. 55(d)]. Section 1608(e) does not require
>
> this court to demand additional or different evidence than it would ordinarily
>
> receive in rendering its decision.  In assessing the plaintiffs' evidence, this
>
> court may accept as true the plaintiff's uncontroverted evidence.  Further, a
>
> plaintiff may establish proof by affidavit.

(*emphasis supplied*); see also *See also Gates v. Syrian Arab Republic*, 580

F.Supp.2d 53, 63 (D.D.C. 2008) ("the plaintiff must present a legally sufficient

prima facie case, i.e., 'a legally sufficient evidentiary basis for a reasonable jury to

find for plaintiff.'").  Notably, *Ungar*, in rejecting what it called the "*prima facie*

case" standard, used the same language the *Kilburn* and *Gates* courts used in

adopting it.  Thus, different courts ascribe different meaning to the term "*prima

facie* case" for purposes of Section 1608(e).  But, the common denominator among

these decisions is that they apply a standard comparable to that found in the

Federal Rules of Civil Procedure in defining the quantum of evidence necessary to

30

withstand judgment as a matter of law.  *See* Fed. R. Civ. P. 50(a) (setting the standard as "a legally sufficient evidentiary basis" for a reasonable jury to find for the plaintiff).

Many of the courts discussing the standard for default judgment under Section 1608(e) note that the standard for entering default judgment in favor of an FSIA plaintiff against a foreign state is identical to the standard for entering default judgment against the United States government under Fed. R. Civ. P. 55(d).  See e.g., Appx. 380; *Kilburn*, 699 F. Supp. 2d at 150.  And, the federal courts of appeal that have addressed the quantum of evidence required for default judgment under Rule 55(d) agree that Rule 55(d) requires a minimal evidentiary showing.  Thus, in *Giampaoli v. Califano*, 628 F.2d 1190, 1194 (9th Cir. 1980)[2], the court held:

> In the case of an ordinary default judgment where the plaintiff has the burden of proof, the effect of rule 55(e) is not especially onerous, because the plaintiff need only present enough of the evidence she has marshalled for trial to satisfy the judge that her claim has some factual basis.

This standard appears to be even lower than the "legally sufficient evidentiary basis standard" required by the courts in *Kilburn*, *Ungar,* and *Gates*.  Similarly, the requirement that a plaintiff satisfy a burden that "is not especially onerous" and

---

[2] The *Giampaoli* and other courts cite to Rule 55(e).  However, more recently Congress amended the Rule and renumbered the provision addressing default against the United States as Rule 55(d).

that requires merely that the plaintiff demonstrate "some factual basis" for her claim is clearly less demanding than the "rigorous" evidence required by the district court. *Appx. 380*.

Consistent with the Ninth Circuit's formulation in *Giampaoli*, the Second Circuit held that "the quantum and quality of evidence that might satisfy a court can be ***less than that normally required***."  *Marziliano v. Heckler*, 728 F.2d 151(2d Cir. 1983) (*emphasis supplied*), *quoting Alameda v. Secretary of Health, Education and Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980); *but see Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion* 88 F.3d 948 (11th Cir. 1996) (requiring "satisfactory evidence as to each element of the claims upon which relief was sought").

The trial court purported to require the Kims to produce sufficient evidence to establish a *prima facie* case.  However, regardless of the name given to the standard, in requiring the Kims to produce "rigorous" evidence in support of their claim, the trial court clearly applied a different standard than the majority of district and circuit courts that have discussed the standard.  The district court's application of the wrong legal standard (even *if* under the right name) constituted an abuse of discretion. *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995).

Similarly, the district court's misapprehension as to what the precedents it cited actually held is also an abuse of discretion.  *Id.*  ("The district court abuses its discretion if it did not apply the correct legal standard … or if it misapprehended the underlying substantive law.")  The district court's decision should be reversed.

2. **The district court erred when it held the Kims failed to produce details about the severity of Reverend Kim's torture.**

The Kims sued the DPRK for torture and extrajudicial killing, both of which are actionable under 28 U.S.C. § 1605A(a) and (c) (the "Terrorism Exception" to foreign sovereign immunity), under which the Kims filed this action.  The district court noted that the Complaint alleged that Reverend Kim was tortured to death by the DPRK, and therefore held that both the claim for torture and the claim for extrajudicial killing depended upon a showing that the DPRK had tortured Reverend Kim.

The FSIA Terrorism Exception incorporates the definition of "torture" established under the Torture Victims Protection Act ("TVPA").  The district court focused on the TVPA's definition of "torture," and in particular, the TVPA's requirement that to constitute "torture," the alleged abuse must involve the infliction of "severe" pain or suffering.  *Appx. 375-380.*  In attempting to flesh out the severity element, the district court relied almost exclusively on this Court's decision in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C.

Cir. 2002). As discussed below, the district court misapplied *Price* in several respects.

In *Price*, the plaintiffs, Price and Frey, were American citizens who were working in Libya when they were arrested after photographing various locations in and around Tripoli. 294 F.3d at 86. Price and Frey were denied bail and were held in a Libyan prison for 105 days. *Id.* In their complaint, Price and Frey alleged that the prison conditions were deplorable. *Id.* The complaint alleged that Price and Frey were held in a cramped prison cell with seven other inmates, urine-soaked mattresses, and "sub-standard plumbing." *Id.* They were provided with inadequate food and no medical care. *Id.* Finally, the complaint alleged that the two Americans "were 'kicked, clubbed and beaten' by prison guards, and 'interrogated and subjected to physical, mental and verbal abuse.'" *Id.*

After the Libyan court acquitted Price and Frey of all charges and released them, the two sued Libya in United States federal court, seeking damages and asserting subject matter jurisdiction against Libya based upon "torture." *Id.* The *Price* court held that the plaintiffs failed to allege sufficient details of their abuse to satisfy the "severity" element of torture. *Id.* The court of appeals remanded the case to the district court to enable the plaintiffs to amend their complaint to provide additional details demonstrating that they were in fact subjected to "torture" as defined by the TVPA, and not mere police brutality. *Id.* at 85, 92-93.

34

The *Price* court discussed at length the severity requirement for torture under the TVPA, *Id.* at 92-93.  And, the district court here quoted a large portion of that discussion.  *Appx. 377.*  Part of the district court's block-quote follows:

> The severity requirement is crucial to ensuring that the conduct proscribed by … the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term "torture" both connotes and invokes . . . . The term "torture" . . . is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain . . . . The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim . . . . [I]n order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering . . . . [T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault. Not all police brutality, not every instance of excessive force used against prisoners, is torture under the FSIA . . . . [I]t is especially important for the courts to ensure that foreign states are not stripped of their

sovereign immunity unless they have been charged with actual torture, and
not mere police brutality.

*Id.* quoting *Price*, 294 F.3d at 92-93.

The Kims presented abundant evidence of the brutal and systematic torture
that pervades the DPRK's prison system; of practices that are so "extreme and
outrageous" that they not only "***warrant*** universal condemnation," they have, in
fact, repeatedly ***incurred*** international condemnation.  Thus, for example, February
1, 2013 Report of the United Nations' Special Rapporteur on the Situation of
Human Rights in the Democratic People's Republic of Korea (the "United Nations
Report"), which was submitted to the District Court (*Appx. 329*), found that
torture, public executions, and enforced disappearances, including abductions of
foreign nationals, were among what the United Nations Report identified as
"crimes against humanity" that are commonplace in the DPRK.  *Appx.* 338, 342.

The torture in the prison camps is so extreme that the Report classified the
*kwan li so* prisons as "political concentration camps." *Appx. 352.*  The Report
concluded that torture in DPRK prison camps is not merely widespread, but
"ubiquitous."  *Appx. 347*.

The district court cited *Price* for the proposition that torture consists of
"extreme, deliberate and unusually cruel practices, for example, sustained
systematic beating, application of electric currents to sensitive parts of the body,

and tying up or hanging in positions that cause extreme pain." Evidence of this

degree of brutality was lacking in the *Price* complaint. However, in the instant

case, as discussed in the trial court's June 14, 2013 decision, the Kims proffered

evidence showing that the torture inflicted on inmates by the DPRK was "extreme,

deliberate, and unusually cruel." The trial court acknowledged evidence from

expert, David Hawk, demonstrating that inmates were

> subject to burnings, skin piercing, water torture, being hung by wrists or
>
> upside-down, sleep deprivation, food deprivation, facial and shin beatings
>
> with rifle butts, whippings with belts, beatings in the legs with a wooden
>
> stave, undersized punishment cells where detainees could not stand up or lie
>
> down and placement in punishment cells for a week or more.

*Appx. 393-94.*

Chuck Downs, another expert who provided a declaration on behalf of the

plaintiffs, stated that prisoners in North Korean prisons are "routinely subject to

severe punishment that is often fatal. *Appx. 307.* And, Downs did not restrict his

testimony to general practices in the DPRK camps. He explicitly discussed the

degree of torture to which Reverend Kim was likely subjected. Downs opined, "I

am virtually certain that Reverend Kim has been subject to exceptionally painful,

brutal, and outrageous treatment while in prison. There is essentially no chance

that he has escaped brutal punishment." *Appx. 307.* Downs added: "The brutal

37

punishment that Reverend Kim was most probably subjected to includes severe beatings while in stress positions (such as while suspended from the ceiling), near-starvation, and forced physical exertion to the point of absolute physical exhaustion." *Appx. 307.*  Finally, Downs affirmed: "I am aware of the testimony of approximately 1000 former North Korean prisoners who served time in North Korean prison camps. I do not know of any case in which the former prisoner was not subjected to torture while in the prison camp. There is a steady flow of testimony of former prisoners that describe the most severe types of torture." *Appx. 307.*

The over-crowed prison cell, urine soaked mattresses, and "sub-standard plumbing" of which the plaintiffs in *Price* complained do not compare to "the most severe types of torture" to which Reverend Kim was subjected. Similarly, the *Price* complaint's alleged unspecified beatings are a far cry from the evidence that Reverend Kim was severely beaten while in stress positions (such as while suspended from the ceiling), deliberately starved, and forced into extremely difficult physical labor to the point of absolute physical exhaustion.  Indeed, the treatment to which Reverent Kim was subjected is precisely the kind of treatment the *Price* court was referring to when, in its description of torture, it held that "the term torture … is usually reserved for extreme, deliberate, and unusually cruel practices" such as "tying up or hanging in positions that cause extreme pain."

38

The district court, however, failed to credit the evidence of the ubiquity of torture in the DPRK prisons.  And, it failed to credit the opinions of experts who, while unsure of the precise methods or implements of torture that were employed against Reverend Kim, were certain that, as a political-religious prisoner, Reverend Kim was subjected to "the most severe types of torture."  After discrediting the force of the circumstantial evidence and expert testimony the Kims produced, the court found that the Kims had failed to produce evidence of the severity element that was satisfactory to the court.  This finding was erroneous.   The Kims certainly produced a legally sufficient evidentiary basis for a reasonable jury to find in their favor and satisfied their burden under Section 1608(e).

**3.  The trial court erred when, purporting to follow *Price*, it mechanically insisted that the Kims produce direct, first hand evidence of the frequency and duration of Reverend Kim's torture, the parts of the body at which the torture was aimed, and the implements used to carry out the torture.**

The *Price* court did not establish a rigid standard for determining whether specified conduct would satisfy the "severity" element of "torture."  Rather, in discussing at length various factors that may be considered when determining whether specified conduct constitutes "torture," the Court signaled that the severity question must be determined on a case-by-case basis.  *Price*, 294 F.3d at 92-93.

After discussing the many factors quoted above, *Price* applied the factors to the facts as alleged in the plaintiffs' complaint, and held:

39

In this case, plaintiffs' complaint offers no useful details about the nature of the kicking, clubbing, and beatings that plaintiffs allegedly suffered. As a result, there is no way to determine from the present complaint the severity of plaintiffs' alleged beatings - including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out - in order to ensure that they satisfy the TVPA's rigorous definition of torture. *Price*, 294 F.3d at 93.

*Price* held, in the absence of allegations of this nature and under the limited facts alleged in the complaint, the court could not determine whether the plaintiffs had been tortured or merely subjected to police brutality. Id. at 93-94.

However, the district court seized upon this statement about the type of allegations that were omitted from the *Price* complaint, divorced it from the context in which it was written, and then mechanically and repeatedly applied that statement to find that the Kims had failed to produce evidence that Reverend Kim had been tortured. The district court observed -- ***no less than six times*** -- the purported lack of specific first-hand evidence of the frequency and duration of Reverend Kim's torture, the body parts at which it was aimed, and the weapons used to carry it out. *Appx. 390, 392, 395, 398, 402, 403.* The trial court concluded that "*Price* constrains us from employing discussion about the abuses generally in

40

these camps to show that mistreatment of Reverend Kim occurred that rose to the

level of torture under the TVPA." *Appx. 403*.

     The district court construed *Price* as precluding consideration of the abuses

generally perpetrated in prisoner camps to establish that Kim actually suffered

mistreatment rising to the level of torture.  The court misunderstood *Price* to

require a plaintiff to produce direct evidence of particularized details of the torture.

It did not accept the voluminous circumstantial evidence and expert opinions

produced by the Kims in support of the severity of Reverend Kim's torture.  The

district court erred in holding that only direct evidence would suffice under Section

1608(e).

     *Price* was concerned with the *particularity* of the allegations in a FSIA

complaint.  It said nothing about the type, quality, or quantum of evidence that a

plaintiff may use to prove those allegations.  Specifically, *Price* was silent as to

whether anything less than direct evidence of all the particulars would suffice.

Moreover, in *Price*, the victims of the beatings were alive and present in the United

States, and were able to provide additional details based upon their own first-hand

knowledge.  In the instant case nearly all of the witnesses to Reverend Kim's

ordeal in North Korea, including Reverend Kim himself, are unavailable because

they are dead, imprisoned in North Korea, among those responsible for carrying

out the torture and killing, or were and remain in a real state of fear that they or

their relatives will be subjected to similar brutality if they testify publically as to Reverend Kim's treatment.

If the district court's decision stands, a claim for torture and extrajudicial killing in circumstances of enforced disappearance could likely never be sustained should the defendant simply decide to not participate in the litigation. Had the DPRK participated in the litigation in the trial court, it would have been compelled to disclose any information it possesses relating to Reverend Kim. In compelling the FSIA plaintiffs to produce direct evidence of torture and extrajudicial killings to prevail in their FSIA action, the trial court essentially rewarded the DPRK for refusing to appear.

**4. The court erred in failing to consider circumstantial evidence and expert testimony.**

The trial court's excessively narrow view of the available type of evidence under the FSIA and under Section 1608(e) contravenes this Court's ruling in *Hill v. Republic of Iraq*, 328 F.3d 680, 683-84 (D.C. Cir. 2003) and the decisions of other courts applying Section 1608(e), as discussed below. It also effectively immunizes uncooperative States and rewards them for their refusal to participate in discovery.

In *Hill* the trial court disallowed as "speculative" and "imprecise" evidence supporting the FSIA plaintiffs' claims for economic loss and future medical expenses. On appeal, this Court held that the FSIA plaintiffs could prove their

claims for damages "in the same manner and to the same extent" as other plaintiffs. *Id*. at 684.  The Court found that while evidence that was nothing more than "mere speculation or guesswork" was insufficient, the plaintiffs' future damages could be recovered by establishing that the facts asserted were "more likely than not (a greater than 50% chance)" to occur.  *Id*. at 684.

Discussing Section 1608(e)'s requirement that to obtain a default judgment a plaintiff must produce "evidence satisfactory to the court," *Hill* referred to the legislative history, which the court held demonstrated an intent to create "a ***relaxed evidentiary*** burden" on FSIA plaintiffs:

> The Report of the House Judiciary Committee, noting that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P.," observed that "in determining whether the claimant has established his claim or right to relief, it is expected that courts will take into account the extent to which the plaintiff's case depends on appropriate discovery against the foreign state."
> *Id. (citation omitted).*

In other words, where a foreign sovereign does not participate in discovery, as in the case of a default, it severely interferes with the plaintiffs' access to evidence. To counteract an uncooperative defendant's ability to defeat an FSIA claim by

simply refusing to participate, *Hill* indicates that courts should relax evidentiary burdens.

Similarly, in *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir. 1994), a case brought under the "commercial activity" exception to the FSIA, the Second Circuit affirmed a district court's entry of default judgment against an Iranian bank. The court of appeals agreed that the evidence produced by the plaintiff satisfied the requirements of Section 1608(e). The Second Circuit rejected the Iranian bank's objections, and found that the district court was not obligated to conduct an evidentiary hearing or to make explicit findings. 15 F.3d at 242. Additionally, the Second Circuit held that 1608(e) does not "require the court to demand more or different evidence than it would ordinarily receive in order to make its decision." *Id.*

In *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) the court found that the plaintiffs had produced sufficient evidence under Section 1608(e) that the decedent had been tortured even though the plaintiffs had no direct evidence of what the decedent experienced while in the custody of Hizbollah. The court held:

> While the precise circumstances of Peter Kilburn's captivity are not known
> because of his subsequent murder, Dr. Clawson (whose testimony the court
> credits and will treat as expert testimony) testified that he had no reason to

> believe that the circumstances of Peter's time as a hostage were any different
> from other captives of Hizbollah.

*Id*.  The court found that other captives of Hizbollah had been held under

"extraordinarily unpleasant" circumstances, which included, beatings, unsanitary

conditions, inadequate food and medical care, and mock executions.  Based upon

evidence of the harsh treatment of others, the court concluded that Kilburn's

treatment "likely constitute[s] torture" under the TVPA.  *Id*.

Similarly in *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F.

Supp. 2d 217, 228 (S.D.N.Y. 2003), and *Peterson v. Islamic Republic of Iran*, 264

F. Supp. 2d 46, 51 (D.D.C. 2003) the courts relied almost exclusively on the

opinion testimony of experts to establish the defendant states' liability for deaths

caused by the September 11, 2001 attack in the United States and the Hizbollah

bombing of the Unites States marine barracks in Lebanon, respectively.  Neither

court demanded direct evidence of the defendant states' liability.  The *Smith* court

held:

> a very substantial portion of plaintiffs' evidence is classically hearsay . . . .
> However, the opinion testimony of the plaintiffs' experts is sufficient to
> meet plaintiffs' burden . . . . Although these experts provided few actual
> facts of any material support that Iraq actually provided, their opinions,
> coupled with their qualifications as experts on this issue, provide a sufficient

basis for a reasonable jury to draw inferences which could lead to the

conclusion [put forth by Plaintiffs]. . . . Juries are invited to draw inferences

from facts presented and this constitutes circumstantial evidence and this is

what the Court has done here.

*Smith*, 262 F. Supp. 2d at 232.

Instead of relaxing the Kims' evidentiary burdens as instructed by this Court

in *Hill*, the district court raised the bar, demanding both more and different

evidence than it would ordinarily receive.  The district court held that only direct,

first-hand and particularized evidence would satisfy the requirements for default

judgment under the FSIA.  This holding distorted the meaning and intent of

Section 1608(e) and contradicted the holdings of this Court in *Hill* and of other

courts that have refused to require FSIA plaintiffs to satisfy higher than ordinary

evidentiary standards.

**B.    The district court erred when it required the Kims to proffer in
support of their claim for extrajudicial killing evidence that would
satisfy the TVPA's definition of torture.**

In addition to stating a claim against the DPRK for torture, the Kims seek

damages under 28 U.S.C. 1605A(c) for the extrajudicial killing of their father and

brother, Reverend Kim.  The complaint alleged and the evidence showed that the

DPRK killed Reverend Kim by torturing him and deliberately starving him.  In

46

evaluating the claim for extrajudicial killing the trial court held that because the Kims alleged that the extrajudicial killing was effected through torture, the Kims were required to satisfy the elements of "torture" as defined in the TVPA. *Appx. 376 (*"Thus, the plaintiffs' extrajudicial killing claim relies squarely upon an adequate showing that Reverend Kim was tortured*").*  This constituted error. Regardless of the definition of "torture" as a cause of action under the FSIA (incorporating the definition from the TVPA, 28 U.S.C. § 1605A(h)(7)), the claim for extrajudicial killing could stand on its own merits.  Moreover, when the Kims alleged in support of their claim for extrajudicial killing that Reverend Kim was ***tortured*** to death, they did not intend to imply that all of the elements of "torture" under the TVPA were satisfied.  Rather, the Kims meant only that the DPRK subjected Reverend Kim to severe abuse, and regardless of whether the abuse satisfied all of the elements of "torture" under the TVPA, it caused Reverend Kim's death.  When the trial court required the Kims to prove all of the elements of "torture" under the TVPA in order to sustain their claim for extrajudicial killing, it applied the wrong legal standard and abused its discretion.  *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995).

Section 1605A(h) defines both "torture" and "extrajudicial killing" by reference to the TVPA.  28 U.S.C. § 1605A(h).  The TVPA, in turn, defines extrajudicial killing as follows:

47

> For the purposes of this Act, the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note, § 3(a). The Kims provided extensive evidence that the DPRK deliberately killed Reverend Kim without authorization by a previous judgment of a regularly constituted court, and that the killing was not lawfully carried out under international law under the authority of any foreign nation.

However, the trial court never considered the evidence supporting the elements of the claim for extrajudicial killing. Instead, the district court read the ***factual*** allegation that the DPRK tortured Reverend Kim to death as if it were an allegation of a ***legal*** conclusion that the DPRK's abuse of Reverend Kim both satisfied the legal standards for torture under the TVPA and that it caused his extrajudicial killing. This interpretation was not required by the FSIA or the TVPA, and it was clearly not intended by the Kims. The Kims intended the Complaint to include separate claims for extrajudicial killing and torture, each claim requiring proof of its own elements, as provided by statute.

48

Once the district court determined that the Kims could not prevail on their claim for extrajudicial killing unless they prevailed on their claim for torture, the court never considered the merits of the former claim. Instead, as discussed above, the district court found that the Kims had failed to satisfy the severity element of "torture" under the TVPA, and it dismissed both claims.

The Kims maintain that they proffered evidence satisfying all of the elements for the torture claim. However, even if this Court rules otherwise, it should reverse the trial court's dismissal of the claim for extrajudicial killing. In refusing to consider whether the Kims had produced sufficient evidence that DPRK had killed Reverend Kim through a combination of severe beatings (that may not have risen to the TVPA's definition of "torture") and deliberate malnutrition, the trial court improperly made the claim for extrajudicial killing dependent upon a showing that Reverend Kim had been tortured under the TVPA. The district court applied the wrong legal standards in assessing the merits of the extrajudicial killing claim, and never made any factual or legal findings relating to that claim that were not dependent upon the TVPA's definition of torture.

**C.    The district court erred when, upon finding that the Kims had failed to produce evidence satisfactory to the court that the DPRK had severely tortured Reverend Kim, it dismissed their case for lack of subject matter jurisdiction.**

    **1.    Assuming the Kims failed to produce sufficient evidence to support default judgment under Section 1608(e), which requires satisfactory evidence of a "claim or right to relief," that deficiency did not justify the dismissal for lack of subject matter jurisdiction**.

Section 1608(e) speaks to the sufficiency of the evidence required to support the entry of a default against a foreign state under the FSIA.  The statute is silent as to the requirements for subject matter jurisdiction; and it is silent as to the implications of a failure to satisfy its evidentiary burden, other than to say that such failure precludes entry of default.  The district court erred when it held that the purported failure to produce sufficient evidence to support default judgment required (or even permitted) it to conclude that the Kims could not establish subject matter jurisdiction.

In *Price*, the Court held: "When reviewing a plaintiff's unchallenged factual allegations to determine whether they are sufficient to deprive a foreign state defendant of sovereign immunity, we assume those allegations to be true."  *Price*, 294 F.3d at 93.  Accordingly, at the pleadings/pre-discovery stage of the proceeding, the court should have based its decision as to subject matter

50

jurisdiction upon the well-pleaded factual allegations.  The Kims established

subject matter jurisdiction with the well-pleaded allegations of the Complaint.  The

district court abused its discretion when, finding insufficient evidence to support

entry of default judgment under 1608(e), it used that ostensible insufficiency to

dismiss the case for lack of subject matter jurisdiction.

> 2. **Upon determining the evidence was insufficient to support entry of default judgment, the district court should have ordered the Kims to engage in discovery and proceed toward summary judgment or trial**.

The district court reviewed the evidence proffered by the Kims in support of

their motion for entry of default final judgment, and found that it did not satisfy the

evidentiary burden created by Section 1608(e).  At that point the district court

should have simply denied the motion for entry of default judgment and allowed

the Kims to engage in discovery and proceed towards summary judgment or trial.

Instead, the court construed the purported deficiency in evidence prior to discovery

as an indication the Kims would not be able to provide additional evidence

following discovery.  Accordingly, in addition to denying the Kims' motion for

entry of default final judgment, the court dismissed the entire action for lack of

subject matter jurisdiction.

The district court had previously notified the Kims that it deemed

insufficient the evidence submitted in support of the motion for entry of default

final judgment. *Appx. 300*. In a memorandum order, the court indicated that the Kim's failure to produce "***direct*** evidence of torture" was fatal to the entry of default judgment. Appx. 301 (*emphasis supplied*). The court directed the Kims to supplement the evidence of torture submitted in support of default judgment.

The court's August 17, 2012 focused almost exclusively upon the plaintiffs' evidentiary burden under Section 1608(e) for entry of default judgment and on the district court's interpretation of *Price*. The order alluded to jurisdiction only twice in passing. Towards the beginning of the order, the court referred to the FSIA as a jurisdictional statute. *Appx. 300*. The court observed that it could enter judgment against a foreign state only where the plaintiff produces evidence supporting an exception to sovereign immunity. *Id*. Again, towards the end of the order, the court made the following statement: "In order to facilitate the jurisdictional inquiry into whether the plaintiffs' evidence 'satisfies the TVPA's rigorous definition of torture' the plaintiffs will be directed to supplement their proposed finding of fact and conclusions of law." *Appx. 303*. The court gave no indication that it was considering dismissing the action for lack of subject matter jurisdiction.

Under the circumstances of this case, where the Kims alleged facts supporting subject matter jurisdiction and provided extensive evidence that support subject matter jurisdiction, the district court erred in dismissing the case *sua sponte* without providing specific notice that it was considering such dismissal. This is

52

particularly so, where the Kims have not exhausted their efforts at taking

discovery.  As indicated in the expert declarations and in numerous reports, a

number of witnesses spoke of Reverend Kim's torture and death.  While at this

stage in the proceeding, that evidence remained largely hearsay, the Kims should

be given the opportunity to identify any witnesses with first-hand knowledge of

Reverend Kim's ordeal.

Similarly, the Kims should be extended the opportunity to demonstrate that

some of these statements made to experts or researchers might be admissible under

the Federal Rules of Evidence 804 (declarant unavailable) and 807 (residual

exception).  Moreover, in the time since the district court's decision dismissing the

case, additional evidence of the DPRK's gross and pervasive torture has been

widely published.  This new evidence would provide even more additional

potential sources for direct, first-hand evidence (if that is what is really required

under Section 1608(e)).

Finally, the Kims should be allowed to attempt to obtain discovery directly

from the DPRK.  Even though the DPRK would be unlikely to participate, any

perceived deficiency in the Kims' evidence that the DPRK tortured and killed

Reverend Kim could be cured through appropriate sanctions for the DPRK's

failure to participate in discovery.  In *United States v. Sumitomo Marine & Fire

Insurance Co. Ltd.*, 617 F.2d 1365, 1370 (9th Cir. 1980), the court held that

notwithstanding the restrictions on entering default judgment against the United

States under Rule 55(e) Fed. R. Civ. P., a district court may impose an array of

discovery sanctions on the government for its failure to participate in discovery.

Similarly, the court held in *Giampaoli*, 628 F.2d at 1194, that Rule 55(e) does not

preclude the imposition of discovery sanctions under Fed. R. Civ. P. 37(b).  The

court rejected the government's argument that permitting the imposition of

discovery sanctions under Rule 37 would "offend the spirit" of Rule 55(e).  *Id*.

(*citing cases*).

    As discussed above, 28 U.S.C. 1608(e) discussing entry of default against

foreign sovereigns applies the same standards as Rule 55(d) applies for default

judgment against the United States government.  Therefore the rationale of these

cases discussing the relationship between entry of default judgment and discovery

sanctions against the United States should apply equally to discovery sanctions

against a foreign sovereign.  While not directly on point, this Court's decision in

*Hill* of the legislative history of Section 1608(e) is particularly enlightening. *See

Hill*, 328 F.3d at 683.  The Court held: "The Report of the House Judiciary

Committee, noting that § 1608(e) establishes 'the same requirement applicable to

default judgments against the U.S. Government under rule 55(e), F.R. Civ. P.,'

observed that 'in determining whether the claimant has established his claim or

right to relief, it is expected that courts will take into account the extent to which

the plaintiff's case depends on appropriate discovery against the foreign state.'"
The *Hill* Court made clear that not even a foreign sovereign otherwise immune
should not profit from its recalcitrance in the discovery process.

Anyone who reviews the voluminous evidence submitted to the district court
and is aware of the scope and severity of the DPRK's atrocities cannot reasonably
doubt that Reverend Kim was severely tortured and murdered by the DPRK.  If a
technical deficiency in evidence created only by the DPRK's unparalleled
repression would otherwise bar the Kims' claim the Court should allow that
deficiency to be cured with an appropriate evidentiary sanction against the DPRK
for its failure to participate in discovery.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.  The District Court should be directed to enter default judgment in favor of the Plaintiffs-Appellants.  Alternatively, the case should be remanded to the district court with directions to allow the Kims to engage in discovery, and to proceed towards summary judgment or trial.

Dated, May 29, 2014                    Respectfully Submitted,

                                       /s/ Asher Perlin_____
                                       ASHER PERLIN
                                       Florida Professional Law Group, PLLC
                                       4600 Sheridan Street
                                       Suite 303
                                       Hollywood, Florida 33021
                                       954-284-0900 ext. 102
                                       asher@asherperlin.com
                                       Attorney for Plaintiffs-Appellants

56

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(A), (B), and (C) of the Federal Rules of Appellate Procedure, I hereby certify that this brief uses a proportionately spaced font and contains 12,699 words exclusive of those portions that are excluded under Rule 32(a)(7)(B)(iii).


/s/ Asher Perlin_____
Asher Perlin

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2014, I filed the foregoing using the ECF system.  The Defendant-Appellee, the Democratic People's Republic of Korea, made no appearance in the trial court, where the clerk entered default.  The Defendant-Appellee has also made no appearance in this Court.  Accordingly, and following a discussion with the office of the clerk of the court, no additional copies of the foregoing brief are being served.

/s/ Asher Perlin _____
Asher Perlin

58