No. 13-7147
## ORAL ARGUMENT NOT YET SCHEDULED
—————————————————

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
—————————————————

## HAN KIM and YONG SEOK KIM,

*Plaintiffs-Appellants,*

v.

## DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, also known as NORTH KOREA,

*Defendant-Appellee*

—————————————————

## On Appeal from the United States District Court
## for the District of Columbia
—————————————————

## APPENDIX OF THE PLAINTIFFS-APPELLANTS
—————————————————

**ROBERT J. TOLCHIN**
**The Berkman Law Office, LLC**
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
*Attorney for Plaintiffs-Appellants*

**NITSANA DARSHAN-LEITNER**
**Nitsana Darshan-Leitner & Co.**
10 Hata'as Street
Ramat Gan, 52512 Israel
*International Co-Counsel for the Plaintiffs-Appellants*

**ASHER PERLIN**
**Florida Professional Law Group, PLLC**
4600 Sheridan Street, Suite 303
Hollywood, FL 33021
(954) 284-0900 ext. 102
*Attorney for Plaintiffs-Appellants*
asher@asherperlin.com

# TABLE OF CONTENTS

*Page*

Complaint filed November 24, 2009 (Doc. No. 5) .....................................................1

Entry of Default Judgment on May 21, 2010 (Doc. No. 12) ...................................12

Declaration of Han Kim on October 12, 2010 (Doc. No. 17) ...............................13

Declaration of Yong Seok Kim on October 12, 2010 (Doc. No. 18) ....................26

Report of Yoshikuni Yamamoto on December 11, 2010 (Doc. No. 19) ...............35

Declaration of J.D. Kim on December 4, 2010 (Doc. No. 20) .............................52

Declaration of Do Hee-Youn on January 7, 2011 (Doc. No. 22) ........................119

Declaration of Professor David Hawk on April 5, 2011 (Doc. No. 29) ..............123

Declaration of Ernest C. Downs on April 5, 2011 (Doc. No. 30) ........................269

Declaration of Robert J. Tolchin on April 12, 2011 (Doc. No. 37) .....................288

Memorandum Order (Doc. No. 46) .......................................................................300

Supplemental Declaration of Ernest C. Downs (Doc. No. 50) ............................304

Supplemental Memorandum (Doc. No. 53) ..........................................................326

Supplemental Submission of New Authority (Doc. No. 54) ...............................329

Memorandum Opinion of June 14, 2013 (Doc. No. 56) .......................................371

Order Denying Petition to Appeal ........................................................................407

Order of Dismissal (Doc. No. 59) .........................................................................408

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------X

HAN KIM
5511 Wooded Creek Drive
St. Charles, MO

                                                        Civ. No. 09-648 (RWR)

and

YONG SEOK KIM
5511 Wooded Creek Drive
St. Charles, MO,

                          Plaintiffs,

                  -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,
a.k.a. NORTH KOREA
c/o Foreign Minister, Pak Ui Chun
Ministry of Foreign Affairs
Jung song-dong, Central District
Pyong Yang, DRK

and

JOHN DOES 1-10.
                          Defendants.

-------------------------------------------------------------------X


## **FIRST AMENDED COMPLAINT**

        Plaintiffs, by counsel, complain of the Defendants and allege for their First Amended

Complaint as follows:

## **INTRODUCTION**

        1.        This is a civil action for damages pursuant to the Foreign Sovereign Immunities

Act ("FSIA") 28 U.S.C. § 1602 *et seq*., brought by United States citizens whose father and

brother, Reverend Kim Dong Shik, was abducted on January 16, 2000 by officials, employees

and agents of defendant Democratic People's Republic of Korea ("North Korea"), and was then

tortured and murdered by officials, employees and agents of defendant North Korea.

## JURISDICTION

2.      This Court has jurisdiction over this matter and over the defendants pursuant to 28

U.S.C. §§ 1330 and 1605A(a), which create subject-matter and personal jurisdiction for civil

actions for personal injury or death caused by acts of torture or extrajudicial killing carried out

by state sponsors of terrorism and their officials, employees and agents.

## THE PARTIES

3.      Plaintiff Yong Seok Kim is the younger brother of Reverend Kim Dong Shik.

Plaintiff Yong Seok Kim was on January 16, 2000 and remains today a United States citizen. As

the result of his brother's torture and murder, plaintiff Yong Seok Kim has experienced the loss

of his brother's society, companionship, comfort, advice and counsel and has suffered severe

mental anguish, extreme emotional distress and solatium damages.

4.      Plaintiff Han Kim is the son of Reverend Kim Dong Shik. Plaintiff Han Kim

became an American citizen in 2003 and remains a United States citizen today. As the result of

his father's torture and murder, plaintiff Han Kim has experienced the loss of his father's society,

companionship, comfort, advice and counsel and has suffered severe mental anguish, extreme

emotional distress and solatium damages.

5.      Defendant Democratic People's Republic of Korea ("North Korea"), through its

officials, employees and agents, intentionally ordered, directed and caused the torture and

murder of Reverend Kim Dong Shik and the resulting harm to the plaintiffs herein.

6.      Defendant North Korea is a foreign state within the meaning of 28 U.S.C. § 1603.

7.      Defendant North Korea was designated as a state sponsor of terrorism pursuant to

section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)) in 1988 and was so

designated within the six month period before this action was filed.

8.      Defendants John Does 1-10 are, and at all times relevant hereto were, officials,

employees and agents of North Korea who, within the scope of their office, employment and

agency, tortured and murdered Reverend Kim Dong Shik and/or ordered, directed and caused the

torture and murder of Reverend Kim Dong Shik, and thereby harmed the plaintiffs herein.

### STATEMENT OF FACTS

**A.      Relevant Background**

9.      Defendant North Korea is a one-party totalitarian state modeled as a Stalinist

dictatorship. North Korea's supreme leader Kim Jong-il rules over his citizens with an iron fist,

limits all political and economic freedoms and tolerates no dissent. Every aspect of social,

political, and economic life is tightly controlled by the state. Human rights organizations have

identified North Korea as one of the most repressive regimes in the world, with a brutal record of

human rights violations. Those who have managed to escape from North Korea have reported

that torture, starvation, rape, medical experimentation, forced labor and murder are utilized by

the regime and its security services to maintain control over the population. The death penalty is

regularly imposed on those accused of even minor political infractions against the state.

10.     Defendant North Korea has frequently abducted and imprisoned foreign citizens.

In 2002, North Korea publicly admitted that its security services had engaged in the kidnapping

of Japanese citizens between 1977 and 1983. While some surviving victims and their families

were allowed to leave North Korea and return to Japan, numerous other cases of Japanese

detainees remain unresolved. In October 2005, North Korea acknowledged for the first time

having kidnapped South Korean citizens in previous decades, claiming that several abductees, as

well as several POWs from the Korean War, were still alive in North Korea. South Korea asserts that nearly 500 of its citizens have been abducted and imprisoned by North Korea since the end of World War II.

11.   Pursuant to the official policy of North Korea prior to and leading up to Reverend Kim Dong Shik's abduction, torture and murder, North Korea's official security services actively hunted down and abducted refugees and defectors who had crossed into China, as well as other perceived enemies of the regime, and brought these abductees to North Korea where they were imprisoned, tortured and frequently murdered.

12.   The U.S. Department of State has confirmed that those imprisoned in North Korea are subjected to torture:

> Methods of torture and other abuse reportedly included severe beatings, electric shock, prolonged periods of exposure to the elements, humiliations such as public nakedness, confinement for up to several weeks in small "punishment cells" in which prisoners were unable to stand upright or lie down, being forced to kneel or sit immobilized for long periods, being hung by the wrists, being forced to stand up and sit down to the point of collapse, and forcing mothers recently repatriated from China to watch the infanticide of their newborn infants. Defectors continued to report that many prisoners died from torture, disease, starvation, exposure to the elements, or a combination of these causes.
>
> During the year Shin Dong-hyuk, a defector born and confined in a political prison camp in Kaechon in South Pyongan Province for 22 years, explained that beatings and torture were a common occurrence within the camp. Shin reported that he was tortured with hot coals while being hung from the ceiling after members of his family tried to escape from the camp.
>
> In 2006 a defector reported that, upon his repatriation from China in 2000, authorities forced him to crouch for long periods of time with a wooden pole placed between his calves and thighs; while crouching, booted guards

would stomp on the top of his legs, crushing his toes and hyperextending his knees. He also reported that interrogators forced him to kneel forward onto fire-heated iron plates.

In 2005 a defector reported that she lost the use of her feet due to severe beatings she received from police for attempting to leave the country. …

Reports indicated that conditions in the political prison camps were harsh. Systematic and severe human rights abuses occurred throughout the prison and detention system. Detainees and prisoners consistently reported violence and torture. According to refugees, in some places of detention, prisoners received little or no food and were denied medical care.

U.S. State Department publication, *2007 Country Reports on Human Rights Practices: Democratic People's Republic of Korea*.

### B.     The Abduction, Torture and Murder of Reverend Kim Dong Shik

13.     Reverend Kim Dong Shik was born in South Korea in 1947. He graduated Koshin University in Pusan and was ordained as a Presbyterian minister. He was the father of two children from his first marriage and adopted five additional children with his second wife. Reverend Kim was employed for many years as a minister in South Korea on behalf of the Chicago Evangelical Holiness Church, a Korean-American church located in Illinois.

14.     In 1993 Reverend Kim Dong Shik moved to China to work as a missionary providing humanitarian and religious services to the families of North Korean defectors and refugees who had fled across the Sino-Korean border seeking asylum.

15.     At the time, tens of thousands of North Koreans were living in China after fleeing the dismal humanitarian conditions and political oppression in their homeland. There have been famines, starvation and widespread shortages of basic food supplies in North Korea for decades. Humanitarian conditions and health care in neighboring China are known to be of a much higher

standard and many North Korean citizens have risked arrest and imprisonment to escape to China in order to feed themselves and care for their families and escape the repressive North Korean government.

16.     In the Chinese town of Yunji, Reverend Kim set up numerous refugee shelters and a school for expatriate North Korean children and handicapped persons. He named the school "The School of Love."

17.     During this period North Korean and its security agencies took steps to stop the flow of defectors and refugees to China, which were a political embarrassment and undermined the regime. North Korea increased its military patrols along the Chinese border. The security services gathered information against those seeking to defect and carried out pre-emptive arrests and imprisonments. North Korean border guards had a policy of shooting to kill anyone attempting to escape North Korea for China. In addition, the security services organized squads of agents who crossed into Chinese border towns in order to hunt down North Koreans who had fled. These agents frequently disguised themselves as refugees and infiltrated the shelters and hide-outs of those who successfully reached China. Once located, the agents abducted the refugees and defectors and brought back to North Korea where they were imprisoned in harsh labor camps, tortured, underwent "re-education" programs and in many instances were executed. The most severe sentences and treatment were inflicted by North Korea on Christian activists or those who attempted to make their way to South Korea, North Korea's main enemy.

18.     The North Korean security service learned of Reverend Kim's activities on behalf of the defectors and refugees and decided to abduct him and bring him to North Korea to thwart his work on behalf of those who had escaped.

19.     In April 1999 an agent of the North Korean security services, who used the

pseudonym "Lee Sun Hee" made Reverend Kim's acquaintance while posing as a defector. For ten months she kept in close contact with Reverend Kim and reported to her superiors in the North Korean security services on his activities as the abduction plan was being organized by the North Korean security services. According to the confessions of a member of the abduction squad, Kim Hak Ju, who was eventually arrested and prosecuted in South Korea for his role in the abduction, Lee Sun Hee operated under instructions from a senior North Korean state-security official who was charged with abducting defectors and others deemed to be working against the interest of the North Korean government.

20.     On January 16, 2000, Lee Sun Hee arranged to meet with Reverend Kim at a restaurant under the pretext of introducing him to two other recent defectors. After eating a meal together and leaving the restaurant, Reverend Kim was forced inside a taxi by North Korean security agents.

21.     As Reverend Kim was placed in the front seat of a taxi, two of the abductors jumped in the back and forced the cabbie to drive off. The taxi drove Reverend Kim out of Yunji city and in the town of Sanhe the North Korean security agents transferred him to another car that transported him to the Sino-Korean border near the crossing on the Tumen River. The abductors then took Reverend Kim across the border to North Korea.

22.     Reverend Kim was imprisoned in a labor camp in North Korea for political detainees where he underwent brutal torture by officers, employees and agents of defendant North Korea.

23.     Officers, employees and agents of defendant North Korea demanded that Reverend Kim renounce his religious beliefs and adopt Juche, the official political ideology of the North Korean government.

24.     When Reverend Kim refused to adopt the Juche ideology he was punished by being deprived of all food by his jailers, who were officers, employees and agents of defendant North Korea.

25.     Reverend Kim died as the result of starvation and the torture inflicted upon him during his imprisonment by officers, employees and agents of defendant North Korea.

26.     Although the exact date and location of Reverend Kim's death are not known, his remains are believed to be in People's Army Camp 91, a garrison in Sangwon, a suburb on the outer skirts of Pyongyang.

27.     In 2005, several former North Korean agents were arrested by South Korean law enforcement officials and prosecuted for abducting refugees and defectors who had escaped to China. From these agents information concerning Reverend Kim's arrest, torture and murder was provided to the plaintiffs. Specifically, the plaintiffs learned that Reverend Kim had been taken to North Korea and tortured to death by officers, employees and agents of defendant North Korea acting within their office, employment and agency.

**FIRST CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**ACTION FOR DAMAGES UNDER 28 U.S.C. §1605A(c)**

28.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

29.     Defendant North Korea was designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)) in 1988 and was so designated within the six month period before this action was filed.

30.     Defendant North Korea, through its officials, employees and agents including defendants John Does 1-10, intentionally ordered, directed and caused the torture and murder of

Reverend Kim Dong Shik.

31.    Defendants John Does 1-10 are, and at all times relevant hereto were, officials, employees and agents of North Korea who, within the scope of their office, employment and agency, tortured and murdered Reverend Kim Dong Shik and/or ordered, directed and caused the torture and murder of Reverend Kim Dong Shik.

32.    Defendants' treatment of Reverend Kim Dong Shik constituted torture within the meaning of 28 U.S.C. § 1605A.

33.    Defendants' murder of Reverend Kim Dong Shik constituted an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

34.    The torture and murder of Reverend Kim Dong Shik by defendants caused his brother, plaintiff Yong Seok Kim, severe harm, including the loss of his brother's society, companionship, comfort, advice and counsel and severe mental anguish, extreme emotional distress and solatium damages.

35.    The torture and murder of Reverend Kim Dong Shik by defendants caused his son, plaintiff Han Kim, severe harm, including the loss of his father's society, companionship, comfort, advice and counsel and severe mental anguish, extreme emotional distress and solatium damages.

36.    The defendants are therefore jointly and severally liable under 28 U.S.C. § 1605A(c) for the full amount of plaintiffs' damages.

37.    Defendants' conduct was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
### INFLICTION OF EMOTIONAL DISTRESS PURSUANT TO
### MISSOURI AND CALIFORNIA LAW OR OTHER APPLICABLE LAW

38.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

39.     Defendants' conduct was willful, outrageous, egregious, and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

40.     Defendants illegally abducted, tortured and murdered Reverend Kim and in doing so intentionally or negligently terrorized the plaintiffs and caused them severe emotional distress.

41.     Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large warranting an award of punitive damages.

## THIRD CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
### LOSS OF CONSORTIUM AND SOLATIUM PURSUANT TO
### MISSOURI AND CALIFORNIA LAW OR OTHER APPLICABLE LAW

42.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

43.     At all relevant times, plaintiffs Han Kim and Yong Seok Kim were, respectively, the son and brother of Reverend Kim.

44.     As a result of the abduction, torture and murder of Reverend Kim by the defendants the plaintiffs were deprived of the services, society and solatium of their father and brother and suffered severe mental anguish, bereavement and grief, and injury to their feelings

45.     Defendants' conduct was outrageous in the extreme, wanton, willful and

malicious, and constitutes a threat to the public at large. Plaintiffs are therefore entitled to an award of punitive damages against defendants in an amount to be determined at trial.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs pray that this Court:

(a)     Enter judgment against defendants, jointly and severally, in favor of each plaintiff for compensatory damages in amounts to be determined at trial;

(b)     Enter judgment against defendants, jointly and severally, in favor of each plaintiff for punitive damages in amounts to be determined at trial;

(c)     Enter judgment against defendants in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees; and

(d)     Grant such other and further relief as justice requires.


Dated: November 23, 2009

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Counsel for Plaintiffs*


By:     /S/ Robert J. Tolchin
        Robert J. Tolchin
        (D.C. Bar #NY0088)

        111 Livingston Street, Suite 1928
        Brooklyn, New York 11201
        (718) 855-3627
        Fax: (718) 504-4943

        NITSANA DARSHAN-LEITNER & CO.
        Nitsana Darshan-Leitner
        (International co-counsel)
        10 Hata'as Street
        Ramat Gan, 52512 Israel

Default   Rule 55A (CO 40 Revised 2/2010)

# UNITED STATES DISTRICT AND BANKRUPTCY COURTS
## FOR THE DISTRICT OF COLUMBIA

CHAIM KAPLAN, et al

_____
Plaintiff(s)

Civil Action: 09-648 (RWR)

v.

HEZBOLLAH et al

_____
Defendant(s)


**RE:** DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA
also known as
NORTH KOREA


## DEFAULT

It appearing that the above-named defendant(s) failed to plead or otherwise defend this action though duly served with summons and copy of the complaint    on    March 18, 2010    , and an affidavit on behalf of the plaintiff having been filed, it is this 21st day of _____May_____, 2010 declared that defendant(s) is/are in default.


ANGELA D. CAESAR, Clerk


By: _____/s/ Jackie Francis_____
Deputy Clerk


000012



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------ X

HAN KIM, et al.,                                          |

                        Plaintiffs,          Civil Action No: 09-648 (RWR)

        -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, et
al.,

                        Defendants.

------------------------------------------------ X

## DECLARATION OF HAN KIM

HAN KIM, of St. Charles, Missouri, pursuant to 28 USC § 1746, declares

the following statements to be true, subject to the penalties of perjury:

      1.   I am a resident of St. Charles, Missouri,

      2.   I was born on October 23, 1976 in Jinhae, South Korea.

      3.   I am the youngest child of Dong Shik Kim and Jung Soon Kim who

were married in South Korea on October 23, 1973. My sister Dani Kim Butler was born

on May 18, 1974.

      4.   At the time of my father's abduction in 2000, I was a Permanent

Resident in the United States. I became US citizen on March 6th 2003.

      5.   As a child, our family first lived in a small town near Masan, South

Korea, and then moved to Seoul in time for me to attend fifth grade there.

6.    Growing up in Seoul I recall my family as being very close-knit and dedicated to each other. My parents were deeply religious. Much of our lives revolved around church events and the congregations which my father served as a preacher. Although, my father was very dedicated to his congregants and spent many long hours providing them with clergical services, he was also very much a family man and both my parents worked tirelessly to ensure that my sister and I were well cared for.

7.    I have many fond childhood memories of my father. In Masan, as an example, my father tried to teach me about baseball which was not such a popular sport in South Korea at that time. I remember he bought me a complete uniform for the Kyung Nam baseball team and would love when I dressed up in it. I did not understand any of the rules back then but he tried repeatedly and patiently to explain them to me. He is the reason I am such a big baseball fan today.

8.    I would describe my family and my upbringing as being very conventional. We attended church every Sunday, and traveled often to church functions. My father's religious faith and his involvement with other people in our community had a dramatic impact on me and greatly influenced who I am today. From a legacy standpoint, his overriding faith is the most important thing that I have.

9.    When my sister and I were growing up, my father was often required to travel on church related business. However, he always felt it was important to maintain contact with my mother and us and he called often to let us know how he was doing.

-2-

000014

10.    In 1986, while I was attending fourth grade in Seoul, my mother was tragically killed in a car accident. Her death, as can be imagined, had a very profound effect on my family. For my sister and me, losing our mother at this stage in our lives was extremely traumatic. My father was also very deeply affected by his severe loss and was almost inconsolable for several years.

11.    In the aftermath of my mother's death, my father worked very hard to keep the family united and strong. Even with his own sadness to contend with, he wanted my sister and me to understand that he was there for us and that our lives should continue on as normal. We grew even closer to my father and were reassured by his strength and determination. During this period of time, my father decided to adopt five children who needed a family. He was a compassionate and selfless man. He wanted to make a difference in the lives of these unfortunate children.

12.    My mother's death impacted upon my father very strongly, but it did not deter him from doing what he wanted to do. He was determined to get involve with missionary work in China and North Korea.

13.    Three years after my mother's death, in 1989, my father got remarried to a woman named Young Hwa Kim. Although she could never take the place of my mother, she became a stepmother to my sister and me. We considered her to be a close member of our family who helped to care and raise us I have a half brother, Chun Same, from this relationship.

14.    When I was 16 years old, my stepmother took me to the United States where she was enrolled in a course to receive missionary training from a church

-5-

000015

organization in Illinois. She intended to eventually join my father in his missionary work. My father was himself away at this time, working in China as a missionary.

15.     I chose to remain in the United States to complete high school in Rockford, Illinois.

16.     Upon graduation from High School in 1996, I attended Millikin University in Decatur, Illinois where I studied music with a minor in business. I graduated from university in 2000.

17.     I worked at several different jobs before deciding to launch my own company. I currently have my own media company that specializes in digital marketing. Additionally, I am a media technology coordinator at Westminster Christian Academy.

18.     I am married and have two daughters, neither of whom has ever met her grandfather or grandmother.

19.     My father first got involved in missionary work in China as a volunteer at the 1988 Special Olympics. His exposure to special-needs Chinese athletes compelled him to transition from a community preacher to a human rights activist.

20.     Seeing the dire need and pitiful conditions in China, my father organized donations of medical supplies for disabled Chinese citizens from the South Korean medical community.

21.     It was my father's work in northern China that alerted him to the plight of ordinary North Koreans attempting to flee the totalitarian regime where they were born. In South Korea one can hear the horrifying stories about life in North Korea,

-1-

000016

but nothing is confirmed because there is no communication between the two countries. In China, there is much greater access to North Korea and to North Koreans. A steady stream of North Koreans seek to escape to China across the border every year. Naturally, this deeply angers the North Korean government which is steadfast not to allow any information or reports of the inhumanity, starvation and suffering which prevails there to reach foreign human rights groups. After arriving in China, these penniless defectors must spend many months attempting to arrange asylum in other countries. My father saw the need to reach out to and care for those seeking to escape from North Korea and got involved in ministering to the refugees arriving in China.

22.    My father often told us that assisting North Koreans was his true calling. One could hear in his voice that he truly loved these unfortunate people and that helping them was his purpose on Earth. This made a very deep impression on me.

23.    For several years before my father was abducted, he would tell us that he could not reveal certain aspects of his work because it could jeopardize some of the people he had assisted. Many of those who made it across the border to China had suffered inhumane conditions or had been brutally tortured. While his work assisting those escaping North Korea might have angered the officials of that repressive regime, he was truly championing human rights and freedom. He was making a real difference in the lives of many downtrodden and desperate people.

24.    Several days after my father's abduction on January 16, 2000, I received a phone call from my sister Dani informing me that he had been abducted in China. She had heard the report from Tae Ha Kim, one of my adopted brothers who

000017

worked in China along with my father. My brother said that my father had been seized by a group of agents from North Korea in a border town, thrown roughly into a taxi cab and driven into North Korea. My sister told me that the Chinese police were alerted to the abduction and were looking into the matter but that there was nothing we could really do about it because as non-Chinese citizens, we did not have any direct influence on the Chinese police investigation.

25.    To this day, the Chinese authorities have not provided my family with any information about my father's disappearance along the border. Moreover, we do not know if the matter is still under investigation by China, whether it was somehow resolved nor whether the Chinese authorities simply discontinued their investigation into it.

26.    When an individual goes missing in China near the North Korean border it is not a normal cross-border missing-persons case like it might be n the United States and Canada. It is comparable to a disappearance along the border of other repressive regimes such as Cuba, Syria, or Iran. In one's heart one fears the worst and every person you speak to relates an opinion that confirms your most dreaded suspicions. We have no basis to believe that the North Korean authorities are cooperating with any Chinese investigation. We do not believe that China mounted any real investigation.

27.    The days following the report that my father had been violently kidnapped were very difficult for me. I was seized with apprehension and fears about his wellbeing and fate. Being in the United States, so far away from where all of this

-6-

000018

was happening, was especially painful and frustrating. I was unable to sleep and I could not stop thinking about what had happened to my father. My family did not know who to contact, what could be done nor how we could play a role in locating him. Waiting each day for news that did not arrive made this period especially agonizing and psychologically debilitating.

28.    I attempted to remain strong and hopeful and tried to continue on with my regular routine. I was in college at the time and I sought to attend classes, study and engage in my normal activities. I found, however, that I was not able to simply carry on as usual, and my mind continued to race back to thoughts of my father and the danger he was in. I was anguished that he might be undergoing torture by those that had seized him. I was truly fearful that I might never see him alive again. My images of North Korea, from what he and others had told me over years and what I had read, made me very scared that the officials of this repressive regime would not be deterred by anything to inflict physical abuse, starvation or worse on my father. I often hide my family story to myself because it was very painful to share and I knew that friends and people around me wouldn't understand what I was going through. Denial was medicine for me at the school. To function in day to day activities, I had to tell myself to ignore what was going on with my father.

29.    I prayed frequently for my father's safety and quick return to us during these days and I stayed in close contact with my sister and stepmother hoping that we would hear something from some source about my father's situation. The long days of waiting, however, stretched into weeks and months and then long years and we

-7-

000019

still heard almost nothing about my father's fate. No matter where we turned, no one could provide us any verifiable information about where or why my father had been kidnapped. Our days were spent wondering what actions we should be engaged in. We understood that he had been forcefully taken to North Korea and our only hope was that he was still alive, that his health was holding up and that he would be released at some point.

30.   It is our firm belief that agents of North Korea kidnapped my father. Yet, to my family's great frustration and sadness we still, to this day, have not had an official report on his fate. This has been incredibly painful as it is impossible to have any closure without knowing what happened to him. Not knowing if he is still alive or whether he was killed, and if so, where his body lies, is far more difficult and unsettling then knowing his fate conclusively. I have no sense of closure over his death at all, cannot come to terms with it in my mind, and am endlessly plagued with thoughts and feelings of guilt that perhaps there are actions I still should be taking on his behalf. My suffering and grief over not knowing his whereabouts or fate is compounded immensely.

31.   From time to time news reports, usually from the South Korean media, stating that my father was being held captive in a North Korean prison camp were brought to our attention. These news stories, however, could never be confirmed.

32.   Similarly, we heard reports from the South Korean news media that my father had been murdered in a North Korean prison camp. We, however, have

-8-

000020

never received any official confirmation of my father's death and the stories could never be verified.

33. My father was not in good health at the time of his abduction and this amplifies our fears that he is now dead. We do not believe that he could have survived torture and such a long period of imprisonment in the brutal environment of the North Korean prison camps.

34. My stepmother, Young Hwa Kim, was dramatically affected by my father's abduction. For many months and then years after his disappearance she could talk of nothing else. She became solely focused on this one issue and began to suffer a mental deterioration. It became almost impossible to speak with her because this was all she was able to discuss. Conversations with her made my own suffering over my father even more acute. The entire affair had so emotionally scarred my stepmother that she suffered a devastating mental breakdown. Today, she is unable to discuss my father without experiencing severe emotional trauma. My father's abduction truly broke her and deprived her the opportunity to live a normal healthy life as well. Her life, in a sense, stopped the day my father was abducted. The loss of my step-mother's companionship and guidance in the wake of my father's abduction is yet another difficult loss I have suffered.

35. As a man of 23, and a senior in college, I was robbed of my father at a time that I desperately needed him. I never had a father-son conversation on graduating from college and choosing a career, and more importantly choosing a spouse and building a family.

-9-

36.   Not having my father in my life has been very confusing. It is as if a serious hole has been torn in my life. While our family may not have been perfect, we always managed and persevered through the challenges to share our love with each other. My father's abduction, however, has changed all this and taken the very foundation of our family life from us. Today, I can only describe my family as being shattered.

37.   It has been difficult for me to discuss my father's abduction with others. I find that I am unable to summon the words to express the many confused and painful thoughts I have. It is a strange answer when people ask me what my parents do and it emphasizes to me just how much his absence has cost me.

38.   My father's abduction has been a rollercoaster in my life. It affects my identity immensely and it frequently causes me to experience bouts of emotional pain and grief. I feel like individuals or a government that I never had any contact with, and never wronged in any way, have waged a war against my family and grievously harmed us, and we only have an amorphous target—North Korea—rather than specific human beings against whom to direct our emotions and outrage. I cannot comprehend the motivation or hatred that triggered his disappearance. I am unable to fathom the cruelty of depriving us of the most basic human consideration for so many years.

39.   I feel the loss of my father most strongly at different times of the year. Holidays such as the Christmas and Easter seasons, that were once so joyful, especially remind me of my father and sometimes bring up very lonely feelings. At these seasons of the year when time seems to slow down a bit, I frequently reflect on my

000022

father's disappearance and the fact that he is no longer in my life. I wonder what has become of him and whether he suffered very much as a captive in North Korea. It is on these occasions that I feel my father's absence so much more strongly and it makes the pain and the loss even greater. I think back on family holidays we spent together and I realize that I will never share them with him again and it creates a terrible bitterness and overwhelming grief. When my sister and I celebrates our birthdays or those of my children, my thoughts once again focus on my father and the birthdays we all shared together when he was in our lives. These family celebrations now, despite my best efforts to be cheerful for my wife and children, are always tinged for me with feelings of sadness and depression.

40. My father's abduction has meant that he was not there to share some of the most important milestones of my life with me. My father never attended my college graduation. He was not there when I got my first jobs nor when I made plans to launch my own business. I did not have my father there when I got engaged to my wife, neither was he there to celebrate my wedding day with me. My family and I were deprived of having him there with us when his grandchildren were born. Through this past decade since his abduction, I did not have him with me to provide me counsel nor companionship nor support as I mark the different accomplishments and face the different challenges in my life. I did not have him my father around to ask him questions about marriage, life or how to be a good parent. Moreover, he never had the opportunity to see the man I have grown into, the type of son that he could be proud of or the way I am raising my own children.

-11-

000023

41. Personally, the most tragic aspect of my father's abduction is that my two daughters will never know their grandfather and what a special man he was. Thankfully my in-laws are wonderful grandparents, but this is still only a one-sided involvement. It is incomplete. That my children will never know their grandfather nor share his warmth and love pains me very greatly. It is something I am unable to compensate them for and it is a loss that I can never fully measure or explain to them. I am additionally saddened that my wife has not had the chance to meet my father. It is a side of me she will never have the opportunity to know. Family is such an important value in my culture, and to me personally, and those closest to me will never truly experience my family's love because of my father's abduction.

42. My father was a leader amongst our extended family. I visited South Korea recently and many distant relatives came to see me to express their support and admiration for my father. The relationships my father had with them were truly mutual. My whole family looked up to him. He was somebody they would come to for support, guidance, and assistance with their problems. My father was the glue that kept both our nuclear and extended family strong. Our extended family too, very strongly continues to grieve for the loss of my father.

43. I remember my father as a man who positively affected and motivated many people through his bravery. He was working for a noble cause by assisting people desperate for his help. The highest value to him was freedom and it was a blessing he wished to bestow on everyone living in North Korea. Moreover, I vividly remember from conversations we had before he was abducted of many of his

-12-

000024

hopes, dreams and aspirations which he shared with me. I have always been very proud of him and what he struggled to achieve for others.

44.    I miss my father and feel his absence every day of my life. Losing him causes me to feel as if a vital part of my body has been cut off. I experience his absence and his memory every day, in everything I do. Losing a loved one and not knowing his fate is not something that time can ever heal; it is an open wound that bleeds and continues to hurt without rest.

45.    It saddens me that my own children will never really know their grandfather or the heroic type of person he was. While it is difficult, I hope that my family will come to see my father as a man who believed in what he was doing and executed boldly, despite the serious risks and dangers of his work. This would be a fitting legacy for my father.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    St. Charles, Missouri
October /2-, 2010

IIAN KIM

-13-

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------- X

HAN KIM, *et al.*,                                                           I

        Plaintiffs,                              Civil Action No: 09-648 (RWR)

    -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, *et al.*,

        Defendants.

---------------------------------------------------------------- X

## DECLARATION OF YONG SEOK KIM

    **YONG SEOK KIM**, of Newark, California, pursuant to 28 USC § 1746, declares the following statements to be true, subject to the penalties of perjury:

    1.    I am a resident of Newark, California. I was born on October 24, 1954 in Jinhae City, South Korea. My father was the Ki Myung Kim; my mother's name was Doo Sun Kang.

    2.    I am today and was at the time of my brother, Kim Dong Shik's abduction to North Korea, a citizen of the United States.

    3.    I attended Jinhae Center Elementrary School and Jinhae High School in South Korea. I attended Kyung Nam University located in Masan South Korea where I graduated with a Bachelor of the Arts degree in Physical Education in February 1978.

5.      Dong Shik Kim was my older brother. He was seven years old when I was born.

6.      I have another older brother, Yong Gun Kim, and a younger sister, Jung Ae Yoon.

7.      Growing up in South Korea, our family was very religious. We did not travel often, but we attended many church functions.

8.      When I was three years old, my brother Dong Shik, who was ten at the time, severely injured his knee. The damage never healed and he was required to walk with a cane from that point onwards. This injury, however, did little to slow him down. My brother always displayed an amazing amount of energy and a determined spirit.

9.      As the eldest child, my older brother was like a father figure to me. We grew very close. He served as a mentor and role model in our family and in our church where he took a leadership position at a young age. I was easily influenced by what my brother said and accomplished because I knew I could place my trust in him.

10.      As the eldest son of the eldest son of our extended family, Dong Shik was also a leader to our cousins and other relatives. The entire family looked to him for advice and guidance. He, in turn, felt a tremendous obligation to them and felt that it was his duty, as the oldest son, to ensure that everyone could count on him and that he was vigilant in pursuing solutions to the problems they faced.

11.      After my brother married his first wife, Jung Soon Kim, I continued to see him as a mentor. The fact that he no longer lived at home and was establishing

-2-

000027

his own family did not change our tight knit relationship. In fact, in many ways my
brother and his wife began to play an even larger role in my life. It was my sister-in-law
that introduced me to my spouse. As I began to start my family my brother was there to
support me with encouragement and advice. Whenever my family was in need we
looked to him for assistance and guidance.

12.   I married my wife in South Korea in 1984. She was a resident of the
United States at the time and I joined her here in April 1985.

13.   My wife and I have two children, a son David Kim, and a daughter
Hanna Kim.

14.   After I moved to the United States, my brother and I continued to
maintain a close relationship and he would visit me two to three times a year. During
his visits I would introduce him to local churches.

15.   It is my understanding that my brother first made contact with
Chinese officials during the 1988 Special Olympics which were held in Seoul, South
Korea. He was invited to work with disabled individuals in China by the Chinese
government. This offer interested him greatly and he saw it as an opportunity to
undertake a project on behalf of handicapped people who had received little care or
attention before. It was after moving to China that he first came into contact with North
Korean refugees living in towns along the border these two countries share. This was a
community that was desperately in need. The refugees had managed to escape from the
totalitarian regime of North Korea and were living in China, but lacked any official
status with the Chinese government. Many of them were suffering from malnutrition

-3-

000028

and had been tortured by the North Korean government. After seeing the plight of these abused individuals, who simply wanted to escape the impoverished conditions they suffered under in North Korea, he believed that he had found his true calling. He wholeheartedly identified with those who were seeking their freedom and had risked their lives to try and make a better future for themselves. He understood there was no one else in the world that really knew about them or what they had endured in trying to reach freedom. He was in a position to lend them critical assistance and he began to work with them in a humanitarian and missionary manner.

16.    While I did not work directly with my brother, I did fundraise for his North Korean causes in the United States.

17.    I was first informed that my brother had gone missing along the North Korean border by my nephew, Tae Ha Kim, who worked with him in China.

18.    When I first heard the news I was very shocked and fearful. I sensed right away that my brother was in serious trouble. I prayed very hard that he would return and the episode would come to a quick resolution but for many weeks we heard no news at all. The days following his abduction were difficult for me. I thought about my brother day and night and I was unable to sleep. I kept wondering where he had been taken and whether his life was in danger. Growing up, I had heard so many horrifying stories about human rights abuses in North Korea, that terrifying images of my brother's situation continued to plague me. There was very little I could do to obtain information. The only person I knew in far way China was my nephew and he had almost no information at all. It was very frustrating not being able to help my brother

-4-

who was in this type of danger. There was no one to turn to. It was beyond our abilities to get anyone involved and we had to rely upon the Chinese authorities to investigate. After a while my shock turned to despair and depression.

19.    The waiting and waiting for news from China took its toll and I became very nervous. I could not stop thinking about what had happened. It affected my ability to work at my business. My mind was occupied with my brother and I was unable to focus on my customers. I hardly functioned at all. My family life also suffered. I was very tense and could not find any way to relax. I felt anxious and fearful, had difficulty concentrating, and was very impatient with everyone around me. My life became a nightmare that I could not wake up from. There are no words to describe the bottomless feelings of hurt and suffering that envelope one over and over again when a loved one has been kidnapped and one is deprived of any information concerning his fate.

20.    Although we never received any official information from the Chinese government nor from the South Korean authorities, we pieced together, through my nephew and his co-workers, what had happened.

21.    My brother had been lured to a meeting with North Korean agents who had posed as refugees. At the end of the meeting, as they walked out to the street, my brother was violently seized, thrown into a car and driven across the border into North Korea.

22.    I first heard reports that my brother had been killed in North Korea from news stories in the South Korean press a while later. The reports were

-5-

unsubstantiated and I was unable to accept them as true. I did not want to believe that he had been killed.

23.    When I first heard the news I, did however, tell, my wife and children. My mother was elderly and living with us at the time. I felt that it would not be prudent to tell her the news, as it would be a tremendous shock to her and I was not sure she could survive it. She would frequently inquire about my brother. I did eventually tell her that he had been kidnapped by North Korea, but she died without knowing that he had been murdered there.

24.    As long as there is still a chance that my brother is still alive I have a very difficult time accepting that he has been killed. I recognize that the passage of so many years without any word from him seems to indicate he is longer alive but the thought is too difficult for me to come to terms with. I feel I would be disloyal to my older brother if I simply ruled in my mind that he was dead. Because I do not know if he is alive or not, I have feelings of guilt that I must continue to do something to save him although I do not know how I could do that. Unlike the cases where a body is returned to the family, we have no way to channel our emotions and we have no grave or even anniversary date to commemorate. As such, what the North Korean government has done, in addition to depriving us of our loved one is prohibit us from any sense of closure. Instead, I go to bed each evening never knowing if my brother is still alive. None of us ever had the opportunity to say what we needed to express to my brother nor to even say goodbye.

-6-

25.     My brother has children who live in the United States. I sometimes feel that now that my brother is gone that I have to assume the responsibility of the eldest child. This is a huge emotional burden on me and I am not able to carry it out properly. It saddens me greatly when I see all of his children growing up without their father. The youngest child, Chun Gook, has been especially devastated by my brother's disappearance. His mother, who was my brother's second wife, Young Hwa Kim, has suffered a severe nervous breakdown from the shock and tension of having her husband kidnapped in this manner. As such, the child who was 11 years old at the time of my brother's disappearance has become an orphan and was placed in a foster home.

26.     I have observed these unfortunate children at the different stages of their lives since January 2000, as they have tried to bravely go about their pursuits, get married and raise families of their own and it breaks my heart. When we see each other it is very painful. We can look at each other's faces and understand the grief that one is suffering without expressing any words. It causes me tremendous anguish to think of how much his children miss him and how he is not there for them.

27.     Family celebrations and holiday seasons are very hard for me now. I find myself thinking constantly about my brother and remembering all the happy celebrations we shared together over the years. The holidays no longer feel as carefree, as joyful or as meaningful as they did before. A cloud hangs over me now. I know I must be strong for my wife and children but the thoughts of my brother, greatly dampen my spirits and all that I set out to do. In our culture the family structure is very important and it provides the central framework of our lives. My brother's abduction

-7-

has destroyed this framework for our family and we are all trying our hardest to continue on despite this tragedy. The family we once were before January 16, 2000, no longer exists.

28.  The unrelenting worry and fear over my brother's abduction has caused me to experience a long term sadness and depression. I find that I do not have the energy and zeal for life I once had. Although I can now go for longer periods without thinking about my brother, I find that the heavy thoughts always catch up to me and leave me in pain. The tragic thoughts and consequences of the kidnapping seem to continue along with me over the years and have a gravitational pull that makes it very hard for me to rise above them. I very much long to be carefree and unburdened by all these dark feelings and heavy thoughts. It has been more than ten years that he has been gone and the emotional suffering I experience does not decrease.

29.  It is unfathomable to me why a government with which we never had any dealings would subject an innocent family like ours to such cruel treatment. How can they simply withhold all information like this and refuse to even let us know if my brother is alive or dead? I lost part of myself when my brother was abducted and taken from me. I lost my brother, my friend, my mentor, my advisor and my role model. Now, I am trying to learn to live all over again. Yet, none of our lives will ever be the same. I know that I will never return to the person I was before the kidnapping.

30.  If the worst is true and my brother is indeed dead, I hope that he will be viewed as a humanitarian who helped the people of North Korea, and as a

-8-

martyr who died for his religion. I pray for him and I hope the day will come when we
learn the full truth of what happened to him and a measure of closure is granted to us.

      I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

Dated:   Newark, California
        October 12, 2010

                                                      YONG SEOK KIM

000034

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------X

HAN KIM
5511 Wooded Creek Drive
St. Charles, MO

**Civil Action No.:** 09-648 (RWR) and

YONG SEOK KIM
5511 Wooded Creek Drive
St. Charles, MO

Plaintiffs,

-against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,
a.k.a. NORTH KOREA
c/o Foreign Minister, Pak Ui Chun
Ministry of Foreign Affairs
Jung song-dong, Central District
Pyong Yang, DRK

and

JOHN DOES 1-10.

Defendants.
---------------------------------------------------------------X


**REPORT OF YOSHIKUNI YAMAMOTO**


I, Yoshikuni Yamamoto, currently residing part-time in each of Kanagawa, Japan and

in Arlington, VA, declare pursuant to 28 U.S.C. § 1746, as follows:

000035

## A.      Professional Background

**1.**      I am currently the Senior Researcher for the Committee for Human Rights in North Korea (HRNK) in Washington, DC and have held this position since July 2009.

**2.**      I have been studying security issues in the Asian Pacific Rim for over 15 years with a special focus on the methodology of the Democratic People's Republic of Korea ("DPRK").   I hold a Master of Arts in Security Studies from Georgetown University's School of Foreign Service and a Master of Public Administration from Syracuse University's Maxwell School of Citizenship and Public Affairs.   My Bachelor of Arts in Political Science is from Waseda University in Tokyo, Japan.

**3.**      I am the Co-founder and Steering Committee Member of the Washington, DC-based North Korea Freedom Coalition, a grass-roots advocacy group promoting human rights and related freedoms in the DPRK.    Among other appointments, in earlier this year I was nominated as Cabinet Advisor for Abduction and Korean Peninsula issues from the Hatoyama Government of Japan.   And I am currently finalizing the forthcoming publication tentatively titles "*Hostage-Taking*: The Policy of Abduction by North Korea" which I co-authored with several attorneys at the national law firm DLA Piper LLP which is scheduled to be published by HRNK in Spring 2011.

**4.**      Between 2007-2009 I worked for the Washington, DC-based Public Affairs Company VOX Global Mandate (now VOX Global) and for VOX Global Asia during which time I advised various governmental and private sector clients about Asian security policy matters and other issues.   Prior to this appointment I worked for the House Republican Policy Committee (108th Congress) in Washington,

000036

DC, primarily as a consultant preparing materials and drafting Policy Statements regarding issues concerning East Asia and US relations.

5.      A true copy of my resume is attached hereto as Appendix "A".

**B.      Nature of This Expert Witness Report**

6.      I have been asked by counsel for the plaintiffs in the case of <u>Kim et al. v. Democratic People's Republic of Korea et al.</u>, to provide my professional opinion about the tactical use of abductions by the DPRK to promote its political goals and to intimidate its opponents and their supporters.  Specifically, I have been asked to review the available evidence in this case to determine specifically whether the DPRK used its intelligence services and their employees, officials and agents (1) located in China to abduct Reverend Kim Dong Shik ("Reverend Kim") on January 16, 2000, (2) to thereafter illegally and forcibly transport Reverend Kim to North Korea by means of a surreptitious border crossing, and subsequently (3) to incarcerate Reverend Kim in a North Korean prison camp and regularly interrogate and brutally torture him, where according to various reports he died shortly thereafter as a result of such torture and the other inhuman conditions of his captivity.

7.      My opinion as set forth below is based upon my position as Senior Researcher for the Committee for Hunan Rights in North Korea, my academic studies, research, and publishing over the course of many years as expert on international security issues. I have obtained information from interviews with NGO leaders, reviews of documents, periodicals, media statements made by the terrorist organizations, credible news reports, discussions with reliable journalists, government publications, and scholarly works, as well as from my own experience, working, living and traveling in Asia, particularly in Japan, China and South Korea.  I have

000037

reviewed the complaint filed by the plaintiffs against the defendants and agree with its stated facts and conclusions.

**C.      Background into Ideology of North Korean Regime**

  **8.**  One of the most fundamental beliefs of the DPRK is that in order to achieve its central political goal - the unification of an independent homeland for the Korean people on the Korean peninsula - there must first be a "democratic" revolution which will result in the destruction of the imperialist America and the South Korean governments and thus liberate the Korean people from the poisonous influence of the West.  North Korea proposes that the only possible method of unification is a "Korean Federation," which would require, as a condition of its formation, the relinquishment of power by the South Korean government, the repeal of the National Security Law of South Korea, the ratification of a peace treaty between North Korea and the United States whereby the United States would submit to various North Korean demands, and the withdrawal of U.S. troops from the region.   The communist DPRK government has devoted and continues to devote significant resources to pursuing this goal - perhaps the most basic of these is in disseminating anti-Western propaganda to South Korean non-ruling class members such as workers and farmers with the goal of establishing a core community of supporters to be enlisted to further recruit South Korean students, intellectuals and small and medium sized businesses to the party's cause.[1]

  **9.**  Since its inception in 1948, the DPRK has employed various brutal and rather brazen tactics to facilitate its political goals.  One the most high-profile and effective of these methods has been to actively engage in the systematic tracking and

---

[1] Interview by author with President Doh Hee Yun of Citizen's Coalition for Human Rights of Abductees and North Korean Refugees, October 29, 2009 in Seoul, South Korea.

000038

abduction of foreign national civilians, as orchestrated and overseen by such government entities as the North Korean State Security Department (SSD)[2] and carried out by its agents.  The DPRK's widespread use of abductions was evident from its inception; during the 1950-53 Korean War, North Korea abducted a whopping 80,000[3] South Korean citizens for varying purposes.

      **10.**    In more recent years, abduction targets have most often been either persons considered by the DPRK to be opponents of the North Korean regime or otherwise deemed to be valuable in any of a variety of capacities to further its communist and isolationist policies.   There has been significant research (including numerous studies) conducted by various human rights groups, South Korean NGOs as well as prominent South Korean and Japanese journalists[4] regarding the DPRK's systematic use of abductions as a political tool and the goals the North Korean regime hopes to achieve by engaging in such activities.[5]  As a result of my own research, I have found the following seven categories as a concise way to summarize the DPRK's motivations for engaging in the abduction of foreign civilians: (1) the theft of

---

[2] The SSD, sometimes also referred to as either the North Korean National Security Agency (or NKNSA) or the North Korean Security Agency (NKSA), functions under direct control of the North Korean National Defense Commission whose Chairman is none other than "Supreme Leader" Kim Jong-Il is  and acts as the North Korean regime's primary intelligence-gathering body.  Its primary responsibilities range from counter-intelligence at home and abroad to responding to perpetrators of political crimes, arresting persons who attempt and/or commit treason against the regime, and in general putting under surveillance anyone who is deemed to cause a potential threat to the North Korean government.

[3] The South Korean NGO *Korean War Abductees Family Union (KWAFU)* states that of the 80,000 abducted victims, 20,000 were "scholars, students, intellects, doctors, medical specialists, politicians and even government officials." They were "systematically sought out"; i.e., each had been hand-picked by the North Korean regime to be either "useful for their national interest or targets of retaliation." The other 60,000 abducted victims were used as part of North Korea's much needed labor force, and were utilized to join the Korean People's Army or worked in factories and labor camps.

[4] To name just a few, Cho Gab-Je of Monthly Chosun, Pres. Doh Hee Yun of Citizen's Coalition for Human Rights of Abductees and North Korean Refugees, Pres. Choi Sung-Yong of the Abductees' Family Union, Pres. Lee Mi-Il of Korean War Abductees Family Union, Pres. Kazuhiro Araki from the Investigation Commission on Missing Japanese Probably Related to North Korea (COMJAN), Chairman Tsutomu Nishioka and Vice Chairman Yoichi Shimada from the National Association for the Rescue of Japanese Kidnapped by North Korea (NARKN)

[5] Professor Yoichi Shimada, Vice Chairman of the National Association for the Rescue of Japanese Kidnapped by North Korea  (NARKN), testified before the US House of Representatives, Committee on International Relations on April, 27, 2006 regarding the motivations behind Pyongyang's employment of a policy of abducting foreign nationals.

000039

passports and other official identification documents, (2) forced marriages to other victims abducted from abroad, (3) localization and the recruitment and education of spies, (4) supplemental advanced technology, unique skills and labor force, (5) containing witnesses and destroying evidence, (6) an extension of war efforts and historical animosity, and (7) hostage taking, propaganda and deterrence.  Below I will quickly describe each of these categories further.


**D.      Goals of the DPRK's Abduction Policy**

   **11.    *Theft of Passports and Other Identification Documents*:** One of the ancillary but yet valuable benefits to the DPRK of abducing foreign nationals was the ability of its agents to easily misappropriate the identities of such individuals.  North Korean operatives regularly used such South Korean, Japanese and other country's passports and other identification documents when travelling abroad in order to disguise themselves as foreign nationals to facilitate the assumption of an alter ego and thus effectively infiltrate a target county[6].  With respect to South Korea especially, which since the 1960's had become increasingly difficult for DPRK agents to penetrate due to heightened security, the use of South Korean identity documents greatly aided North Korean intelligence personnel to operate undetected in South Korea.[7]  The core objective of dispatching operatives to operate in South Korean territory was to conduct espionage, local recruitment of cooperators, disseminate pro-

---

[6]Ahn, Myong-Jin, *Sin Shougen Rachi* (Kosaido Shuppan: 2005), pp. 172-205
[7] For example, North Korean spy Sin Kwang-Su was arrested in Seoul on February 24, 1985 carrying a passport originally owned by Japanese abduction victim named Tadaaki Hara. There are other similar cases such as Hiroshi Kume and potential victim Kenzo Kozumi where North Korean spies are suspected to have not only stolen their identities, but have also operated inside Japan and abroad acting as if they were those citizens themselves.

000040

North Korean propaganda, and perpetuate terrorist acts such as abductions and assassinations.[8]

**12.**   ***Forced Marriage to Other Abducted Victims***: Another DPRK motivation to abducting foreigners is a practical - if rather misguided - one, namely to provide companionship to victims already abducted and living in North Korea so as to presumably increase their quality of life and thus make attempted escapes less likely. To this end, a large proportion of the female foreign nationals abducted by the SSD were forced to marry with other foreign males who had been early abducted and forcibly brought to North Korea.[9]   The DPRK believed that the "internal-marriage" between foreign victims made it easier to sequester such persons from the general population and thus to limit the spread of harmful outside information into North Korea.   The effort to stem the flow of any such information was further evidenced by foreign victims who were forced to marry each other also were relegated to living in housing complexes that were set apart from the general public and were commonly called "*Guest Houses*", thereby (i) limiting any interaction between such individuals and North Korean civilians, and (ii) making such individuals dependent on "*Instructors*", who are intelligence personnel from SSD or other North Korean intelligence services and who are charged with surveillance and re-education purposes, as well as active agents working with those persons chosen to be involved in covert operations[10].   Alternatively, the DPRK considered its policy of forced

---

[8]Kim Guk-Seok, *Rachi Higaisha ha Ikiteiru* (Koubunsha: 2004), p. 22.

[9] Examples such as abducted female Japanese victim Yokota Megumi was married to a South Korean national Kim Young-Nam who was also kidnapped in the beaches when only a high school student. So were Lebanese female victim Siham Shraidhi who was married with US Army deserter Jerry W. Parrish, Rumanian probable abducted victim Doina Bumbea (US Army deserter and abducted victim Charles Jenkins testifies that he has seen her during his time in Pyongyang) was forced to marry US Army deserter James J. Dresnok and Thai probable abducted victim Anocha Panjoy was ordered to marry US Army deserter Larry Abshier and later with a German businessman (Jenkins,  Charles R., *To Tell the Truth Japanese Edition*, Kadokawa Shoten: 2005, p.97).

[10] As described in Charles Jenkin's memoir, the "Instructors" often use aliases when interacting with abducted foreign victims so their true identities are not know. Yet through various testimonies

000041

marriage as a means of giving "purpose" in life to abducted victims and hopefully having them distracted with the needs of raising children and family life in general, instead of being focused on planning their escape or rebelling against the DPRK's authority[11]. While the effectiveness of the DPRK policy of forced marriages has not been determined definitively, in certain cases family ties did become the central reason why foreign victims decided to refrain from fleeing North Korea (i.e., abducted victims did not want to flee North Korea when family members would be unable to join them and thus remain hostages of the DPRK). However, as one might expect, in other cases the forced marriage exacerbated the suffering of abducted victims by pairing them with abusive or otherwise undesirable partners.[12]

**13.** ***Localization and the Recruitment and Education of Spies***:  One of the key rationales behind the DPRK's policy of abductions was "*Localization*", a term that "Supreme Leader" of the DPRK Kim Jong-Il used himself in a speech made in 1976[13]. "Localization" refers to the abduction of foreign nationals to either (i) act as instructors of language, culture and other subjects of their home nations for North Korea intelligence operatives, or (ii) to themselves become North Korean spies working in furtherance of DPRK's national interests. The primary objective of *Localization* was to extend the reach of North Korean operatives who had mastered the ability to "blend in" in foreign country effectively so that they could set-up and operate local spy cells to conduct espionage and terrorist activities. However, in many

---

from former North Korean operatives such as Kim Hyon Hui and Ahn Myong-Jin as well as foreign abducted victims Megumi Yao, Charles Jenkins, Chung Ki-Hae and Kaoru Hasuike, the possibility is high that "Instructors" are employees of intelligence agencies such as SSD and other DPRK entities.  See also testimony by former SSD personnel Yoon Dae-Il http://nippon-senmon.tripod.com/hantou/kitachousen/aku_sikkoubu html.

[11] Jenkins, *To Tell the Truth,* p. 118.

[12] The case of Megumi Yao and the seven other Japanese females who had married the members of the Red Army terrorist group are also a tragic case of forced marriage and Yao even confesses about how her husband has physically abused her in front of her children (Yao, Megumi, *Shazai shimasu*, Bungeishunjyu: 2002).

[13] See Eya, Osamu, *Tainichi Bouryaku Hakusho* (Shogakukan: 1999) and Nishioka, Tsutomu, *Kim Jong-Il ga Sikaketa Tainichi Bouryaku Rachi no Shinjitsu* (Tokuma Shoten: 2002.

000042

cases the DPRK found the use of abductees as foreign agents to be more problematic than originally anticipated, as many of the "spies" trained as part of "*Localization*" ended up becoming disloyal to the regime and escaped or attempted to escape, and thus the DPRK slowed its use of abductions for the purposes of forcibly recruiting intelligence personnel.[14] However, the DPRK found alternative uses of these abductees already in the country (they could not simply be returned to their home countries since they now possessed sensitive information about the North Korean regime), mostly as foreign language instructors for North Korean spies and diplomats. Thus the DPRK was able to utilize the talents of these abductees without risking the exposure that would be involved in using them as active intelligence operatives. [15]

**14.** ***Supplement Advanced Technology, Unique Skills, and Labor Force***: The critical shortage of academic and industrial talent and know-how inside of North Korea - largely due to the DPRK's strict isolationist policies from the international community - has encouraged North Korean operatives to target and capture foreigners with unique skills which it requires to promote the North Korean national interest. The abduction of two prominent South Koreans during the latter 1970s - Choi Un Hee and Shin Sang Ok - a famous actress and a film director, respectively, is a clear example of using abductions to upgrade what was an antiquated film industry in North Korea. Film production for propaganda purposes is pivotal in maintaining Pyongyang's grip on power. Furthermore, research conducted by the Investigation Commission on Missing Japanese Probably Related to North Korea (COMJAN) has revealed that North Korea is likely to be behind a suspicious trend in the disappearance of several Japanese nationals who had experience in the

---

[14] See Kim Hyon-Hui, *Wasurerarenai Hito* (Bungei Shunjyu: 1995) and Kim, *Rachi Higaisha ha Ikiteiru.*
[15] See details regarding how abducted foreign victims were considered by North Korean authority for use in multiple purposes; Hasuike, Toru, *Dakkan Dai Ni Shou* (Shinchousha: 2005), p. 57 and Jenkins, *To Tell the Truth*, pp. 95-97.

000043

telecommunication and physics industries, as well as those with expertise in the printing of counterfeit money, network tapping, nuclear weapons testing - activities which the DPRK believes are  necessary to promote its national interests.[16]

15.    *Containing Witnesses and Destroying Evidence*: North Korean spies have been entering into Japanese and South Korean soil in a regular basis, not only to carry out abduction and other espionage, but to secretly transport "in and out" senior North Korean agents[17] as well as for military routine training and other reasons[18]. Abductions have also been carried out to silence eyewitness among the South Korean population from later identifying such North Korean personnel or from otherwise compromising the secrecy of a pending operation.   Cases of South Korean and Japanese fishermen being captured are also claimed to be instances where the DPRK active spy ships had concerns of being spotted by local fishermen and would attack and kidnap the crew members to protect their secret missions from being leaked.[19]

16.    *An Extension of War Efforts and Historical Animosity*: North Korea considers both the US and South Korea as war time enemies; the armistice agreement signed in July 27, 1953 has never been followed by a peace treaty ate.  Former KPA Reconnaissance Division Lieutenant, Kim Guk-Seouk, testifies in his memoir that there is no doubt that the Korean Workers' Party elites, from "Supreme Leader" Kim Jong-Il himself down to local cooperators, considered the use of abductions as a type of revenge for the brutality to which North Korean citizens were subjected by the US-South Korea forces during the Korean War (as well as the treatment from Japanese

---

[16] See COMJAN list of all the names of those who are considered likely candidates for being abducted by North Korea. http://www.listserver.sakura.ne.jp/cgi-bin/list/list3.cgi?mode=list2.
Also regarding details on missing people with particular expertise in printing see
http://trycomp.org/blog/index.php?e=235.
[17] Han, Gwang-Hee, *Waga Chousen Soren no Tsumi to Batsu* (Bungeishunjyu: 2002).
[18] Kim. *Rachi Higaisha ha Ikiteiru*
[19] The case of Takeshi Terakoshi and his two relatives who were abducted in May 1963 while in sea, is a typical example of this category.

000044

Imperialists during occupation era).  Kim also states that DPRK's use of abduction as a tactical methodology were "absolutely necessary" in an environment where Pyongyang seriously believed (and continues to believe) that a "Second Korean War" may break out at any moment[20].  Many experts also believe that the psychological justification of the DPRK to abduct innocent foreign civilians is rooted in a belief (i) that those civilians are not truly innocent (in line with a unique tradition of Korean culture that punishment for one's sin may be transferred to later generations), and (ii) known as *Han* (a prickly combination of pessimism, vengefulness and xenophobia that had evolved over centuries, in response to the frustration aroused by the North Korea's status as a small nation bullied by bigger and more powerful neighbors[21]).

17.    ***Hostage Taking, Propaganda and Deterrence***:   North Korea has consistently employed the tactics of blackmail, ransom and other acts of intimidation to achieve its goals.  One of the most prominent examples of this methodology was the illegal seizing in international waters of the *USS Pueblo* by the DPRK in January 1968.  As a result of this incident, 83 U.S. Navy personnel (one died during an exchange of gunfire) were tortured and held hostage in the DPRK for over 11 months until the U.S. sent the DPRK a written apology.  While North Korea charged the *USS Pueblo* for conducting espionage and intruding territory lines, U.S. and South Korea experts saw this incident as an attempt by Pyongyang to divert attention from a much deadlier attempt, known as the "Blue House Raid", conducted by the DPRK only five days before this *USS Pueblo* seizure.  In the "Blue House Raid" thirty-one North Korean commandos infiltrated across the DMZ with South Korea in an attempt to kill then South Korea President Park Chung Hee. While the plot failed, firefights broke out on the streets of Seoul for three days causing significant casualties amongst

---

[20] Hwang Jang-Yop, *Kyouken ni Obieruna* (Bungei Shunjyu: 2000), pp. 145.
[21] Martin, Bradley K., *Under the Loving Care of the Fatherly Leader* (Thomas Dunne Books: 2004), p.19.

000045

civilians, and the death of 30 North Korean commandos[22].  More recent examples of the DPRK using violence to pursue its goals is the capture of two U.S. journalists, Laura Ling and Euna Lee, along the DPRK boarder on March 17, 2009 and sentenced to 12 years of in re-education in a North Korean work camp[23].  In order to obtain a "pardon" for the journalists, former U.S. President Bill Clinton visited Pyongyang to meet Kim Jong-Il and offer an apology.  There also have been numerous, although not as widely publicized, cases of South Korean fishing boats being seized despite not being near North Korean territorial waters.  Furthermore, the DPRK has been involved in a series of abductions (of over 200 citizens of the People's Republic of China (PRC)) since the early 1990s. As the *Chosun Ilbo* reports, North Korean refugees who were lucky enough to escape to China would stay under custody of secret safe-houses that NGOs and religious humanitarian groups had established or that PRC locals in the area with ethnic Korean descent would support[24].  North Korean agents infiltrated these communities and targeted ethnic-Korean PRC locals as well as corrupt border guards as part of a campaign to stop people from fleeing North Korea.[25]  By abducting the PRC locals within the border area, the DPRK sends a message of deterrence to other individuals who might be enlisted to support North Korean defectors. This use of force by the DPRK in this manner is the very backdrop against which the abduction of Reverend Kim occurred.

### E.      Use of Local Agents by the SSD

**18.**      Former North Korean Army (KPA) Lieutenant Kim Guk-Seok testified in his memoir that Pyongyang's policy of carrying out abductions would be

---

[22] Downs, Chuck, *Over the Line* (AEI Press: 1999), pp. 121-146.
[23] Choe, Sang-Hun, "N. Korea Sentences 2 US Journalists to 12 Years of Hard Labor," The New York Times, June 8, 2009.
[24] AFP, "N. Korea Kidnapped Chinese in Refugee Crackdown: Report," November, 17, 2009.
[25] Ibid..

000046

significantly hampered without the coordination by local agents in the host country[26]

in which civilians are being targeted by North Korean operatives such as the SSD.

Many of these local agents have not undergone the rigors of formal training

undertaken by full-time SSD agents, and therefore they are loyal to and follow

directives issued by these career agents who receive direct orders from leadership.[27]

These local agents support the SSD by conducting preliminary research of targets,

planning and advising precisely how targets can be abducted, participating in the

abduction itself, and assisting with the handling when there is fallout from an

abduction plan once  the local police as well as a victim's family and neighbors start

its search for the missing[28].


**F.      Reverend Kim**

    **19.**      Since the early 1990s, foreign religious and NGO humanitarians came

to live along the DPRK-Chinese border in response to the serious famine and growing

flux of North Korean refugees seeking asylum just across the Chinese border.  These

humanitarian workers would often operate in Chinese border cities to assist refugees

to escape from North Korea, hide once across the border and eventually flee out of

China to third countries for a better life.[29]

    **20.**      In 1993 Reverend Kim moved to China from his congregation in the

U.S. to work as a missionary providing humanitarian and religious service for the

families of North Korean descent who had fled across the Chinese-Korean border

---

[26] Kim, *Rachi Higaisha ha Ikiteiru,* p. 23. See also testimony by former North Korean intelligence operative  Ahn, *Sin Shougen Rachi*, pp. 188-196 where he mentions the actual training he went through as a group in conducting abduction operations.
[27] Many cases exist where untrained ad-hoc  local accomplices are used by North Korean agents. See Gaji Jiken Kenkyu Kai, *Sengo no Gaiji Jiken* (Tokyo Hourei Shuppan: 2007), pp. 140-141.
[28] Eya, *Tainichi Bouryaku Hakusho,* pp. 187, 196.
[29] Interview by author with President Doh Hee-Yun of the *Citizen's Coalition for the Human Rights of Abductees and North Korean Refugees*, October 29, 2009 in Seoul, South Korea.

000047

seeking asylum. Reverend Kim set up numerous refugee shelters and a school (named the "School of Love") for expatriate North Korean children and handicapped persons in the town of Yanji, close to the Chinese-North Korean border.

21.    The SSD learned of Reverend Kim's activities on behalf of North Korean defectors and refugees and decided to abduct him and bring him to North Korea to thwart his work and deter other humanitarian workers from pursuing their humanitarian activities.

22.    On January 16, 2000, Reverend Kim was abducted from Yanji City by a group of local SSD agents residing in China who had already orchestrated several abductions of civilians living in China for the SSD.    These agents transferred Reverend Kim across the border into North Korea, directly handing him over to their superior, a senior director in the SSD.   It is reported that Mr. Kim was tortured after refusing to collaborate and that he died in February 2001 and was buried in District 91 military training base in Sangwon-ri near Pyongyang.

## G.    Conclusion

23.    It is likely that Reverend Kim was selected as an abduction target since he was widely known as an aid worker helping North Korean defectors[30] and his abduction would be a clear sign to other foreign humanitarian workers that the SSD was watching them[31]. From the perspective of the DPRK leadership in Pyongyang, religious humanitarian workers like Reverend Kim are enemies to their regime, as they cast light on the failings of the North Korean system which Pyongyang would

---

[30] In November 1999, Kim Dong-Shik has a record of helping 11 North Korean refugees escape through Mongolia.
[31] Similar cases exist in the past where a South Korean pastor named Ahn Seung-Un was abducted in Yanji city on July 9, 1995. According to Yoon Dae-Il, a former SSD agent who defected,  Ahn was taken by SSD personnel who suspected him as being a spy while spreading the teachings of Christ among ethnic Koreans in China. Ahn is claimed to have died in North Korea in 2009. See Monthly Chosun July 2002 edition and also the summary link of the case at http://yb.gnk.cc/date01/2005.html.

000048

prefer to keep hidden, and as demonstrated in the case of Reverend Kim the DPRK will not hesitate to use severe measures to silence such individuals.

24.     It should be stressed that unlike most abductions of foreign nationals carried out by the North Korean operatives, which due to the extremely insular nature of North Korean society are conducted under a thick veil of secrecy, a relatively significant amount of information has been learned about the details surrounding the abduction of Reverend Kim.  This is largely due to two factors: (1) Reverend Kim, as a religious leader and U.S. citizen, was a higher-profile victim than most others, and (2) one of the local SSD agents who was a member of Reverend Kim's abduction squad, Liu Yong Hua (Hua), was eventually arrested in South Korea for his role in the abduction and was prosecuted by a South Korean court largely relying on his sworn testimony.  The South Korean court, after conducting an exhaustive investigation into the circumstances surrounding Hua's many activities on behalf of the SSD in China, found that Hua had operated under clear instructions from a senior North Korean state security official whose task was to oversee the abductions of defectors and others deemed to be working against the interests of the North Korean regime.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on  December 11, 2010

_____
Yoshikuni Yamamoto

000049

# Exhibit A

000050

## Yoshikuni "Yoshi" Yamamoto

1011 Arlington Blvd 725 Arlington VA 22209, USA · CP 202-285-2191
6-29-6-1206 Nakanoshima Tamaku Kawasaki· Kanagawa, JAPAN 214-0012 · CP (+81) 90-1542-7429

### *EDUCATION*

**SYRACUSE UNIVERSITY, Maxwell School of Citizenship and Public Affairs**, Syracuse NY
**Full-Scholarship Graduate Associate; Master of Public Administration,** June 2006
Conducted Paid Research on Medicaid, Medicare, Telemedicine and Long-Term Care for NY State
and Onondaga County Health and Social Security Department

**GEORGETOWN UNIVERSITY, School of Foreign Service**, Washington DC
**Master of Arts in Security Studies**, May 2005
Coursework includes: Assessing US-Japan Relations, International Arms Trade, Theory and Practice
of Security, U.S. National Security Policy, Korean Security and Foreign Relations.

**WASEDA UNIVERSITY,** Tokyo, Japan
**Bachelor of Arts in Political Science**, March 1998
Concentration: Security Issues in the Asian Pacific Region
Selected for elite *Ship for Southeast Asian Youth Program*, 1995

### *EXPERIENCE*

**The Committee for Human Rights in North Korea (HRNK),** Washington DC
**Researcher;** from July, 2009 to current
- Author of "*Hostage-Taking*: The Policy of Abduction by North Korea (title tentative)" co-authored
  with the law firm DLA Piper LLP and published by HRNK, set for release in spring 2011.
- Co-founder and Steering Committee Member of the Washington, DC- based North Korea
  Freedom Coalition  (NKFC)
- Nominated as Cabinet Advisor for Abduction and Korean Peninsula issues from the Hatoyama
  Government of Japan in early 2010.

**VOX Global Mandate,** Washington, DC
**Regional Director;** from 2007 to 2009 worked for the Washington, DC-based Public Affairs Company
VOX Global Mandate (now VOX Global) and Consultant for VOX Global Asia to advise various
clients in the private sector, Governments, and Political Parties.
- Specialize in Asian and U.S. Security, Health Tech, Telemedicine, Finance and overall Policy
  Exchanges between US, Japan and South Korea.

**HOUSE REPUBLICAN POLICY COMMITTEE (108th US Congress),** Washington, DC
**From Intern to Consultant**; with the endorsement from several US pundits and policy staffers,
started as an intern from the summer of 2004 and became a Northeast Asia consultant, 2004-2006
- Organized conferences, prepared materials and draft Policy Statements regarding issues concerning
  East Asia and US relations. Also prepared talking points and memos for then Chairman
  **Christopher Cox** for press interviews and speeches.

**DENTSU INC.,** Tokyo, Japan
**Account Executive**, Account Management Division 18, April 1998- May 2002
Dentsu is the top Advertising Agency in Japan and the fourth largest in the world.
- Developed and worked within a budget, creative work, and the use of mass media.
- Specialized in both Brand Marketing and Media Buying.
- Awarded from the *Japan Advertising Agencies Association* for **Best Advertising Essay** in1999.

### *SKILLS/PERSONAL*

**Computers:** Power Point, Persuasion, Excel, MS Word, SPSS, STATA
**Languages:** Born in Singapore in 1974, raised in Westchester, NY, and Kawasaki City, a Japanese
national with fluency in English, Japanese and basic knowledge on Korean as well as Chinese.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- X

HAN KIM, *et al.,*                                                    I

               Plaintiffs,              Civil Action No: 09-648 (RWR)

       -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, *et al.,*

             Defendants.

-------------------------------------------------------------------- X


## DECLARATION OF J.D. KIM


I, J.D. Kim, Esq., of New York, New York, pursuant to 28 USC § 1746, declare the following statements to be true, subject to the penalties of perjury:

1. I am fluent in written and spoken English as well as written and spoken Korean.

2. I am fully familiar with the Decision by the Seoul Joong Ang Ji Bang Court Criminal Part 23 decided on April 21, 2005 regarding Defendant Liu Yong Hua.

3. I hereby state that the attached translation is to the best of my knowledge and belief, a true and accurate translation from Korean into English of said Decision, which is attached.

       I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    New York, New York
          December 4, 2010

J.D. Kim, Esq.

# SEOUL JOONG ANG JI BANG COURT

# CRIMINAL PART 23

# DECISION

| | | |
|---|---|---|
| Case | 2005 Go Hab 43 | A. Violation of National Security Law (Acting in Furtherance of a Crime) |
| | | B. Violation of National Security Law (Infiltration, Fleeing) |
| | | C. Violation of National Security Law (Meeting, Communication, etc.) |

Defendant        LIU YONG HUA, (Born April 30, 1969)

Address: Seoul Kwan Ak Koo Shil Lim 4 Dong 516-6

Citizenship: People˝s Republic of China

Prosecutor        Jeong Jum Shik, Jeon Woo Jung

Attorney        Ham Jong Kil

Decision Date        April 21, 2005

## ORDER

Defendant is sentenced to ten years imprisonment.

One hundred and thirty three (133) days are subtracted from the sentence for time served.

## REASONING

THE FACTS OF THE CRIME

1

Liu Yong Hua ("Defendant") was born on April 30, 1969 in the People's Republic of China in

Kil Lim Sung Yong Jung Shi Yong Moon Ga Yong Pyong Guh 3 Jo. His father is Liu Chang

Soo (67 years old) and his mother is Kim Kum Sook (64 years old). Both were farmers at the

time of his birth and had two sons and two daughters including the Defendant. Defendant worked

in the apparel business but starting from 1992 began to purchase mushrooms and other farm

products and also antiques from North Korea via the border near Ham Pook Hwoe Ryung Shi,

making frequent trips. He sold them in China at markets in Yong Jung, Yun Gil and other

locations. He also smuggled items of Chinese made clothing into markets in North Korea at Ham

Pook Hwoe Ryung Shi, selling them himself. It was at this time that he [Defendant] met Ji

Young Soo (hereinafter "Director Ji") who at the time was an instructor at the Foreign Affairs

Department of North Korea's Security Agency in the area of Ham Pook Hwoe Ryung Shi ("Ham

Pook Division").  Later around July of 1998 Defendant came under the influence of Director Ji

when he attained the position of Director of Security at the Koksan Factory within the Ham Pook

Division. Defendant purchased an apartment with funds provided by Director Ji and used it to

provide a base of operations for North Korean security agents of the Koksan Factory location

within the Ham Pook Division. Defendant also took orders from Director Ji, abducting North

Korean defectors engaged in anti-North Korean activity in the Dong Pook 3 Sung area of China

for him [Director Ji] and then turning them over to him [Director Ji]. On January 16, 2000

Defendant abducted a South Korean, Reverend Kim Dong Shik (hereinafter "Reverend Kim").

Afterwards, he [Defendant] learned that he was being investigated along with Kim Song San (39

years old), an agent of North Korea's security agency Ham Pook Division due to this incident by

the Foreign Affairs Department of China's security agency at Kil Lim Sung Yong Jung Shi.

Accordingly, he [Defendant] crossed the Yalu river with Kim Song San and hid at Kim's

000055

residence at Ham Pook Hwoe Ryung Shi in North Korea, which is also where the Ham Pook

Division was located, for four (4) months. He [Defendant] then returned to China around July to

Pook Hae Shi, while continuing to hide. He [Defendant] then received word to come to South

Korea by Rhee Young Chun (who had arrived in March of 2001) and entered the country on July

9, 20001 under a thirty (30) day temporary visa. Once here, Defendant worked in a restaurant

and in construction. He also worked in a „Room Salon," in Seoul Kang Nam Ku Non Hyun Dong

and at other places. His visa expired and he remained in the country illegally until he received an

extension to stay on October 25, 2003. (He also received another extension to stay subsequently,

until the date of May 9, 2005). He then took up residence with his wife in Seoul Kwan Ak Koo

Shil Lim Dong.


The Communist Party of North Korea has formed a false and illegitimate government. It is also

an illegally formed anti-government organization that has designated the unification of the

Korean peninsula by force as its basic objective. It advocates that South Korean society is a

colony enslaved by the United States, and that the possessions of its people are being

misappropriated by that nation which it claims to be an imperialist one. It holds as strategy that

in order for independent unification and the freeing of its people to occur, imperialist America

and the South Korean government must be destroyed and that there must be a democratic

revolution that will free the race and the people. To this end it targets non-ruling class members

such as workers and farmers in South Korea as a foundation and then spreads to students,

intellectuals and small and medium sized businesses and seeks to strengthen its goal of

unification and anti-Americanism. It uses all manner of legal and illegal, non-violent and violent

methods, advertising that an anti-American and anti-fascist battle must be waged. It also

000056

proposes that the only possible method of unification is a „Korean Federation,‟ which would have as its conditions for formation the relinquishment of power by the South Korean government, the repeal of the National Security Law, the ratification of a peace treaty between North Korea and the United States, and the withdrawal of U.S. troops. Additionally, it falsely pretends to spread peace through leftist and overseas Korean communities in foreign countries, while at the same time getting anti-government officials and students to go to North Korea to strengthen its unification strategy. In the mid 1990‟s the „March of Hardship‟ occurred in the Dong Pook 3 Sung area of China when North Korean‟s suffering under economic destitution escaped to that area and organized anti-North Korean and anti-Kim Chong Il activities. As a result, the communist party of North Korea sent agents under their National Security Agency to abduct defectors along with South Koreans who assisted them.

North Korea‟s National Security Agency is charged with identifying and uncovering those who plot against the communist party and the government and has a branch in each province, city and village. It‟s Ham Pook Division, oversees the efforts and the information sharing activities of the various other branches. Under Yoon Chang Joo, the head of the Anti-Detection Department agents continue to abduct North Korean defectors who engage in anti-party and anti-government activities in China. The Kok San Factory location operated at the level of a „federated‟ agency and was part of the Ham Pook Division. It is charged with collecting information concerning anti-party and anti-government activities in its area and being near the border, to spy on those North Korean defectors who engaged in anti-party and anti-government activities and to abduct them. Director Ji was the director of that facility and had the above responsibilities and

000057

Defendant knew him to be a member of the North Korean Communist Party, which is an anti-government organization. And yet,

1. One day in November of 1997 the Defendant lost the support of an unidentified instructor in North Korea‛s special espionage unit, the „Chosun Ihn Min Koon Bo Wee Sa Ryung Boo,‟ as to his smuggling activities when that individual was transferred to the Ham Pook Na Jin area. So he [Defendant] put his head together with Kim Song San an acquaintance to figure out a way to resume the smuggling. In early January of 1998 he [Defendant] heard from Kim that an individual Jeon Yung Sam of Kil Lim Yong Jung Shi Sam Hab Jin was receiving assistance from Director Ji as to his smuggling activities. Kim Song San told him that Director Ji‛s power was considerable in the area of Ham Pook Hwoe Ryung Shi and pointed to the fact that he [Kim Song San] was allowed to cross the border quickly as evidence. Since Defendant had lost his connection to the instructor, Kim suggested that they seek Director Ji out and ask for help. Defendant then determined that receiving the assistance of Director Ji would make smuggling possible and looked for a way to involve himself closely with him [Director Ji]. On one day in July of 1998 Kim Song San paid a visit to Defendant at his residence, located Kil Lim Sung Yong Jung Shi Yong Moon Ga Yong Pyung Guh 3 Jo in China. Kim repeated what he had said previously about Jeon Yung Sam receiving the assistance of Director Ji and about asking for his help. Shortly after, Defendant visited the Kok San Factory location within the Ham Pook Division of North Korea‛s Security Agency, saying that he [Defendant] had come to seek a meeting using Kim Song San‛s name as a reference. When granted a meeting with Director Ji, Defendant went into his office and told him, "I have collected some mushrooms, but have been unable to get them out of North Korea and have been

5

troubled by this. I asked you before, but I would like to seek your help." In response,
Director Ji replied, "We'll figure out getting the mushrooms out of North Korea gradually.
The urgent thing is for you to find out the names of South Korean agents along with their
contact information and inform me." Defendant than said, "Yes, I will try to find that
information, so please help me smuggle mushrooms across the border." However, for a
time he [Defendant] didn't receive either a response or assistance from Director Ji. Then
Defendant met Director Ji again in August of the same year again, but this time with Kim
Song San. Defendant said "Like Jeon Yung Sam and Kim Song San, I too would like to
receive your permission to sell mushrooms. Please help me." Then Director Ji replied, "In
exchange for my helping you, you must also help me – do you think you can do that?" To
which Defendant replied, "As long as you help me smuggle mushrooms, I will do
anything you ask of me and I will work hard at it." Director Ji then said, "In exchange for
my help, you must help Song San and Kun Chun (this referred to Park Kun Chun who
was a North Korean defector from Ham Pook Hwae Ryung) to abduct North Korean
defectors hiding in China who have abandoned their loyalty to us, and South Korean
Security agents and take them to North Korea. Song San and Kun Chun aren't familiar
with China. So you lead the 'jobs' (referring to abductions) in China and when they are
there, use your apartment. And make sure you can cross the border. Also, look for some
men to support your tasks and don't tell you family or anyone else anything you hear or
know." Then Defendant assured Director Ji that he would maintain secrecy. He also said,
"Don't worry about my enlisting help. I have close friends that go way back in the Yong
Jung Tae Pyung Chon area. They are good at following orders and I can get them
together." And Defendant, along with Kim Song San and Park Kun Chun determined that

000059

he would act as an agent who would be under the command of Director Ji. To stay in contact, Defendant provided Director Ji with his cell phone and address. He [Defendant] also received Ji's phone number and stored it in his phone. Immediately following that meeting, until mushroom season was over Defendant received the assistance of Ji as to transportation and other ways and made over 20 smuggling trips with Kim Song San. The mushrooms were taken from the Kyo Doo area of North Korea in Hampook Namyang to the Yong Jung area of China where they were sold for a profit. It was at this time that Defendant also met Han Tae Kun, who was a security agent at Ham Pook Division. They met through Kim Song San. At the time Han was 34 and also went by the aliases Lee Chun Kil and Kim Chun Kil. In January of 2003 he [Han Tae Kun] had defected from North Korea. In December of 1998 North Korean security agents Kim Song San and Park Kun Chun visited Defendant at his residence. They informed Defendant that they had been ordered by Director Ji to perform some 'jobs,' which referred to abduction. As they were unfamiliar with China, they asked Defendant for his [Defendants″] assistance. They also said that the jobs would require additional manpower and told Defendant to quietly gather some friends that he could trust. Defendant told them, "I understand. I have some friends in Yong Jung who think like me and I″ll try to get them together."

° As a result, Defendant contacted Choi Yong Chul (35 years of age, also known as Lee Yong Chul and Ryoo Yong Chul), Nam Soo (Age 35) and Park Il Moon (Age 36, alias Lee Il Moon). These three were friends of Defendant who grew up with him. Defendant told them that he was selling mushrooms with the assistance of Security Director Ji of North Korea of the Ham Pook Hwoe Ryung Shi, saying that he would continue to need Director Ji's assistance. For that reason he [Defendant] asked for his friend″s help telling

7

them that he [Defendant] would return the favor if he was able to make a lot of money.

Defendant informed them that what needed to be done was that when they received

orders from Director Ji through Song San or Kun Chun, they were to capture North

Koreans who had escaped to China and return them across the border. He [Defendant]

characterized the tasks as not being too difficult. When Choi Yong Chul was hesitant

Defendant treated the three to food and alcohol, obtaining their cooperation.

° Defendant then introduced the three to Kim Song San and Park Kun Chun. These

meetings took place at the Pook Doo Kareoke Hall near the 'Suh Shi Jang' in the city of

Yun Kil in China, and at the "Shin Sung Beef Rib Restaurant," in Kil Lim Sung Yong

Jung Shi over drinks. Kim Song San thanked the three for their assistance and told them

of the need for secrecy, instructing them not to let their families know of their activities.

Kim also said they needed code words to ensure secrecy. Abduction was referred to as a

'job.' Director Ji was designated as 'old man Ji,.' Kim Song San was designated as 'Kim

Kwang Soo,' and Park Kun Chun was to be referred as 'Guh Shi.' Defendant was to be

called by his son's name, "Kyung Hoon," Choi Yong Chul was called "Lee Yong Chul,"

and Nam Soo was just called by his own name. These meeting were meant to encourage

Defendant´s three friends and to secretly prepare the code words and agreements used in

their abduction activities. In this way Defendant was in collusion with Director Ji, whom

he knew to be a member of an anti-government organization that threatened the existence,

security and democratic order of South Korea.


2.   In the middle of January 1999 Kim Song San and Han Tae Kun visited Defendant at his

home located at Kil Lim Sung Yong Jung Shi Yong Moon Ga Yong Pyung Kuh 3 Jo, in

000061

China. They conveyed instructions by Director Ji to abduct Liu Yung Bum, who was described as having cooperated with South Korean security agents and planned anti-North Korean acts. They were to return him to North Korea. At that time they planned as follows.

° Choi Yong Chul was to use his 'Santana' vehicle which he used in his Taxi business.

° Kim Song San and Han Tae Kun were to dress as Chinese security officers and be transported by Choi Yong Sul's vehicle.

° The Defendant, Nam Soo, and Park Il Moon were to follow the target Liu Yung Bum. In this way the kidnapping of Liu Yung Bum (Male, Age 57, also known as Liu Kun and whose name was originally Liu Yung Chan) was planned by North Korean's Kim Song San and Han Tae Kun and Chinese-Koreans Choi Yong Chul, Nam Soo, Park Il Moon, Jeon Yung Sam, Lee Hak Joo, and Defendant, who was in collusion with them.

° That same month an individual whose name is unknown visited Defendant at his residence at the direction of Han Tae Kun, where he called Liu Yung Bum telling him to appear at a specified location where he claimed he would exchange material on North Korea he had collected for money. That location consisted of the residence of an unknown individual located at Kil Lim Sung Yong Jung Shi Sam Hab Jin Pook Hung 5 Dae in China. Then along with Han Tae Kun who was dressed in the uniform of a Chinese security officer, Kim Song San, Nam Soo, Park Il Moon and potentially others took Choi Yong Chul's vehicle from Yong Jung to the Bus Terminal that goes to Sam Hab Jin. There, they waited for Liu Yung Bum to arrive. When they saw him board the bus to Sam Hab Jin, Defendant, Park Il Moon and Nam Soo also boarded the bus. Han

000062

Tae Kun, Kim Song San and Choi Yong Chul took Choi's vehicle ahead to the destination point and waited.

° The same day at approximately 12:30 the bus arrived at Pook Hung 5 Dae and Liu Yung Bum got off, with the Defendant, Park and Nam following. As Liu cut through an alley, Han Tae Kun blocked his path. Then Kim Song San struck Liu Yung Bum so that he could not resist and put the handcuffs on him, which Han Tae Kun had prepared. They then placed Liu in Choi's vehicle.

° Defendant and Nam Soo returned to Defendant's residence. Han Tae Kun, Park Il Moon and Kim Song San along with Choi Yong Chul took Liu to the a place in the Yalu River that was shallow and easier to cross. At the same time, Jeon Young Sam and Lee Hak Joo took a motorcycle and also went to that location in the river, having coordinated with Han Tae Kun. That location was near Kil Lim Sung Yong Jung Shi Sam Hab Jin Nam Ho 1 Dae.

° Kim Song San and Han Tae Kun dragged Liu Yung Bum across the river to North Korea, specifically, Ham Pook Hwoe Ryung Shi Kang Ahn Dong. There they met with Director Ji, who had been waiting there along with Kim Sung Kook, who was an instructor at the North Korean Security Agency located at Kok San Gong Jang. Liu Yung Bum was handed over to Director Ji and Kim Sung Kook.

3. In early February 1999 Defendant was at his residence as identified above along with Kim Song San when they were paid a visit by Han Tae Kun, who had met Director Ji and also Yoon Chang Joo in North Korea. Han informed the Defendant and Kim of a woman named Park Poon Ok, who was part of the subnet of Liu Yung Bum, who had just been

10

returned to North Korea. She was thought to be conducting anti-North Korean activities somewhere in China near Ahn Do Hyun, although her exact location was unknown. Defendant, along with Kim Song San were asked to determine her location and then capture her and return her to North Korea. As a result Defendant held a meeting at his residence with Kim Song San, Han Tae Kun, Park Kun Chun and Choi Yong Chul regarding this. They made the following plans to capture Park Poon Ok.

° Kim Song San would ascertain her whereabouts as he had an associate in the area she was thought to be in.

° The others were to wait until said whereabouts where determined and then take Choi Yong Chul's vehicle.

° Han Tae Kun was again to dress as a Chinese security officer.

° That same month when it was determined that Park Poon Ok was in Kil Lim Sung Ahn Do Hyun,

° Choi Yong Chul drove the above group in his vehicle to her location. Han was dressed as a security officer. Once there, they determined that Park was alone in her home. Defendant, Han Tae Kun and Kim Song San went over the wall and entered Park's property. They then entered the residence by breaking through glass and Han Tae Kun placed handcuffs on Park. Then they began transported her in Choi's vehicle to Kil Lim Sung Yong Jung Shi Sam Hab Jin Nam Ho 1 Dae. However, Han Tae Kun said that the border passage point was blocked and they were to wait until it was freed up. After waiting, Han was contacted by an unidentified individual and was informed that the passage was open. So, they completed the distance to the above location.

11

° While Choi waited behind, Defendant, Kim Song San and Han Tae Kun took Park across the Yalu river into North Korea and turned her over to Director Ji and Yoon Chang Joo.

° After that, Defendant met Kim Song San, Park Kun Chun and others at his residence as identified above. He was told that Director Ji had sent four antique items that were to be used as expenses for their activities. There was one white celadon vase and three white ones. The items were sold at the Daewoo hotel antique shop in Yun Gil for $1500. Defendant kept $500, Kim Song San and Park Kun Chun each took $300, and Han Tae Kun, Choi Yong Chul, Nam Soo and Park Il Moon each took $100.

In this way Defendant was under the command of Director Ji and Yoon Chang Joo, members of an anti-South Korean government organization in the form of the North Korean security agency. Defendant also can be said to have collaborated with these anti-government forces and to have illegally travelled to their country. Defendant threatened the security of South Korea along with its government structure and its organization along democratic principles and he did this knowingly.

4. In early February 1999 at Defendant's residence as identified above, he was paid a visit by Kim Song San and Han Tae Kun. Through Kim and Han, Director Ji sent word that they were to abduct Suk Doo Ok, who in association with the South Korean Paek Sung Kook, was conducting anti-North Korean activities. Director Ji had already arranged for Suk to appear at the Kil Lim Sung Yong Jung Sam Hab Jin storage facility that night, so Defendant and others were to abduct him [Suk Doo Ok] when he [Suk Doo Ok] did so.

000065

° In the evening of the same day, Defendant met with Han Tae Kun, Kim Song San, Nam Soo, Choi Yong Chul and Park Il Moon to plan the abduction of Suk Doo Ok. They then went to storage facility at Kil Lim Sung Yong Jung Shi Sam Hab Jin in China. Some went in Choi's vehicle. Others went in that of another taxi driven by an unidentified individual. Once there, Han Tae Kun and Kim Song San waited in ambush near the entrance. Defendant, Park Il Moon, Nam Soo and others waited in the two vehicles parked near the facility and observed the movements of Suk. When he [Suk Doo Ok] appeared, Kim Song San and Han Tae Kun struck him and placed handcuffs on him. Then Han Tae Kun and Kim Song San placed him in the taxi.  They took him to the same area they previously used to cross the Yalu river and handed him over to Director Ji and Kim Sung Kook at the same place they had previously met. Director Ji told the men they performed well. He also warned them to go back and lay low and be cautious in the face of the search for Suk that would ensue. He told them to wait until he contacted them again.

° Not long afterwards, Kim Song San visited Defendant at his residence as specified above. Kim passed along Director Ji's new orders, informing them of Paek Sung Kook a South Korean security official who was said to be using the alias Paek Rhee Sa to engage in anti-North Korean activities in China. They were to 'arrest' him and take him to North Korea. According to Kim, Director Ji was able to ascertain that Paek Sung Kook and his girlfriend resided on the second floor in an apartment across from the 'Hotel Saeng Il' by torturing the recently captured Suk Doo Ok. As a result, Defendant met with Kim Song San, Han Tae Kun, Choi Yong Chul, Nam Soo, Park Il Moon and others to plan the kidnapping of Paek Sung Kook.

° Defendant, Kim Song San, Nam Soo, and Park Il Moon rented a van of the type used to transport cotton at a rental business near Yun Gil Shi in China and along with Choi's vehicle, divided themselves up and met Park Kun Chun and Han Tae Kun, at the "Yung Dung" Coffee

13

Shop near the residence of Paek Sung Kook as specified above. There they also were introduced to Ji Kwang Chul, and agent of the North Korean Security Agency out of the Ham Pook Division. They engaged in more specific planning to abduct Paek, age 48. In this way there was collusion between the Defendant, Han Tae Kun, Kim Song San, Park Kun Chun, Choi Yong Chul, Nam Soo, and Park Il Moon, with North Korean security agent Ji Kwang Chul.

° But, an unidentified North Korean agent ascertained that the entrance to Paek's residence was made of iron and would be difficult to break into. So, Han Tae Kun called Director Ji using his cell phone and informed him of this fact. Director Ji instructed them to retrieve a key to Paek's residence that captured Suk Doo Ok had stored at his house. Han Tae Kun and Choi Yong Chul in fact retrieved the key, but when they approached Paek's residence there were too many people nearby so the men waited.

° The same day around 18:00, Paek Sung Kook and an unidentified woman who appeared to be in her thirties emerged from the residence. They got into a taxi and were followed by the men, who divided themselves into two groups with one riding Choi's vehicle, and the other riding the 'cotton' van. On the way, Han Tae Kun called Director Ji using his cell phone at which time Director Ji indicated his belief that the woman was Paek's girlfriend. Director Ji further indicated that according to information he received from Suk, Paek was on his way to meet a fellow Korean who would be arriving from abroad at the Yun Gil airport. Director Ji instructed them to follow Paek to the airport and then when the opportunity arose, to abduct all three individuals - Paek, his girlfriend, and the individual arriving from South Korea. However, when Paek arrived at the airport, he boarded a plane and left China. The men returned to Defendants residence empty handed. However, in this way, they placed themselves under the command of Director Ji,

a North Korean Security official and engaged in the planning of the abduction of a South Korean citizen.

5. In early February 1999 Defendant was at his residence as identified above with Nam Soo, Park Il Moon, Choi Yong Chul and others when they were contacted by Kim Song San. They were instructed by him to come to the Shin Sung Beef Rib Restaurant in Kil Lim Sung Yong Jung Shi in China. Once there, they met with Han Tae Kun who was dressed in a Chinese security official uniform along with Park Kun Chun, North Korean agent Ji Kwang Chul, and two additional North Korean agents, Moon Ha Joon and Lee Sung Chul. They had dinner together during which they heard from Kim Song San that in January, a sergeant and a corporal in the North Korean Border Patrol had been arrested in North Korea by North Korean security officials and were being investigated for smuggling and other wrongdoings when they escaped to China while still in handcuffs. Although they tried to recapture them, the North Korean security agency had difficulty doing so. Kim Song San claimed that they sought his help and that as a result, he [Kim Song San] and Defendant should provide their assistance. Accordingly Kim said that they should go arrest the two North Korean soldiers who had been under Choi Yung Ho, a member of the „Chosun Ih Min Army‟ who had defected to South Korea. Efforts were made to determine Choi's whereabouts in South Korea through his mother-in-law who lived in Ham Pook Hwoe Ryung North Korea, named Lim In Sook. It was also thought there was a high probability that the two soldiers were hiding at the residence of Lim In Sook's younger sister, Lim Chang Sook who resided across the border in China. So, Kim Song San, Defendant and the others were given orders to 'arrest' the soldiers at Lim Chang Sook's house by Director Ji. Thereafter, Choi Yong Chul and Nam Soo were able to obtain the address of this Lim Chang Sook which was in fact in

15

China and was located at Kil Lim Sung Yong Joo Shi Ahn Min. So by planning the abduction of the two North Korean soldiers, Kim Song San, Park Kun Chun, Ji Kwang Chul, Moon Hwa Joon, Lee Sung Chul, Nam Soo, Choi Yong Chul, Park Il Moon and Defendant colluded with each other. That night, after they had dinner together at the above-mentioned Beef Rib Restaurant, they went to the house of Lim Chang Sook.

° Defendant had many friends inside the Kil Lim Sung Yong Jung Shi Security Department. For this reason, he was able to determine whether Chinese security officials were near or not.

° Choi Yong Chul parked his vehicle near Lim Chang Sook's house prepared to flee from the seen as soon as they were able to capture Lim Chang Sook.

° Nam Soo went up to the roof of the house and cut the phone lines as soon as the others entered.

° An unidentified North Korean security agent went over the wall and opened the main gate allowing Kim Song San, Park Kun Chun, Han Tae Kun, Ji Kwang Chul, Park Il Moon and another unidentified North Korean Security agent to enter the house. Inside, Ji Kwang Chul struck Lim's son so that he couldn't resist. They then searched for the two escaped North Korean soldiers, but could not find them. As they sought information concerning their whereabouts from Lim Chang Sook, her husband collapsed. This caused the men to fear that the situation would escalate and they decided to flee, returning to Defendants residence. Yet, in this way, Defendant placed himself under the authority of Director Ji and planned the abduction of two North Korean defectors.


6. Around the middle of February 1999, Defendant received a phone call from Kim Song San who was in North Korea in Ham Pook Hwoe Ryung. Kim told him there was something that needed to be taken care of and that he and Park Kun Chun needed to cross the Yalu river into

000069

China. He asked him to contact Choi Yong Chul to bring his vehicle. Choi in fact drove his

vehicle to the Defendant″s residence. Defendant then called an individual he was friendly with in

the Chinese Border Defense at Kil Lim Sung Yong Jung Shi Sam Hab Jin and arranged for Kim

Song San and Park Kun Chun to cross the Yalu river without being detected. The same day

around 19:00 Defendant and Choi Yong Chul took Choi's vehicle to the Yalu river near Kil Lim

Sung Yong Jung Shi Sam Hab Jin. There, they turned the headlights on and off as a signal to

Kim Song San and Park Kun Chun. When they [Kim Song San and Park Kun Chun] appeared

the four men returned to Defendants house. On the way, Kim Song San filled Defendant in on a

new incident in which a North Korean solider escaped to China with a pistol causing much

trouble in the Ham Pook Division of North Korea″s Security Agency. Kim said that unless he

was captured soon, there could be an incident and that Director Ji had ordered them to handle the

matter and to do so quickly. The soldier was believed to be hiding in a village near 'Moah'

mountain in China. As a result, Defendant held a meeting with Kim Song San, Park Kun Chun,

Ji Kwang Chul, Choi Yong Chul, Nam Soo, Park Il Moon and others where instruction was

given and planning was conducted concerning the capture of the Korean soldier in his twenties

and where said individuals colluded with each other in this matter. Then Defendant along with

Han Tae Kun, who was dressed as a Chinese security agent and who had rope, handcuffs and an

air gun and Kim Song San, Park Kun Chun, Nam Soo, Park Il Moon, and Choi Yong Chul took

Choi's and another vehicle to 'Moah' mountain. Once they arrived Defendant, Choi Yong Chul,

Nam Soo and Park Il Moon waited in Choi's vehicle. Kim Song San, Han Tae Kun, Park Kun

Chun, and Ji Kwang Chul approached the house where the North Korean solider was thought to

be hiding, broke the window and entered, tying the soldiers hands and feet with the rope. They

took him outside and placed him in Choi's vehicle. Nam Soo and Park Il Moon took a taxi back

000070

to Defendant´s residence. The Defendant contacted his friend in the Chinese border patrol and arranged for the undetected river crossing. And Defendant, Kim Song San and Park Kun Chun joined Choi Yong Chul in his vehicle and took him to the location at the Yalu river specified repeatedly above where they had crossed previously. Once they arrived, Defendant and Choi Yong Chul waited in the vehicle. Kim Song San and Park Kun Chun took the soldier across and turned him over to Director Ji. In this way Defendant placed himself under the authority of North Korean security official Director Ji, a member of an anti-South Korean government organization and engaged in the abduction of a North Korean defector.

7. In late February 1999 at the direction of Kim Song San, a meeting was held at Defendants residence by Kim Song San, Park Kun Chun, Han Tae Kun, Ji Kwang Chul, Park Il Moon, Nam Soo, Defendant and other unidentified individuals. There Kim Song San conveyed the orders of Director Ji to kidnap a woman named Ryang Cho Ok and four of her family members. They had escaped from North Korea to China in the area of Hok Ryong Kang Sung Hae Rim Shi Wa Ryong Hyang where many Chinese-Koreans resided. Ryang Cho Ok was a Japanese-Korean woman who married a North Korean and moved to North Korea. When her husband died in 1998, she took her daughter who was married, her grand-daughter, son and daughter-in-law and fled to China, hoping to return to Japan. According to what Kim Song San conveyed from Director Ji, the upper levels of the North Korean government, upon learning of her escape feared embarrassment were she to successfully re-enter Japan. So they issued urgent orders for her capture. In this way Defendant colluded with Kim Song San, Park Kun Chun, Han Tae Kun, Ji Kwang Chul, Park Il Moon, Nam Soo, Kim Yoon Kil, and Lee Hak Joo to abduct a Japanese citizen who had lived in North Korea and subsequently defected to China. A few days later

000071

Defendant, Kim Song San, Park Kun Chun, Han Tae Kun, Ji Kwang Chul, Park Il Moon, Nam

Soo, Kim Yoon Kil and Lee Hak Joo took a vehicle belonging to an unknown individual to the

bus station located at Hok Ryong Kang Sung Hae Rim Shi Wa Ryong Hyang So Jae in China.

There they met with Kim Yun Kil, an associate of Kim Song San who led them to the Chinese-

Korean community where Ryang Cho Ok and her family was thought to be hiding.

° Upon arriving, Kim Yun Kil and Defendant waited in the vehicle.

° Han Tae Kun dressed as a Chinese security official and the rest of the men entered the home

and subdued Ryang Cho Ok, her daughter, her son and her daughter-in-law placing them in

handcuffs and dragging them out to the vehicle.

° As they were heading to the border, Ryang, who mistakenly thought that she was being

arrested by Chinese security officials pleaded with them to release her and her family, informing

them that she was Japanese, but moved to North Korea and that rather than starve, she had

brought her family to China. They ignored her and took her to Kil Lim Sung Yong Jung Shi Sam

Hab Jin. Then Defendant, Nam Soo, Park Il Moon and some of the others took the vehicle to

Defendants'' residence. Han Tae Kun, Kim Song San, Park Kun Chun and Ji Kwang Chul took

Ryang Cho Ok and her family across the Yalu river to North Korea where they turned them over

to Director Ji who was waiting with a Jeep. In this way, Defendant placed himself under the

authority of Director Ji and Yoon Chang Joo, head of the Anti-Detection Department who were

members of an anti-South Korean government organization in the form of the North Korean

Security Agency and engaged in the planning and abduction of Ryang Cho Ok and her family.


8. In early March of 1999 Defendant received orders to kidnap a man named Hwang Yung Chan.

This occurred when Kim Song San paid him a visit at his residence having received instructions

from Director Ji. Hwang was about 68 years old at the time and was the vice chairman of an

unidentified government committee under Jung Moo Won of Pyung Yang Moh Rahn Bong.

Accordingly, he [Hwang Yung Chan] was a high ranking official and his capture was to take

priority over other matters - Defendant and his associates were to pour „one hundred percent‟

effort into it. Defendant prepared in advance for the abduction by meeting with Han Tae Kun,

Kim Song San, Ji Kwang Chul, Park Il Moon, and Choi Yong Chul to discuss the location and

method. The men also procured an air gun in anticipation of Hwang's resistance. In this way

defendant was in collusion with them as to the preparation to abduct Hwang Yung Chan.

° The next day, the men were led by Ji Kwang Chul to the residence of Hwang, an apartment

located at Kil Lim Sung Yong Jung Shi To San Ga in China. Once there Defendant, Nam Soo,

Choi Yong Chul and Park Il Moon waited in Choi's vehicle in order to block the road when

necessary. Han Tae Kun, Kim Song San, Park Kun Chun and Ji Kwang Chul waited in front of

the apartment building.

° At around 22:30, the men spotted Hwang with a Chinese friend returning to his apartment. Han

Tae Kun approached Hwang, pretending to be drunk and bumped into him. Then he quickly fired

the air gun three times at Hwang, subduing him. Kim Song San, Park Kun Chun and Ji Kwang

Chul blocked the mouth of Hwang and dragged him into Choi's vehicle.

° Then Kim Song San ordered Defendant, Nam Soo and Park Il Moon to return to Defendants

resident.

° The rest of the men took Hwang across the Yalu river to the same location as they had

previously used, turning him [Hwang] over to Director Ji, who was waiting on the other side. In

this way, Defendant placed himself under the authority of Director Ji, a member of an anti-South

Korean government organization as to the abduction of Hwang Yung Chan.

000073

9. In early March of 1999 Han Tae Kun paid Defendant a visit at his residence as identified above. Han informed him [Defendant] that previously he [Han] had captured a defector intending to return that individual to North Korea, but at the time the border was being guarded so he had kept him [the defector] in China. That individual had escaped back deeper into China. Using the code language they had developed he said that 'old man Ji' was aware of the situation and considered Defendant's residence to no longer be secure. Ji's instructions were to relocate. Accordingly, Defendant obtained an additional residence at Kil Lim Sung Yong Jung Shi Ahn Min Ga at the 'Myung Pool' Apartments on the first floor in unit number one, located behind the Labor Department. (Hereinafter "Labor Department Apartment") He was able to obtain the unit by paying the high amount of 300 renminbi per month and thereafter used it as a base of operations for himself and the other men. In the middle of March of that year, Kim Song San paid Defendant a visit at his new residence. Kim told Defendant that Han Tae Kun had notified 'old man Ji,' that Defendant had procured the new apartment. Hearing that there was now a secure location, Director Ji had conveyed orders through Han to arrest a woman by the name of Lim Ihn Sook and her family, also conveying two documents listing their names and addresses. He also gave Han pictures of the family members. As a result Defendant met with Han Tae Kun, Kim Song San, Park Kun Chun, Ji Kwang Chul, Choi Yung Chul, Nam Soo, Park Il Moon, Kim Yun Kil, Lee Hak Joo and other unidentified individuals for the purpose of planning the abduction of Lim Ihn Sook and her family and in this way was in collusion with them.

° Shortly afterwards, Kim Song San visited Defendant at his new residence again. He conveyed instructions from Director Ji that there was reason to believe that Lim Ihn Sook and her family were hiding near Kil Lim Sung Yong Jung Shi Tae Pyung Chon in China and that the men were

21

000074

to go find her. As a result, Defendant, Han Tae Kun, Kim Song San, Park Kun Chun, Nam Soo, Choi Yong Chul and Park Il Moon went to the area and searched, but were unable to find them.

° A few days later, Park Il Moon was able to obtain the phone number of Lim Ihn Sook's younger brother, Lim Yong Bum who was in his late forties. Then Nam Soo was able to determine the brother's address using the phone number through an individual at a government department. It was determined that he resided in Kil Lim Sung Yong Jung Shi in China.

° Then Defendant, Kim Song San, Park Kun Chun, Han Tae Kun, Ji Kwang Chul, Nam Soo and Choi Yong Chul went to the home of Lim Yong Bum. Once there Defendant,, Choi Yong Chul and Park Il Moon stayed on the look-out and prepared to capture him [Lim Yong Bum].

° Han Tae Kun, Kim Song San, Park Kun Chun, Ji Kwang Chul and other unidentified individuals entered Lim Yong Bum″s house. Although Lim was there, a search revealed that his sister and family were not.

° As a result, Ji Kwang Chul questioned Lim Yong Bum and obtained the information that a Chinese friend Choi Hwa Ja, a woman who was 41 years at the time had helped Lim Ihn Sook and her family to escape to another location. Then Park Il Moon used Choi Hwa Ja's license number to determine that she resided in Kil Lim Sung Ahn Do Hyun of China and along with the Defendant went to that area to find her [Choi Hwa Ja].

° In early April of the same year, the men determined that Choi Hwa Ja worked as a nurse at Kil Lim Sung Ahn Do Hyun Hospital. So Han Tae Kun, Ji Kwang Chul, Park Il Moon, Lee Hak Joo and other individuals followed Choi to her residence where they discovered that Lim In Sook and her family were hiding. They then planned for their capture by simulating the event.

° On the same day at 19:00 Nam Soo and Park Il Moon kept watch outside.

22

° Defendant, Han Tae Kun, Kim Song San, Park Kun Chun, Ji Kwang Chul and other unidentified individuals entered the house. Once inside Han Tae Kun grabbed Lim Ihn Sook, Ji Kwang Chul grabbed her husband Han Ihn Chan who was about 65 years old, Defendant grabbed Lim's daughter Jeon Sun Hee, Kim Yun Kil grabbed the second daughter whose name is unknown, Park Kun Chun grabbed the oldest son, Han Kwang Pil and Lee Hak Joo grabbed grandson Choi Choong Sung who was about 8 years old. They then forced them into the vehicle they had procured, which was waiting outside and took them to Kil Lim Sung Yong Jung Shi Sam Hab Jin. There, Jeon Yung Sam who had been waiting got in the vehicle and Lee Hak Joo led the way on a motorcycle to the banks of the Yalu river.

° The Defendant and Nam Soo took the above vehicle back to his residence.

° Han Tae Kun, Kim Song San, Park Kun Chun, Ji Kwang Chul, and Lee Hak Joo were led by Jeon Yung Sam and took Lim Ihn Sook and her family across the river to North Korea at Ham Pook Hwoe Ryung Shi Ihn Kye Ri to Director Ji and Yoon Chang Joo who were waiting. In this way, Defendant placed himself under the authority Director Ji and Yoon Chang Joo, members of an anti-South Korean government organization as to the abduction of six individuals including Lim Ihn Sook.


10. In early June of 1999 Defendant was visited by defector Kim Chang Rok, a man who was 34 years old from Hwoe Ryung, North Korea who he had come to know through Kim Song San. This occurred at his residence in Kil Lim Sung Yong Jung Shi Yong Moon Ka Yong Pyung Guh 3 Jo. While conversing with him, Defendant learned that Kim Chang Rok was a user of illegal narcotics. Shortly after, when Defendant was visited by Kim Song San, he protested, telling him [Kim Song San] that it was not right for him to bring drug users around his house because he had

000076

children. In mid-June of the same year, Kim Song San paid another visit to Defendant. He informed him that when he mentioned Kim Chang Rok to 'old man Ji' he was told that he had made off to China with one ton worth of food from a storage facility. Director Ji had ordered that they capture him. As a result, Defendant met with Han Tae Kun, Kim Song San, Park Kun Chun, Ji Kwang Chul, Choi Yong Chul, Park Il Moon, Nam Soo and others to discuss the planning of the capture of an individual [Kim Chang Rok] and in this manner was in collusion with them.

° Shortly after, an unknown agent phoned Kim Chang Rok and got him to agree to meet him at Kil Lim Sung Yong Jung Shi Sam Hab Jin in China to socialize. This agent followed through and met with Kim near the bus terminal at Kil Lim Sung Yong Jung Shi. Together they got in Choi Yong Chul's vehicle which Choi himself drove. Defendant was sitting next to him [Choi Yong Chul] and Nam Soo, Park Il Moon and Kim Chang Rok were in the back seat. On their way to Sam Hab Jin, Choi stopped the vehicle near the road while Defendant grabbed Kim Chang Rok's hair and struck him in the face several times. Nam Soo and Park Il Moon grabbed Kim's arms and legs and then tied him up with rope laying him on the floor of the vehicle. They then went to Sam Hab jin Nam Ho 1 Dae by the Yalu river and transferred him to Han Tae Kun, Park Kun Chun, Kim Song San, and Ji Kwang Chul.

° Then Defendant, Choi Yong Chul, Nam Soo and Park Il moon returned home.

° The others took Kim across the Yalu river to North Korea at Ham Pook Hwoe Ryung Shi Kang Ahn Dong and turned him over to Director Ji who was waiting there. In this way, Defendant placed himself under the authority of an anti-South Korean government organization member Director Ji as to the capture of North Korean defector Kim Chang Rok.

000077

11. In August of 1999 Defendant was visited at his residence by Park Kun Chun. Park conveyed to him that two months ago he had heard from his nephew-in-law Kim Chul, who was age 34 and a North Korean defector from Hwoe Ryung, about South Korean Reverend Kim Dong Shik. More specifically, he heard that Reverend Kim was giving instruction to North Korean defectors through a church at Yun Gil. Park said that when he visited North Korea and had told 'old man Ji,' about Reverend Kim, Director Ji said that one had to eliminate a force like that who prayed in a negative way in churches. Park told Defendant that he would convey Director Ji's orders to Kim Song San and Ji Kwang Chul and that he would find out from his nephew-in-law when Reverend Kim would travel to Yun Gil, China again. He also told Defendant that he required his strong assistance and support, adding that 'old man Ji' had said there would be a considerable monetary payment so they should make sure they succeeded. As a result, Defendant had his first meeting for the concerted planning of the capture of Revered Kim with Kim Song San, Park Kun Chun, Nam Soo, Ji Kwang Chul, Choi Yong Chul and others at his residence.

° The first plan involved Park Kun Chun ascertaining the next date and time that Reverend Kim would arrive in Kil Lim China from Kim Chul along with his lecture schedule. The Defendant was to handle the initial expense in the procurement of the various materials that the 'team of agents' would need. He was also to take care of bribing the Chinese border official so they would be able to take Reverend Kim to North Korea safely. Nam Soo's task was to procure a non-Korean speaking Taxi with its driver in order to transport Reverend Kim to the agreed upon transfer site. Choi Yong Chul was to have his vehicle ready at that transfer site so that Reverend Kim could be moved over.

° In late August of the same month the second meeting to plan the abduction of Reverend Kim was held. The individuals that participated were Defendant, Kim Song San, Ji Kwang Chul, Park

000078

Kun Chun, Choi Yong Chul, Park Il Moon, Nam Soo and potentially others. The location was at the 'Myung Joo' Tea House located at Kil Lim Sung Yun Kil Shi on the first floor of a seven floor apartment building, the exact address of which is unknown. They confirmed the plans from the first meeting and determined to carry through with them.

° In late December of the same year, the Defendant met with Kim Song San, Park Kun Chun, Park Il Moon, Nam Soo, Ji Kwang Chul, Choi Yong Chul and potentially others at his 'Labor Department Apartment.' There, Park Kun Chun said that he had been contacted by Kim Chul and had heard that Reverend Kim was to go to Yun Kil China in mid-January of the next year and deliver a sermon at the Yun Gil Shi Christian Church. The men once again confirmed that Defendant would put up the initial expenses for the equipment needed for the Reverend's capture and that he would make sure the border was safe and accessible. And on the day of the abduction, Nam Soo was to procure a taxi with a Chinese female driver, who did not know Korean. They would put Reverend Kim in that taxi and then move him to a gas station at the entrance to the highway heading to Yun Kil Yong Jung. There they were to move him over to Choi Yong Chul's vehicle. In this way they confirmed that they would execute what had been agreed upon at the first and second meetings. Then as they used the above apartment to wait for word as to when Reverend Kim would arrive, they got word from Park Kun Chun's nephew-in-law who had befriended a North Korean defector thought to be in his late 40's, by paying several visits to the "House of Love," that Reverend Kim had operated in Kil Lim Sung Yun Gil Shi in China.

° As a result, they learned that Reverend Kim would arrive in Kil Lim Sung Yun Gil Shi in China on January 15, 2000 and that on the following day he was to deliver a sermon at the Yun Kil Shi Christian Church.

000079

- On January 15, 2000, Defendant received a call from Park Kun Chun, who said that he would

treat him and the rest of the group to refreshments at the 'Myung Joo,' Tea House.

- That same day at around 15:00 Defendant arrived at this facility located at Kil Lim Sung Yun

Kil Shi Ha Nam Ga Chun Ji Ro in China.

- Kim Song San, Park Kun Chun, Park Il Moon, Nam Soo, Ji Kwang Chul, Choi Yong Chul and

potentially others were present.

- At this fourth meeting the group finalized their plans for the abduction of Reverend Kim and

reviewed it. Nam Soo had already arranged for the female Chinese taxi driver who had a red

vehicle known as a 'Sally,' or 'Sal Li,' car in China to be at the Yun Kil Shi Christian Church on

the morning of the 16th. The license plate is not known. Kim Song San, Ji Kwang Chul and Park

Kun Chun were to actually seize Reverend Kim while the Defendant and Choi Yong Chul

blocked the road and be on the lookout near the church, following Kim Song San's directions

when he was able to give them. The men planned to use the Chinese female's taxi because Choi

Yong Chul's vehicle was registered in Kil Lim Sung, China and would be easy to detect. They

would take the Reverend to the transfer site at the first gas station near the exit to the highway

heading in the direction of Yung Kil and Yong Jung. From there, the Defendant, Kim Song San,

Nam Soo and others would take him to North Korea. If the men failed to capture him at the

church, Kim Chul was to invite the Reverend to a restaurant or Tea House. Since they had also

heard that the Reverend had a lot of money, they agreed that they would share it among

themselves. In this way, they divided up the tasks, planned the specific details and once again

reconfirmed their plan. Together they also determined to go to a sauna named 'Hae Joo,' to spend

time together and further coordinate their efforts on that night. It was located near the church

where the Reverend was to deliver his sermon. In this way Defendant was in collusion with Kim Song San, Ji Kwang Chul, Park Kun Chun, Choi Yong Chul, Park Il Moon, and Nam Soo.

° On the 16th of the same month, Kim Song San, Park Kun Chun, Ji Kwang Chul, Choi Yong Chul, Park Il Moon, Nam Soo and Defendant emerged from the Hae Joo sauna at 07:00. When they arrived at the Yun Kil Shi Christian Church they took their positions. Kim Song San, Ji Kwang Chul and Park Kun Chun waited in front of the building. Defendant and Choi Yong Chul waited across the street in Choi's vehicle. The same day around 12:00 the men were unable to spot Reverend Kim as the roughly 200 members of the church exited at once. Defendant was called on his cell phone by Park Kun Chun who said to wait as there might be a delay. About 30 minutes later, Defendant heard again from Park Kun Chun who said that Reverend Kim and his party had left the church and was now at the 'Ye Rim Beef Restaurant.' Accordingly, Defendant was to head to the restaurant and wait.

° So, along with Choi Yong Chul he headed to the restaurant located at Kil Lim Sung Yun Kil Shi Sam Hwa Ga 51.

- When he got there, he waited on the North side of the building with Nam Soo.

- Park Kun Chun and Ji Kwang Chul waited near the entrance.

- Kim Song San got into Choi's vehicle and kept watch across the street.

- The female taxi driver was waiting near the restaurant.

° The same day around 14:00, Reverend Kim finished his meal and came out of the restaurant where he parted with Kim Chul, and an unidentified married couple who were North Korean defectors. He then got into the waiting 'Sally' taxi in the passenger's seat next to the Chinese driver. Before the car accelerated, Ji Kwang Chul got in through the

rear right door, while Kim Song San entered through the rear left door. The driver then took off. Then Park Kun Chun called the Defendant on his cell phone and told him that the 'job' had been finished and that he and the rest should follow to the designated gas station. So Defendant, Nam Soo, Park Il Moon and Choi Yong Chul took Choi's vehicle and went to that location.

° When he arrived, Defendant saw Revered Kim in the 'Sally' taxi with Kim Song San and Ji Kwang Chul inside and Park Kun Chun standing next to it. He called Park on his cell phone and said "We don't want the Chinese taxi driver to remember our faces. Send her off." Park told him that it would be okay as she didn't know Korean. So Choi pulled his vehicle next to the 'Sally' taxi and Kim Song San and Park Kun Chun quickly moved Reverend Kim into it. They then sent to taxi off.

° Park Kun Chun, Ji Kwang Chul and Park Il Moon remained behind to cover their tracks before returning home. In Choi's vehicle, the Defendant got into the seat next to the driver. In the back, Reverend Kim was placed in the middle, while Kim Song San was on his left side and Nam Soo was on his right. Although they went to the usual border transfer point at Kil Lim Sung Yong Jung Shi Sam Hab Jin Nam Ho 1 Dae, the border was not 'open' for crossing. So the men went to the Defendant's residence at Kil Lim Sung Yong Jung Shi Yong Moon Ka Yong Pyung Guh 3 Jo and waited while he called his man in the Chinese Border Patrol to arrange for the crossing.

° At around 15:00 on the same day, the Defendant, Kim Song San, Nam Soo and Choi Yong Chul took Reverend Kim in Choi's vehicle to the border crossing point. On the way, Reverend Kim asked, "Who are you men? I'm a patient. Just where is it that you are taking me?" Kim Song San told him in response, "If you just be still nothing will

000082

happen to you," calming him down. The men then examined his belongings, finding his Korean passport, a note pad with information on North Korean defectors, a wallet, a cell phone and medicine. They also called Director Ji on this phone, receiving instructions from him to place Reverend Kim in handcuffs so that he would look 'proper.'

° At around 16:30 they arrived at the transfer point located at Kil Lim Sung Yong Jung Shi Sam Hab Jin Nam Ho 1 Dae. They placed Reverend Kim in handcuffs and went over his belongings one more time. In the meantime, the Defendant and Choi Yong Chul waited in Choi's vehicle. Kim Song San and Nam Soo each held one of the arms of Reverend Kim and crossed the Yalu river, which took about ten minutes. Across the border in North Korea at Ham Pook Hwoe Ryung Shi Kang Ahn Dong, they transferred the reverend to Director Ji and Kim Sung Kook. They then returned to China and took Choi's vehicle to return home.

In this way, Defendant placed himself under the authority of Director Ji, a member of an anti-government organization as to the abduction of South Korean Reverend Kim Dong Shik.


**EVIDENCE USED**

1. The transcript of Defendant"s testimony from the 1st Court Decree Material
1. Defendant"s Legal Statements
1. The Legal Statements of Han Tae Kun
1. The Prosecutor"s Interrogatories directed at Defendant
1. The Legal Statements of Choi Ki Chul and Jung Kwang Il taken by the Police
1. The On-Site Report (Including the transcript of Paek Sung Kuk"s testimony, the contents of the wallet in former Ham Pook Division of North Korea"s Security Agency agent Han Tae Kun"s possession, the positive identification of Ham Pook Division Anti-detection unit head, Yoon Chang Joo and confirmation of the activity of agents against the South, the positive identification of the Koksan Factory location of the Ham Pook Division Director Ji Young Soo and confirmation of the anti-South activities of his agents, the

000083

positive identification of Ham Pook Division agent Kim Song San, the positive
identification of Ham Pook Division agent Choi Yong Chul, the positive identification of
Reverend Kim and confirmation of the reporting of his abduction, and the positive
identification of the location used by the North Korean security agents at Yong Jung)


## APPLICATION OF THE STATUTE

1.  Provisions that Apply to the Facts of the Crime

National Security Law Article 8 Section 1, Criminal Law Article 30 (As to the Meetings) ,
National Security Law Article 4 Section 1 Number 4, Criminal Law Article 30 (As to Acting
in Furtherance of the Crime of Abduction), National Security Law Article 6 Section 2,
Criminal Law Article 30 (As to Fleeing), National Security Law Article 4 Section 3, Section
1 Number 4, Criminal Law Article 30 (Acting in Furtherance of the Crime of Preparing to
Abduct)


1.  Choosing Only the Most Serious Offense

 Criminal Law Article 40, Article 50 [As to Section 3 between the National Security Law

Violation as to Acting in Furtherance of a Crime against Park Poon Ok and National Security

Law (infiltration, fleeing) the former is chosen as applicable. As to Section 5, the Violation

of National Security Law as to Acting in Furtherance of a Crime as to the to North Korean

defector soldiers, the crime against the higher ranking sergeant is chosen as applicable. As to

Section 7, the Violation of the National Security Law regarding Acting in Furtherance of a

Crime as to Ryang Cho Ok and her four (4) family members, the crime against Ryang herself

is chosen as being applicable. As to Section 9, the Violation of National Security Law

regarding Acting in Furtherance of as to Lim Ihn Sook and her 5 family members, the one

against Lim herself is chosen.


1   Choosing the Sentence

31

Defendant is found to have violated the National Security Law regarding Acting in

Furtherance of a Crime

1. Adding the Applicable Offenses

   Criminal Law Article 37, Article 38 Section 1 Number 2, Article 50

1. Subtraction of Sentence for Time Served

   Criminal Law Article 57

**EXPLANATION OF THE DURATION OF THE SENTENCE**

Defendant followed the orders of North Korean agents and abducted South Korean,

Reverend Kim Dong Shik who supported North Korean defectors in China and North Korean

defectors themselves. In turning them over to North Korea, even though he knew that in a worst

case scenario that they could be shot and otherwise severely punished, he only considered the

monetary gain to be had by performing the acts and his smuggling activities. That is how he

arrived at committing these crimes. The „Song San Team" (named after North Korean agent Kim

Song San) that Defendant participated in engaged in premeditated and careful planning such as

blocking off roads and using violence to subdue individuals. They abducted North Korean

defectors in a highly organized manner. Defendant fell under the influence of Director Ji even

participating in the abduction of other Chinese-Koreans and he allowed his residence to be used

by the „Song San Team" as their base of operations for the abductions. So among the Chinese-

Koreans, he played a leading role. The reason he ceased such activities was not due to his

conscience or feelings of guilt, but rather because he heard that he was being investigated by the

Chinese Security Agency and by fleeing to North Korea and to South Korea. As a Chinese-

000085

Korean and as a Chinese citizen, it might be thought that Defendants awareness of the National Security Law of our country may not be strong. However, he abducted those who tried to escape a destitute life or sought freedom from North Korea as defectors and he did so by force. And in the case of Reverend Kim, he clearly knew that he was a South Korean, and yet he abducted him and handed him over to North Korea. So at a minimum, he had a clear understanding that he was depriving individuals of their personal freedom and rights. Over the course of one year, he was involved in the successful abductions of 15 North Korean defectors and one South Korean. He was also involved in the preparation and attempted abduction of two additional North Koreans and in the preparation for the abduction of one South Korean. In this way over a long period of time he engaged in many crimes. Those individuals have likely been severaly harmed in North Korean, and in the case of Reverend Kim, there is hearsay that he is deceased with no way of confirming whether it is true or not.

Accordingly, given the above and taking into account the fact that Defendant was born in the socialist country of China which resembles North Korea and was raised there as well as the fact that his awareness of the National Security Law was likely low and also his current repentance we issue the sentence as indicated in the ORDER section of this Decision.


Chief Justice          Justice          Lee Ki Taek


                       Justice          Kang Ji Hyun


                       Justice          Kwak Yoon Kyung

000086

# 서 울 중 앙 지 방 법 원

## 제 2 3 형 사 부

### 판            결

| | |
|---|---|
| 사       건 | 2005고합43  가. 국가보안법위반(목적수행) |
| | 나. 국가보안법위반(잠입·탈출) |
| | 다. 국가보안법위반(회합·통신등) |
| 피  고  인 | 류영화 (劉永華, LIU YONG HUA, 1969. 4. 30.생),  노동 |
| | 주거  서울 관악구 신림4동 516-6 |
| | 국적  중국 |
| 검       사 | 정점석, 전우정 |
| 변  호  인 | 변호사 함종길(국선) |
| 판 결 선 고 | 2005. 4. 21. |

### 주        문

피고인을 징역 10년에 처한다.

이 판결 선고 전의 구금일수 133일을 위 형에 산입한다.

### 이        유

**범 죄 사 실**

- 1 -

피고인은 1969. 4. 30. 중국 길림성(吉林省) 용정시(龍井市) 용문가(龍門街) 용풍거(龍風居) 3조(組)에서 당시 농업에 종사하던 부 류창수(67세)와 모 김금숙(64세)의 2남 2녀 중 2남으로 출생하여 의류판매업에 종사하다가 1992년경부터 함북 회령시 인근 국경지대를 통해 북한을 왕래하면서 북한산 송이버섯 등 농수산물 및 골동품 등을 구입하여 중국 연길(延吉)·용정 등지의 시장에 판매하고 중국산 의류를 함북 회령시 장마당 등에 판매하는 밀무역에 종사하다가 북한 국가안전보위부 산하 함북 회령시 안전보위부 외사과 지도원으로 근무하던 지영수를 알고 지내던 중, 1998년 7월경 당시 함북 회령시 곡산공장 보위부장으로 활동하던 지영수에게 포섭된 후 그가 제공하는 자금 등으로 아파트를 구입하여 위 곡산공장 보위부 소속 공작원들의 근거지로 제공하는 한편 지영수의 지령을 받고 중국 동북3성(吉林省, 遼寧省, 黑龍江省) 지역에서 반북활동을 하던 탈북자 등을 납치하여 지영수 등에게 인계하는 등의 활동을 하다가 2000. 1. 16. 한국인 김동식 목사를 납치한 후 중국 길림성 용정시 공안국 외사과 운전기사로 근무하던 이모부 시정도로부터 중국 길림성 용정시 공안국에서 김동식 목사 납치 사건 주도혐의로 피고인 및 함북 보위부 소속 공작원 김송산(39세) 등을 수배하고 있다는 연락을 받고, 김송산 등과 함께 두만강을 건너 함북 회령시 역전동 소재 김송산의 집 등에서 4개월 동안 숨어 지내다가 중국으로 귀환한 후 같은 해 7월경 중국 북해시(北海市)로 이동하는 등 도피생활을 계속하던 중, 먼저 국내에 들어온 처 리영춘(2001년 3월 입국)으로부터 한국으로 들어오라는 연락을 받고 2001. 7. 9. 단기상용비자(30일)를 발급받아 국내에 입국하여 식당종업원, 건설공사현장 노동자 및 서울 강남구 논현동 소재 룸살롱의 종업원으로 종사하는 등 불법체류하다가 2003. 10. 25. 법무부로부터 체류허가(2회에 걸쳐 기간연장허가를 받아 2005. 5. 9.까지 체류 가능)를 받아 서울 관악구 신림동에

서 처와 함께 거주하고 있는 자인바,

북한공산집단은 정부를 잠칭하고 국가를 변란할 목적으로 불법조직된 반국가단체로서 대남적화통일을 기본목표로 설정하고, 남한사회는 미 제국주의에 종속된 식민지로서 모든 인민이 수탈당하고 있다고 주장하면서, 자주적 통일과 인민해방을 위해서는 미 제국주의 침략자들과 남한 정권을 타도함으로써 민족해방인민민주주의혁명을 이룩하여야 한다는 전략 아래, 이를 위하여 남한의 노동자·농민 등 피지배계급을 축으로 하여 청년학생·지식인·중소상인 등 모든 애국적 역량을 망라한 반미 구국통일전선을 구축하고, 폭력·비폭력, 합법·반합법 등의 모든 수단을 동원하여 반미·반파쇼투쟁을 전개하여야 한다고 선전·선동하는 한편, 유일한 통일방안으로 이른바 "고려연방제"를 주장하면서 그 선결조건으로 남한 정권 퇴진, 국가보안법 철폐, 북한과 미국 간의 평화 협정 체결, 주한미군 철수 등을 내세우고 있는 이외에 제3국의 공작거점 및 해외 반한 교민단체를 전위조직으로 하여 위장평화공세를 전개함과 아울러 국내 반정부 인사 및 운동권 학생을 입북시켜 연공통일전선을 구축하고자 획책하고 있을 뿐 아니라 1990년대 중반 이후 소위 "고난의 행군"시기에 경제난을 견디지 못한 북한주민들이 중국 등지로 탈출할 뿐 아니라 일부 탈북자들이 중국 동북3성 지역에서 반북·반김정일활동을 전개하자 국가안전보위부 산하 공작원들을 이용하여 위와 같은 탈북자들과 이들을 지원하는 한국인들을 납치하여 오고 있다는 사실,

북한의 국가안전보위부는 반당·반국가 음모 및 기도자 색출·적발, 간첩·불순적대분 자 색출업무를 담당하는 부서로서 각 도, 시·군에 지역보위부를 두고 있고, 함북 안전 보위부는 도내 소재 도급기관(道級機關)에 대한 정보사업, 도내 시·군 보위부 및 연합 기업소 보위부에 대한 지도사업 등의 업무를 담당하는 한편, 반탐정처장 윤창주의 지

000089

령을 받은 조직원들이 중국에서 반당·반국가활동을 하는 탈북자 등을 납치하는 활동을 전개하고 있으며, 함북 회령시 곡산공장 안전보위부는 함북 안전보위부 소속 연합기업소 단위 보위부로서 곡산공장 내 반당·반국가활동 정보 수집을 주된 업무로 하면서 국경지역인 함북 회령시에서의 탈북주민 감시 및 인접 중국지역에서 반당·반국가활동을 하는 탈북자 등을 납치하는 활동을 전개하고 있다는 사실,

윤정수는 함북 국가안전보위부 반탐정처장으로서 중국에서 반당·반국가활동을 전개하는 탈북자 등을 납치하는 업무를 수행하는 자, 지영수는 함북 회령시 곡산공장 안전보위부장으로서 위와 같은 업무를 수행하는 자로서 각 반국가단체인 북한공산집단의 구성원이라는 사실을 각 알고 있음에도 불구하고

1. 1997년 11월 일자불상경 그 동안 협조관계를 맺어오면서 피고인의 밀무역을 지원해 오던 조선인민군 보위사령부 소속 성명미상 지도원이 함북 나진지역으로 전보되어 보위사를 통한 송이버섯 밀수가 어렵다고 판단하여, 평소 알고 지내던 북한인 김송산과 밀무역 방법을 궁리해 오다가, 1998년 1월 초순경 김송산으로부터 "중국 길림성 용정시 삼합진(三合鎭)에 사는 전영삼이도 지부장(지영수를 지칭함)의 도움으로 밀무역을 하고 있다. 지금 함북 회령시에서는 지부장의 힘이 막강하다. 그래서 나도 지부장의 도움으로 이렇게 빨리 풀려 나오지 않았느냐. 너도 이제 보위사 선이 끊어졌으니 지부장을 찾아가서 정식으로 도움을 요청해 보는 것이 어떻겠느냐"라는 말을 듣고 지영수가 회령 등 함북 지역에서 상당한 영향력을 갖고 있는 실력자이므로 그의 도움을 받는다면 다시 밀무역이 가능해 질 것으로 확신하고, 그 무렵부터 지영수와 그 전부터 맺어오던 관계를 뛰어넘어 더욱 밀접한 관계를 맺기 위한 기회를 모색해 오던 중,

- 4 -

000090

○ 1998년 7월 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 피고인의 주거지를 방문한 김송산으로부터 "지난번에도 내가 이야기했지만 중국 길림성 용정시 삼합진에 사는 전영삼도 지부장의 승인을 받아 활동하면서 송이버섯을 넘긴다고 하니 너도 한번 지부장을 찾아가서 도와 달라고 해 봐라"는 말을 듣고, 그 직후 함북 회령시 덕흥리 소재 회령시 곡산공장 보위부를 방문하여 정문 면회실에서 김송산이 가르쳐 준 대로 "김송산" 명의로 면회를 신청하고 지영수의 사무실로 들어가 피고인의 근황을 묻는 지영수에게 "송이를 좀 모아두었는데 가지고 나가지 못해 걱정입니다. 지난번에도 말씀드렸지만, 부장님이 송 나가는 것(밀수)을 좀 도와주었으면 합니다."라고 부탁하자 지영수로부터 "송이 나가는 문제는 차차 만나 생각하기로 하고, 중국에서 공화국 체제 붕괴활동을 하는 남조선 안기부 요원들의 이름, 연락처 및 그들의 동향을 파악하여 나에게 알려 달라"는 지시를 받고 "알겠습니다. 제가 알아봐 드리겠으니 앞으로 송이 밀수를 할 수 있도록 좀 도와 주십시오."라고 답변하였으나 그 이후에도 지영수로부터 아무런 답변이나 조치가 없어 모아둔 송이를 반출하지 못하고 있던 중,

○ 같은 해 8월 일자불상경 김송산과 함께 함북 회령시 곡산공장 보위부장실을 다시 방문하여 지영수를 만나, 그에게 "저도 김송산이나 전영삼처럼 부장님의 승인을 받아 활동하면서 송이장사를 하고 싶습니다. 좀 도와주십시오."라고 부탁하여, 지영수로부터 "내가 너를 도와주는 대신 너도 나를 도와주어야 하는데 도와줄 수 있겠느냐"라는 제의를 받고 "송이 밀무역만 도와주신다면 부장님이 시키는 일은 무엇이든지 열심히 하겠습니다."라고 답변하고, 이어서 지영수로부터 "그러면 내가 너의 장사를 방조하는 대신 너는 송산이와 근춘(박근춘을 지칭, 함북 회령 출신 탈북자)

- 5 -

이를 도와 중국지역에 숨어있는 조국을 반변(反變, 배신)한 탈북자 및 남조선 정보

기관 요원들을 잡아서 북송시켜라. 송산이와 근춘이는 중국 사정을 잘 모르니까 중

국에서 작업(납치공작을 지칭)은 네가 주도하고 그들이 중국에서 작업할 때 너의

집을 아지트로 이용하도록 해라. 중국에서 너의 일을 방조할 사람을 몇 명 물색하

고, 변방지역 통로를 여는 문제를 잘 해결하라. 그리고 작업을 하면서 들은 사항이

나 알고 있는 내용을 절대 너의 가족이나 다른 사람에게 이야기하지 말고 비밀을

잘 유지하라"는 지시를 받고, "비밀을 잘 지키겠습니다. 친구들을 동원하는 문제는

걱정할 것 없습니다. 용정 태평촌에서 같이 자란 송아지 친구(고향 친구)들이 있으

니 그들을 동원하여 일을 시키면 잘 할 것입니다"는 등의 내용으로 답변하여, 피고

인도 김송산, 박근춘 등과 함께 지영수의 지령을 받아 활동하는 공작원이 되기로

결심하고, 향후 연락관계를 유지하기 위해 지영수에게 피고인의 휴대전화번호 및

주거지 전화번호를 알려주고 지영수의 휴대전화번호를 받아 피고인의 휴대전화에

저장하고,

○   그 직후부터 송이 철(매년 8~10월)이 끝날 때까지 지영수의 차량지원 등 도움으로

김송산 등과 함께 20여회에 걸쳐 함북 남양시 교두(橋頭)지역을 통해 송이버섯을

밀반출한 후 중국 용정지역에서 판매하여 인민폐 3만 원 가량(韓貨 450만 원 상당)

의 수입을 올리던 중 그 무렵 김송산을 통해 함북 보위부 반탐공작원으로 활동하

던 한태근(34세, 가명 이춘길 또는 김춘길, 2003년 1월 귀순한 탈북자)을 소개받고

○   1998년 12월 일자불상경 위 피고인의 주거지를 방문한 함경도 보위부 소속 공작원

김송산, 박근춘 등을 만나, 김송산으로부터 "우리가 지영수 부장의 지시로 탈북자

작업(납치)을 해야하는데 중국을 잘 모르니까 도와 달라. 탈북자 작업을 하려면 어

000092

러 사람이 필요하니 믿을 만한 친구들을 조용히 좀 소집하라."는 지영수의 지령을
전달받고, 김송산, 박근춘에게 "알겠다. 용정에는 나와 마음이 맞는 친구들이 몇 명
있는데 모아보겠다."라고 답변한 후

○ 그 시경부터 지영수의 지시에 따라 중국 길림성 용정시 태평촌에서 출생하여 함께
자란 친한 친구인 최용철(35세, 가명 리용철 또는 류용철), 남수(35세), 박일문(36세,
가명 리일문) 등을 차례로 만나, 그들에게 "내가 함북 회령시 곡산광장 보위부장
지영수의 일을 하면서 송이버섯 장사를 하고 있는데 앞으로도 지부장의 도움을 받
아 돈을 좀 벌어야 하니 너희들이 도와 달라. 내가 장사를 해서 많은 돈을 벌면 너
희들을 도와 줄 테니 우리 모두 힘을 합쳐 잘 살아 보자. 우리가 해야 할 일은 송
산이나 근춘이를 통해 지영수 부장의 지시를 받아 탈북자를 체포하여 북송하는 일
인데 그렇게 어렵지는 않을 것이다." 등의 말을 하면서 최용철, 남수, 박일문 등을
설득하였으나, 최용철이 "이런 일을 해도 되는가"라며 비협조적인 태도를 보이자
그들에게 식사와 술을 대접하여 최용철 등으로부터 승락을 받고, 김송산, 박근춘
등이 지영수의 지령에 따라 추진 중인 탈북자 납치공작조(일명 송산조)에 끌어들이
고,

○ 그 무렵 김송산, 박근춘 등의 지시로 최용철, 남수, 박일문 등과 함께 중국 연길시
"서시장" 인근 "북두노래방" 및 길림성 용정시 내 미식가(美食街)에 위치한 "신성
소갈비식당" 등지에서 모임을 갖고 함께 술을 마시면서 김송산, 박근춘 등을 합류
시켜 상호 인사하는 자리에서, 김송산으로부터 "너희들(최용철, 남수, 박일문 등 지
칭)이 우리 일에 합류하게 되어 고맙다. 우리 일은 은밀하게 이루어져야 하며 너희
들 가족이나 누구도 알아서는 안된다. 그러기 위해서는 다른 사람들이 모르게 우리

- 7 -

끼리 사용할 수 있는 말을 정해야 한다. 납치한다는 것은 '작업한다'라고 하고, 상

호 호칭은 지영수 부장은 '지영감', 김송산은 '김광수', 박근춘은 '거시', 영화는 아

들 이름을 따서 '경훈', 최용철은 '리용철', 박일문은 '리일문' 등으로 하고 남수는

그대로 '남수'로 부르기로 하자"는 등 김송산, 박근춘으로부터 친구인 최용철, 남수,

박일문 등을 납치공작조에 끌어들인 것에 대한 격려 및 최용철 등에 대한 환영회

를 개최하면서 은밀한 납치 공작 수행에 필요한 음어를 상호 약성하는 등

국가의 존립·안전이나 자유민주적 기본질서를 위태롭게 한다는 정을 알면서 반국가

단체 구성원인 지영수와 회합하고

2. 1999년 1월 중순 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의

주거지를 방문한 김송산, 한태근 등을 만나, 그들로부터 "지영감의 지시로 남조선

안기부 요원과 손잡고 반공화국 책동을 벌이는 탈북자 류영범을 잡아서 보내야 한

다."는 지영수의 지령을 전달받고, 김송산, 한태근, 남수, 박일문, 최용철 등과 함께

류영범 납치를 위한 보임을 갖고,

   ○ 최용철은 택시영업을 할 때 사용하는 산타나 차량을 운전하고

   ○ 김송산과 한태근은 중국 공안 복장을 하고 최용철의 차량을 타고 이동하고

   ○ 피고인, 남수, 박일문은 함께 류영범을 미행하여 따라 간다

는 등으로 탈북자 류영범(남, 57세, 일명 류근, 본명 류영찬)을 납치하기 위한 사전

계획을 수립하는 등 한태근, 김송산(이상 북한인), 최용철, 남수, 박일문, 전영삼, 이

학주(이상 조선족)와 공모하여

   ○ 같은 달 하순 일자불상경 피고인의 주거지에서 한태근의 지시를 받은 성명불상

     의 북한인이 류영범에게 전화로 "북조선 자료를 가지고 왔으니까 돈을 가지고

- 8 -

중국 길림성 용정시 삼합진 북흥 5대 ○○○의 집으로 오라"고 말하고, 중국 공안 복장을 한 한태근을 비롯하여 김송산, 남수, 박일문 등과 함께 최용철의 차량으로 용정에서 삼합진으로 가는 버스터미널에 도착하여 그곳에서 류영범이 나타나기를 기다리던 중 류영범이 삼합진행 버스를 타는 장면을 목격하고 피고인과 남수, 박일문은 류영범이 탑승한 버스에 동승하여 동인을 감시하고, 한태근과 김송산은 최용철이 운전하는 위 승용차에 탑승하여 중국 길림성 용정시 삼합진 북흥 5대에 먼저 도착해 류영범이 탄 버스가 오기를 기다리며 대기하던 중,

○ 같은 날 12:30경 위 북흥 5대에서 도착한 류영범이 버스에서 내리자 피고인, 남수, 박일문도 버스에서 내려 류영범을 뒤따라가면서 감시하고, 한태근은 골목길에서 류영범을 막아 도주로를 차단하고, 김송산은 골목길에서 류영범을 저항하지 못하도록 주먹 등으로 때리고, 한태근은 준비해 간 수갑을 채워 최용철의 승용차에 강제로 태우고,

○ 피고인과 남수는 그곳에서 주거지로 복귀하고, 한태근, 박일문, 김송산은 최용철의 승용차에 동승하고, 한태근의 지시를 받고 미리 대기하고 있던 전영삼, 이학수는 오토바이를 타고 강폭이 좁고 수심이 얕아 북한지역으로 도강하기 쉬운 길림성 용정시 삼합진 남호 1대로 이동한 후

○ 김송산, 한태근은 류영범을 끌고 두만강을 도강하여 맞은 편 함북 회령시 강안동 강변으로 가 그곳에서 미리 대기하던 지영수 및 곡산공장 보위부지도원 김성국에게 류영범을 인계하는 등

반국가단체 구성원인 지영수의 지령을 받고 그 목적수행을 위하여 탈북한 북한인

- 9 -

류영범을 약취하고

3. 1999년 2월 초순 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의 주거지에서 김송산과 함께 대기하던 중 윤창주와 지영수를 만나고 돌아온 한태근으로부터 "지영수 부장이 지난번 잡아간 류영범의 하부망으로 반북활동을 하고 있는 박분옥이 중국 안도현에 있는데 비밀리 은신처를 확인한 후 잡아오라고 지시하였다."는 등 내용의 윤창주, 지영수의 지령을 전달받고, 그 무렵 피고인의 주거지에서 김송산, 한태근, 박근춘, 최용철과 함께 모임을 갖고

   ○ 김송산과 관계를 맺고 있는 사람이 중국 안도현에 살고 있어 박분옥이 숨어 있는 집을 찾는 데는 문제가 없을 것 같으니 김송산은 중국 안도현 소재 박분옥의 은신처를 빨리 확인한다

   ○ 다른 사람들은 이곳에 대기하다가 박분옥의 은신처가 확인되면 최용철의 차량으로 이동한다

   ○ 한태근은 동네 사람들로부터 의심을 받지 않도록 공안 복장을 하고 간다

   는 등으로 탈북자 박분옥(여, 49세 가량)을 납치하기 위한 사전계획을 수립하는 등 한태근, 김송산, 최용철과 공모하여

   ○ 같은 달 초순 일자불상경 중국 공안 복장을 입은 한태근, 김송산과 함께 최용철이 운전하는 산타나 승용차에 탑승하여 박분옥의 은신처로 확인된 중국 길림성 안도현(安圖縣)으로 이동하여 박분옥이 집 안에 혼자 있는 것을 확인하고

   ○ 최용철은 위 차량에서 대기하고, 피고인, 한태근, 김송산은 함께 박분옥의 주거지 담장을 뛰어 넘어 들어가 현관 유리창을 깨고 시정 장치를 제거한 후 방 안으로 들어가 한태근이 박분옥의 손목에 미리 준비한 수갑을 채운 후 끌고 나와

000096

최용철의 승용차에 강제로 태운 후 중국 길림성 용정시 삼합진으로 이동하다가

한태근이 "변방 통로가 열리지 않았으니 연락이 올 때까지 기다려라"고 하여

그 곳에서 대기하던 중 한태근이 성명불상자로부터 변방 통로가 열렸다는 연락

을 받고 중국 길림성 용정시 삼합진 남호 1대로 이동하고,

○ 최용철은 그곳에서 대기하고, 피고인, 김송산, 한태근은 박분옥을 데리고 두만

강을 건너 함북 회령시 강안동 강변에서 대기하고 있던 윤창주, 지영수에게 동

인을 인계하고,

○ 그 직후 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의 주거지를 방문

한 김송산, 박근춘 등을 만나, 그들로부터 "지영수 부장이 활동경비로 사용하라

면서 골동품 4점(백자 3점, 청자 1점)을 주어 받아왔다."고 하면서 건네주는 골

동품 4점을 받아 연길 대우호텔(大宇飯店)에서 성명불상의 한국인 골동품상에

게 이를 판매하여 그 대금 미화 1,500달러 중 500달러는 피고인이 가지고, 김송

산과 박근춘에게 각 300달러, 한태근, 최용철, 남수, 박일문에게 각 100달러를

나누어 주는 등

반국가단체 구성원인 윤창주, 지영수로부터 지령을 받고 그 목적수행을 위하여 탈

북한 북한인 박분옥을 약취하고, 반국가단체 구성원의 지령을 받고 반국가단체 지

배지역으로 탈출하고, 국가의 존립·안전이나 자유민주적 기본질서를 위태롭게 한

다는 정을 알면서 반국가단체 구성원인 윤창주, 지영수와 회합하고

4. 1999년 2월 초순 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의

주거지에서 김송산, 한태근 등으로부터 "지영수 부장이 남조선 사람(한국인 백승국

지칭)들과 연계하여 반북활동을 하던 조선족 석두옥을 오늘 밤에 중국 길림성 용정

000097

시 삼합진 양식창고 앞으로 나오도록 유인해 놓았으니 잡아오라고 지시하였다."는

등의 내용의 지영수의 지령을 전달받고,

○ 같은 날 저녁 한태근, 김송산, 남수, 최용철, 박일문 등과 함께 석두옥 납치계획

을 모의한 후, 공작조원들이 최용철이 운전하는 산타나 승용차와 성명불상자가

운전하는 택시에 나누어 타고 중국 길림성 용정시 삼합진 양식창고로 이동하여

한태근, 김송산은 양식창고 경비실에 잠복하고, 피고인, 박일문, 남수 등은 양식

창고 인근에서 위 차량 및 택시에 분승하여 석두옥의 출현 여부를 감시하던 중,

석두옥이 택시를 타고 양식창고에 나타나자, 김송산, 한태근은 택시에서 내리는

석두옥을 때려 제압한 후 양손에 수갑을 채워 붙잡고, 한태근, 김송산은 미리

준비한 택시에 석두옥을 강제로 태워 길림성 용정시 삼합진 남호 1대로 이동하

여 두만강을 건너 맞은편 함북 회령시 강안동에 미리 와 기다리던 지영수와 김

성국에게 인계하고, 지영수로부터 "고생하였다. 중국에서 사람이 없어졌다고 시

끄러울지 모르니 빨리 돌아가서 조심하고 있으면 다시 연락하겠다"는 지령을

받고, 피고인의 주거지로 복귀하여 대기하던 중,

○ 그 직후 중국 길림성 용정시 용문가 용흥거 3조 소재 피고인의 주거지를 방문한

김송산으로부터 "남조선 괴뢰 안기부 백승국이란 놈이 "백리사"(백승국 지칭)라

는 신분으로 위장, 반공화국 책동을 벌이고 있으니 체포해 오라. 지난번에 잡아

갔던 석두옥을 죽였더니 백리사와 그의 애인이 연길 생일호텔 맞은편 아파트 2

층에 살고 있다는 것을 확인했는데 그 놈을 잡아야겠다."는 등 내용의 지영수의

지령을 전달받고, 김송산, 한태근, 최용철, 남수, 박일문 등과 모임을 가진 후

○ 피고인, 김송산, 남수, 박일문은 피고인이 중국 연길시 기차역 인근에 위치한 차

- 12 -

량임대업체에서 빌린 면포차량(faqa, 승합차의 일종)과 최용철이 운전하는 산티나 승용차에 나누어 타고 중국 연길시 소재 "서시장" 인근에 위치한 백승국의 아파트 부근 "영등포다방"에 도착하여 그곳에서 미리 와 대기하던 박근춘, 한태근을 만난 후 함께 나온 함북 보위부 소속 공작원 지광철(가명 지송철)을 소개받고 한국인 백승국(48세, 회사원)을 납치하기 위한 사전계획을 수립하는 등 한태근, 김송산, 박근춘, 지광철, 최용철, 남수, 박일문과 공모하여

○ 그 직후 북한 출신의 공작원 1명이 백승국의 주거지를 찾아가 동태를 살피다가 출입문이 철문으로 되어 있어 침입할 수 없다는 사실을 확인하고, 한태근은 휴대전화를 이용하여 이를 지영수에게 보고하고, 그로부터 "석두옥이 보관하고 있는 백리사의 집 열쇠를 받으러 오라"는 지시를 받은 한태근과 최용철이 회령으로 가 위 열쇠를 가지고 왔지만 주변에 사람들이 너무 많아 위 아파트에 침입하지 못하고 대기하던 중

○ 같은 날 18:00경 백승국의 주거지에서 백승국과 성명불상의 30대 여자가 나오는 것을 발견하고, 백승국을 납치하기 위해 전원이 최용철이 운전하는 위 승용차와 임차한 승합차량에 나누어 타고 백승국이 탑승한 택시를 따라가던 중, 당시 상황을 지영수에 보고한 한태근으로부터 "백리사와 애인인 조선족 여자가 틀림없는 것 같다. 석두옥의 말에 따르면 지금 심양에서 오는 다른 남조선 놈을 마중하러 연길공항으로 가는 것이라고 한다. 연길 공항까지 따라가서 새로 나타나는 남조선 놈과 만나면 따라붙다가 적당한 곳에서 세 놈을 모두 잡아들이라고 했다."는 등 내용의 지영수의 지령을 전달받고 백승국을 미행하였으나 백승국이 연길공항에서 탑승수속을 마치고 편명불상 비행기에 탑승하여 출국해

- 13 -

버리자 납치하지 못하고 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의

주거지로 복귀하는 등

반국가단체 구성원인 지영수의 지령을 받고 목적수행을 위하여 한국인 백승국을

약취하기 위하여 예비하고

5. 1999년 2월 초순 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의

주거지에서 남수, 박일문, 최용철 등과 함께 대기하다가 김송산의 연락을 받고 중국

길림성 용정시 미식가 소재 "신성소갈비식당"으로 이동, 그곳에서 중국 공안복장을

한 한태근을 비롯하여 박근춘, 지광철, 한태근이 데리고 온 북한 보위사 요원 2명

(문하준, 이성철)을 만나 식사하면서, 김송산으로부터 "지난 1월에 회령 국경경비대

중사 한 놈과 상등병 한 놈이 인신매매와 밀수 알선혐의로 체포되어 조사를 받던

중 수갑을 찬 채로 중국으로 도망 간 사건이 있었는데 보위사에서 자체적으로 해결

해 보겠다고 체포공작에 나섰으나 잘 되지 않아 도와 달라는 요청이 왔으니 우리가

채포해야겠다. 탈북 군인 2명은 남조선으로 귀순한 조선인민군 소속 최영호의 부하

였던 관계로 함북 회령에 거주하고 있는 최영호의 장모 림인숙으로부터 최영호의

남조선 연락처를 입수하고, 그들이 탈북하자마자 용정에 사는 림인숙의 여동생 림

청숙의 집에 은신할 가능성이 높으니 그 곳을 덮쳐 탈북한 군인 2명을 채이 오라는

지시가 있었다."는 등 내용의 지영수의 지령을 전달받고, 최용철과 남수 등이 중국

길림성 용정시 안민가 소재 최영호의 연고지인 림청숙의 집을 확인한 후 공작조원

들과 함께 탈북 군인 2명을 납치하기 위한 사전계획을 수립하는 등 한태근, 김송산,

박근춘, 지광철, 문하준, 이성철, 남수, 최용철, 박일문과 공모하여

○ 같은 날 저녁 시간불상경 위 "신성소갈비식당"에서 식사를 마치고 나와 김송산

- 14 -

등과 함께 탈북 군인 2명이 은신하고 있을 것으로 추정되는 중국 길림성 용정시 안민가 소재 림창숙의 집으로 이동하여

○ 피고인은 중국 길림성 용정시 공안국에 아는 친구들이 많아 용정 시내에 있는 "110 범죄신고대" 정문 부근에서 중국 공안들이 출동하는지 여부를 감시하고

○ 최용철은 림창숙의 집 부근에 자신의 산타나 승용차를 대기시켜 체포조가 림창숙의 신병을 확보하는 즉시 탑승시켜 현장을 이탈하기 위하여 준비하고

○ 남수는 림창숙의 집 지붕 위에 올라가 있다가 체포조가 집안으로 들어가는 동시에 전화선을 끊어 외부와의 연락을 차단하고

○ 보위사 요원 1명이 림창숙의 집 담장을 넘어 출입문을 열어주자, 김송산, 박근춘, 한태근, 지광철, 박일문 등은 나머지 보위부 요원 1명과 함께 집안으로 들어가 지광철은 집안에 있는 림창숙의 아들을 때려 제압하고 집안에 탈북 군인이 있는지를 수색하였으나 찾을 수가 없어 이들의 소재를 확인하기 위해 림창숙을 위협하던 중 그녀의 남편이 갑자기 쓰러지는 바람에 문제가 커질 수 있다고 판단하고, 공작조 전원이 즉시 현장을 이탈하여 탈북 군인 2명을 체포하지 못한 채 피고인의 주거지로 철수하는 등

반국가단체 구성원인 지영수의 지령을 받고 그 목적수행을 위해 성명불상의 탈북한 북한 군인 2명(중사 1명, 상등병 1명)을 약취하기 위하여 예비하고

6. 1999년 2월 중순 일자불상경 피고인의 휴대전화로 함북 회령시에 체류하던 김송산으로부터 "지금 일이 있어서 나와 근춘이가 강을 건너가려고 하는데 차를 가지고 좀 나와 주어야겠다."라는 연락을 받고, 최용철에게 연락하여 차를 가지고 피고인의 주거지로 오도록 하고 평소 친하게 지내던 중국 길림성 용정시 삼합진 변방수비대

000101

짠장(站長, 대장, 조선족)에게 연락하여 김송산, 박근춘 등이 무사히 두만강을 건너

올 수 있도록 변방 통로를 열어 달라고 조치한 후, 같은 날 19:00경 최용철이 운전

하는 산타나 승용차를 이용하여 함께 중국 길림성 용정시 삼합진 부근 두만강변으

로 이동한 후 강 건너편의 김송산과 박근춘에게 자동차 불빛을 깜박거려 마중 나온

사실을 알려준 다음, 두만강을 건너온 김송산과 박근춘을 만나 최용철의 승용차에

함께 타고 피고인의 주거지로 돌아오던 중, 김송산으로부터 "군인 한 놈이 권총을

가지고 중국으로 도망하여 함북 회령시 보위부에서 난리가 났다. 그 놈을 빨리 체

포하지 않으면 사고가 날 수 있으니 서둘러야 하는데 그 놈이 지금 '모아산(山)' 인

근 마을에 숨어 있다고 하니 서둘러 잡아야겠다."는 등 내용의 지영수의 지령을 전

달받고, 그 직후 피고인의 주거지에서 김송산, 박근춘, 지광철, 최용철, 남수, 박일문

등과 함께 탈북한 북한 군인 1명(20대)에 대한 설명과 함께 그를 납치하기 위한 사

전계획을 수립하는 등 김송산, 박근춘, 지광철, 최용철, 남수, 박일문과 공모하여

○ 그 직후 중국 공안 복장 차림에 노끈·수갑·가스총을 휴대한 한태근, 김송산,

　박근춘, 남수, 박일문과 함께 최용철이 운전하는 산타나 승용차와 다른 승용차

　에 나누어 타고 탈북 군인이 숨어 있다는 모아산 인근 마을로 이동하여

○ 피고인과 최용철, 남수, 박일문은 최용철의 차량에 대기하고

○ 김송산, 한태근, 박근춘, 지광철은 탈북 군인이 은신해 있는 집의 유리창을 깨

　고 방안으로 들어가 탈북 군인을 체포하여 노끈으로 손과 발을 묶어 최용철의

　차량에 강제로 태우고

○ 남수와 박일문은 택시를 이용하여 피고인의 주거지로 돌아가고

○ 피고인은 중국 변방수비대 짠장(站長)에게 연락하여 변방 통로를 열어달라고

- 16 -

부탁한 후 피고인, 김송산, 박근춘은 최용철이 운전하는 승용차에 동승하여 중국 길림성 용정시 삼합진 인근 두만강변으로 이동한 다음, 피고인과 최용철은 최용철의 차량에서 대기하고, 김송산, 박근춘은 위 탈북 군인을 데리고 두만강을 건너 맞은편 함북 회령시 강안동 강변에 대기하고 있던 지영수에게 인계하고, 지영수로부터 "날씨도 추운데 고생했다. 아지트로 가서 다음 지시를 기다리고 있으라"는 지시를 전달받는 등

반국가단체 구성원인 지영수의 지령을 받고 그 목적수행을 위하여 위 탈북한 북한 군인 1명을 약취하고

7. 1999년 2월 하순 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의 주거지에서 김송산의 공작조 소집 지시에 따라 김송산, 박근춘, 한태근, 지광철, 박일문, 남수 등이 모인 가운데, 김송산으로부터 "함북 회령시 유선구에서 살고 있던 량초옥이 가족 4명을 데리고 조선을 탈출하여 중국 흑룡강성 해림시 와룡향 조선족 마을에 숨어 있으니 이들을 잡아 북송하라는 지시가 떨어졌다. 량초옥은 원래 일본 여자인데 1960년대 밀경 조선 사람과 결혼하여 장녀와 함께 조국으로 들어왔다가 1998년경에 남편이 죽자, 시집간 딸과 외손녀, 아들, 며느리를 데리고 중국으로 도망 나와 일본으로 들어가려고 시도하고 있다. 상부에서 이 사실을 알고 이들이 일본으로 가게 되면 나라 망신이니 무조건 체포하여 압송하라고 지시하였다"는 등 내용의 지영수의 지령을 전달받고, 그 자리에서 일본인이었으나 북한으로 귀화한 여성 량초옥(여, 61세, 일명 한초옥)을 납치하기 위한 사전계획을 수립하는 등 김송산, 박근춘, 한태근, 지광철, 박일문, 남수, 김윤길(34세, 탈북자), 리학주와 공모하여

○ 그 며칠 후 성명불상의 중국인이 운전하는 임차승합자를 이용하여 이들과 함께

- 17 -

중국 흑룡강성 해림시(海林市) 와룡향 소재 버스정류장에 도착한 후 김송산이

알고 지내던 김윤길의 안내를 받아 량초옥이 은신해 있다는 와룡향 조선족 마

을로 이동한 다음

○ 피고인과 김윤길은 위 승합차에서 대기하고

○ 중국 공안 복장을 한 한태근 등 나머지 공작원들은 량초옥의 집으로 들어가 량

초옥과 량초옥의 딸, 아들 및 며느리를 차례로 붙잡아 수갑을 채운 후 강제로

끌고 나와 미리 대기시켰던 위 승합차에 태워 입북 지점인 중국 길림성 용정시

삼합진 남호 1대로 이동하던 중, 중국 공안에 끌려가는 것으로 오인한 량초옥이

"나는 일본 여자인데 북조선에서 살다가 먹고 살기가 힘들어 중국으로 탈출하

였다. 제발 살려 달라."고 울부짖으면서 호소하였으나, 이를 무시한 채 길림성

용정시 삼합진으로 이동한 다음

○ 피고인과 남수, 박일문 등은 위 승합차를 이용하여 주거지로 돌아가고

○ 한태근, 김송산, 박근춘, 지광철 등은 량초옥과 그 가족을 끌고 두만강을 건너

함북 회령시 강안동에 짚차 및 승합차량을 가지고 미리 대기하고 있던 윤정수

와 지영수에게 량초옥과 그 가족 등 4명을 인계하는 등

반국가단체 구성원인 윤정수와 지영수의 지령을 받고 그 목적수행을 위하여 일본인

이었으나 북한에 귀화한 량초옥과 그 가족 등 4명을 약취하고

8. 1999년 3월 초순 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의

주거지에서, 김송산으로부터 "중국 길림성 용정시 토산가에 숨어 있는 탈북자 황영

찬을 잡아오라는 지시가 있었다. 그 사람은 68세 가량으로, 평양 모란봉 구역에 거

주하던 정부원 ○○위원회 부위원장이란 고위급 인물이므로 다른 일에 우선하여 이

- 18 -

일에 전력을 기울여야 한다."는 등 내용의 지영수의 지령을 전달받고, 한태근, 김송
산, 지광철, 박일문, 남수, 최용철과 함께 납치 장소, 납치 방법 및 납치시 저항에
대비하여 가스총을 미리 준비하자는 등 탈북자 황영찬(남, 68세)을 납치하기 위한
사전계획을 수립하는 등 한태근, 김송산, 지광철, 박일문, 남수, 최용철과 공모하여

○ 그 다음날 지광철의 안내로 중국 길림성 용정시 토산가 소재 황영찬의 주거지
   인 아파트로 이동하여, 피고인, 남수, 최용철, 박일문은 도주로를 차단하기 위하
   여 최용철의 산타나 승용차를 타고 부근에서 대기하고, 한태근, 김송산, 박근춘,
   지광철은 아파트 앞쪽에서 대기하던 중

○ 22:30경 황영찬이 성명불상의 중국 동포와 외출하였다가 귀가하는 것을 발견하
   고 한태근은 술이 취한 척 어깨를 부딪히면서 순간적으로 가스총을 3회 발사하
   여 황영찬을 제압하고, 김송산, 박근춘, 지광철은 황영찬의 입을 막고 최용철의
   승용차에 강제로 탑승시킨 후

○ 피고인, 남수, 박일문은 김송산의 지시를 받고 주거지로 되돌아오고

○ 나머지 공작조원들은 최용철이 운전하는 승용차로 중국 길림성 용정시 삼합진
   남호 1대로 이동한 후 한태근과 김송산은 황영찬을 데리고 두만강을 건너 함북
   회령시 강안동 강변에서 대기하고 있던 지영수에게 황영찬을 인계하는 등

반국가단체 구성원인 지영수의 지령을 받고 그 목적수행을 위하여 황영찬을 약취하
고

9. 1999년 3월 중순 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의
   주거지에서, 한태근으로부터 "지난번 탈북자를 잡아 넘기는 과정에서 변방 통로가
   열리지 않아 이곳에 잠시 잡아 두었다가 조선으로 넘긴 놈이 다시 중국으로 도주하

- 19 -

000105

였다고 한다. 지영감도 이 사실을 알고 우리 아지트가 위험하다고 하면서 바로 아지트를 옮기라고 하였다."는 지영수의 지령을 전달받고, 그 무렵 중국 길림성 용정시 안민가 소재 노동국 뒤편에 위치한 명불상 아파트 1층 1호(이하 노동국 아파트라고 약칭)를 인민폐 300원(韓貨 45,000원 상당) 상당의 월세를 지불하는 조건으로 임차하여, 새로운 공작아지트를 마련하여 사용하던 중, 같은 해 3월 중순 일자불상경 노동국 아파트에서 김송산으로부터 "한태근이 지영감을 만나 새 아지트를 마련한 사실을 보고하자, 지영감은 림인숙의 중국 친척들 명단과 주소지가 기재된 문건(2매) 및 인물사진을 주면서 중국으로 도망간 림인숙 일가를 체포해 오라고 하였다." 는 등 내용의 지영수의 지령을 전달받고, 한태근, 김송산, 박근춘, 지광철, 최용철, 남수, 박일문, 김윤길, 리학주 등과 함께 림인숙 일가를 납치하기 위한 사전계획을 수립하는 등 한태근, 김송산, 박근춘, 지광철, 최용철, 남수, 박일문, 김윤길, 리학주, 전영삼과 공모하여

○ 그 직후 노동국 아파트에서 김송산으로부터 "림인숙 일가가 중국 길림성 용정시 태평촌 부근에 숨어 있는 것 같으니 태평촌을 중심으로 찾아보라는 지영감의 지시가 있었다"는 등 지영수의 지령을 전달받고, 그 시경부터 한태근, 김송산, 박근춘, 남수, 최용철, 박일문 등과 함께 중국 길림성 용정시 태평촌 및 대흥동 일대를 뒤졌으나 림인숙 일가의 은신처를 찾는 데 실패하고

○ 그로부터 머칠 후 박일문이 림인숙의 동생 림용범(40대 후반)의 전화번호를 알아내어 남수가 중국 길림성 용정시 우정국에 근무하는 지인을 통해 위 전화번호의 설치장소를 추적하여 림용범이 중국 길림성 용정시에 거주하고 있다는 사실을 확인하고, 김송산, 박근춘, 한태근, 지광철, 남수, 최용철 등과 함께 림용범

의 집에 도착한 후

○ 피고인, 최용철, 박일문은 돌발 사태에 대비하여, 주변을 감시하고

○ 한태근, 김송산, 박근춘, 지광철 등은 림용범의 집으로 들어가 수색하였으나 림
　　인숙 일가가 보이지 않자 지광철이 림용범을 추궁하여 중국 동포 최화사(여,
　　41세)가 림인숙 일가족을 다른 곳으로 피신시킨 사실을 알아내고

○ 그 직후 박일문이 위 차량번호를 조회하여 차량 등록지가 중국 길림성 안도현
　　(安圖縣)임을 확인한 후 피고인 등 공작조 전원이 안도현으로 이동하여 최화사
　　의 소재를 추적하던 중

○ 같은 해 4월 초순 일자불상경 최화사가 중국 길림성 안도현 병원 간호사로 일
　　하고 있다는 사실을 알아내고 한태근, 지광철, 박일문, 리학주 등과 함께 최화
　　사를 미행하여 최화사의 집 별체에 림인숙 일가가 숨어있다는 사실을 확인하
　　고, 그 곳에서 림인숙 일가 체포 작전을 모의하여

○ 같은 날 19:00경 남수와 박일문은 밖에서 주변을 감시하면서 돌발 사태에 대비
　　하고

○ 피고인, 한태근, 김송산, 박근춘, 지광철 등은 함께 최화자의 집 안으로 들어가
　　한태근은 림인숙을, 지광철은 림인숙의 남편 한인찬(65세 가량)을, 피고인은 림
　　인숙의 장녀 전선희를, 김윤길은 림인숙의 차녀 한○○을, 박근춘은 림인숙의
　　장남 한광필을, 리학주는 림인숙의 외손자 최충성(8세 가량)을 내리고 나와 미
　　리 내기시켜 둔 승합차량에 강제로 탑승시킨 후 위 승합차를 이용하여 중국 길
　　림성 용정시 삼합진으로 이동하고, 그 곳에서 대기하고 있던 진영삼은 위 승합
　　차에 탑승하고 리학주는 오토바이를 이용하여 두만강변까지 길을 안내하고

- 21 -

○ 피고인, 남수 등은 위 승합차를 이용하여 주거지로 복귀하고

○ 한태근, 김송산, 박근춘, 지광철, 리학주는 전영삼의 안내를 받아 림인숙 등을 데리고 두만강을 건너 함북 회령시 인계리에 미리 와 대기하던 윤창주와 지영수에게 인계하는 등

반국가단체 구성원인 윤창주와 지영수의 지령을 받고 탈북한 북한인 림인숙 등 6명을 약취하고

10. 1999년 6월 초순 일자불상경 북한을 출입하면서 김송산을 통해 알게 된 탈북자 김창록(34세, 회령 출신, 일명 진창록)이 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의 주거지를 방문하여 김창록과 함께 대화하는 과정에서 그가 마약(물건)을 하는 사실을 알고, 그 직후 피고인의 주거지를 방문한 김송산에게 "우리 집에 애도 있는데 마약 하는 사람을 데려오면 어떻게 하느냐"라고 항의하고, 같은 해 6월 중순 일자불상경 피고인의 주거지를 방문한 김송산으로부터 "내가 지영감에게 탈북자 김창록에 대해 보고하였더니 그놈이 북한 양식창고에서 쌀 1톤을 훔쳐 중국으로 달아난 놈인데 잡아 오라고 하였다."는 등 내용의 지영수의 지령을 전달받고, 한태근, 김송산, 박근춘, 지광철, 최용철, 박일문, 남수 등과 함께 김창록을 납치하기 위한 사전계획을 논의하는 등 한태근, 김송산, 박근춘, 지광철, 최용철, 박일문, 남수 등과 공모하여

○ 그 직후 공작원 중 성명불상자가 김창록에게 전화로 중국 길림성 용정시 삼합진에 놀러가자고 유인한 후 중국 길림성 용정시 버스터미널 인근에서 김창록을 만나 최용철이 운전하는 산타나 승용차의 조수석에는 피고인, 뒷좌석에는 남수, 박일문, 김창록이 탑승하여 삼합진으로 이동하다가 최용철이 위 차량을 도로변

- 22 -

에 일시정지시키자 피고인은 김창록의 머리카락을 움켜잡고 주먹으로 얼굴을
몇 차례 때리고, 남수와 박일문은 김창록의 팔과 다리를 잡고 미리 준비해 둔
노끈으로 팔과 몸을 묶어 위 차량의 바닥에 눕힌 후 삼합진 남호 1대 두만강변
으로 이동하여 미리 대기하고 있던 한태근, 박근춘, 김송산, 지광철에게 김창록
을 인계하고

○ 피고인과 최용철, 남수, 박일문은 주거지로 돌아가고

○ 한태근, 박근춘, 김송산, 지광철은 김창록을 데리고 두만강을 건너 함복 회령시
강안동에 미리 와 대기하고 있던 지영수에게 김창록을 인계하는 등

반국가단체 구성원인 지영수의 지령을 받고 그 목적수행을 위하여 탈북한 북한인
김창록을 약취하고

11. 1999년 8월 일자불상경 중국 길림성 용정시 용문가 용풍거 3조 소재 피고인의 주
거시에서 박근춘으로부터 "내가 두 달 전 조카사위 김철(34세 가량, 회령 출신 탈
북자)을 통해 남조선 김동식 목사가 연길에서 교회를 중심으로 탈북자들을 만나
강습을 하고 있다는 사실을 알고 이를 지난번 조선에 갔을 때 지영감에게 보고하
였는데 지영감은 교회에서 나쁜 기도를 하고 있는 남조선 김동식 목사를 지목하여
그러한 세력은 뿌리째 뽑아야 한다며 김동식 목사 납치를 지시하였다. 내가 송산
이와 광철이에게 지영감의 지시를 전달하고 조카사위 김철을 통해 김동식 목사가
언제 연길에 오는지 알아 볼 테니 그렇게 알고 있고 너의 도움이 필요하니 힘껏
방조하라. 지영감은 이 건을 성공하면 많은 돈을 준다고 하면서 반드시 성공시키
도록 하라고 특별히 지시하였다"는 등 내용의 지영수의 지령을 전달받고, 그 직후
피고인의 주거지에서 김송산, 박근춘, 박일문, 남수, 지광철, 최용철 등이 참석한

- 23 -

가운데 김동식(57세) 목사 납치관련 협의를 위한 1차 모임을 개최하여,

○ 박근춘은 김철과 연계하여 김동식 목사가 중국 길림성 연길시에 오는 시기 및 연길 도착 후 강연일정 등 동향을 파악하고, 피고인은 공작조원들이 김목사를 납치하는 데 소요되는 경비를 부담하고, 김목사를 납치한 후 안전하게 두만강을 건너 갈 수 있도록 사전에 중국 변방수비대장을 매수하기로 하고, 남수는 김목사를 납치한 후 사전 약정된 인계지점까지 안전하게 이동시킬 수 있도록 조선말을 모르는 한족(漢族) 기사가 운행하는 택시를 동원하고, 최용철은 자신의 산타나 승용차를 가지고 있다가 남수가 동원한 택시가 김목사를 태워 인계 장소에 도착하면 위 승용차에 김목사를 옮겨 싣기로 하는 등 내용의 김동식 목사 납치를 위한 1차 계획을 수립하고

○ 같은 해 8월 하순 일자불상경 중국 길림성 연길시 하남가 천지로 소재 상호불상의 7층짜리 아파트 1층에 위치한 명주다방(또 문경다방)에서 피고인을 비롯한 김송산, 지광철, 박근춘, 최용철, 박일문, 남수 등 참석하에 2차 모임을 개최하여, "1차 모의한 계획대로 김동식 목사 납치를 성공할 수 있도록 하자"고 각자 다짐하는 등 납치 계획을 재차 확인하고

○ 같은 해 12월 하순 일자불상경 중국 길림성 용정시 안민가 소재 노동국 아파트에서 김송산, 박근춘, 박일문, 남수, 지광철, 최용철 등과 만나, 박근춘으로부터 "김철로부터 연락이 왔는데 내년 1월 중순경 김목사가 연길에 도착하여 '연길시 기독교회'에서 강연(설교)을 할 예정이라고 한다. 지난번 1·2차 모임에서 논의한 대로, 영화(피고인)는 작업에 소요되는 경비를 부담하고 김동식 목사를 납치한 후 조선까지 안전하게 넘길 수 있도록 변방 통로를 연다. 남수는 납치 당일 영업

000110

용 택시를 1대 동원하되, 조선말을 모르는 한족(漢族) 여자 기사를 구한다. 일단 그 영업용 택시로 김동식 목사를 납치한 후 연길-용정 간 고속도로 입구에 있는 주유소에서 최용철의 차량에 김동식 목사를 옮겨 태운다."는 등 1·2차 모임에서 논의된 납치 계획대로 실행하기로 결의하고 위 아파트에서 김동식 목사의 연길 방문소식을 기다리면서 비상 대기하던 중, 박근춘은 조카사위인 김철을 앞세워 김동식 목사가 운영하는 중국 길림성 연길시 "사랑의 집"을 출입하면서 친분을 맺고 있던 탈북자(동정남으로 추정, 40대 후반)를 통해 김목사가 2000. 1. 15. 중국 길림성 연길시에 도착하여 다음날 삼화가 소재 "연길시 기독교회"에서 강연을 한다는 사실을 미리 확인하고

○ 2000. 1. 15. 10:00경 박근춘으로부터 "오늘 내가 한턱 내겠으니 다들 명주다방에서 보자"는 연락을 받고, 같은 날 15:00경 중국 길림성 연길서 하남가 천지로 소재 명주다방에 도착하여 그곳에 와 있던 김송산, 박근춘, 박일문, 남수, 지광철, 최용철 등과 만나, 김동식 목사 납치를 위한 4차 모임을 개최하여 최종 준비 및 점검을 한 후

- 남수가 이미 물색해 놓은 한족(漢族) 여자기사가 운행하는 쎌리(차종 "夏利"의 중국식 발음, 빨간색, 차량번호 불상) 택시를 16일 아침부터 "연길시 기독교회" 앞에서 손님을 태우는 차량으로 위장하여 대기하고

- 김송산, 지광철, 박근춘 등은 김목사를 직접 납치하고, 피고인과 최용철은 도주로를 차단하면서 교회 부근에서 망을 보다가 김송산이 손짓으로 지시하는 방향으로 움직이고

- 최용철의 차량은 중국 길림성 용정시 등록 차량이기 때문에 다른 사람들의 눈에

- 25 -

노출되기 쉬우므로 먼저 한족(漢族) 여자기사가 운전하는 연길시 등록 차량으로 납치하였다가 연길-용정 간 고속도로 입구 첫번째 주유소까지 운반해 주민 피고인, 김송산, 남수 등이 김동식 목사를 인계받아 북송시키고

- 만약 "연길시 기독교회"에서 김목사 납치에 실패할 경우, 김철을 통해 김동식 목사를 식당이나 다방도 좋으니 적당한 장소로 유인하기로 한다

- 김동식 목사가 돈을 많이 가지고 있다고 하니 납치한 후 돈이 많이 있으면 우리들이 나누어 가지자

라는 등 내용으로 각자 임무를 분담하면서 세부 납치 계획을 재차 확인하고, 그날 밤 공작조원들의 행동을 통일하기 위해 김동식 목사가 강연을 하기로 한 "연길시 기독교회" 인근에 위치한 중국 길림성 연길시 우시가(牛市街) 소재 "해주사우나" (海州춍우浴)에 함께 투숙하는 등 김동식 목사를 납치하기로 김송산, 지광철, 박근춘, 최용철, 박일문, 남수와 공모하여

○ 같은 달 16일 07:00경 김송산, 박근춘, 지광철, 최용철, 박일문, 남수 등과 함께 위 "해주사우나"에서 나와 연길시 삼화가(參花街) 1685 소재 "연길시 기독교회"를 중심으로 분산하여 김송산, 지광철, 박근춘은 교회 앞쪽에서 대기하고, 피고인과 최용철은 교회 맞은편에서 최용철의 승용차에 탑승하여 대기하다가 같은 날 12:00경 신도 200여 명이 "연길시 기독교회"에서 예배를 마치고 한꺼번에 교회 밖으로 쏟아져 나오는 등 혼잡스러운 과정에서 김동식 목사를 발견하지 못하여 당황해 하고 있던 중, 박근춘으로부터 "일이 지연될 수 있을 것 같으니 조금만 기다려라"는 내용의 연락을 피고인의 휴대전화로 받고 약 30분 가량을 더 대기하다가, 박근춘으로부터 "김동식 목사 일행이 '연길시 기독교회'

- 26 -

에서 나와 지금 '예림불고기식당(藝林烤肉店)'으로 들어갔으니까 이쪽으로 와서

기다려라"라는 내용의 연락을 피고인의 휴대전화로 받고,

○ 최용철과 함께 중국 길림성 연길시 삼화가(參花街) 51 소재 "예림불고기식당"

인근으로 이동하여

- 피고인과 남수는 식당 북쪽방향에서 대기하고

- 박근춘과 지광철은 식당입구에 대기하고

- 김송산은 최용철의 산타나 승용차에 탑승하여 식당 맞은편에 대기하면서 "예림

불고기식당" 주변을 감시하고

- 한족(漢族) 여자기사가 운전하는 택시는 손님을 기다리는 차량으로 위장하여 식

당 인근에서 대기하던 중

○ 같은 날 14:00경 김동석 목사가 식사를 마치고 나와 김철 및 성명불상의 탈북

자 부부(동정남 부부로 추정) 등 일행들과 인사하고 헤어져 식당 앞에 대기하

고 있던 한족(漢族) 여자기사의 "썰라" 택시 조수석에 승차하여, 서서히 출발하

려는 순간 지광철은 택시 오른쪽 뒷문으로, 김송산은 왼쪽 뒷문으로 들어가 함

께 탑승한 상태에서 위 택시가 출발하고, 이어서 박근춘은 피고인에게 "이미

작업을 하였으니 너희들은 약속장소인 주유소로 따라 와라"는 연락을 하고, 피

고인, 남수, 박일문, 최용철은 최용철이 운전하는 승용차를 이용하여 연길-용정

간 고속도로(연길-용정 간 1급도로 지정)에 들어서면서 도로변에 있는 첫번째

주유소인 "연봉주유소(延龍中國石油)"로 이동하고

○ 피고인은 미리 그곳에 도착해 있던 김목사를 태운 "썰라(夏利)" 택시에 김송산

과 지광철이 타고 있고 위 택시 옆에 박근춘이 서 있는 것을 발견하고, 휴대전

- 27 -

화를 이용하여 박근춘에게 "한족(漢族) 여자기사가 우리 얼굴을 기억하면 안 되니까 빨리 보내라"고 말하고, 박근춘으로부터 "조선말을 알아듣지 못하는 기사라서 괜찮다"라는 말을 듣고 최용철의 차량을 위 "쌍리(夏利)" 택시 앞으로 접근시키자, 김송산과 박근춘은 김동석 목사를 신속하게 최용철의 승용차에 옮겨 태운 후 위 택시는 돌려보내고

○ 사후 처리를 위해 박근춘, 지광철, 박일문 등은 현장에 남아 있다가 주거지로 되돌아가고

○ 피고인, 김송산, 남수는 최용철의 승용차에 탑승(조수석에 피고인, 뒷좌석 가운데 김동석 목사, 좌측에 김송산, 우측에 남수가 착석)하여 중국 길림성 용정시 삼합진 남호 1대를 통해 북송하려고 하였으나 변방 통로가 열리지 않아 중국 길림성 용정시 용문가 용룡거 3조 소재 피고인의 주거지에 들러 잠시 대기하면서 피고인은 중국 변방수비대 참장(站長)에게 연락하여 "변방 통로를 열어 달라"고 부탁하고

○ 같은 날 15:00경 피고인의 주거지에서 피고인, 김송산, 남수, 최용철은 김동석 목사를 최용철 운전의 승용차에 탑승시켜 중국 길림성 용정시 삼합진으로 가는 도중에 김동석 목사가 "너희들은 누구냐. 나는 환자인데 도대체 어디로 나를 데리고 가는 것이냐"라고 묻자, 김송산은 "그저 가만히 앉아 있기만 하면 아무 일이 없을 것입니다"라고 안심시킨 후 김동석 목사의 소지품을 검색하여 김동석 목사의 한국 여권과 탈북자 관련내용이 적힌 메모지, 손지갑 및 휴대전화, 약이 들어 있는 것을 확인하고, 도중에 지영수로부터 위 휴대전화로 "김동석 목사를 넘기기 전에 보기 좋게 수쇄(수갑)를 채워 넘겨라"는 지시를 받고

- 28 -

000114

○ 같은 날 16:30경 중국 길림성 용정시 삼합진 남호 1대에 도착한 다음 차에서 내려 김송산은 김동석 목사에게 수갑을 채우면서 재차 소지품 검색을 한 후

○ 피고인과 최용철은 최용철의 승용차 안에서 대기하고

○ 김송산과 남수는 김동석 목사의 양옆에서 팔짱을 끼고 부축한 채 결빙된 두만강을 약 10여분 간 도보로 건너 맞은편인 함북 회령시 강안동지역 두만강변에 도착하여, 미리 대기하던 지영수와 김성국에게 김동석 목사를 인계한 후 다시 중국 지역으로 되돌아와 최용철의 승용차를 이용하여 주거지로 복귀하는 등 반국가단체 구성원인 지영수의 지령을 받고 그 목적수행을 위하여 한국인 김동식을 약취하였다.

## 증거의 요지

1. 제1회 공판조서 중 피고인의 진술기재

1. 피고인의 법정 진술

1. 증인 한태근의 법정 진술

1. 피고인에 대한 검찰 피의자신문조서

1. 한태근, 성광일에 대한 각 검찰 진술조서

1. 최기철, 이영춘에 대한 각 경찰 진술조서

1. 수사보고(백승국 진술조서 첨부, 전 함북 보위부 공작원 한태근 소식 수집 내용 확인, 함북 보위부 반탐정처장 윤창주 신원 및 대남공작 활동사실 확인, 회령시 국산 공장 보위부장 지영수 신원 및 대남공작활동 사실 확인, 함북 보위부 공작원 김송산 신원 확인, 함북 보위부 공작원 최용철 신원·동향 확인, 김동석 목사 신원 및 납치사건 보도내용 등 확인, 용정 소재 보위부 납치조 공작 아지트 소재 확인)

000115

**법령의 적용**

1. 범죄사실에 대한 해당법조

     각 국가보안법 제8조 제1항, 형법 제30조(회합의 점), 각 국가보안법 제4조 제1항 제

     4호, 형법 제30조(목적수행약취의 점), 국가보안법 제6조 제2항, 형법 제30조(지령

     탈출의 점), 각 국가보안법 제4조 제3항, 제1항 제4호, 형법 제30조(목적수행약취예

     비의 점)

1. 상상적 경합

     각 형법 제40조, 제50조[3항 기재 박분옥에 대한 국가보안법위반(목적수행)죄 및 국

     가보안법위반(잠입·탈출)죄 상호간, 죄질이 더 중한 전자에 정한 형으로 처벌, 5항

     기재 탈북 군인 2명에 대한 국가보안법위반(목적수행)죄 상호간, 범정이 더 중한 중

     사 1명에 대한 죄에 정한 형으로 처벌, 7항 기재 량초옥과 그 가족 등 4명에 대한

     국가보안법위반(목적수행)죄 상호간, 범정이 더 중한 량초옥에 대한 죄에 정한 형으

     로 처벌, 9항 기재 림인숙과 그 가족 등 6명에 대한 국가보안법위반(목적수행)죄 상

     호간, 범정이 더 중한 림인숙에 대한 죄에 정한 형으로 처벌]

1. 형의 선택

     국가보안법위반(목적수행)죄에 대하여 유기징역형 선택

1. 경합범 가중

     형법 제37조 전단, 제38조 제1항 제2호, 제50조

1. 미결구금일수 산입

     형법 제57조

**양형의 이유**

피고인은 북한 공작원의 지령에 따라 중국으로 탈북한 북한인들 및 이들을 지원하는 활동을 해 오던 한국인 김동식 목사를 납치하여, 북한 측에 인계할 경우 그들이 북한에서 심한 경우 총살까지 당하는 등 중한 처벌을 받게 될 것을 인식하면서도 오로지 밀부역 및 납치 대가 등 경제적 이익만을 목적으로 이 사건 범행에 이르렀고, 피고인이 가담한 일명 "송산조"는 사전에 치밀하게 계획하여 도주로를 차단하고 폭력으로 제압하는 등 매우 조직적으로 탈북한 북한인 등을 납치하였을 뿐만 아니라, 피고인은 지영수에게 포섭되어 다른 조선족들까지도 납치활동에 가담시키고 피고인의 주거지를 송산조의 아지트로 이용하는 등 위 납치조에 가담한 조선족들 가운데에서 주도적인 역할을 하였고, 피고인이 이러한 납치 범행을 그만두게 된 계기도 양심의 가책이나 죄책감에 의한 것이 아니라 한국인 김동식 목사의 납치 이후 중국 공안에서 위 납치사건으로 수배 중이라는 말을 듣고 북한으로 도피하였다가 다시 우리나라로 도피하면서 그만두게 된 것일 뿐이다.

피고인은 조선족 중국인으로서 비록 우리나라의 국가보안법에 대한 인식은 강하지 않았다고 볼 수 있을지는 모르나, 생활고에서 벗어나기 위하여 혹은 자유를 찾아 탈북한 북한인들을 그들의 의사에 반하여 강제로 납치하여 북한에 인계하였고, 특히 김동식 목사는 한국인이라는 사실을 명백히 인식하면서도 납치하여 강제로 북한 측에 인계한 것이어서, 적어도 그들의 개인적 자유와 인권을 침해한다는 점에 대하여는 명백한 인식이 있었다 할 것임에도 약 1년간에 거쳐 탈북한 북한인들 15명, 한국인 1명의 납치에 성공하고 탈북한 북한인 2명 및 한국인 1명의 납치를 예비하는 등 오랜 기간 수차례 범행을 저질렀으며, 결국 그들은 북한에서 중한 처벌을 받았을 것이고 특히 김동식 목사는 현재 사망하였다는 전문도 있는 등 그 생사를 전혀 알 수 없는 상태다.

000117

따라서 위와 같은 여러 사정들에다가, 피고인이 북한과 같은 사회주의 국가인 중국
에서 태어나고 자라면서 사회주의 교육을 받은 사람으로서 국가보안법위반에 대한 인
식은 그리 크지 않았을 것으로 보이는 점, 그 잘못을 뉘우치고 있는 점 등을 함께 참
작하여 주문과 같은 형을 선고한다.


재판장     판사     이기택     _____


          판사     강지현     _____


          판사     곽윤경     _____

000118

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————————————X

HAN KIM, *et al.*,

                Plaintiffs,                  Civil Action No: 09-648 (RWR)

     -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, *et al.*,

                Defendants.

————————————————————————X

## DECLARATION OF DO HEE-YOUN

I, Do Hee-Youn, of Seoul, South Korea pursuant to 28 USC § 1746, declare the following statements to be true, subject to the penalties of perjury:

1. I am a member of the Citizen's Coalition for Human Rights of Abductees and North Korean Refugees ("C.H.N.K") based in Seoul, South Korea as well as a Co-Representative of the Antihuman Crime Investigation Committee, also of Seoul, South Korea.

2. As a result of my efforts with the above organizations, I have a network of individuals that have supplied me with information concerning North Korean matters over the years in both North Korea and China. My organization refers to these individuals as our 'information net,' and many of these individuals are kept confidential to ensure their safety from potential retribution against them by the North Korean government.

3. As I continue to conduct a private investigation into the disappearance of Reverend Kim Dong-Shik ("Reverend Kim") on occasion I also communicate with my government counterparts. These individuals are also confidential by necessity.

4. Amongst past and present members of my organization C.H.N.K., are individuals who worked with Reverend Kim such as elder Bae Hae Hyun in his Christian mission work as well as his human rights efforts on behalf of North Korean defectors.

5. In fact, C.H.N.K. continues to be closely involved with North Korean issues.

6. I became aware of Reverend Kim's disappearance from elder Bae Jae Hyun, who had been with Reverend Kim shortly before that disappearance. More specifically, it is my understanding that while in China, Reverend Kim had failed to appear for a scheduled meeting in January 2000, and that he could not be found subsequently.

7. Immediately thereafter, a rescue effort was made by past and current members of my organization as well as other individuals who had been assisted by Reverend Kim, our assumption being that he had been abducted by the North Korean government as many North Korean defectors had been.

8. It is a well-known fact in South Korea that North Korean defector and former North Korean Security official Lee Chun Kil has detailed his work on behalf of the North Korean government with regards to the abduction

of defectors in a book he authored, although this does not include Reverend Kim.

9. Those involved in Reverend Kim's rescue effort have included but are not limited to the deceased Reverend Lee Suh, elder Bae Jae Hyun and the son of Reverend Kim.

10. We have also been assisted by members of a group of thirteen (13) North Korean defectors who were able to escape first to Mongolia and then to South Korea through the direct efforts of Reverend Kim, that include Cho Bong Il.

11. I heard at different times from individuals in the information net, more specifically by missionary Lee Yun Gil and Hong Seung Man that Reverend Kim had been taken to North Korea.

12. Three members of South Korea's National Intelligence System ("NIS") who have been among the government investigators of Reverend Kim's disappearance have also shared with me their belief that Reverend Kim was abducted by the North Korean government.

13. Eventually through the information net, I received word that Reverend Kim had died in North Korea as a result of torture and malnutrition in February, 2001.

14. I personally attended the trial of Liu Yong Hua, which on April 21, 2005 resulted in Liu's conviction for the abduction of Reverend Kim as well as various other North Korean defectors on behalf of the North Korean government.

15. Liu was found to have been among a group of North Korean security
agents as well as Chinese-Korean recruits who engaged in the above
abductions on behalf of the North Korean government.

16. Additionally, I was able to alert the South Korean authorities when an
individual named Kim Mo arrived in the country as a result of what I
learned from the information net, which led to his arrest and trial for the
abduction of Reverend Kim.

17. I hereby declare under penalty of perjury under the laws of the United
States of America that the foregoing is true and correct.

Dated: *1 - 7 - 11*
     Seoul, Korea

_____

**Do Hee-Youn**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------X

HAN KIM
5511 Wooded Creek Drive
St. Charles, MO

**Civil Action No.:** 09-648 (RWR) and

YONG SEOK KIM
5511 Wooded Creek Drive
St. Charles, MO

Plaintiffs,

-against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,
a.k.a. NORTH KOREA
c/o Foreign Minister, Pak Ui Chun
Ministry of Foreign Affairs
Jung song-dong, Central District
Pyong Yang, DRK

and

JOHN DOES 1-10.

Defendants.

-------------------------------------------------------------------X

1

## DECLARATION OF PROFESSOR DAVID HAWK

I, David Hawk, of Seaside Park, New Jersey, declare pursuant to 28 U.S.C. § 1746, as follows:

## A.      Professional Background

1.      I am the former Executive Director of the United States section of Amnesty International and Officer-In-Charge of the Cambodia Office of the UN High Commissioner for Human Rights.  I am a consultant to the U.S. Committee for Human rights in North Korea in Washington, D.C.  My current activities focus on researching and documenting ongoing human rights violations of the Pyongyang regime.   I am a visiting scholar at the Columbia University Institute for the Study of Human Rights.

2.      Previously, I was a Reagan-Fascell Fellow at the International Forum for Democratic Studies at the National Endowment for Democracy in Washington, D.C., where I worked on issues pertaining to North Korea's nuclear weapons program.

3.      Prior to that I was a consultant to Freedom House in New York, where I investigated human rights abuses of the North Korean regime and analyzed its gulag system of work camps for political prisoners.

4.      I have also been a consultant to the U.S. Commission of International Religious Freedom in Washington, D.C. and a consultant to the U.S. Committee for Human Rights in North Korea where I researched and authored a landmark 120 page report, *The Hidden Gulag: Exposing North Korea's Prison Camps – Prisoner's Testimonies and Satellite Photographs*, based on extensive in-depth interviews with North Korean refugees who had recently obtained asylum in South Korea.  I also worked at the Landmine Survivors Network for several as a consultant.

000124

5.    Prior experience also includes positions as (i) the Head of Office for the U.N. High Commissioner for Human Rights Cambodia Office in Phnom Penh, (ii) the Executive Director of the Cambodia Documentation Commission, (iii) a Fellow at the Columbia University Center for the Study of Human Rights for six years, (iv)  an Adjunct Lecturer on human rights at Hunter College in New York, and (v) the Executive Director of Amnesty International USA in New York from its formative years in 1974-1978.

6.    I have published extensively in the areas of human rights in North Korea.  My published works in this area include:  (i)  ─Appendix: Human Rights Issues During Phase Three of the Six Party Talks on the Denuclearizaiton of the Korean Peninsula" in *Failure To Protect: the Ongoing Challenge of North Korea,* Havel, Bondevik and Wiesel, DLA Piper, the Committee for Human Rights in North Korea, and The Oslo Center for Peace and Human Rights, September, 2008, (ii) *"*Introduction", *A Prison Without Bars: Refugee and Defector Testimony of Severe Violations of Freedom of Religion or Belief in North Korea,* US Commission on International Religious Freedom, Washington DC, March 2008, (iii) *"*The Realities and Policies of Third-World Nations Regarding North Korean Defectors, with an Emphasis on Mongolia and Thailand", *International Trends Concerning Human Rights for North Korean Defectors,* National Human Rights Commission of Korea, Seoul, November 2007, (iv) *Concentrations of Inhumanity: An Analysis of the Phenomena of Repression Associated with North Korea's Kwan-li-so Political Penal Labor Camps According to the Terms and Provisions of Article 7 of the Rome Statute of the International Criminal Court and the Parallel Provisions of Customary International Law on Crimes Against Humanity*, 65 pages, Freedom House, Washington, May 2007, Korean translation, Seoul, July 2007, (v) ─Factoring Human Rights Into the Dismantlement of Cold War Conflict on the Korean Peninsula" in *Human Rights in North*

3

*Korea*, Eds.. Kie-Duck Park and Sang-Jin Han, The Sejong Institute, Seoul, 2007, (vi) ―Human

Rights and the Crisis in North Korea" in *North Korea: 2005 and Beyond*, Eds. Philip Yun and

Gi-Wook Shin, Asia-Pacific Research Center (APARC), Stanford University/Brookings Press,

March 2006, (vii) *Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of*

*Freedom of Thought, Conscience and Religion in North Korea*, United States Commission on

International Religious Freedom, Washington DC, November 2005, 106 pages, and (viii) *Hidden*

*Gulag: Exposing North Korea's Prison Camps – Prisoner's Testimonies and Satellite*

*Photographs,* US Committee for Human Rights in North Korea, Washington DC, November

2003, 120 pages. Korean language edition, Seoul, January 2004. Japanese language edition,

Tokyo, August 2004.

   A copy of my curriculum vitae  is attached hereto as Appendix "A".

**B.**  **Nature of This Expert Witness Report**

   7.  I have been asked by counsel for the plaintiffs in the case of <u>Kim et al. v.</u>

<u>Democratic People's Republic of Korea et al.</u>, to provide my professional opinion as to whether

the defendants in this action provided material support, resources, training, and oversight in the

abduction from China of Reverend Kim Dong Shik ("Reverend Kim") and in his subsequent

imprisonment, torture and death.

   8.  My opinion as set forth below is based upon my academic studies, research,

teaching positions and publishing over the course of many years as an expert on Korean affairs.

I have obtained information from interviews with political leaders and refugees, reviews of

documents, periodicals, credible news reports, discussions with reliable journalists, government

publications, and scholarly works, as well as from my own experience, working, living and

traveling in the Far East, particularly in South Korea.  In preparing this opinion, I have examined the complaint filed by the plaintiffs against the defendants.

## C.   Political Penal Labor Colonies

9.   A significant portion of my extensive research spanning the past decade on the Democratic People's Republic of North Korea (the "DPRK") has been in connection with the phenomena of widespread and systematic repression by the North Korean regime of its citizens and foreign nationals, specifically by means of forced abductions and displacement to the *kwan-li-so*, or political penal-labor colonies.  I have had the opportunity to interview scores of former prisoners and former security guards who defected from North Korea in order to gain firsthand information about the various inner-workings of the dreaded *kwan-li-so* over two dozens of trips to South Korea.  In the *kwan-li-so*, a large proportion of political prisoners and others deemed to be opponents of the DPRK regime — along with their family members — have been abducted and imprisoned without any judicial process, in many instances for lifetime sentences.

10.   The *kwan-li-so* are often described as colonies because they are sprawling encampments, some as large as up to twenty or more miles long and ten to twenty miles wide, containing multiple, enclosed, self-contained sections for different categories of prisoners.[1]  They are located, mostly, in the valleys between high mountains, mostly, in the northern provinces of North Korea.  There are between 5,000 and 50,000 prisoners per *kwan-li-so*, totaling some 150,000 to 200,000 prisoners throughout North Korea.[2]  The *kwan-li-so* are a significant part of

---

[1] *Hidden Gulag: Exposing North Korea's Prison Camps – Prisoner's Testimonies and Satellite Photographs,* US Committee for Human Rights in North Korea, Washington DC, November 2003, page 24.  *Hidden Gulag* is attached as <u>Appendix B</u> attached hereto.

[2] *Id.*  The 200,000 figure comes from a former guard, AHN Myong Chol, who previously worked at four different prison camps. YOON Dae Il, a former official of the *bo-wi-bu* National Security Agency, the police organization that administers the prison camps, says the 200,000 figure is "the minimum."

5

the DPRK policy to deter dissent in the larger population by ensuring swift and severe punishment for suspected wrongdoing or wrong thinking.   The existence of these political forced-labor camps is denied by the DPRK, though their existence has been confirmed by escaped prisoners and other defectors, former guards, now reinforced by satellite photography.

11.     One of the most strikingly corrupt characteristics of the *kwan-li-so* system is that prisoners are not formally arrested, charged (or even told of their offense), or tried in any sort judicial procedure, where they would have a chance to confront their accusers or offer a defense (even were no legal counsel permitted).   Presumed offenders of the North Korean regime are simply abducted by DPRK forces and taken to an interrogation facility, where they are frequently tortured to –confess" to whatever crime has been fabricated by DPRK authorities before being deemed deported to one of the *kwan-li-so*.

12.     Another distinctive feature of the *kwan-li-so*   is political prisoner labor camp system is collective responsibility - known in Korean as *yeon-jwa-je* - whereby up to three generations of family members of an accused offender are incarcerated due only to their blood relationship with the accused.   In many cases these family members of presumed offenders - mothers, fathers, sisters and brothers, grandparents, children and sometimes even grandchildren - are similarly detained without warning and transferred to a *kwan-li-so*, without ever being told of the whereabouts or wrongdoings of the presumed offender or of why specifically they themselves have been incarcerated.   In fact, there are certain sections of certain *kwan-li-so* which are specifically designed for the families of presumed offenders (so that those family members cannot speak out to others against the wrongful imprisonment of their relatives).   It is not uncommon for these family members to be imprisoned in the *kwan-li-so*, without any judicial process or legal recourse whatsoever, for lifetime sentences of extremely hard labor.   Former

6

prisoners and guards trace the systematic employment of *yeon-jwa-je* to a statement by "Great Leader" Kim Il Sung made in 1972: "Factionalists or enemies of class, whoever they are, their seed must be eliminated through three generations."[3] According to the testimony of a former guard at *Kwan-li-so* No. 11 at Kyungsung, North Hamgyong Province, this slogan was carved in wood in the prison guards' headquarters building.[4]  According to the testimony of a former DPRK police official, the number of family members abducted and sent to the lifetime labor camps depends on how severe the presumed political offense is deemed to be by DPRK officials.[5]

13.     The *kwan-li-so* are strongly fortified and punctuated with guard towers and are patrolled by heavily armed guards.  Escape from the camps themselves is extremely rare.  With very few exceptions, prisoners have no contact with the outside world (for instance, no correspondence is permitted), except for news provided by newly arriving prisoners.

**D.     Punishment and Brutality**

14.     Prisoners of  the *kwan-li-so* face horrendous conditions and are treated without regard to the most fundamental of human rights.   One of the most salient feature of day-to-day prison-labor camp life is the combination of below-subsistence food rations and tedious and back breaking forced physical labor.  Many of the *kwan-li-so* involve mining for coal, iron deposits, gold or various other ores, or logging and wood-cutting.  Prisoners also undertake farm labor during planting and harvesting seasons. This back-breaking labor is often performed twelve or more hours per day, seven days per week.  Prisoners are provided only enough food to be kept on the verge of starvation.  And prisoners are compelled by their hunger to eat, if they can get away

---

[3] *Id.*
[4] *Id.*
[5] *Id.*

000129

with it, whatever "extra" food source they can find, including commonly plants, grasses, bark, rats, and snakes.  It should be noted that below-subsistence-level food rations have been the norm even when North Korea was not experiencing one of its periodic severe nationwide food shortages.  The combination of below-subsistence-level food rations and slave-labor working conditions leads to a large number of prisoner deaths during incarceration.

15.     There are also various punishments to endure.  Punishment for "minor" rule infractions or working too slowly include a reduction in the already meager food rations.  Brutal beatings by guards are routine.  Another customary punishment is the long-term solitary confinement in punishment cells which do not have enough space for a person to completely lie down or stand up, causing inmates to experience a loss of circulation and atrophy of legs, and often leading to death within several weeks.  Attempted escapees are automatically executed and other "major" rule-breakers are publicly executed by hanging or firing squad in front of the assembled prisoners of that section of the camp.  The bodies of prisoners killed in detention are often times denied burial, and rather are routinely dumped in open areas (something that is culturally very offensive to Koreans).[6]

16.     Many inmates cannot withstand the harsh conditions of their imprisonment and a significant number die within a year of their arrival to the *kwan-li-so.*  A large number of those who survive develop permanent disabilities - signs of premature aging, hunchbacks and other physical deformities due to the brutal work conditions and cell sizes.  Many prisoners become disabled from work accidents or require amputations due to hypothermia resulting from exposure to harsh weather conditions.[7]  In winter, hands and fingers numb from cold are prone to accidents from the sewing needles and scissors.  Mindful of their production quotas, prisoners continue at

---

[6] *Id.* at 28.
[7] *Id.* at 25.

their work-stations, doubly fearful that their dripping blood resulting from any accident will soil the garments being sewn.  Such a fear is commonly exacerbated by the fact that an entire work group is punished for the infraction of one of its members, a common infraction being the failure to meet individual - or group - production quotas.  The most common and immediate punishment is reduced food rations and beatings.  Semi-starvation also yields large numbers of informants among the prisoners, leading to a prison culture of distrust and hostility.  Prisoners fight each other over scraps of food or over the clothing of deceased inmates.[8]

17.    Most prisoners are not allowed to marry or have children (or to have sex with each other), except for a very few privileged couples.  It is not uncommon for women to be raped or coerced into sex by prison guards and for some of these women to then become pregnant.  And there have been especially horrific reports of forced abortions and baby killings at the *kwan-li-so*.    Women who are brought to the *kwan-li-so* pregnant were required to have injection-induced or surgical abortions once their pregnancies are discovered.  One prisoner witnessed a group of ten pregnant women taken away for mandatory abortions, and the women were returned to hard labor the very next day.  If a pregnancy is too advanced, women are permitted to deliver their babies naturally only to have them killed immediately after birth by prison authorities.

18.    One female prisoner who was responsible for "caring" for pregnant inmates helped deliver seven babies, and all of the surviving babies were killed.  Another prisoner witnessed how two pregnant women (one six months pregnant and the other eight months pregnant) were treated by prison authorities - both women had their babies born alive and then suffocated in a vinyl cloth.[9]

---

[8] *Id.*
[9] *Id.* at 66.

000131

19.     Another female prisoner who helped to deliver babies reported that she was forced to deliver various full-term and premature babies.  On one occasion a guard forced her to place two full-term baby boys she had delivered in a box and then immediately leave the area.  Two days later, she was able to check the box and to her shock she found that the baby boys were still alive - they still blinked their eyes even though their skin had turned yellow and their mouths were blue.  A guard who had been watching her came over and saw that the babies were still living, and proceeded to stab both babies forceps in the soft spot in their skulls, killing them instantly.[10]   Another former prisoner reported seeing pregnant women  kicked in the stomach by prison guards to induce bleeding.  She also saw four babies who were born in a room set aside for birthing, placed in a wicker basket in an adjacent store-room, covered in vinyl cloth, and left to die.[11]   Another prisoner was recruited by prison guards to help deliver the babies of fellow prisoners who were repatriated from China.  When these babies were born, they were placed face down on the ground.  Some babies died right away; others lay there breathing longer.  If any babies were still alive after two days, the guards would smother them in wet vinyl. The babies lying on the ground could be seen by the women standing at the front of the other cells.  The guards would say that the mothers had to see and hear the babies die because these babies were Chinese.[12]

**E.     Reverend Kim**

20.     It is widely reported that Reverend Kim was abducted from China by DPRK agents and brought against his will to North Korea.    While I do not have any firsthand knowledge about Reverend Kim's case specifically, given my extensive experience with the

---

[10] *Id.* at 62.
[11] *Id.* at 68.
[12] *Id.* at 69.

000132

DPRK and the manner in which abductees repatriated from China were usually treated, it is likely that he would have been initially held in a *ku-ryu-jang*, or a DPRK police detention and interrogation facility, before being transferred to a *kwan-li-so*.  It also seems likely to me that Reverend Kim, at a minimum, would have been subjected to the harsh treatment afforded to all of its prisoners.  But because Reverend Kim was such a valuable target of the DPRK and so much planning, effort and other resources had gone into his abduction, it is clear to me that Reverend Kim was subjected to additional brutality.  I believe that the various reports of his torture and eventual starvation, from the accounts of other prisoners, are likely to be reliable and accurately describe how Reverend Kim was treated by his captors from the time he was abducted and incarcerated until his untimely death.

**F.      Conclusions**

21.      North Korea has continually demonstrated that it is one of the most repressive regimes on the globe, and that it does not hesitate to employ various brutal means to suppresses political dissent or other activities that are viewed by its leadership as being detrimental to its interests.  Reverend Kim was not an anti-regime leader or rebel rouser; he merely acted out of his love for human dignity and freedom to help provide the basic needs of North Korean refugees who had settled across the border in China.   But the DPRK branded Reverend Kim's humanitarian activities as significant enough of a threat to target him for a well-organized and efficiently executed abduction by agents its intelligence services.  Reverend Kim unfortunately received an end he did not deserve - the same end as many innocent North Korean citizens whose only crime is that they happen to live under a ruthless regime whose leaders live in unrestricted largesse and at the expense of citizens who are impoverished and oppressed.  As such, given the brutal nature of North Korean regime and its excessive concerns with secrecy and

000133

security it is unsurprising that verifiable information concerning Reverend Kim's abduction, imprisonment and likely murder has not reached his family, his co-workers nor the human rights organizations.

22     The *kwan-li-so* continue to be an effective tool of deterrence for the DPRK.  So long as the current regime retains power, I do not foresee the North Korean regime loosening its iron tight grip on its people in the foreseeable future, and thus the abduction of North Korean citizens and their transfer to the *kwan-li-so* will likely continue unabated.

23     In consideration of the foregoing, and based upon my personal knowledge and research of the type reasonably relied upon by an expert in my field, it is my opinion that North Korea is directly responsible for the abduction, torture and death of Reverend Kim.  The claims as stated in the plaintiff's complaint are, in my expert opinion, valid and consistent with the facts.

24     I am providing this Declaration on behalf of the Kim Family plaintiffs without monetary compensation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the 5th day of April, 2011

David Hawk

12

<u>Appendix A</u>

Curriculum Vitae

000135

*RESUME*                                                    *December  2008*

# David Hawk

446 Kent Avenue, Apt 6D
Brooklyn, NY 11211
Tel (212) 787-0235     Mobile (718) 644-2963
Email: hawkdavid@hotmail.com

## CAREER HIGHLIGHTS

- Voter registration and community organizing in Mississippi and Georgia during the civil rights movement;
- Leadership positions in opposition to the escalation of the war in Vietnam;
- Executive Director of the United States section of Amnesty International during its formative stage;
- Path-breaking research, documentation and analysis of the Khmer Rouge atrocities in Cambodia under the auspices of the Columbia University Center for the Study of Human Rights;
- Helped pioneer human rights education and training programs and the insertion of human rights provisions in comprehensive peace agreements and peace-keeping missions;
- Directed the Cambodia Office of the UN High Commissioner for Human Rights, then the largest UN human rights field office;
- Path-breaking research, documentation and analysis of the severe human rights violation in  North Korea.

## WORK EXPERIENCE

**Consultant, Human Rights and International Affairs**

**Senior Advisor**,
U.S. Committee for Human Rights in North Korea
Washington DC, July 2008 to present

Recommend advocacy positions on North Korea vis-à-vis the United Nations, the US and South Korean governments and non-governmental organizations; research and documentation of on-going human rights violations in North Korea.

**Reagan-Fascell Fellow,**
International Forum for Democratic Studies
National Endowment for Democracy
Washington, D.C.  March to July 2008

1

Investigated human rights, governance and transparency provisions regarding bi-lateral and multilateral assistance to North Korea in the event of progress toward the elimination of North Korea's nuclear weapons program.

**Freedom House**
New York, NY (August 2006 to July 2007)

Analyzed the phenomena of repression associated with the North Korean gulag system according the elements of crimes against humanity as set forth in Article 7 of the Rome Statute of the International Criminal Court and parallel provisions from the Ad Hoc Tribunals for Rwanda and the former Yugoslavia.  Authored report, *Concentrations of Inhumanity*, published in May 2007 in English and July 2007 in Korean.  Presented findings at UN Human Rights Council parallel meeting, Geneva, March 2007.  Made presentations for Freedom House in Washington, Rome, Gdansk, Seoul, Toronto and Ottawa.

Designed strategy for including human rights issues in the Working Groups at the Beijing-based "Six Party Talks" and met past and present US negotiators to discuss potential human rights components in the North Korean de-nuclearization process.  Designed strategy for raising DPRK "state-responsibility," "individual accountability, and "responsibility to protect" in the UN system.  Conducted trainings for South Korean and Korean-American student activists in Seoul and Berkeley, California.

**US Commission on International Religious Freedom**
Washington, DC (November 2004 – December 2005)

Researched freedom of thought, conscience, religion and belief in North Korea based on extensive interviews with former North Korean refugees now resident in South Korea, and authored one hundred page report *Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of Freedom of Thought Conscience and Religion in North Korea* published in November 2005 and in Korean in 2006.  Presented findings to UN Ambassadors luncheon at UN Commission on Human Rights, Geneva, March 2005.

**US Committee for Human Rights in North Korea**
Washington, DC (August 2002 – November 2004)

Researched and authored landmark 120 page report, *The Hidden Gulag: Exposing North Korea's Prison Camps – Prisoner's Testimonies and Satellite Photographs*, based on extensive in-depth interviews with North Korean refugees who recently obtained asylum in South Korea.  The report was translated into Korean and Japanese and published in book format in Seoul and Tokyo.

000137

Organized a successful advocacy campaign at the 2003 and 2004 UN Commission on Human Rights to secure the first-ever UN resolutions recognizing and condemning gross human rights violations and unsatisfactory humanitarian practices in the Peoples Democratic Republic of Korea.  Testified on North Korean political forced labor camp system to Senate Foreign Relations Committee.  Lectured on North Korea at numerous universities including Harvard, Cornell, University of Pennsylvania, Columbia, Stanford, UC Berkeley, University of Texas, Fordham, Seoul National University and Handong University, Korea.  Participated in numerous conferences, seminars and consultations on strategic and political developments on the Korean peninsula.

**Landmine Survivors Network**
Washington, DC (June 1999- 2004)

Conducted needs assessment, designed program, drafted and negotiated Memoranda of Understanding and Agreement for a program of assistance and peer group support to amputees in Quang Binh Province, Vietnam; investigated the prospects and requirements for the employment of disabled persons in Cambodia's garment industry; conducted feasibility study and assisted campaign strategy for United States accession to the 1997 Landmine Ban Treaty; designed campaign strategy for and attended the 2003 and 2004 meetings of the Ad Hoc Committee (of the General Assembly) for Consideration of Proposals for a Convention on the Rights of Persons with Disabilities.

**United Nations**
UN High Commissioner for Human Rights Cambodia Office, Phnom Penh
**Head of Office** (July 1996 - January 1998)
**Chief, Education, Training and Information Unit** (Nov.1995-June 1996; Jan.1998-Jan. 1999)

Responsibilities: <u>Head of Office</u>

Represented the United Nations High Commissioner for Human Rights to the Royal Government of Cambodia, the diplomatic corps, UN Agencies, non-governmental organizations, press and media in Cambodia.

Provided overall leadership and direction for the Cambodia Office, a UN field operation of fifty staff persons stationed in twelve provinces and Phnom Penh, with an annual budget of three to four million dollars.

Oversaw the implementation of technical cooperation programs, including legal assistance to the National Assembly and Government ministries, education, training and

3

000138

information programs for the judiciary, armed forces, police, teachers, other officials, and NGO staff and members at the national, provincial and local levels.

Assured -- in cooperation with the Special Representative of the Secretary-General for Human Rights in Cambodia -- the protection of the human rights of all persons in Cambodia, including overseeing the monitoring, investigating and reporting of human rights violations; advised and assisted the Special Representative on his official missions to Cambodia and managed the necessary follow-up, including confidential communications with the Government of Cambodia, and public reports.

Developed and implemented programs and policies of cooperation with other UN agencies, programs and funds, intergovernmental organizations, bilateral assistance programs, foundations and NGOs including the preparation of project documents and funding proposals, and including the preparation of reports to the UN General Assembly and Commission on Human Rights.


Responsibilities: <u>Chief of Education, Training and Information Unit</u>

Developed, managed and supervised substantial education, training and information programs in human rights for the Cambodian Government, NGOs, and targeted publics.

Commissioned or oversaw the preparation of curricula, training and information materials for various target groups such as police and military personnel, members of the judiciary, school teachers, clergy, local government officials, women, minorities, and other targeted groups.

Promoted public awareness of human rights and coordinated the translation and distribution of existing UN instruments, publications and relevant Cambodian laws.

Developed and managed a large-scale program of support to Cambodian NGOs financed through the UN Trust Fund for Human Rights Education in Cambodia.

Developed and managed programs of support to vulnerable groups such as women, children and minorities.

Assisted the Cambodian Government in the preparation of reports to UN treaty implementation review bodies for the human rights conventions ratified by Cambodia.


**Consultant, Human Rights and International Affairs**
New York, (1994 - 1995)

Principal author of chapters on ethnic minorities in Brunei, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand and Vietnam, *World Handbook on Minorities*, Minority Rights Group, London, England, 1996.

000139

Participated in Amnesty International mission to Rwanda-Burundi and contributed to AI report making recommendations for action by international community (June-July 1995).

Revised, up-dated and edited report on "Ethnic Minorities in Cambodia" for the Minority Rights Group, London, England, 1995.

Investigated Rwandan genocide through detailed reconstruction of selected massacres, and prepared report for the US Committee for Refugees, Washington D.C. (July-Sept. 1994).

Organized human rights educational and training exchange programs for Cambodian and Indonesian human rights activists for the Puebla Institute and the National Forum Foundation, Washington, D.C., 1994-1995.

**Executive Director, Cambodia Documentation Commission**
New York, (1983 to 1994)

Founded NGO composed of Cambodian refugee leaders, human rights and international law specialists to promote and protect human rights in Cambodia and seek accountability for the grave violations of international law committed under Khmer Rouge rule.

Developed strategy and organized planning, fundraising, public relations, and general management; wrote or edited research papers, reports, petitions and appeals; conducted press conferences and briefing sessions for radio, TV and print media.

Monitored and reported on annual deliberations at the General Assembly and UN Commission Human Rights, peace conferences and negotiations, and the UN peace-keeping mission in Cambodia.

Organized the translation of fifteen major international human rights conventions and declarations into the Khmer language.

Developed and conducted human rights education, teacher and monitoring training programs in Cambodia and the refugee encampments in Thailand.

Lobbied signatories to the Genocide Convention to take legal action against the Khmer Rouge at the International Court of Justice.

Successfully lobbied Permanent Members of the Security Council to include stronger human rights provisions in the 1991 Cambodian peace treaty.

Successfully lobbied Cambodian political leaders to ratify major human rights treaties.

000140

**Fellow**, **Columbia University Center for the Study of Human Rights**
**New York  (1982-1988)**

Conducted and organized oral histories with survivors of the Cambodian genocide, gathered archival and photographic documentation, and organized scholarly and legal research on the grave violations of international law in Cambodia under Khmer Rouge rule in order to collect and/or produce evidentiary and legal analyses necessary for potential proceedings before the International Court of Justice by States Parties to the Convention on the Prevention and Punishment of the Crime of Genocide.

Co-authored a 200-page model legal brief, "The Case Against the Standing Committee of the Communist Party of Kampuchea.

**Adjunct Lecturer, Hunter College, City University of New York**
New York (Fall and Winter 1982)

Taught course on international human rights, Dept. of Philosophy, Program on Religion

**Director, Khmer Program, World Conference on Religion and Peace**
Bangkok, Thailand (1980-1981)

Monitored the largest (up to that time) UN refugee and humanitarian relief operation for a NGO in Consultative Status with ECOSOC.

Prepared reports for circulation within the UN system.

Provided in-depth briefings and coordinated on-site visits for parliamentarians and donor agency officials to refugee encampments along the Thai-Cambodia border.

**Consultant, Amnesty International**
New York, Washington, London (Fall 1978-Spring 1980)

Lobbied Department of State, White House and Congress and organized legal, human rights, religious and labor groups to press for U.S. ratification of UN human rights conventions.

Formulated strategy and background papers for set of hearings by Senate Foreign Relations Committee on the International Human Rights Covenants.

Researched and designed an international education and lobbying campaign on the human rights conventions for the London-based Secretariat of Amnesty International.

000141

**Executive Director, Amnesty International, USA**
New York (1974-1978)

Planned, reorganized and directed growth of United States section of the 1978 Nobel Prize winning human rights organization.  Oversaw growth of AIUSA budget from $250,000 to $2 million per year and supervised national staff expansion from three to twenty persons.

Expanded program to include rapid response mechanisms, publicity campaigns on specific countries and global phenomena of repression as well as group letter writing campaigns for individual political prisoners.

Opened Washington D.C. office to advocate greater role for human rights considerations in formation of US policy and funded AI office at United Nations to press for human rights measures in the UN system.

**Consultant, National Council of Churches**
New York (Fall and Winter 1971)

Designed ecumenical conference and commission on U.S. policy in Indochina

**Co-Founder and National Coordinator, Vietnam Moratorium Committee**
Washington D.C. (1969-70)

Organized the broad-based, large-scale public rallies known as the "Moratoriums" of 15 October and 14-16 November 1969.

**Vietnam and Draft Coordinator, National Student Association**
Washington, DC  (Spring 1967 – Summer 1969)

**Case Worker, New York State Department of Social Services**
Central Harlem, New York (Fall 1967)

**Counselor and Youth Worker, Greene Avenue Methodist Church**
Bushwick/Bedford-Stuyvesant, Brooklyn, (Weekends1965-1967)

**Voter Registration and Community Organizer, Southwest Georgia Project**
Cordelle, Georgia (Summer 1966)

Organized tenants council in low income housing project and assisted voter registration and education drive by civil rights and church groups.

**Voter Registration and Community Organizer, Council of Federated Organizations**
Hattiesburg, Mississippi (Summer 1964)

000142

Worked on voter registration and education campaign for coalition of civil rights and church groups known as "Mississippi Freedom Summer."


PUBLICATIONS
(Partial Listing)

"Appendix: Human Rights Issues During Phase Three of the Six Party Talks on the Denuclearizaiton of the Korean Peninsula" in *Failure To Protect: the Ongoing Challenge of North Korea,* Havel, Bondevik and Wiesel, DLA Piper, the Committee for Human Rights in North Korea, and The Oslo Center for Peace and Human Rights, September, 2008

"Introduction", *A Prison Without Bars: Refugee and Defector Testimony of Severe Violations of Freedom of Religion or Belief in North Korea,* US Commission on International Religious Freedom, Washington DC, March 2008.

"The Realities and Policies of Third-World Nations Regarding North Korean Defectors, with an Emphasis on Mongolia and Thailand", *International Trends Concerning Human Rights for North Korean Defectors,* National Human Rights Commission of Korea, Seoul, November 2007.

*Concentrations of Inhumanity: An Analysis of the Phenomena of Repression Associated with North Korea's Kwan-li-so Political Penal Labor Camps According to the Terms and Provisions of Article 7 of the Rome Statute of the International Criminal Court and the Parallel Provisions of Customary International Law on Crimes Against Humanity,* 65 pages, Freedom House, Washington, May 2007, Korean translation, Seoul, July 2007.

"Factoring Human Rights Into the Dismantlement of Cold War Conflict on the Korean Peninsula" in *Human Rights in North Korea*, Eds.. Kie-Duck Park and Sang-Jin Han, The Sejong Institute, Seoul, 2007.

"Human Rights and the Crisis in North Korea" in *North Korea: 2005 and Beyond*, Eds. Philip Yun and Gi-Wook Shin, Asia-Pacific Research Center (APARC), Stanford University/Brookings Press, March 2006

*Thank You Father Kim Il Sung: Eyewitness Accounts of Severe Violations of Freedom of Thought, Conscience and Religion in North Korea*, United States Commission on International Religious Freedom, Washington DC, November 2005, 106 pages.

*Hidden Gulag: Exposing North Korea's Prison Camps – Prisoner's Testimonies and Satellite Photographs,* US Committee for Human Rights in North Korea, Washington DC, November 2003, 120 pages. Korean language edition, Seoul, January 2004. Japanese language edition, Tokyo, August 2004.

8

"Going to Trial, Or Maybe Not: Notes on Cambodia's Tortuous and Unresolved Path to Transitional Justice," Brandeis University Center for Ethics, Justice and Public Life, January 2003.

"Confronting Genocide in Cambodia," *Pioneers in Genocide Studies*, Eds. Samuel Totten and Steve Jacobs, Greenwood Publishers, 2003

Chapters on Brunei, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand and Vietnam, *World Handbook on Minorities*, Minority Rights Group, London England, 1996.

"Rwanda and Burundi: A Call for Action by the International Community," Amnesty International, London, September 1995 (co-author).

"Genocide in Rwanda: Documentation of Two Massacres during April 1994," U.S. Committee for Refugees, Washington D.C., October 1994.

"Human Rights Aspects of a Comprehensive Solution to the Conflict in Cambodia," Cambodia Documentation Commission, New York, 1990.

"Torture and Extra-judicial Execution Under Khmer Rouge Rule," Karl Jackson, ed., *Cambodia 1975-1979: Rendezvous with Death*, Princeton University Press, 1989.

"The Cambodian Genocide," Israel Charny, ed*., Genocide: A Critical Bibliographical Review*, Mansell Ltd., London, 1988.

"International Human Rights Law and Democratic Kampuchea," Ablin and Hood, eds., *The Cambodian Agony*, M.E. Sharpe, 1987.

 "How S.21 Killed 20,000 at Tuol Sleng," *Index on Censorship*, January 1986 (cover story).

"Relief and Rehabilitation in Kampuchea," Nishino and Yomaoka, eds., *Development Cooperation in Asia*, Waseda University, Tokyo, 1984 (in Japanese).

"Review: Quality of Mercy by William Shawcross, *Washington Post Book World*, July 15, 1984 (cover review).

"The Killing of Cambodia: A Report from Phnom Penh," *The New Republic*, November 15, 1982 (cover story).

"Famine Relief, Refugee Flows and Political Stalemate in Cambodia," Waseda University, Tokyo, November 1981 (in Japanese).

"Three Books on Foreign Policy and Human Rights: A Review," *Worldview*, New York, March 1980.

"Carter's Human Rights Policies at Half Time," *The New Republic*, April 1979.

(A series of reports written in Bangkok between 1980 and 1982 and in New York between 1982 and 1992 on the Cambodian refugee crisis, famine relief operation, and political developments regarding the international conflict in and over Cambodia is available upon request.)

ACADEMIC BACKGROUND

Member, University Seminar on Human Rights, Columbia University, New York, 1982-1995, 2000-2008; participant in University Seminar on Peace 2006-2007.

International Fellow in Human Rights, Intervention and International Law
Brandeis University Center for Ethics, Justice and Public Life, 2001-2003.

Fellow, Columbia University Center for the Study of Human Rights, 1982-1988.

Research Fellow, Indochina Studies Program, Social Science Research Council
New York, 1983-84.

Magdalen College, Oxford University, Oxford England, 1972-1974
        Completed two years of graduate study in International Relations.
        Activities and Honors: Oxford University Foreign Policy Club (faculty and
        graduate students by invitation), Oxford University Strategic Studies Club.

Union Theological Seminary, New York City, 1965-67, 1972, Master of Divinity, 1972
        Area of Study: Social Ethics
        Activities and Honors: Dean's Assistant, Student Interracial Ministry.

International Fellow, School of International and Public Affairs, Columbia University,
1970-71
        Interdisciplinary seminar program (providing full tuition scholarship to Columbia
        graduate school) with SIPA faculty and prominent diplomatic, military and
        political authorities.

Cornell University, Ithaca New, New York 1960-1965, Bachelor of Science, 1965
        Area of Study: Industrial-Labor Relations; social and political sciences
        Activities and Honors: Dean's List, Junior and Senior Men's Honorary Societies,
        Dorm Counselor, All-American Intercollegiate Swim Team.

Appendix B

Hidden Gulag: Exposing North Korea's Prison Camps –
Prisoner's Testimonies and Satellite Photographs

# The Hidden GULAG

## Exposing North Korea's Prison Camps

*Prisoners' Testimonies
and Satellite Photographs*

**David Hawk**
**U.S. Committee for Human Rights in North Korea**

000147

# The Hidden GULAG

## Exposing North Korea's Prison Camps

*Prisoners' Testimonies*
*and Satellite Photographs*

**David Hawk**
**U.S. Committee for Human Rights in North Korea**

000148

**The U.S. Committee for Human Rights in North Korea** is an independent, nongovernmental organization based in Washington, D.C. Created in 2001, the Committee was established to conduct independent research on human rights abuses in North Korea, and to disseminate its findings. It is not affiliated with the U.S. government.

## Board of Directors

Morton Abramowitz, *The Century Foundation*

Gary Ackerman, *U.S. House of Representatives*

Jaehoon Ahn, *Radio Free Asia*

Richard V. Allen, *The Richard V. Allen Company*

Robert L. Bernstein, *founder of Human Rights Watch*

Roberta Cohen, *The Brookings Institution*

Chuck Downs, *author of* Over the Line: North Korea's Negotiating Strategy

Nicholas Eberstadt, *American Enterprise Institute*

Phil Fishman, *AFL-CIO*

Carl Gershman, *National Endowment for Democracy*

Helen-Louise Hunter, *author of* Kim Il-Song's North Korea

Fred Charles Iklé, *Center for Strategic and International Studies*

Stephen Kahng, *4C Ventures*

Mark Kirk, *U.S. House of Representatives*

Helie Lee, *author of* In the Absence of Sun: A Korean American Woman's Promise to Reunite Three Lost Generations of Her Family

James Lilley, *American Enterprise Institute*

Philip Merrill, *Export-Import Bank*

Marcus Noland, *Institute for International Economics*

Joseph Pitts, *U.S. House of Representatives*

Jack Rendler, *Human rights advocate*

Suzanne Scholte, *Defense Forum Foundation*

John Shattuck, *John F. Kennedy Library Foundation*

Stephen J. Solarz, *APCO Worldwide*


Debra Liang-Fenton, *Executive Director*
**U.S. Committee for Human Rights in North Korea**
1101 15th Street, NW, Suite 800
Washington, DC 20005 USA
Tel: (202) 467-4765
Fax: (202) 293-6042
Web: WWW.HRNK.ORG

Report edited by Jennifer Fiore, Debra Liang-Fenton
Designed by Stewart Andrews, *Noodlebox Design, LLC*

## About the Author

A prominent human rights investigator and advocate, David Hawk worked for the United Nations directing the Cambodia Office of the U.N. High Commissioner for Human Rights in 1996 and 1997. In the early and middle 1980s, Hawk investigated and analyzed the Khmer Rouge genocide, publishing groundbreaking prisoner/execution photographs and original documents in association with the Columbia University Center for the Study of Human Rights. In the late 1980s and early 1990s, Hawk established and directed the Cambodia Documentation Commission (New York), which sought an international tribunal for the Khmer Rouge leadership, and human rights provisions and mechanisms in the 1991 Cambodian peace treaty and U.N. transitional peacekeeping operation.

In August 1995, Hawk traveled to Rwanda to investigate that nation's massacres for the U.S. Committee for Refugees, and in 1995, he returned to Kigali on a mission for Amnesty International. More recently, Hawk has consulted for the Landmine Survivors Network on U.S. landmine policy and humanitarian assistance projects in Cambodia and Vietnam. From 2001 to 2003, Hawk was a Brandeis University Fellow in Human Rights, Intervention, and International Law. A former executive director of Amnesty International/USA, he has served on the board of directors of that organization and on the advisory board of Human Rights Watch/Asia.

Hawk traveled to Seoul three times between August 2002 and February 2003 to interview former North Korean prisoners now in exile in South Korea for this report.

# ACKNOWLEDGMENTS

The U.S. Committee for Human Rights in North Korea expresses its deep appreciation to the Seoul-based Citizens' Alliance for North Korean Human Rights (Citizens' Alliance) and the Network for North Korean Democracy and Human Rights (NKnet) for arranging interviews in South Korea. An additional interview was arranged by Pnan, a refugee assistance group. The Committee also owes a debt of gratitude to the many North Korean former prisoners for their patience during the painstaking process of collecting information for this report, and for their courage for speaking out.

Obtaining the satellite images for this report would not have been possible without the support of DigitalGlobe, a spatial imaging and information company based in the United States. The Committee expresses its deep appreciation for DigitalGlobe's support, and for its important contributions in the field of satellite imaging.

This project has been made possible by the combined efforts of many talented and committed people. Highest appreciation goes to Matthew McKinzie, Sujin Hwang, Jason Slemons, and Tom Cochran of the Natural Resources Defense Council, an environmental advocacy organization, for their technical expertise related to the satellite photographic images. The Committee is indebted to Benjamin Yoon and Young Ja Kim of the Citizens' Alliance, and Howard Young of NKnet for their help, particularly in connection with the Glossary of Repression. Special thanks go to Hae Young Lee of the Citizens' Alliance for her invaluable assistance in reviewing the plethora of maps and satellite photographs with former North Korean prisoners, and for serving as skilled intermediary, translator, and fact-checker. Louisa Coan Greve's thoughtful review of the preliminary drafts of the report has greatly enhanced the finished product. Appreciation goes to the anonymous reviewers, and to Erin Sawaya for a range of assistance.

© 2003 U.S. Committee for Human Rights in North Korea

USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 153 of 411



© Copyright 2000 by Times Books Group Ltd., and Bartholomew Ltd. Random House, New York (Typeset and printed in the UK, February 2001).

# TABLE OF CONTENTS

Preface: Anne Applebaum, author of *Gulag: A History*                8
Executive Summary                                                     10

## INTRODUCTION                                                       14

Note on Sources                                                       15
Not in a Vacuum                                                       17
Note on Translations                                                  18
Information Base                                                      19
Glossary of North Korean Repression                                  22


## PART ONE

**THE NORTH KOREAN GULAG I:**
***KWAN-LI-SO* POLITICAL PENAL-LABOR COLONIES**

Introduction: Generations Imprisoned without Trial                   24
Who Are the Political Prisoners?                                      26
How Do We Know?                                                       28

**Witnesses and Testimony**
Witness: Ali Lamada, Sariwon                                          29

Witness: KANG Chol Hwan                                              30
Witness: AN Hyuk                                                      31
Witness: KIM Tae Jin                                                 32
Witness: LEE Young Kuk                                               33
Testimony: *Kwan-li-so* No. 15                                       34

Witness: KIM Yong                                                    36
Testimony: *Kwan-li-so* No. 14                                       37
Testimony: *Kwan-li-so* No. 18                                       38

Witness: AHN Myong Chol                                              38
Testimony: *Kwan-li-so* No. 22                                       39

**Closed *Kwan-li-so***
Witness: CHOI Dong Chul                                              40

Nos. 11, 13, 26, 12, 27                                              40

**Other *Kwan-li-so***
Nos. 16, 25, Suseong, 105                                            41

**THE NORTH KOREAN GULAG II:**
***KYO-HWA-SO* PRISON-LABOR FACILITIES**

Introduction: Deaths in Detention                                    41

**Witnesses and Testimony**
Witness: LEE Soon Ok                                                 43
Testimony: *Kyo-hwa-so* No. 1, Kaechon, South Pyong-an Province      44

Witness: JI Hae Nam                                                  46
Testimony: *Kyo-hwa-so* No. 1, Kaechon, South Pyong-an Province      47

Witness: Former Prisoner #6                                          48
Testimony: *Kyo-hwa-so* No. 77, Danchun, North Hamgyong Province     48

Witness: YOU Chun Sik                                                         49
Testimony: *Kyo-hwa-so* No. 22, Oro-kun, South Hamgyong Province              51

Witness: Former Prisoner #3                                                   51
Testimony: *Kyo-hwa-so* No. 3, Sinuiju, North Pyong-an Province              52

Witness: Former Prisoner #12                                                  52
Testimony: *Kyo-hwa-so* Hoeryong, North Hamgyong Province                    52

Witness: Former Prisoner #19                                                  53
Testimony: *Kyo-hwa-so* No. 4, Kangdong-kun, South Pyong-an Province         53

Witness: Former Prisoner #28                                                  54
Testimony: *Kyo-hwa-so* No. 12, Jeonger-ri, North Pyong-an Province          55


## PART TWO

**DETENTION FACILITIES AND PUNISHMENTS FOR NORTH KOREANS
FORCIBLY REPATRIATED FROM CHINA**

Introduction: *kam-ok, ku-ryu-jang, jip-kyul-so, ro-dong-dan-ryeon-dae*      56

**Witnesses and Testimony**
Witness: CHOI Yong Hwa                                                        60
Testimony: Provincial Detention Center, South Sinuiju                        60

Witness and Testimony: Former Detainee #24                                   61
    Provincial Detention Center, South Sinuiju

Witness: Former Detainee #1, Nongpo Provincial Detention Center, Chongjin    63
Testimony: Nongpo Provincial Detention Center, Chongjin                      63

Witness and Testimony: Former Detainee #8, Chongjin Detention Center         64
Witness and Testimony: Former Detainee #9, Onsong Labor-                     65
    Training Camp and Chongjin Provincial Detention Center

Witness and Testimony: Former Detainee #21, Onsong Police Jail               66

Witness and Testimony: Former Detainee #25, Onsong Detention                 67
    Center and Nongpo Detention Center

Witness: Former Detainee #26, Nongpo Detention Center                        68
Testimony: Nongpo Detention Center                                           69


## PART THREE
Summary of Torture Testimony                                                 70
Summary of Infanticide Testimony                                             72

## PART FOUR
Recommendations                                                              73


## APPENDICES

A.  U.N. Commission on Human Rights, Resolution on North Korea,
    15 April 2003, E/CN.4/2003/L.31/Rev.1                                    76

B.  Concluding Observations of the U.N. Human Rights Committee:
    Democratic People's Republic of Korea, 27 July 2001
    CCPR/CO/72/PRK                                                           79

C.  International Labor Organization                                         86
    Declaration on Fundamental Principles and Rights at Work

# SATELLITE PHOTOGRAPHS

Satellite Imagery of the North Korean Gulag                                    88
*Matthew McKinzie, Natural Resources Defense Council*

Map of Selected North Korean Prison Camp Locations                            89

*Kwan-li-so No. 15, Yodok, South Hamgyong Province*
*Annotations: KANG Chol Hwan*
    Partial Overview                                      90
    Detail of Knup-ri District                            91
    Detail of Knup-ri District                            92
    Detail of Knup-ri District                            93
    Detail of Yongpyong-ri District                       94
    Detail of Yongpyong-ri District                       95
    Detail of Pyongchang-ri District                      96
    Detail of Limsan Valley                               97
    Detail of Prison Workers' Unit 4 Village              98
    Detail of Ipsok-ri District                           99
    Detail of Gold Mine Village                          100

*Kwan-li-so Nos. 14 and 18, Kaechon and Bukchang, South Hamgyong Province*
*Annotations: KIM Yong*
    Partial Overview                                     101
    Detail of No. 18, 6th Division                       102
    Detail of No. 18, 6th Division                       103
    Detail of No. 18, 6th Division                       104
    Detail of No. 18, 4th and 5th Divisions              105
    Detail of No. 18, 4th and 5th Divisions              106
    Detail of No. 18 Periphery                           107
    Detail of No. 18 Periphery                           108
    Detail of No. 14 and No. 18                          109
    Detail of No. 14, Headquarters                       110
    Detail of No. 14, Prisoner Housing                   111
    Detail of No. 14, Prisoner Housing                   112

*Kwan-li-so No. 22, Haengyong, North Hamgyong Province*
*Annotations: AHN Myong Chol (taken from the Far Eastern Economic Review)*
    Overview                                             113
    Detail of Northern Haengyong                         114
    Detail of Southern Haengyong                         115
    Detail of Haengyong Headquarters                     116
    Detail of Chungbong Mine                             117

*Kyo-hwa-so No. 1, Kaechon, South Pyong-an Province*                          118
*Annotations: JI Hae Nam, LEE Soon Ok*

Sinuiju Detention Center, North Pyong-an Province                             119
*Annotations: Former Prisoner*

Nongpo Detention Center, Chongjin, North Hamgyong Province                    120
*Annotations: Former Prisoner*

# PREFACE

## Anne Applebaum

*In 1929, when Stalin's Politburo first began* to discuss the expansion of the concentration camp system that eventually became known as the gulag, there were almost no objections. According to the protocols of the commission set up to examine the matter, a few of the Soviet Union's leaders did worry that it would be difficult to set up prison camps in the far northern region of the country. A few also wondered whether it would be possible to build roads and railroads to those distant places. No one, then or later, worried that conditions would be too harsh or that too many people would die. In the end, only one possible problem was taken seriously: that the system might look bad abroad. "The bourgeois foreign press," one commissar complained, might claim that "instead of building a penitentiary system intended to reform prisoners through corrective labor, we've put up [secret police] fortresses."

In other words, the Politburo never worried that the camps *were* bad, but some did fear that they might *look* bad. That fear continued to nag at Stalin's henchmen, as well as their successors. In the early 1930s, the Soviet Union went to great lengths to disguise the number of prisoners working in its logging camps, in order to discourage foreign boycotts of Soviet timber. In 1931, the writer Maxim Gorky was commissioned to write a book — *The Canal Named for Stalin* — that described, in glowing terms, the White Sea Canal. The canal had been constructed by some 100,000 prisoners working in the most primitive conditions imaginable. The book was intended to convince foreigners that Soviet prisoners had been enlightened by the experience. Throughout the 1930s and 1940s — and indeed throughout the 1970s and 1980s — the Stalinist regime laid on elaborate propaganda tours for foreign delegations, inviting them to see how well prisoners lived. Model prisons were constructed especially for such visitors.

At the same time, the regime did its best to hide the real truth about the camps, concealing both the vast geographic extent of the slave-labor system, as well as the enormous numbers of prisoners involved. From 1918, right up until the Soviet Union's collapse in 1991, Soviet leaders did everything possible to hide their prisons and labor camps from the outside world. They feared both that the Soviet Union's international reputation would be damaged if the truth were known, and, more importantly, that the revelation about life in the camps would undermine the regime's legitimacy at home. If the "bourgeois foreign press" got hold of the evidence, after all, then it would be far harder for the Soviet Union to portray itself as progressive, as enlightened, and as the font of international revolution.

In the fullest possible sense, the contemporary leaders of North Korea are the intellectual and moral descendants of these Stalinists. From the testimony presented so vividly in this volume, it is clear, first of all, that the North Korean camps were built according to a Stalinist model, and that they continue to be run that way. Documents have already come to light proving that the Soviet Union sent advisers to China in the 1950s to help the Chinese organize labor camps. This volume provides strong evidence that something similar happened in North Korea. As in Stalin's time, North Koreans are arrested for trumped-up political "crimes," such as reading a foreign newspaper, singing a South Korean pop song, or "insulting the authority" of the North Korean leadership. As in Stalin's time, North Korean prisoners — even children — are given ludicrous and impossible work "quotas" to fulfill and are subjected to brutal, irrational punishments. And, as in Stalin's time, North Korea's leadership doesn't want anyone to know any of these details, since such revelations not only will damage their foreign reputation but also put their own regime at risk.

This, of course, is precisely why the full documentation of the North Korean camps is so important and why this report, compiled with such care and precision, is so significant. Painstakingly, David Hawk and the U.S. Committee for Human Rights in North Korea have compiled an enormous amount of information, including not just the numbers of prisoners and the locations of camps but also the details of camp life — the winter cold, the numb fingers, the workplace accidents — that make the stories more vivid. Those details are also what make this report so powerful.

Some, of course, will avoid reading it, fully knowing that if they do read it, they will have to change their tactics, or at least think differently about the political problems posed by North Korea. Certainly after absorbing such details, it will be more difficult for Americans or Europeans to sit down and negotiate, coldly, with their Korean counterparts and not mention human rights violations. South Koreans, when they know the details of life in the North, will also find it more difficult to argue in favor of appeasing the Northern regime. If these stories filter back to the North Korean police and administrators, those officials too will find it more difficult to justify their own behavior, or to claim that they don't know what is really happening in the country's concentration camps. And if the full truth about the camps becomes known to the wider population, then whatever support remains for the state constructed by Kim Il Sung and Kim Jong Il will begin, even more decisively, to ebb away.

This is not to say that words can make a dictatorship collapse overnight. But words certainly can make a dictatorship collapse over time, as experience during the last two decades has shown. Totalitarian regimes are built on lies and can be damaged, even destroyed, when those lies are exposed. The greater and more detailed evidence that can be provided, the more damage the truth can do.

# EXECUTIVE SUMMARY

This report describes a number of penal institutions in the Democratic People's Republic of Korea (DPRK) administered by two different North Korean police agencies: the *In-min-bo-an-seong* (People's Safety Agency)[1] and the more political *Kuk-ga-bo-wi-bu* (National Security Agency). The report outlines two distinct systems of repression: first, a North Korean gulag[2] of forced-labor colonies, camps, and prisons where scores of thousands of prisoners — some political, some convicted felons — are worked, many to their deaths, in mining, logging, farming, and industrial enterprises, often in remote valleys located in the mountainous areas of North Korea; and second, a system of smaller, shorter-term detention facilities along the North Korea–China border used to brutally punish North Koreans who flee to China — usually in search of food during the North Korean famine crisis of the middle to late 1990s — but are arrested by Chinese police and forcibly repatriated to the DPRK.

Both police agencies above are involved with both repressive systems detailed and categorized in the following pages. And both systems involve extreme phenomena of repression that, to the researcher's knowledge, are unique to North Korea: guilt-by-association, lifetime sentences of hard labor for three generations of individuals related to the purged political prisoners who are sent to the gulag with no judicial process whatsoever; and forced abortions for detained North Korean pregnant women forcibly repatriated from China or the murder of their newborn infants.

**Introduction.** The introduction of this report outlines the methodology, sources, and information-base used in creating the report and contains a glossary of terms relating to North Korean repression.

**Part One.** Part One of this report begins by describing the phenomena of repression associated with the North Korean *kwan-li-so*, most descriptively translated as "political penal-labor colonies." In the *kwan-li-so*, tens of thousands of political prisoners — along with up to three generations of their families — are banished and imprisoned without any judicial process for usually lifetime sentences. Their sentences entail slave labor in mining, logging, and farming enterprises in the valleys of mountainous areas in north and north-central North Korea. The *kwan-li-so* are described as colonies because they are sprawling encampments, twenty or more miles long and ten to twenty miles wide, containing multiple, enclosed, self-contained sections, or "villages," for different categories of prisoners.  Some of the sections are for the political prisoners; others are for the families of the presumed political offenders, so that purged political prisoners have no contact with their imprisoned parents, grandparents, or children.

The existence of the political forced-labor camps is denied by the DPRK. Part One of this report also describes how the outside world has come to know about these political penal-labor colonies, and what is known about who the prisoners are.

---

[1] Before 1998, called the *Sa-hoe-an-jeon-bu* (Social Safety Agency).

[2] A Russian-language acronym for *Glavnoe Upravlenie Lagerei*, the "general administration of [slave labor] camps."

One of the *kwan-li-so*, No. 15, at Yodok in South Hamgyong Province, is unique in that it has a re-education section, from which small numbers of prisoners can be released. At least four such prisoners have been released from Yodok, fled North Korea, and were interviewed for this report. They are profiled, along with a description of *Kwan-li-so* No. 15 drawn from their accounts. Only one former prisoner is known to have escaped from the *kwan-li-so*. He is profiled along with his account of No. 14 and No. 18, where he was imprisoned. A former guard at several *kwan-li-so* defected to South Korea. His story is told along with his description of *Kwan-li-so* No. 22. With the exception of *Kwan-li-so* No. 18, the political penal-labor colonies are administered by the *Kuk-ga-bo-wi-bu* (National Security Agency).

Formerly there had been a dozen *kwan-li-so*, but these have been consolidated into six or seven colonies. This consolidation and what is known about the closed camps is briefly described. Within the last several months, commercial satellite photographs of several *kwan-li-so* have become available. Several such photographs are contained in this report, with specific buildings identified by the former prisoners.

Part One of this report goes on to describe the second component of the North Korean gulag: a series of smaller penal-labor camps and penitentiary-like institutions called *kyo-hwa-so*. In the *kyo-hwa-so*, as in the *kwan-li-so*, prisoners are compelled to perform hard labor — virtually slave labor — under dreadfully harsh conditions, in mining, logging, textile manufacturing, or other industrial projects, such as brick- or cement-making. However, these prisoners are subjected to a judicial process and given fixed-term sentences according to the DPRK criminal code, after which they can be released. The *kyo-hwa-so* are administered by the *In-min-bo-an-seong* (People's Safety Agency).

The majority of *kyo-hwa-so* prisoners are imprisoned because they have been convicted of what would be in any society felony crimes. But some prisoners are "political" in that they are convicted for actions that would not be normally criminalized: one woman interviewed for this report, for example, described being convicted of disturbing the "socialist order" for singing, in a private home, a South Korean pop song.

A major phenomenon of repression associated with the *kyo-hwa-so* is the shockingly large number of deaths in detention from slave labor under dangerous circumstances and from starvation-level food rations. Former prisoners interviewed for this report explain that many of their fellow captives did not expect to survive long enough to complete their sentences — and that thousands of them did not survive. States, of course, have the right to deprive duly convicted criminals of liberty and remove them from society. States do not have the right to deprive prisoners of their right to food, or to work them, literally, to death. Eight former *kyo-hwa-so* prisoners were interviewed for this report. Their stories, and their accounts of seven different prison-labor camps, are described in Part One.

**Part Two.** Part Two of this report describes a series of detention facilities, administered by North Korean police forces, that are located in areas along the North Korea–China border and used to interrogate and punish North Koreans forcibly repatriated from China. These facilities are called *ka-mok* (police-station jails) or *ku-ryu-jang* (detention-interrogation facilities, typically inside a police station). The two types of penal-labor facilities in this system are called *ro-dong-dan-ryeon-dae* (labor-training camps) and *jip-kyul-so* (detention/forced-labor centers). Provincial *jip-kyul-so* are referred to as *do-jip-kyul-so*.

The *jip-kyul-so* detention centers are facilities where both repatriated North Koreans and low- or misdemeanor-level criminals are held for up to six months of hard labor, for example brick-making or local construction projects. It should be noted that many technically illegal misdemeanor offenses are famine-motivated, for example taking food from state storehouses or state farm fields; not showing up at one's assigned workplace (when the North Korean production-distribution system broke down and enterprises were no longer in production or paying wages, many workers stopped going to their assigned jobs); unauthorized private enterprise; unauthorized trading or economic activity; leaving one's assigned village without authorization; or leaving the country without authorization.

The *ro-dong-dan-ryeon-dae* labor-training camps are even shorter-term, more localized detention/forced-labor facilities. One former detainee stated that, unlike the *jip-kyul-so* detention centers and the *kyo-hwa-so* prison-labor facilities, the *ro-dong-dan-ryeon-dae* do not appear in the North Korean statute books. Rather, they are ad hoc measures initiated by local authorities to cope with the overflow of famine-related misdemeanor arrestees. Another former detainee mentioned that all inmates in one labor-training camp were former repatriates who were being isolated from the common-crime detainees in the provincial detention center, so that the repatriated detainees could not tell the common-crime detainees about the prosperity and personal freedoms available in China.

When first repatriated from China, North Koreans are questioned in the police jails and detention facilities about why they went to China, what they did there, and when. More ominous questions follow, revolving around whether the individual being questioned had any contact with South Koreans while in China, which is deemed a political offense. (Many North Koreans do have contact with South Koreans there, as this part of northeast China, formerly known as Manchuria, is frequented by South Korean businessmen, students, tourists, missionaries, and refugee and humanitarian aid workers.) Fearing transfer to a *kwan-li-so* or *kyo-hwa-so*,[3] or even execution, repatriated North Koreans typically deny having had any contact with South Koreans or exposure to South Korean radio stations, television programs, movies, or music while in China. But such denials often are not deemed credible by the North Korean police, who literally attempt to beat the truth out of the repatriated detainees. When the police are satisfied, the repatriates are transferred to the *jip-kyul-so* police detention centers or *ro-dong-dan-ryeon-dae* labor-training camps. This report tells the stories of nine North Koreans forcibly repatriated from China, and the police interrogations, detentions, and mistreatments these Koreans were subjected to upon repatriation.

---

[3] Three former repatriated persons interviewed for this report were so transferred.

Two phenomena of extreme repression are associated with the treatments meted out to repatriated Koreans. First, the *jip-kyul-so*, despite the shortness of sentences served there, are characterized by very high levels of deaths in detention from inadequate food combined with excessively hard labor — most seriously affecting those detainees lacking nearby relatives to bring them extra food. (Many detainees, when they become too emaciated or sick to perform hard labor, are given sick-leave or release so that they can recover or die at home, reducing the number of deaths in detention.) Second, in at least three places of detention along the North Korea–China border cited by persons interviewed for this report, North Korean women who were pregnant when repatriated were subsequently subjected to forced abortions, or if the pregnancy was too advanced, were allowed to deliver their babies only to have them killed immediately after birth (based on the possibility that the Korean women had been impregnated by Han Chinese men).

**Part Three.** Most of the prisoners and detainees interviewed for this report were tortured, many horribly and repeatedly. Part Three of this report summarizes the methods of torture endured or witnessed by the former prisoners and detainees interviewed. It also summarizes the testimony of eight former detainees who themselves witnessed or have firsthand knowledge of forced abortions and ethnic infanticide.

**Part Four.** The concluding section of this report, Part Four, makes various recommendations to the DRPK, to China and South Korea, as North Korea's closest neighbors, and to other U.N. Member States in the international community. In regards to the last, this report includes recommendations that all intergovernmental contact with North Korea should include discussion of improvements of human rights conditions. Further, it makes the case for incorporating human rights conditions in any comprehensive approach to the multiple crises that North Korea faces with nearby and other states — security-related, political-diplomatic, and humanitarian.

Specifically, any security and cooperation agreement for the Korean peninsula should require that all parties, including North Korea, demonstrate respect for human rights, including the rights of refugees who have fled North Korea, encourage human contact, promote the reunification of families, and provide for the free flow of information. Additionally, verified improvements in North Korea's human rights situation should be included in any comprehensive approach to the Korean crises involving foreign aid to or investment in North Korea. Any multilateral or bilateral arrangements involving foreign investment in extraction or production enterprises in North Korea for export to world markets should preclude the utilization of forced, slave, or prison labor, or the evolution of a situation where privileged workers in exclusive export zones produce for world markets, while production for domestic consumption is based on prison, forced, and slave labor.

# INTRODUCTION

In his 1997 history *Korea's Place in the Sun*, Bruce Cumings predicted, "... if and when the [North Korean] regime falls, we will probably learn of larger numbers [of people held in prisons and reform-through-labor camps] and various unimaginable atrocities..."[4]

Korea specialists Kongdan Oh and Ralph Hassig have noted that increasing diplomatic ties "are not accompanied by people-to-people relations as North Korea's borders remain closed. In North Korea it is an article of faith to keep outsiders guessing about what is happening in the country.... This lack of transparency forces outsiders to draw conclusions based on fragmentary evidence."[5]

Since the turn of the millennium, a growing number of North Korean defectors and escapees have obtained asylum in South Korea. A small number of these desperate, famine-fleeing North Koreans received media and diplomatic attention in 2001 and 2002, when they broke through gates or climbed the fences of various embassies, consulates, and missions in Beijing. Much larger numbers of North Koreans have fled to China across the Yalu or Tumen rivers into the area of northeast China formerly known as Manchuria and reached South Korea via an extraordinary 4,000- to 5,000-mile trek involving some combination of bus, train, car, motorbike taxis, and walking. They travel south to Beijing, Shanghai, or Kunming, and then down through Burma, Laos, or Vietnam into Cambodia before reaching Thailand, and then flying to Seoul. Other escapees reach Seoul by traveling to Mongolia or Hong Kong.

A number of these North Korean escapees and defectors[6] were either prisoners or guards in a variety of prison camps and detention/punishment facilities in North Korea. Their fragments of information are accumulating and now afford a closer look at the North Korean system of forced-labor camps and the unimaginable atrocities taking place under the rule of Kim Jong Il. This report is based on a review of materials written in English and on thirty in-depth interviews with former North Koreans who found asylum in South Korea. These interviews were conducted largely in Seoul in August 2002, November–December 2002, and February 2003.

Most of the information in this report comes from former prisoners, who during their interviews described in detail the situations of their imprisonment, their living and work units, and their treatment and observations while imprisoned or detained. These prisoners' accounts are corroborated and amplified by accounts from former prison guards, who saw larger areas of the prison camps, as the prisoners were usually confined to cells and worksites. The perspectives of the prison guards are further amplified by a former prison-system official "defector," whose account provides additional information on the workings of the prison-camp system. (See the Information Base for an overview of the

---

[4] Bruce Cumings. *Korea's Place in the Sun: A Modern History.* (New York, N.Y.: W.W. Norton & Company, 1997), 398. Bracketed explanations provided by David Hawk.

[5] Kongdan Oh and Ralph C. Hassig, eds., "The New North Korea," *Korea Briefing 2000–2001.* (Armonk: N.Y.: East Gate Books, M.E. Sharpe), 78–9.

[6] South Koreans commonly refer to all North Koreans now resident in the Republic of Korea as "defectors," using the name applied to high-level communist Korean Workers' Party officials who "defected" to Seoul in the 1990s. Most of the new North Korean arrivals in South Korea are more accurately termed "escapees," having fled North Korea to escape starvation and/or extreme brutality.

prison camps and detention facilities where individuals interviewed for this report were incarcerated or employed.)

From the accumulated information, it is possible to outline two distinct systems of incarceration in North Korea. Both of these exhibit exceptional violations of internationally recognized human rights: an extremely brutal gulag of sprawling political penal-labor colonies, called *kwan-li-so* in Korean, and prison-labor facilities, called *kyo-hwa-so*; and a separate but also extremely brutal system of imprisonment, interrogation, torture, and forced labor for North Koreans who are forcibly repatriated from China. This latter incarceration system includes police jails, called *ka-mok*, and police detention facilities, called *ku-ryu-jang*, along the North Korea–China border, and short-term detention/forced-labor centers, called *jip-kyul-so*, and even shorter-term, more localized detention/forced-labor training camps, called *ro-dong-dan-ryeon-dae*.

The *kwan-li-so* include the repressive phenomenon of lifetime sentences for perceived political wrongdoers paired with guilt-by-association imprisonment for up to three generations of the supposed wrongdoers' families. Whatever the category, all the prison facilities are characterized by very large numbers of deaths in detention from forced, hard labor accompanied by deliberate starvation-level food rations. Incarceration of Koreans repatriated from China includes routine torture during interrogation and the practice of forced abortion or infanticide inflicted upon babies borne by pregnant repatriates.

## Note on Sources

Many of the former prisoners interviewed for this report, believing their relatives to be dead or now living in South Korea, agreed to have their names and, in some cases, their photographs published. Many others, however, knowing that the North Korean government practices collective punishment, would agree to be interviewed and provide testimony only under condition of anonymity, lest relatives remaining in North Korea be punished for the interviewees' crime of escaping to the Republic of Korea. Such individuals are identified in this report with a number rather than a pseudonym (such as "Former Detainee #6," for example, or "Former Prisoner #13").

For some prison camps and detention facilities described in this report, more than one source of information was available. In such cases, one person's account could be checked against another's. In other cases, the description of a particular camp or facility rested on the testimony of one former prisoner. In those cases, I had to rely on the coherence and internal consistency of the testimony, and my professional experience.[7]  In more than thirty interviews in and around Seoul, only one struck me as sufficiently garbled and inconsistent as to be unreliable and unusable — from a very recent arrival who wanted to make declarations against North Korea but whose story and factual assertions dissolved under close questioning.

The phenomena of repression, in this case terrible human rights violations, happen to individual human beings. Their personal stories are at least as important as the information

---

[7] In the course of several decades of human rights work, I have interviewed large numbers of victims of repression from a variety of political systems and country situations: perhaps, most notably, hundreds of survivors of the Khmer Rouge genocide in Cambodia between 1975 and 1979 and dozens of survivors of the genocide in Rwanda in 1994.

their stories provide about the prison-labor camps. Many former North Korean prisoners have, like the Cambodian and Rwandan survivors I interviewed in the 1980s and 1990s, extraordinary stories. Thus, brief sketches of their personal histories are provided along with their descriptions of the prison camps they survived. To a large extent, this report uses the format of briefly profiling a witness (under the heading "Witness") before providing his or her testimony about the particular camp or facility in which he or she was incarcerated and the phenomena of repression endured and observed there (under the heading "Testimony"). In cases where more than one witness account of a given camp or facility was available, each witness is profiled separately before their combined testimony appears.

This is not to say that the interviewees' memories are always entirely accurate or that some details have not been lost in translation. There may be minor errors in the accounts that follow. Nonetheless, I am convinced that the overwhelming bulk of testimony is reliable. And the stories in this report create a fuller picture of the phenomena of repression in North Korea than has previously existed in English-language sources.

This report does not claim, however, to be comprehensive, as the presently available database is not sufficient for such purposes. For example, evidence has emerged from various sources about the "9/27" camps for *kotjebi*, the young street children orphaned by the breakdown of families caused by extreme famine. But as the interviewees for this report, most of whom were middle-aged or young adults, provided no information on "9/27" camps, information about such facilities is not included.

Another example of missing information: Anne Applebaum notes in her book *Gulag: A History,* that the Soviet prison-labor camp system "produced a third of the Soviet Union's gold, much of its coal and timber, and a great deal of everything else."[8] Given the breakdown of North Korea's production system, one wonders about the economic role and significance of the prison-labor camps in North Korea. Former North Korean prison camp guard AHN Myong Chol states that *Kyo-hwa-so* No. 22 supplies some forty percent of the corn consumed in North and South Hamgyong provinces. Women at the Kaechon prison-labor camp, *Kyo-hwa-so* No. 1, produce — under abominable conditions — textile goods for export to the U.S.S.R., Japan, and France. Other prisoners interviewed for this report mined gold, coal, iron, and magnesite in slave-labor prison camps, exactly the extractive industries cited by Selig Harrison for North Korea's export potential.[9] But, on the whole, to my knowledge, production data from the camps is not available; and the economic role of the camps is not discussed in this report.

Nor is there enough data to project trends over time or to extrapolate beyond the places specifically identified. While I consulted several Korea experts in South Korea and the United States, primarily to fill in some gaps in my own understanding of the North Korean system, the accounts that follow adhere very closely to the information provided by the former prisoners and guards personally interviewed for this report. That information is sufficient to pinpoint the terrible phenomena of repression that victimizes tens or hundreds of thousands of North Koreans.

---

[8] Anne Applebaum. *Gulag: A History*. (New York, N.Y.: Doubleday, 2003), xvii.

[9] Selig S. Harrison. *Korean Endgame: A Strategy for Reunification and U.S. Disengagement.* (Princeton, N.J.: Princeton University Press, Century Foundation Book, 2002), Chapter Five.

North Korean authorities deny that the kinds of prison camps described herein exist and that human rights violations occur in North Korea. Such governmental denials cannot be taken at face value. The only real way for North Korea to contradict or invalidate the claims and stories in the refugee accounts is by inviting United Nations officials, U.N. Human Rights Commission representatives, or reputable NGOs such as Amnesty International or Human Rights Watch to verify or invalidate on-site the allegations of former prisoners. Otherwise the refugees' testimonies stand.

In the event that North Korean authorities decline to engage in the constructive and substantive dialogue with U.N. human rights officials requested in a recent resolution by the U.N. Commission on Human Rights,[10] it can only be hoped that sufficient resources will be found to enable South Korean NGOs or independent human rights bodies to more thoroughly and systematically document the violations outlined in this report.

## Not in a Vacuum

In 1988, the North Korean Ambassador to the United Nations wrote to the Minnesota Lawyers International Human Rights Committee that violations of human rights do not take place and are "unthinkable" in North Korea.[11] In 1994, an official publication, *The People's Korea* proclaimed, "...there is no 'human rights problem' in our Republic either from the institutional or from the legal point of view."[12] North Korean diplomats at the United Nations in Geneva continue to deny that there are any — *any* — violations of human rights in Korea.[13]

On the contrary, the extreme human rights violations documented in this report occur in an environment of the wholesale denial of fundamental rights and freedoms. For descriptions of the North Korean human rights situation generally, readers are referred to the 1988 Minnesota Lawyers/Human Rights Watch Report referenced above, the annual human rights reports by the U.S. Department of State, various reports by Amnesty International and Human Rights Watch, and reputable web sites, including those of the Chosun Journal (chosunjournal.com), the Network for North Korean Democracy and Human Rights (nknet.org), and the Citizens' Alliance for North Korean Human Rights (nkhumanrights.or.kr).  By far the best survey of the overall human rights situation is the annual *White Paper on Human Rights in North Korea* published by the Seoul-based Korea Institute for National Unification (KINU), which covers the categories and provisions of the International Covenants on Human Rights, and references or incorporates up-to-date information and analyses from the U.S. Department of State, press, and NGO accounts.[14]

---

[10] See Appendix.

[11] *Human Rights in the Democratic People's Republic of Korea (North Korea)*, Minnesota Lawyers International Human Rights Committee and Human Rights Watch/Asia, December 1988.

[12] *The People's Korea*, no. 1661 (August 13, 1994), p. 8, as cited in *North Korea Through the Looking Glass*, Kongdan Oh and Ralph C. Hassig, (Washington, D.C.: Brookings Institution Press, 2000), p. 134. (What are described herein and elsewhere as political prisoner camps are proclaimed by *The People's Korea* to be instead "...industrial establishments and cooperative farms animated with creative labor and rows of modern apartment houses and rural houses overflowing with the happiness of the people.")

[13] This is one reason why in 2003 the U.N. Commission on Human Rights took specific notice of the human rights situation in the DPRK, and explicitly called for more North Korean cooperation with the human rights procedures and mechanisms of the United Nations.

[14] Korea Institute for National Unification, SL Tobong P.O. 22, Seoul 142-600, Republic of Korea.

## Note on Translations

In reviewing the North Korea prison literature available in English and after initially conducting interviews through multiple translators, it became apparent that there is no standard or consistent translation of Korean prison or police terminology into English. Further, North Koreans sometimes use the same word inconsistently. For example, the term *ku-ryu-jang* is used generically by some to mean "detention" and more narrowly by others to mean "a detention room within a police station." In such cases, the usage employed by the interviewee was retained for this report.

There are also different ways that Korean terms are romanized or transliterated into alphabetically rendered versions of the Korean *hangul* characters.

More problematically, some Korean prison terms are frequently translated in ways that are technically, literally correct but either meaningless or, worse, entirely misleading in English. For example, the term *kwan-li-so* (alternatively transliterated as *gwalliso*) is sometimes literally translated — as in the *White Paper on Human Rights in North Korea* published annually by the Korea Institute for National Reunification — as "management center," which sounds rather like a business-consulting firm and is a meaningless translation for a political slave-labor concentration camp. The term *kwan-li-so* is also variously translated as "political-detention camp," "prison camp," or "concentration camp," which are better translations. In this report, the term *kwan-li-so* is translated as "political penal-labor colony," a more descriptive English rendering.

If the term *kwan-li-so* is meaninglessly translated as "management center," even more misleading is translating the term *kyo-hwa-so* (alternatively transliterated as *gyohwaso*) as "re-education center," as was done in the November 2002 Human Rights Watch report, or even as "enlightenment center," a translation used by some South Koreans. In reality, of course, there is nothing educational, enlightening, or remotely rehabilitative about these "long-term prison-labor camps," as they are accurately called in this report, since many are characterized by staggeringly high rates of deaths in detention resulting from forced labor under brutal conditions combined with starvation-level food rations.

For ease of reference, this report includes a "Glossary of North Korean Repression" — that is, a chart of common North Korean prison and police terms, listing the Korean characters, the Chinese characters, the formal and common Romanized renderings of the Korean characters, and finally the literal and more descriptive English translations. For clarity, the running text of this report includes the Korean terms used by the interviewees as adjective in front of the descriptive English translation.

Korean names usually appear with the family name followed by the given name, except for a few individuals who have, for English usage, adopted the Anglicized form of their given names and followed these with their family names. For ease of reference, in this report the first time a Korean name is used, it appears with the family name in capital letters and in the form provided when persons were introduced to the interviewer, usually in the Korean fashion (with the family name first).

# INFORMATION BASE

Former North Korean prisoners and detainees interviewed for this report were detained and/or imprisoned at the following places and times:[15]

### *Kwan-li-so*
### (Political Penal-Labor Colonies)

*Kwan-li-so* No. 15
Yodok, S. Hamgyong Province
- 1977–1987
- Nov. 1987–Feb. 1989
- March 1988–1992
- April 1995–Jan. 1999

*Kwan-li-so* No. 14
Kaechon, S. Pyong-an Province
- August 1993–Oct. 1995

*Kwan-li-so* No. 18
Bukchang, S. Pyong-an Province
- Oct. 1995–Sept. 1998

*Kwan-li-so* No. 105
Danchun, S. Hamgyong Province
Mid–1980s (now closed)

---

Former North Korean prison guards interviewed for this report were employed at the following:

*Kwan-li-so* No. 22
Haengyoung (also called Hoeryong), N. Hamgyong Province
- 1990–1994

*Kwan-li-so* No. 11 (closed in 1989)
Kyung-sung, N. Hamgyong Province
- Feb. 1985–June 1986
- May–August 1987

*Kwan-li-so* No. 13 (closed in 1990)
Jong Song, N. Hamgyong Province
- 1987–1989

*Kwan-li-so* No. 26 (closed in 1991)
Pyongyang
- briefly between 1986 and 1989

### *Kyo-hwa-so*
### (Long-Term Prison-Labor Camps)

*Kyo-hwa-so* No. 1
Kaechon, S. Pyong-an Province
- Nov. 1987–Dec. 1992
- early 1993–late 1995

*Kyo-hwa-so* No. 77
Danchun, S. Hamgyong Province
- Sept. 1985–July 1987

*Kyo-hwa-so* No. 22 "Two-Two"
Oro, S. Hamgyong Province
- Sept. 1996–Sept. 1997

*Kyo-hwa-so* No. 8 "Yongdam"
Wonsan City, Kangwon Province
- Early to mid–1980s

*Kyo-hwa-so* No. 3
Sinuiju, N. Pyong-an Province
- Late 1980s–early 1990s

*Kyo-hwa-so*
Hoeryong, N. Hamgyong Province
- 1991–1995

*Kyo-hwa-so* No. 4
Samdeung-ri, Kangdong, S. Pyong-an Province
- April 1997–Nov. 1997

*Kyo-hwa-so* No. 12
Jeonger-ri, N. Hamgyong Province
- Dec. 1998–July 1999

---

[15] Some of the interviewees who required anonymity also asked that the precise dates of their detentions or imprisonments be withheld from publication.

## INFORMATION BASE (continued)

Former North Korean prisoners and detainees interviewed for this report were detained and/or imprisoned at the following places and times:

### *Do-jip-kyul-so*
### (Provincial Detention Centers)

Nongpo, Chongjin City
North Hamgyong Province
- Oct. 1986–May 1987
- December 1997
- December 1999
- May 2000
- Mid–2000
- July–Sept. 2000

Sinuiju, N. Pyong-an Province
- Dec. 1999
- Jan. 2000
- May–June 2000

Musan, N. Hamgyong Province
- August–Dec. 1987
- June 2000

Hyesan, Yang-gang Province
- Nov. 1990–Jan. 1991

Onsong, N. Hamgyong Province
- Sept. 2000

### *Ro-dong-dan-ryeon-dae*
### (Labor-Training Camps)

Onsong, N. Hamgyong Province
- Jan.–Sept. 1996
- June 2000

Youngkwang-kun,
S. Hamgyong Province
- Oct. 2000

# INFORMATION BASE (continued)

Former North Korean prisoners and detainees interviewed for this report were detained and/or imprisoned at the following places and times:

### *Ka-mok* (Police Jails) and *Ku-ryu-jang* (Police Detention Facilities)

Maram (NSA/SSPA), Pyongyang
- Early–Mid 1993
- Nov. 1994–April 1995
- Jan. 1996–Nov. 1997
- March–Sept. 1997

Moonsu (NSA/SSPA), Pyongyang
- Early–Mid 1993

Onsong (NSA/SSPA), N. Hamgyong Province
- March–June 1997
- June 2000
- August 2000
- Dec. 2001

Onsong (PSA/SSA), N. Hamgyong Province
- March–June 1997
- Seven months in 1999
- Oct.–Nov. 1999
- Sept. 2000

Chongjin (NSA/SSPA), N. Hamgyong Province
- Dec. 1987–March 1988
- Three months in 2000

Chongjin (PSA/SSA), N. Hamgyong Province
- May–Nov. 1987
- Dec. 2001–Feb. 2002

Hyeryong (NSA/SSPA), N. Hamgyong Province
- July 2001

Hyesan (PSA/SSA), Yang-gang Province
- Early 1991

Hamju-kun (PSA/SSA), S. Hamgyong Province
- Jan. 1993

Myungchun-kun (PSA/SSA), N. Hamgyong Province
- Jan.–July 1993

Sambong, Musan, (NSA/SSPA), N. Hamgyong Province
- July 2001

Nam Min Dang (NSA/SSPA), Sinuiju, N. Pyong-an Province
- Dec. 1999

Sinuiju (NSA/SSPA), N. Pyong-an Province
- Nov.–Dec. 1999

NSA/SSPA = *Kuk-ga-bo-wi-bu* (National Security Agency / Social Safety Protection Agency)
PSA/SSA = *In-min-bo-an-seong* (People's Safety Agency); before 1998, *Sa-hoe-an-jeon-bu* (Social Safety Agency)

# GLOSSARY OF NORTH KOREAN REPRESSION*

| Korean | 관리소 | 교화소 | 집결소 | 노동단련대 | 감옥 | 구류장 |
|---|---|---|---|---|---|---|
| Chinese | 管理所 | 教化所 | 集結所 | 勞動鍛鍊隊 | 監獄 | 拘留場 |
| Colloquial Korean Phonetic Romanization | kwan-li-so | kyo-hwa-so | jip-kyul-so | ro-dong-dan-ryeon-dae | ka-mok | ku-ryu-jang |
| Formal Korean Phonetic Romanization | gwalliso | gyohwaso | jipkyulso | nodong danryeon dae | gamok | guryujang |
| Literal English | control and manage place | a place to make a good person through reeducation | gathering place | labor-training corps | jail | detention facility |
| Descriptive English | political penal-labor colony | long-term prison labor camp | labor/ detention facility | labor/ detention facility | jail (often pre-sentence detention) | interrogation facility |

* The Korean characters in this chart are based on Chinese characters, which may vary in their construction and meaning.

## GLOSSARY OF NORTH KOREAN REPRESSION (continued)

| Korean | 국가보위부 | 사회안전부 | 인민보안성 |
|---|---|---|---|
| Chinese | 國家保衛部 | 社會安全部 | 人民保安省 |
| Colloquial Korean Phonetic Romanization | Kuk-ga-bo-wi-bu | Sa-hoe-an-jeon-bu | In-min-bo-an-seong |
| Formal Korean Phonetic Romanization | Gukgabowibu | Sahoeanjeonbu | Inminboanseong |
| Literal English | National Security Agency | Social Safety Agency (pre-1998) | People's Safety Agency (post-1998) |
| Descriptive English | National Security Police | police | police |

| Korean | 고문 | 공개사형 | 영아살해 | 강제낙태 | 연좌제 |
|---|---|---|---|---|---|
| Chinese | 拷問 | 公開死形 | 嬰兒殺害 | 强制落胎 | 連坐制 |
| Colloquial Korean Phonetic Romanization | go-mun | gong-gae-sa-hyeong | yeong-a-sal-hae | gang-je-nak-tae | yeon-jwa-je |
| Formal Korean Phonetic Romanization | gomun | gonggae sahyeong | yeongasalhae | gangjenaktae | yeonjwaje |
| Literal English | torture | public execution | killing babies | forced abortion | association system |
| Descriptive English | torture | public execution | infanticide | involuntary abortion | guilt by association |

## PART ONE

# THE NORTH KOREAN GULAG I: *KWAN-LI-SO*
# POLITICAL PENAL-LABOR COLONIES

## Introduction: Generations Imprisoned without Trial

North Korea's *kwan-li-so* consist of a series of sprawling encampments measuring kilometers long and kilometers wide. The number of these encampments has varied over time. They are located, mostly, in the valleys between high mountains, mostly, in the northern provinces of North Korea. There are between 5,000 and 50,000 prisoners per *kwan-li-so*, totaling perhaps some 150,000 to 200,000 prisoners throughout North Korea.[16] Both perceived wrongdoers and up to three generations of their extended families are "arrested," or, more accurately, abducted by police authorities and deposited in the *kwan-li-so*, without any judicial process or legal recourse whatsoever, for lifetime sentences of extremely hard labor in mining, timber-cutting, or farming enterprises. The prisoners live under brutal conditions in permanent situations of deliberately contrived semi-starvation.

The *kwan-li-so* are usually surrounded at their outer perimeters by barbed-wire fences punctuated with guard towers and patrolled by heavily armed guards. The encampments include self-contained, closed "village" compounds for single persons, usually the alleged wrongdoers, and other closed, fenced-in "villages" for the extended families of the wrongdoers. Some of the camps are divided into sections called *wan-jeon-tong-je-kyuk* (total-control zones), where the sentences are lifetime, and sections called *hyuk-myung-hwa-kyuk* (best translated as "revolutionizing zones"), so-called "re-education" areas from which prisoners eventually can be released. In the total-control zones, if the families are together, only privileged prisoners are allowed to marry and have children. With the only known exception of Camp No. 18,[17] prisoners have no correspondence or contact with the world outside the political penal-labor colony, except for news provided by newly arriving prisoners. The *kwan-li-so* are also sometimes referred to as *teuk-byeol-dok-je-dae-sang-gu-yeok*, which translates as "zones under special dictatorship."

The most strikingly abnormal feature of the *kwan-li-so* system is the philosophy of "collective responsibility," or "guilt by association" — *yeon-jwa-je* — whereby the mother and father, sisters and brothers, children and sometimes grandchildren of the offending political prisoner are imprisoned in a three-generation practice. Former prisoners and guards trace this practice to a 1972 statement by "Great Leader" Kim Il Sung: "Factionalists or enemies of class, whoever they are, their seed must be eliminated through three generations." According to the testimony of a former guard at *Kwan-li-so* No. 11 at Kyungsung, North Hamgyong Province, this slogan was carved in wood in the prison guards' headquarters building. According to the testimony of YOON Dae Il, a former police official, the number of family members abducted and sent to the lifetime labor camps depends on the severity of the presumed political offense.

---

[16] The 200,000 figure comes from a former guard, AHN Myong Chol, who previously worked at four different prison camps. YOON Dae Il, a former official of the *bo-wi-bu* National Security Agency, the police organization that administers the prison camps, says the 200,000 figure is "the minimum."

[17] See description of *Kwan-li-so* No. 18 below.

The other strikingly abnormal characteristic of the *kwan-li-so* system is that prisoners are not arrested, charged (that is, told of their offense), or tried in any sort judicial procedure, where they would have a chance to confront their accusers or offer a defense with or even without benefit of legal counsel. The presumed offender is simply picked up and taken to an interrogation facility and frequently tortured to "confess" before being sent to the political penal-labor colony. The family members are also just picked up and deposited at the *kwan-li-so*, without ever being told of the whereabouts or wrongdoings of the presumed wrongdoer.

The most salient feature of day-to-day prison-labor camp life is the combination of below-subsistence food rations and extremely hard labor. Prisoners are provided only enough food to be kept perpetually on the verge of starvation. And prisoners are compelled by their hunger to eat, if they can get away with it, the food of the labor-camp farm animals, plants, grasses, bark, rats, snakes — anything remotely edible. It should be noted that below-subsistence-level food rations preceded, by decades, the severe nationwide food shortages experienced by North Korea in the 1990s.

Many of the *kwan-li-so* involve mining for coal, iron deposits, gold, or various other ores, or logging and wood-cutting in the adjacent mountains. Prisoners undertake farm labor during planting and harvesting seasons. This back-breaking labor is often performed twelve or more hours per day, seven days per week, with time off only for national holidays (such as New Year's Day and Kim Il Sung's and Kim Jong Il's birthdays, for example).

Except for the "revolutionizing zone," in *Kwan-li-so* No. 15 Yodok, and possibly a section of *Kwan-li-so* No. 18, these camps do not feature "re-education," as it is not anticipated that the prisoners will be returned to society. Punishment for rule infractions or working too slowly include further reduction in food rations, or detention within punishment cells that do not have enough space for a person to completely lie down or stand up, causing the loss of circulation and atrophy of legs and often leading to death within several weeks. The combination of below-subsistence-level food rations and slave-labor working conditions leads to large numbers of deaths in detention. Persons who try to escape and other major rule-breakers are publicly executed by hanging or firing squad in front of the assembled prisoners of that section of the camp. (The former guards say they feared and hated the public executions because, heavily armed as they were, they still worried that the rarely assembled inmates might riot.)

Former prisoners — mostly those from the "revolutionizing zone," at *Kwan-li-so* No. 15 Yodok — and former prison guards report that upon arrival, they were struck by the shortness, skinniness, premature aging, hunchbacks, and physical deformities of so many of the prisoners. They also report that there were large numbers of amputees and persons disabled from work accidents, and persons with partial amputations owing to frostbite of the toes, feet, fingers, and hands.

Semi-starvation yields large numbers of informants among the prisoners, leading to a prison culture of distrust and hostility. Prisoners fight each other over scraps of food or over the clothing of deceased inmates. The camps feature the gamut of abnormal and aberrant human behavior that results from treating people like animals.

Kwan-li-so No. 15 Yodok


39.727 N
126.845 E

Originally, the *kwan-li-so* were run by the *In-min-bo-an-seong* (People's Safety Agency), regular police forces that are part of the Ministry of Interior (before 1998 called the *Sa-hoe-an-jeon-bu*, meaning Social Safety Agency). Except for *Kwan-li-so* No. 18 in South Pyong-an Province, administration of the prison-labor camps was taken over by *Kuk-ga-bo-wi-bu* (usually abbreviated as "*bo-wi-bu*"), variously translated as the National Security Agency, National Security Police, State Political Protection Agency, or State Safety and Protection Agency. This security force was created in 1973 and reports, according to former *bo-wi-bu* official Yoon Dae Il, directly to Kim Jong Il, not to the Ministry of Interior or Defense, and that took over running the *kwan-li-so*, except for No. 18. The outer perimeters of the *kwan-li-so* are patrolled by privileged members of North Korea's army. The administrator and internal guards of the camps are *bo-wi-bu* officers.

There has been a gradual consolidation of the *kwan-li-so*, according to former guards and police officials. Originally there were more than a dozen, but several have been closed, for a variety of reasons — primarily for being too close in proximity to the China border — and the prisoners transferred to other camps. According to former police officials, there are now six *kwan-li-so* in operation. Four of these six were confirmed by persons interviewed for this report.

Virtually all of the prisoners in the *kwan-li-so* are victims of "arbitrary detention," as defined by international norms and by the official deliberations of international authorities such as the Working Group on Arbitrary Detention of the U.N. Commission on Human Rights.

## Who Are the Political Prisoners?

The pattern of incarceration of political prisoners in North Korea has followed a trajectory that should be familiar to students of communist rule: imprisonments of reactionaries were followed by waves of purges of the Korean Workers' Party, the army, and the state bureaucracies; the camps then became economically productive dumping-grounds for elements of North Korea's society that did not fit into the "Kim Il Sung nation."

Primitive prison-labor camps in North Korea initially were set up immediately after World War II, for predictable or potential enemies of the revolution: landowners, collaborators with the Japanese occupation, religious leaders, and some family members of those individuals who went south after the Soviet/American creation of northern and southern Korean areas. Following the Korean War, suspected collaborators with the American and South Korean forces were imprisoned.

As Kim Il Sung consolidated power, various factions of the Korean Workers' Party, the state bureaucracy, and the army were purged and imprisoned. The highest-level Korean Workers' Party official to defect to South Korea stated that "complete-control zones" were established after 1956 for "purged factionalists."[18] Korea scholar Charles Armstrong notes, "By the 1960s, the former Manchurian partisans [anti-colonial guerillas, including Kim Il Sung] were at the apex of the power system in the DPRK, and those who had been aligned with the Southern Workers' Party, the Soviets, and the

---

[18] See *White Paper on Human Rights in North Korea*, 2003, KINU, Seoul, 177–180.

Chinese in Yan'an had almost all been purged, executed, sent into exile, or otherwise eliminated from positions of power."[19] Other purges of the Party, the army, and state bureaucracy coincided with the development of the "cult of personality" around Kim Il Sung, and even more purges and imprisonment accompanied the feudal-dynastic succession of Kim Jong Il, the first son of Kim Il Sung's first wife.

Also imprisoned were various categories of people who did not fit into the Party's plan for the country, and those perceived as posing a threat to the regime should they remain in society. Included here were a large number of Japanese citizens of Korean ethnic descent whose families had been taken to Japan for forced labor in the late nineteenth and early twentieth centuries, during the Japanese occupation of Korea, but who returned to North Korea in the 1950s and 1960s. They were later deemed to have been spoiled by their exposure to Japanese liberalism and capitalist prosperity.[20]

When North Korea adopted a three-tiered *seongbun* — a political/class structure — of "loyal," "wavering," and "hostile" classes, divided, in turn, into fifty-one subcategories, and the entire population was registered into one of the fifty-one subcategories,[21] some of those classified within the "hostile" subgroups are believed to have been imprisoned. (However, many of the "purged" North Korean officials noted above would have come from "good" *seongbun* family backgrounds.)

The *seongbun* system provides an important insight into the contemporary North Korean prison-camp system. As Professor Armstrong notes:

> Social stratification had been one of the most enduring characteristics of Korean society before the twentieth century...The **hereditary** [emphasis added] three-tiered structure...that became explicit in North Korea from the 1960s onward was based on the actions of oneself or one's ancestors during the colonial period and the Korean War. Such stratification was made possible by the careful categorization of all North Korean citizens by social strata beginning in 1946 and resonated with the three-class structure of yangban [scholar/bureaucratic aristocracy], commoner, and outcast/slave that dominated Choson [the feudal dynasty that ruled Korea for centuries prior to the Japanese occupation of Korea] society.[22]

The "outcast/slave" characteristic is clearly apparent in the description of the lifetime-sentence, "three-generation" *kwan-li-so* described in this report.

In the 1990s, imprisonment also befell some North Korean students and diplomats who had been studying or posted to the Soviet Union or Eastern Europe and had been exposed to the collapse of socialist rule. Also imprisoned were others who were perceived to be potential complainers and persons who purposely or inadvertently did not take

---

[19] Charles K. Armstrong. *The North Korean Revolution, 1945–1950*. (Ithaca: N.Y.: Cornell University Press, 2002), 241. Bracketed explanations provided by David Hawk.

[20] See the story of KANG Chol Hwan below.

[21] For more information on the *seongbun* citizen classification system, see *Kim Il-Song's North Korea,* Helen-Louise Hunter, (Westport, Conn.: Praeger Publishers, 1999), Chapter One, 3–13.

[22] Armstrong, op. cit. 72–73. Bracketed explanations provided by David Hawk.

proper care of photographs of the "Great Leader," Kim Il Sung, or the "Dear Leader," Kim Jong Il, or even of newspapers that contained photographs of the father and son.

Some South Korean experts posit that these camps also became places where un-repatriated South Korean prisoners of war were dumped after the Korean War, as were a much smaller number of South Korean POWs who were captured by the Viet Cong or North Vietnamese during the American-Vietnamese war and turned over by the Vietnamese to North Korea.[23] Also believed to have been placed in the prison system were a larger number of South Koreans, including many fishermen, who were captured or abducted by North Korea over the years, and a smaller number of Japanese citizens who were abducted from Japan by North Korea for various reasons.

## How Do We Know?

In their 1972 textbook, *Communism in Korea*, Professors Robert Scalapino and Chong Sik Lee noted that two camps had been set up and named after the number of the proclamations that brought them into existence: one camp for perceived political wrong-doers and another camp for their families.[24]

In 1974, the situation of the North Korean prison camps became known in international human rights circles when Amnesty International campaigned for the release of Ali Lamada, a citizen of Venezuela, and Jacques Sedillot, a citizen of France, both of whom had been recruited to work in North Korea by the DPRK Ministry of Foreign Affairs translating the collected works of Kim Il Sung into Spanish and French, respectively. Following the release of Ali Lamada, Amnesty published in 1979 his account of his imprisonment — to the interviewer's knowledge the first English-language North Korean political-prisoner account to introduce the North Korean prison-camp system to an international audience. Lamada's story of his imprisonment from 1967 to 1974, except for his nationality, is so remarkably similar to the stories of recently escaped North Koreans, it is worth recounting on the following pages[25] as it establishes the similarity of the mistreatment of political prisoners over a thirty-year period. While imprisoned at Sariwon prison-labor camp, Lamada learned from guards and "orderlies," who were privileged prisoners, some of whom had been held previously in other prison-labor camps, of some twenty other prison-labor camps holding, Lamada calculated, at that time roughly 150,000 prisoners altogether.[26]

Over a number of years, a small number of North Korean defectors to South Korea provided information on the prison-camp system, which was collected by Republic of Korea government agencies, scholars, and specialists. The first major international human rights NGO report on North Korea, *Human Rights in the DPRK (North Korea)*, was published in December 1988 by the Minnesota Lawyers International Human Rights Committee and Human Rights Watch/Asia. It outlined the camp system, albeit with very little corroboration by prisoner testimony, in the course of a review of the various provisions of the North Korean constitution and legal system.

---

[23] See Prof. HEO Man Ho, "North Korea's Continued Detention of South Korean POWs since the Korean and Vietnam Wars," *The Korean Journal of Defense and Analysis*, Vol. XIV, No. 2, Fall 2002.

[24] Cited in *Human Rights in the DPRK (North Korea)*. Minnesota Lawyers International Human Rights Committee/Human Rights Watch, December 1988, Minneapolis/Washington, D.C., 103.

[25] See pages 29–30 below.

[26] Amnesty International Index: ASA 24/02/79.

Prisoner testimony started to emerge publicly in the mid-1990s, after two former prisoners from the "revolutionizing zone" of *Kwan-li-so* No. 15, often called Yodok, KANG Chol Hwan and AN Hyuk, escaped to South Korea via China in 1992 and published their prison memoirs in Seoul. In 1994, a former prison guard who had worked at four different prison-labor camps, AHN Myong Chol, defected to South Korea and was able to provide a great deal of firsthand information. In 1996, the Seoul-based Korea Institute of National Unification (KINU) began publishing annually a *White Paper on Human Rights in North Korea,* which contains reporting that draws on the extensive interviews conducted by the South Korean government with all North Koreans provided asylum by the Republic of Korea.

In the late 1990s, as the production and distribution system in North Korea broke down, larger numbers of Koreans fled to China, primarily in search of food. Some of these food and/or asylum seekers had been imprisoned in either the *kwan-li-so* or the *kyo-hwa-so*. A number of those who fled to China, particularly after 2000, made their way to South Korea, and published accounts or interviews in South Korean journals or magazines.

An important development occurred in December 2002, when the weekly news magazine *Far Eastern Economic Review* published satellite photographs of *Kwan-li-so* No. 22 at Haengyong (also called Hoeryong) in North Hamgyong Province. Both the United States and South Korean governments have long had even better satellite photographs of the prison-labor camps. (When Kang Chol Hwan first came to Seoul in 1992, he was shown satellite photos of the *Kwan-li-so* No. 15 Yodok so precise that he was able to pick out his former house in the images.)  But these intelligence agencies have never released their photographs to the press or public. John Larkin, a Seoul-based, Korean-speaking then-correspondent for the *Far Eastern Economic Review*, was able to obtain coordinates of latitude and longitude of *Kwan-li-so* No. 22 from old Soviet-made maps of North Korea on which, in consultation with former guard Ahn Myong Chol, Larkin was able to precisely locate the sprawling encampment at Haengyong. After Larkin obtained satellite photos from a commercial firm, Ahn was able to locate and identify buildings at the penal-labor colony.[27]

## WITNESSES AND TESTIMONY
## WITNESS: Ali Lamada: Sariwon, Hwanghae Province

 

As noted in the preceding section, Ali Lamada and Jacques Sedillot were recruited in 1967 by the DPRK Ministry of Foreign Affairs and placed in the Department of Publications to translate the writings of Kim Il Sung into Spanish and French, respectively. Lamada's poetry and books were well known in the Spanish-speaking world, and he was an active member of the Venezuelan Communist Party.

Both Lamada and Sedillot were arrested in September 1967. Sedillot was accused of being a French imperialist spy. No charges were initially brought against Lamada. He

---

[27] The U.S. Committee for Human Rights in North Korea has obtained satellite photographs of several additional prisons and concentration/slave-labor camps for inclusion in this report.

was simply ordered and coerced to confess by means of solitary confinement in a 2-meter by 1-meter by 3-meter cell (7 feet by 3 feet by 10 feet) in the Ministry of Interior for a year on below-subsistence-level food rations. During this time, he lost 22 kilos (more than 50 pounds) and his body became covered with sores.

After a year, Lamada was returned to his residence in Pyongyang and placed under house arrest but was picked up two months later and sentenced to twenty years of forced labor, purportedly for being a spy. He was driven some three hours from Pyongyang and thrown into a punishment cell in a prison camp, where, kept handcuffed for three weeks, he slept on the floor without blanket or mattress in freezing temperatures. Transferred to the main prison-camp buildings, he was locked in unheated rooms and suffered frostbite of the feet. His toenails dropped off, and his feet became covered with sores. From guards, he learned that the name of the prison camp was Sariwon, where some 6,000 to 8,000 prisoners worked twelve hours per day assembling jeep parts. A doctor told Lamada that there was a special section of the prison camp where 1,200 sick persons were held.

The government of Venezuela and the President of Romania intervened on behalf of Lamada, and both he and Sedillot were released in May 1974. But Sedillot died in Pyongyang of prison-related illnesses before he could return to France. Lamada recuperated in Eastern Europe before returning to Venezuela, where he published his account of his experience in the North Korean prisons and Sariwon prison-labor camp.[28]

## WITNESS: KANG Chol Hwan: *Kwan-li-so* No. 15 "Yodok" (1977–1987)



KANG Chol Hwan was born in Pyongyang in 1968. His Korean–Japanese grandfather, who made a fortune in Japanese *pachink*o parlors (pinball/slot machine casinos), and his Korean-Japanese grandmother, a stalwart supporter of Kim Il Sung's Korean Workers' Party, had voluntarily repatriated to Pyongyang to contribute to the building of socialism in North Korea. Gradually the bank accounts, cars, and furniture the family had brought with them to Korea were seized.

One day Kang's grandfather simply disappeared without word or trace. Several weeks later, agents came to Kang's father's home, announced that the grandfather had committed an (unspecified) act of high treason, and took the entire family — except for Kang's mother, who, coming from a high political family herself, was required to divorce Kang's father at that point — to *Kwan-li-so* No. 15 at Yodok. Initially the family had no idea where they were. The sign above the entry gate said only "Border Patrol of the Korean People, Unit 2915." Subsequently, they learned that they were in a guarded "village" surrounded by barbed wire and reserved for the families of ethnic Koreans from Japan who had voluntarily repatriated to North Korea. They also learned that they were in the rehabilitable section — that is, the "revolutionizing zone"— of a sprawling prison-labor camp. Three years later, they learned from a prisoner who had been transferred into Yodok *kwan-li-so* from Sengho-ri *kwan-li-so*, some forty miles from Pyongyang, that Kang's grandfather had been at the Sengho-ri *kwan-li-so*.

---

28 This account is drawn from "Ali Lamada: A Personal Account of the Experience of a Prisoner of Conscience in the Democratic People's Republic of Korea." Amnesty International: ASA 24/02/79.

USCA Case #13-7147    Document #1495112    Filed: 05/29/2014    Page 180 of 411

Kang was imprisoned from age nine to nineteen in what is North Korea's most well-known political prison-labor camp. After being released without explanation in 1987 (Kang suspects that his grandfather had died), Kang lived in several places in North Korea. He eventually met up with another former prisoner, AN Hyuk, whom he had first met in Yodok, and the two of them fled North Korea, going to Yanji, Shenyang, Beijing, and finally Dalian, from where, in 1992, they went by boat to South Korea.

In Seoul, Kang co-authored with historian Pierre Rigolout a superlative and ably translated prison memoir, *Aquariums of Pyongyang: Ten Years in the North Korean Gulag*,[29] the first detailed account of a North Korean prison-labor camp to be published in the West. The book describes the horrible life at Yodok without losing the sense of puzzlement with which a young boy, subsequently a teenager, attempted to comprehend the perniciously bizarre situation in which he grew up. Today, Kang is a reporter for *Chosun Ilbo*, a large daily newspaper in Seoul.

## WITNESS: AN Hyuk, *Kwan-li-so* No. 15 "Yodok" (1987–1989)



AN Hyuk was born at Manpo City, Jakang Province, in 1968 into a loyal party family. At the age of twelve, he received a government scholarship to a school for physical education. In 1986, when he was nineteen, after ice skating in Hysean near Mt. Paekdu on the Chinese border, An crossed into China largely out of curiosity. Arrested in China, he was repatriated to North Korea. He was detained for one year and eight months in solitary confinement in an undersized, underground cell in the Maram *ku-ryu-jang* (detention facility) at Yongsong, Pyongyang, and for another year and a half at the Daesuk-ri singles prison area at Yodok, one of the villages in the "revolutionizing" section of *Kwan-li-so* No. 15.

While at Maram, An was subjected to sleep-deprivation and compelled to sit motionless for days. He saw only forty other detainees but believes there were as many as 1,000. Among those in nearby cells were prisoners detained for spilling ink on or failing to adequately dust photographs of Kim Il Sung, charges even the prison guards regarded as lacking seriousness. An relates that when he was transferred to Yodok, the guards there told him that he had been sitting down for too long and that it was time for him to do some work. During his year and a half at Yodok, there were some 2,000 prisoners in the Daesuk-ri singles section of the prison camp.

At Yodok, An's first labor assignment was construction work at a water-driven electric-power plant at the camp. His duties entailed breaking ice and wading waist-deep into a frozen stream to gather stones, and laying boards to re-channel the water. It was literally a "murderous" construction project, as scores died from exposure, and even more lost fingers and toes to frostbite. His next work assignment was cutting down and carrying from high mountains rare hardwood trees for export to Japan. Deaths resulted from injuries during this project as well. His last work project was gathering wild mushrooms in the mountains, also for export.

Kwan-li-so No. 15 Yodok



39.727 N
126.845 E

---
[29] Kang Chol Hwan and Pierre Rigoulot. *Aquariums of Pyongyang: Ten Years in the North Korean Gulag*. (New York, N.Y.: Basic Books, 2001); originally published in France as *Les Aquariums de Pyongyang*. (Editions Robert Laffont, 2000).

In 1992, An escaped to Seoul along with fellow former Yodok prisoner Kang Chol Hwan. In 1995, Chongji Media in Seoul published his Korean-language prison memoirs, *Yodok List.*

## WITNESS: KIM Tae Jin, *Kwan-li-so* No. 15 "Yodok" (1988–1992)



KIM Tae Jin was born in 1956 in China, where his father worked in the Chinese military. He returned with his mother to North Korea in 1961. After reaching adulthood, he worked in a leather factory in South Pyong-an Province. In 1986, he went to visit relatives in China and stayed for eighteen months before being arrested, in July 1987. In mid-August he was repatriated to the Musan-kun *In-min-bo-an-seong* (People's Safety Agency) detention center in Chongjin, where he was tortured during interrogation. After four months, he was transferred to the *bo-wi-bu* (National Security Agency) police *ku-ryu-jang* (interrogation facility) in Chongjin, where he was again tortured during interrogation and accused of treason, even though he had gone to China only to visit family. He was beaten, deprived of sleep, and forced to kneel or sit motionless for hours on end.  Because Kim was not permitted to wash, the fleas and lice in the jail cells were as bad a problem as the torture and freezing cold temperatures.

In March 1988, Kim was sent to the *hyuk-myung-hwa-kyuk* (revolutionizing process zone) of Daesuk-ri section at Yodok, where he was imprisoned for four years and six months, until April 1992. At Yodok, he farmed corn, cut trees into firewood, and made furniture.

After having spent eight months in confinement in provincial jail cells, Kim thought Yodok an improvement in that he was at least allowed to move around. But food rations were meager, consisting of steamed salty corn dishes — and this was before famine conditions afflicted North Korea. To stay alive, he ate plants and grasses, rats, snakes, and frogs. Kim saw deaths from malnutrition and related diseases "every week." He also personally witnessed five public executions of persons who attempted to escape. While at Yodok, he was beaten and forced to endure a sit-down-stand-up punishment until he could barely sit up. Even though Yodok was a "living hell," he still regarded these as the "golden years" for prisoners at Yodok compared with what longer-term prisoners told him about previous conditions.

After four and a half years, Kim was released. His wife divorced and denounced him. After five years, he became convinced things would never improve for him in North Korea and fled to China. He came to Seoul in June 2001 via Mongolia.

## WITNESS: LEE Young Kuk, *Kwan-li-so* No. 15 "Yodok" (1995–1999)



LEE Young Kuk was born in 1962 in Musan, North Hamgyong Province, into a politically loyal family. During his ten years of compulsory military service, from 1978 to 1988, he became a bodyguard to Kim Jong Il and got to know the "Dear Leader" personally. After returning to his hometown in 1988, Lee was struck by the discrepancies between the lifestyles of the privileged in Pyongyang and the living conditions of the people of Musan. Still, from 1991 to 1994, he was sent to the Central Military College in Pyongyang, after which time he was posted to a senior party position in Musan District. Because of his privileged status, he had a radio capable of receiving KBS (South Korean radio) broadcasts. Soon he became disillusioned with the political indoctrination he had been taught at the Military College, and from the KBS broadcasts, he came to believe that South Korea had become a real democracy with real freedom.

In 1994, Lee fled to China hoping to defect to South Korea. However, he was discovered missing, and because of his personal knowledge of the "Dear Leader," North Korean security agents chased after him. Entrapped in Beijing and wrongly thinking he was talking to a South Korean diplomat who could assist with his defection, Lee confessed his true opinions about the North Korean regime. Under the impression that he was being escorted to the South Korean Embassy, he was whisked instead into the Embassy of North Korea, where he was bound, drugged, and put on a plane to Pyongyang.

Lee was held in Pyongyang for six months in an underground detention cell by the *bo-wi-bu* (National Security Agency) police. He was subjected to kneeling torture (made to kneel motionless, not even turning his head, for hours at a time) and water torture (held down by five or six agents who poured water into his mouth and nose until he gagged and suffocated) and was severely beaten on the shins, eyes, ears, head, and mouth. Six of his teeth and one of his ear drums were broken. Years later, he still suffers double-vision in his left eye and his shins are still black and blue. Lee believes his torture was solely intended as punishment for having fled to China. While in Beijing, he had freely expressed unfavorable opinions about the regime, leaving no further information for the North Korean police to beat out of him.

Because other members of his family continued to serve Kim Jong Il — one of his cousins was one of Kim's chauffeurs — Lee's family was not punished along with him. In March 1995, Lee alone was sent to a singles camp in the *hyuk-myung-hwa-kyuk* (revolutionizing process) section of Yodok, where he quarried stones for fourteen hours each day for four years. Before his capture in Beijing, he weighed 94 kilos (207 pounds). While at Yodok, he also cut logs, cleared rocks, and farmed. Released from Yodok in January 1999, Lee weighed 58 kilos (128 pounds). Lee believes that when he was released, it was on Kim Jong Il's personal intervention.

In April 1999, Lee again fled to China and reached South Korea in May 2000, smuggled aboard a ship from Dalian with three other North Koreans. Nearly two years passed before Lee was willing and able to tell his story. He had arranged during that time for an ethnic Korean in China to go to Musan to tell his parents that he was in Seoul, but

Kwan-li-so No. 15 Yodok



his parents had either disappeared or were somewhere in detention. So, Lee decided to tell his story in South Korea, Japan, and the United States.

## TESTIMONY: *Kwan-li-so* No. 15 "Yodok," South Hamgyong Province

Yodok is the most well-documented *kwan-li-so* in North Korea, because, in addition to having a lifetime-imprisonment "total-control zone," it also has a "revolutionizing zone," which operates more like the *kyo-hwa-so* prisons, described later in this report, in that prisoners can be released back into the larger society. The four former prisoners profiled above were all in the "revolutionizing zone." Their accounts of Yodok cover almost all of the years from 1977 to 1999.

Kang Chol Hwan, who entered Yodok in 1977, remembers a sign at the front gate of the colony reading "Border Patrol Unit 2915." The colony is bound to the north by Mt. Paek (1,742 meters, or 5,715 feet, high), to the northeast by Mt. Modo (1,833 meters, or 6,014 feet, high), to the west by Mt. Tok (1,250 meters, or 4,101 feet, high) and to the south by Mt. Byoungpung (1,152 meters, or 3,780 feet, high). The valley is entered from the east by the 1,250-meter (4,101-foot) Chaebong Pass. The streams from the valleys of these mountains form the Ipsok River, which flows downstream into the Yonghung River, which flows into the sea near Wonsan City.

According to An Hyuk, Yodok, which is shorthand for Yodok-kun, an area of land measurement within a province that would be comparable to a district or county, is located in South Hamgyong Province. Yodok-kun[30] contains twenty ri[31] (also sometimes transliterated as "li" or "ni"), five of which comprise Yodok. The revolutionizing zones include Ipsok-ri (or Yipsok-ri), Knup-ri (or Gnup-ri) for Korean families from Japan, and Daesuk-ri (or Taesuk-ri), where An, Lee, and Kim were held in "singles" villages. Other sections include Pyongchang-ri, a punishment or detention area within the prison camp called Yongpyong-ri, a secluded killing area called Kouek, and other areas for prisoners serving lifetime sentences.

The whole encampment is surrounded by a barbed-wire fence measuring 3 to 4 meters (10 to 13 feet) in height. In some areas there are walls 2 to 3 meters (7 to 10 feet) tall topped with electrical wire. Along the fence there are watchtowers measuring 7 to 8 meters (23 to 26 feet) in height, set at 1-kilometer (0.62-mile) intervals, and patrolled by 1,000 guards armed with automatic rifles and hand grenades. Additionally, there are teams with guard dogs. Inside the camp, each village has two guards on duty at all times.[32]

During An Hyuk's year-and-a-half imprisonment, there were some 30,000 prisoners in the lifetime area, and 1,300 singles and 9,300 family members in the revolutionizing zone along with some 5,900 Koreans, including Kang's family, who had voluntarily repatriated from Japan but were later judged not to fit into the "Kim Il Sung nation."[33] By the time of Kim Tae Jin's release from Yodok in 1992, the number of persons in the revolutionizing zone had decreased to somewhere between 2,000 and 3,000 because of

---

[30] "Kun" may be translated as a large North Korean administrative unit.

[31] "Ri" may be translated as a small North Korean administrative unit.

[32] These figures come from pages 48–59 in An Hyuk's *Yodok List*, translated into English in *Life and Human Rights in North Korea*, Volume 1, Autumn 1996, a publication of the Citizen's Alliance for Human Rights in North Korea, Seoul, 18–19.

[33] Ibid.

releases of prisoners to society and because of larger numbers of transfers of prisoners to
the lifetime-imprisonment zones.

According to Kang Chol Hwan, labor operations at the Knup-ri section of Yodok
included a gypsum quarry and a re-opened gold mine (which was originally opened dur-
ing the Japanese occupation of Korea), where some 800 men worked in groups of five.
Assignments in these mines were considered the worst form of labor because of the fre-
quency of work accidents there. The section for ethnic Koreans who had voluntarily
repatriated from Japan also had textile plants; a distillery for corn, acorn, and snake
brandy; and a coppersmith workshop. The prisoners raised rabbits for the lining of sol-
diers' winter coats, worked on agricultural teams, and were periodically organized to
look for hardwoods and gather wild ginseng in the forest hillsides.

During Kang's ten-year imprisonment there were somewhere between 2,000 and 3,000
persons in his village, and about one hundred deaths per year from malnutrition and
disease, particularly from severe diarrhea leading to dehydration.

While Kang's was a family village, sexual contact between men and women was not
allowed, as it was thought this could result in another generation of counter-revolution-
aries. Such contact did occur, of course, but, with two exceptions in ten years, all preg-
nancies were forcibly aborted. The involved men would be physically punished and the
women would be humiliated by being compelled to recount their sexual encounters to
the entire village.

Kang's village was a "revolutionizing" village, so it included "re-education," which basi-
cally consisted of readings from *Rodong Shinmun*, the Workers' Party newspaper.

The singles area in Daesuk-ri was described by Lee Young Kuk as a valley 4 kilometers
(2.5 miles) long by 0.5 kilometers (0.3 miles) wide next to a small 600–700-meter high
(1,969–2,297-foot) mountain. During Lee's imprisonment, the area held roughly 1,000
prisoners, of which only 50 were women. The women's cells were heated, but the men's
were not, so men prisoners suffered from frostbitten ears and swollen legs during the
winter months. Roughly 200 prisoners died each year during the four years when Lee
was imprisoned, mostly from starvation and related disease. But there were always new
arrivals each month.

Both areas within Yodok where Kang, Lee, An, and Kim were imprisoned, Knup-ri and
Daesuk-ri, had public executions by hanging and shootings — and sometimes worse —
for prisoners who had tried to escape or who had been caught "stealing" food. Lee wit-
nessed one public killing of an attempted escapee, HAHN Seung Chul, who was tied
and dragged behind a car in front of the assembled prisoners until dead, after which
time the other prisoners were required to pass by and place their hands on his bloodied
corpse. Another prisoner, AHN Sung Eun, shouted out against this atrocity, and he was
immediately shot to death. Kim witnessed a public execution by firing squad after which
the assembled prisoners were required to pass by and throw a stone at the corpse still
slumped and hanging from the post to which the victim had been tied. Several women
prisoners fainted as they were pressed to further mutilate the corpse. Kang witnessed
some fifteen executions during his ten years at Knup-ri.

Kwan-li-so No. 15 Yodok



39.727 N
126.845 E

Nonetheless, according to Kang, prisoners who were brought to Yodok from other *kwan-li-so* said it was much better there than at their previous prison-labor camps. He reports that several prisoners committed suicide before they were to be transferred to other camps, where they feared they would just die a slow death.

*See pages 90 to 100 for satellite photographs of Kwan-li-so No. 15 Yodok.*

## WITNESS: KIM Yong, *Kwan-li-so* No. 14 and No. 18



KIM Yong was born in 1950 in Hwanghae Province. When he was seven years old, unbeknownst to him at the time, his father and older brother were executed as spies for the United States. To spare him the collective guilt attributed by North Korean officials to the families of political wrongdoers, Kim's mother placed him in an orphanage under a false name. Kim grew up to become the Korean equivalent of a lieutenant colonel in the *bo-wi-bu* (National Security Agency) police. Like other military and security units and departments, his unit set up income-generating businesses, and Kim became a vice president in the Sohae (West Sea) Asahi Trading Company, which operated three fishing vessels exporting flounder and sole to Japan. As a hard-currency earner for the regime, Kim had access to dollars, foreign goods and culture, and a chauffer-driven car.

Unfortunately, Kim's true parentage was discovered, quite by accident, after someone else turned up bearing his assumed name. He was arrested and interrogated for three months at the Maram *bo-wi-bu* detention/interrogation facility in the Yongsong district of Pyongyang and at another *bo-wi-bu* jail, called Moonsu, also in Pyongyang. The torture at Moonsu was particularly severe. Accused of deliberately infiltrating the security service, Kim was forced to kneel for long periods with a wooden bar placed behind and between his knees and calves. He was suspended by his handcuffed wrists from his prison-cell bars, and he was submerged up to his waist for long periods in tanks filled with cold water.

From 1995 to 1996, Kim was imprisoned in *Kwan-li-so* No. 14 at Kaechon-kun, South Pyong-an Province, where he worked in a coal mine. In 1996 he was transferred, he believes through the intervention of his supervisor at the Asahi Trading Company, to the adjacent *Kwan-li-so* No. 18, located on the other side of the Taedong River in Deukchang-ri, Bukchang-kun, South Pyong-an, where he primarily repaired coal trolleys. There, to his surprise — as he did not know if or where she was imprisoned — he was reunited with his mother, with whom he was allowed to live.

After Kim's mother was crippled by camp guards for gathering edible weeds outside the village compound beyond the allotted time, she encouraged him to escape, even if it meant risking his life. And so he did, in September 1998, by hiding in a coal train bound for the Moonchan Refinery. He soon crossed the Tumen River into China and, in October 1999, came to South Korea via Mongolia.

Parts of Kim's story were told (in Korean) in the May 2000 issue of the monthly magazine *Chosun Wolgan*, or *Chosun Monthly*. Adaptations of that article were published in English in volumes 16 and 17 — the Summer and Autumn 2000 issues, respectively — of *Life and Human Rights in North Korea*. Kim's own prison memoir will be published in 2003. He is the only known escapee from the *kwan-li-so* to have escaped to and been given asylum by South Korea. He is the sole source of information about *Kwan-li-so* Nos. 14 and 18, but secrecy, of course, is part of the point of lifetime-sentence political prison-labor camps.

## TESTIMONY: *Kwan-li-so* No. 14, Kaechon-kun, South Pyong-an Province

Operated by the bo-wi-bu (National Security Agency) police, *Kwan-li-so* No. 14's location is designated as Kaechon-kun, South Pyong-an. According to Kim's description, the camp location is in a mountainous area. The main part of the camp is near Kaechon-kun, so the camp is sometimes called "Kaechon." It encompasses an area some 40–50 kilometers (25–31 miles) long and some 30 kilometers (19 miles) wide, and holds some 15,000 prisoners.

Enterprises included mining, farming, and livestock-raising. The latter was considered the occupation of choice, as the prisoners had the opportunity to steal animal food and even pick through animal droppings for undigested grains. (Daily meals, according to Kim, were limited to 20–30 kernels of corn and watery cabbage soup.) When he first arrived at *Kwan-li-so* No. 14 and was assigned to coal mining at *Mujin II Gang* — that is, No. 2 Cutting Face, or a mine entrance — Kim was shocked by the skinniness and discoloration of the prisoners, who looked to him like soot-covered stickmen.

For two years, all Kim saw was the inside of his mine shafts, and the adjacent barracks, which contained six rooms with fifty persons per room sleeping on three tiers of wooden bunks. Fortunately, as this was a coal mine, the barracks were heated. Next to the barracks was an eating room/washroom, a sawmill, and a pumping station. The mining work was divided among tunneling/digging teams, loaders, tracklayers, railcar operators, and sawmill workers. The leader of Kim's tunneling team was a former major general, KIM Jae Keun, who had been purged and sent to *Kwan-li-so* No. 14 for having sided with Kim Il Sung's stepbrother Kim Pyong Il against the succession of Kim Jong Il.

Men and women were segregated from each other. In fact, the only time Kim saw women during his two years of imprisonment was when all the workers were taken outside the mine area for road construction.

There were no public executions during this time at *Kwan-li-so* No. 14, but many prisoners died of malnutrition and disease, some twenty-five were executed by guards, and even more died from mining accidents. In one execution, a KIM Chul Min was executed for collecting, without authorization, ripe chestnuts that had fallen to the ground from a tree at the mine entrance. Another hunger-crazed prisoner, KAL Li Yong, died after having his mouth smashed by a feces-covered stick for having stolen a leather whip, soaked it in water, and then ate the softened leather.

*See pages 109 to 112 for satellite photographs of Kwan-li-so No. 14.*

Kwan-li-so No. 14 Kaechon



39.579 N
126.068 E

## TESTIMONY: *Kwan-li-so* No. 18, Deukchang-ri, Bukchang-kun, South Pyong-an Province



Kwan-li-so No. 18 Bukchang

39.554 N
126.065 E

Located on the other side of the Taedong River from *Kwan-li-so* No. 14, *Kwan-li-so* No. 18 is something of an anomaly among the *kwan-li-so* in that it is run by the *In-min-bo-an-seong* (People's Safety Agency) police rather than the *bo-wi-bu* (National Security Agency) police[34] and is a much less strict and severe prison-labor colony. But it holds some 50,000 prisoners: the families of the presumed wrongdoers imprisoned in *Kwan-li-so* No. 14. Roughly 30,000 are organized into work teams. The other 20,000 are children and elderly relatives.

Labor projects at *Kwan-li-so* No. 18 included coal-mining, brick-making, and cement-making, along with work in a glass factory and a distillery. Unusually, during Kim's imprisonment at this *kwan-li-so*, the prison laborers were paid a token amount of 30 *won* a month — barely the cost of a pack of cigarettes. Families were allowed to live together, and privileged prisoners were allowed to marry and have children. There were also radio broadcasts, and copies of *Rodong Shinmun*, the *Workers' Daily*, were posted at the entrances to worksites. Privileged prisoners were allowed outside the gates to collect herbs.

*Kwan-li-so* No. 18 also had a very small "revolutionizing zone," for prisoners that were eligible for release back into society, and even a "liberation zone," where a small number of prisoners were allowed to send and receive mail, go to the local market, and even receive a gift of liquor from the state on the occasion of Kim Il Sung's birthday, apparently in recognition of their ongoing citizenship.

Prisoners at *Kwan-li-so* No. 18 did, however, die of malnutrition, disease, and work accidents. And there were public executions — dozens of them, according to Kim. Rule-breakers were shot. Attempted escapees were hanged.

*See pages 102 to 109 for satellite photographs of Kwan-li-so No. 18.*

## WITNESS: Former Guard AHN Myong Chol, *Kwan-li-so* Nos. 11, 13, 26, and 22



Far Eastern Economic Review

Unlike the witnesses just described, who were released or escaped prisoners, AHN Myong Chol was a *kwan-li-so* guard. Ahn was born in 1969 in Hangwon, South Hamgyong Province. Ahn came from a good Korean Workers' Party family, so for his compulsory military service, he became a *bo-wi-bu* (National Security Agency) police guard assigned, consecutively, to four different *kwan-li-so*: No. 11, at Kyungsun, North Hamgyong Province, from May to August 1987; No. 13, at Jongsong, North Hamgyong Province, from August 1987 to the winter of 1990, except for four months during this time when he was sent to the much smaller prison No. 26 in Pyongyang; and No. 22 at Haengyong in Hoeryong, North Hamgyong Province, from late 1990 to mid-1994. Of the four places, as of December 2002, only *Kwan-li-so* No. 22 is still open and operational.

---

[34] And thus might not be considered a *kwan-li-so* by some.

Ahn's father worked at a public distribution center. During the famine, he was caught giving food to one of his neighbors and became labeled as a "reactionary element." When Ahn learned of his father's situation, he fled with his wife across the Tumen River into China.  After he reached Seoul, he was interviewed by the monthly magazine *Chosun Wolgan*, or *Chosun Monthly*. Portions of the resulting article were published in English in *Political Prison Camps in North Korea,* by the Center for the Advancement of North Korean Human Rights, Seoul. Ahn's Korean-language memoirs, *They Are Crying for Help,* was published by Chungji Media, Seoul, but the book is out of print and the publisher is out of business. In 1998, Ahn testified before the U.S. Congress. In December 2002, he was able to identify the buildings and grounds on several satellite photographs of *Kwan-li-so* No. 22 for publication in the *Far Eastern Economic Review* (December 12, 2002).

Ahn's guard duties included making deliveries by truck to various parts of *Kwan-li-so* No. 22. This assignment gave him unusual mobility within the camp, even for a guard. He learned much from his conversations with other guards while making deliveries to various sections of the camp. His work at four of the camps provided him with comparative insights into the functioning of the *kwan-li-so* system. Also of interest is his guard training and indoctrination.

Ahn reports that the prisoners were referred to as "emigrants." Great stress was placed on the harm and threat that "factionalists" posed to the revolution; how factionalism produces class enemies; how factionalists and class enemies have to be destroyed like weeds, down to their roots, through the *yeon-jwa-je* three-generation family-incarceration system; and how guards have to exercise their control duties so as to reveal to the class enemies the dictatorship of the proletariat. Like some of the former prisoners, Ahn recalls the shock he felt upon his first arrival at a camp, where he likened the prisoners to walking skeletons, dwarfs, and cripples in rags.

## TESTIMONY: *Kwan-li-so* No. 22, Haengyong, Hoeryong, North Hamgyong Province

Also sometimes identified as Hoeryong, where the camp headquarters is located, the official designations for *Kwan-li-so* No. 22 are "Chosun People's Security Unit 2209" or "Pueksan-ku Ministry of State Security." No. 22 covers an area, according to Ahn, some 50 kilometers (31 miles) in length and 40 kilometers (25 miles) in width. There are roughly 1,000 guards and 500–600 administrative agents for 50,000 prisoners, the families of alleged wrongdoers.

Ahn reports that the annual agricultural production quotas for *Kwan-li-so* No. 22 were as follows: 400 tons of corn, 100,000 tons of potatoes, 50,000 tons of lima beans, and 10,000 tons of red peppers per year. The camp also grew Chinese cabbages, radishes, cucumbers, and eggplants, and had a distillery that produced soy sauce and whiskeys. No. 22 mined coal that was shipped to the Chongjin Thermal Power Plant and the Chongjin and Kimchaek Steel Mills.

Notwithstanding the agricultural production, Ahn estimates that 1,500 to 2,000 prisoners at *Kwan-li-so* No. 22, mostly children, died from malnutrition yearly. Executions were not public at the colony but were carried out at a site named "Sugol." He estimates that there were ten executions per year, mostly in October, of people who had

Kwan-li-so No. 22 Haengyong



been caught eating from harvest foods. People were fed corn and potatoes, almost no vegetables, and no meat. The only meat in their diets came from the rats, snakes, and frogs they could catch. There were also deaths from beatings of prisoners who had not been meeting their production quotas. In fact, Ahn says, there were so many deaths from beatings that at one point the guards were warned to be less violent.

Only a few privileged prisoners were allowed to marry. Otherwise, sex was prohibited. Ahn is aware of one pregnant woman who was executed as a punishment for her pregnancy. *Kwan-li-so* No. 22 had a notorious detention barracks for prisoners who disobeyed camp regulations. Ahn was a guard nearby and heard the screams of the prisoners as they were beaten.

The prisoners at *Kwan-li-so* No. 22 were paid approximately 500 *won* per year. Youth at the colony received basic schooling in elementary reading, writing, and arithmetic. The camp also had nine holidays per year.

*See pages 113 to 117 for satellite photographs of Kwan-li-so No. 22.*

## Closed *Kwan-li-so*

### WITNESS: Former Guard CHOI Dong Chul



CHOI Dong Chul is the son of LEE Soon Ok, whose story appears below. At the time of his mother's arrest, Choi was a student at Kim Il Sung University in Pyongyang. Prior to his mother's arrest, when the family was still in very high standing within the Korean Workers' Party, Choi fulfilled a portion of his compulsory military service, from February 1985 to June 1986, as a guard at *Kwan-li-so* No. 11 for families of political wrongdoers, located in Kyungsung, North Hamgyong Province. This is the same 15,000–20,000-inmate encampment where Ahn Myong Chol was a guard in 1987. Though *Kwan-li-so* No.11 was closed in 1989 and its inmates transferred to other political penal-labor colonies, Choi's testimony, along with that of Ahn, provides an additional glimpse into the operation of North Korea's *kwan-li-so*.

Both Ahn Myong Chol and Choi Dong Chul were guards at *Kwan-li-so* No. 11 at Kyongsong, North Hamgyong Province, from May to August 1987 and from February 1985 to June 1986, respectively. In this camp, some 20,000 family prisoners engaged in potato farming and logging. According to the KINU *White Paper on Human Rights in North Korea, Kwan-li-so* No. 11 was closed in 1989.

Ahn Myong Chol was also a guard at *Kwan-li-so* No. 13 at Jongsong, North Hamgyong Province, from 1987 to 1990. No. 13 held some 30,000 prisoners, he estimates. According to the KINU *White Paper on Human Rights in North Korea, Kwan-li-so* No. 13 was closed at the end of 1990 because it was too close to the Chinese border, tempting prisoners to try to escape.

For one four-month period while he was a guard at *Kwan-li-so* No. 13, Ahn was briefly transferred to guard the much smaller political prison No. 26 at Hwachon-dong,

Sungho-ri district, Pyongyang. The KINU *White Paper on Human Rights* notes that No. 26 closed in January 1991.

The KINU White Paper also notes that *Kwan-li-so* No. 12 at Changpyong, Onsong, North Hamgyong Province, was closed in 1989, also because of its proximity to the border with China. Further, *Kwan-li-so* No. 27 at Chonma, North Pyong-an Province, was closed in 1990 for unknown reasons.

One of the anonymous former prisoners from one of the *kyo-hwa-so* prisons discussed in the next section of part one of this report was transferred to a *kwan-li-so* at Danchun, South Hamgyong Province in the mid-1980s. He reports that this camp closed in the late 1980s.

### Other *Kwan-li-so*

The KINU White Paper includes *Kwan-li-so* No. 16 at Hwasong, North Hamgyong Province, for the families of condemned, and *Kwan-li-so* No. 25 at Chongjin, North Hamgyong Province, for the condemned.

Professor HEO Man Ho of Kyungpook National University, Daegu, also reports a *Kwan-li-so* No. 16 at Cochang-ri, Hwasang-kun (located in North Hamgyong Province,) containing about 10,000 "anti-revolutionary and anti-Party elements" held on charges of opposing the succession to Kim Jong Il, and adds that former Vice-Chairman of State KIM Dong Gyu is imprisoned there. Heo further notes a Suseong Edification Center in Sunam district, Chongjin City, run by the *bo-wi-bu* (National Security Agency) police; he reports that the center holds about 3,000 detainees and their families, including pastors and presbyters from South Hwanghae Province, and a Mr. HOE Taek, a Korean repatriate from Japan.[35] However, no former prisoners or guards were accessible to provide first-person or eyewitness confirmation during the preparation of this report.[36]



Kwan-li-so No. 16 Kaechon

41.3 N
129.2 E



Kwan-li-so No. 25 Chongjin

41.9 N
129.7 E

# THE NORTH KOREAN GULAG II: *KYO-HWA-SO* LONG-TERM PRISON-LABOR FACILITIES

## Introduction: Deaths in Detention

The Korean word transliterated phonetically as *kyo-hwa-so* translates as "a place to make a good person through re-education." More commonly, *kyo-hwa-so* is translated as an "enlightenment," "re-education," or "re-socialization" center. Some of the former prisoners interviewed for this report used the term "*ro-dong* (labor) *kyo-hwa-so*," meaning "re-education through labor."

In theory, "re-education through labor" might be a more rehabilitative way to treat criminal offenders when compared with simply warehousing convicts to keep them off public streets for long periods. However, this theory bears no relation to the *kyo-hwa-so* described by the former North Korean prisoners interviewed for this report. According

[35] Paper on "Political Detention Camps in Relation to Socio-Political Change in North Korea" (p. 40) presented at the 4th International Conference on North Korean Human Rights and Refugees, 2003, Prague, Czech Republic.
[36] Note: The KINU White Paper focuses on camps run by the 7th Bureau of the *bo-wi-bu* police and therefore does not count No. 18 as a *kwan-li-so* "management center," as it is not run by the *bo-wi-bu*.

The Hidden Gulag      41      Exposing North Korea's Prison Camps                    000188

to these witnesses, the "educational" component at these facilities consisted mostly of forced memorizing of the speeches of Kim Il Sung and Kim Jong Il, and organized "self-criticism" sessions. These sessions were often conducted in the evenings, and the exhausted prisoners were not allowed to return to their cells to sleep until they could recite the speeches. Prisoners, kneeling in front of their work-units and facing the prison officials, would frequently falsely confess to imaginary mistakes, which the prison officials or prison-group leaders could then "criticize," so that the work unit could conclude the criticism sessions and go back to their overcrowded cells.

*Kyo-hwa-so* are run by the *In-min-bo-an-seong* (People's Safety Agency), formerly called the *Sa-hyo-an-jeon-bu* (Social Safety Agency). Some of the *kyo-hwa-so* resemble large penitentiaries: a single large compound surrounded by high walls and barbed- or electrified-wire fencing and containing several buildings for manufacturing production, prisoner housing, and offices for guards and prison officials. Other *kyo-hwa-so* are large barbed-wire-enclosed encampments, located in the valleys of high mountains, composed of prisoner villages where prisoners engage in mining or lumber-cutting activities.

In many aspects of day-to-day prison life, the *kyo-hwa-so* resemble the *kwan-li-so* described in the previous section of this report. The prisons are harsh "strict-regime" places (virtually no prisoner privileges) where prisoners are forced to do hard, often heavy, and often dangerous labor while being provided food rations insufficient to sustain even sedentary life (and where the provision of literally sub-subsistence food rations preceded the mid-1990s famine in North Korea). The combination of hard labor and below-subsistence-level food provisions results in rapid weight loss, industrial or mining work accidents, malnutrition-related diseases, and death. The largely doctor-less and medicine-less prison "hospitals" or "clinics" are essentially places where the sick and injured who can no longer work are sent to await death. Loss of life occurs at such high rates that many of the *kyo-hwa-so* are perceived by prisoners as death camps in that they expect to die before the completion of their sentences.

The primary — and substantial — difference between *kyo-hwa-so* prisoners and *kwan-li-so* prisoners is that the former are almost always subjected to a judicial process and, upon conviction, are given a sentence of set length, while the latter, along with their families, are simply purged and put away for life. In an important respect, *kyo-hwa-so* prisons and prison camps are, by design, correctional facilities for persons convicted of "heavy crimes," the equivalent of what would be in the United States felony offenses. Indeed, some of the former prisoners interviewed for this report admitted that they had committed crimes for which they would be punished in a normal society.

But others sentenced to these prison-labor camps are convicted of offenses that would not normally be criminalized: private economic transactions not undertaken within an officially appointed work station, or offenses that are, in essence, political crimes. Some interviewed for this report were driven to engage in private economic transactions, including activities such as smuggling (trading goods across the North Korea–China border), because of the breakdown in the state-run production and distribution systems. Others were arrested and convicted due to power struggles between the North Korean Communist Party functionaries that staff the production/distribution facilities and police units that were dissatisfied with their share of goods and/or bribes in a collapsing social setting that is endemically corrupt.

Further, it should be noted that while a state has the right to deprive persons who commit crimes of their liberty, it does not have the right to deprive prisoners of food or medical treatment. Indeed, states have a responsibility to feed those who, upon trial and conviction, have been deprived of their liberty and temporarily removed from civil society. And this does not mean the state can squeeze work out of prisoners without feeding them, only to release them to return home to die from their prison-acquired illnesses and diseases. Duly convicted criminals lose their right to liberty but not their right to life.

## WITNESSES AND TESTIMONY
## WITNESS: LEE Soon Ok, *Kyo-hwa-so* No. 1



LEE Soon Ok was born in 1947 into a privileged and stalwart Korean Workers' Party family. Her grandfather had fought in Kim Il Sung's Manchurian army against the Japanese occupation of Korea. Her son was enrolled in Kim Il Sung University in Pyongyang, open only to children of the elite. Trained as an accountant, Lee rose to become a supervisor in the No. 65 Distribution Center in Onsong, North Hamgyong Province, which distributed Chinese-manufactured fabrics to party and state officials. She was arrested in 1986 in what she believes was a power struggle between the Workers' Party, whose members run the nationwide distribution system, and the public security bureau police, who were not satisfied with the amount of goods being provided to them by the distribution centers. She was charged with theft and bribery and held for seven months in the Onsong *bo-wi-bu* (National Security Agency) *ka-mok* (jail), where she was tortured severely because she refused to confess to the allegations against her. Then, upon her expulsion from the Party, she was transferred to an *In-min-bo-an-seong* (People's Safety Agency) provincial interrogation center, where she was held for another seven months and further tortured.

To escape even further torture and threats against her family members, Lee ultimately agreed to sign a confession. Afterwards, she was given a public trial and sentenced to fourteen years at *Kyo-hwa-so* No. 1, located at Kaechon, South Pyong-an Province, where, among other things, the prisoners manufacture garments. Though she originally worked in the ordinary sewing lines, she was eventually transferred because of her accounting and managerial experience to the administrative office of the prison, where she had the opportunity to observe and learn a great deal more about how the prison-labor camp was run.

After her release, in February 1994, Lee and her son fled from North Korea to China, eventually arriving in South Korea in December 1995 via Hong Kong. Once in South Korea, she wrote a prison memoir, *Eyes of the Tailless Animals: Prison Memoirs of a North Korean Woman,*[37] which names numerous persons who died under torture in the jails of Onsong and from various mistreatments at Kaechon prison labor camp.

Lee's testimony for this report was drawn from her published prison memoir as well as from a personal interview.

Kyo-hwa-so No. 1 Kaechon



39.708 N
125.923 E

---

[37] Published in Korean by Chunji Media, Seoul, in 1996, and in English by Living Sacrifice Book Company, Bartlesville, Oklahoma, in 1999.

## TESTIMONY: *Kyo-hwa-so* No. 1, Kaechon, South Pyong-an Province

Located in the corner of a valley surrounded by mountains in Kaechon, South Pyong-an Province, *Kyo-hwa-so* No. 1 is a prison complex holding, at the time of Lee's imprisonment, some 6,000 prisoners. A high wall with an electrified-wire fence surrounds the complex, which includes prisoner dormitories, a large two-story factory, and office buildings for guards and prison officials.[38]

The other prisoners at the time of Lee's imprisonment included actual criminals, citizens convicted of not obeying government rules, and Lee reports, some 250 Korean women who had voluntarily repatriated from Japan in November of 1987. Some women, reportedly, were housewives convicted of stealing food for their families as the North Korean production and distribution system started its decline.

Prisoners were supposed to get rations of some 700 grams (25 ounces) per day consisting of corn, rice, and beans. Instead, the guards ate the rice and beans, leaving each prisoner with only some 100 grams (3.5 ounces) of corn per meal, or a meager 300 grams (11 ounces) per day. Constant and severe hunger was the norm, and the dehumanizing environment led the prisoners to fight each other for scraps of food.

The primary prison-labor occupations at *Kyo-hwa-so* No.1 during Lee's imprisonment were garment and shoe manufacturing. Shoemaking was considered by the prisoners to be the worse of the two occupations because of the hard labor involved in cutting and sewing leather and because of the toxic glue used in the shoes. The garment factory initially made army uniforms but later produced bras for export to the Soviet Union, doilies for export to Poland, hand-knit sweaters for export to Japan, and paper flowers for export to France.

The women's garment factories were organized into various departments: fabric cutting, sewing lines, machinery maintenance, and facility services, for example. Most departments had some 250 to 300 members, and each department had a supervisor, record-keeper, and messenger. The departments were organized into units of fifty to sixty prisoners, and each unit divided into work teams of five to seven prisoners, with one prisoner assigned to be the work-team leader. Each work team did everything as a group: eating, sleeping, even toilet breaks. Newcomers had difficulty adjusting to the group toilet-break regimen. Initially unable to contain themselves, these prisoners would have to remain sitting at their sewing line work-stations in their soiled clothing.

The whole group would be punished for the infraction of one of its members, a common infraction being the failure to meet individual — or group — production quotas. The most common and immediate punishment was reduced food rations. Frequently the threat of reduced food rations drove the women prisoners to work through constant pain. In winter, hands and fingers numb from cold were prone to accidents from the sewing needles and scissors. Mindful of their production quotas, prisoners continued at their work-stations, doubly fearful that their dripping blood would soil the garments

---

[38] Lee Soon Ok was imprisoned at the same place as JI Hae Nam, whose testimony follows Lee's in this report, and only several months apart. The two women were interviewed separately and did not know each other. Lee's figures for the prison population at *Kyo-hwa-so* No. 1 include both male prisoners from a nearby prison and women prisoners.

USCA Case #13-7147      Document #1495112      Filed: 05/29/2014      Page 194 of 411

they were sewing. Repeated infractions led to transfer to the prison's shoe factory. Even more severe punishment included prolonged solitary confinement in a cell too small to allow for a person to fully stand up or lie down inside, leading to loss of circulation and severe pain.

In the prison dormitories, eighty to ninety prisoners slept head-to-toe in cells roughly sixteen by twenty feet square. In winter, sleeping side by side kept the prisoners warm, but in summer, the dorms were dreadfully hot and foul smelling. The prisoners preferred to sleep, if they could, under their sewing machines in the factory, on floors dusty with cotton fiber.

The bodies of prisoners who died in detention were simply dumped in the mountains like dead animals, non-burial being culturally offensive to Koreans. Prisoners were also offended by being cursed or kicked by persons younger than themselves, another cultural offense. Missing stitches, or soiling or spoiling garments, in the sewing factory commonly resulted in kicks or slaps. Several years of below-subsistence-level food rations coupled with hard labor and brutal treatment apparently caused spinal columns and ligaments to weaken. Numerous physical deformities followed, and many women prisoners developed "hunched backs."

In addition to deaths from malnutrition-related diseases and the tiny "punishment cells," there were public executions in front of the assembled prison population — usually of men who had broken under pressure and cursed or defied the guards, but also of women who had been overheard expressing complaints. The other prisoners were required to file by the executed corpses, a practice that caused some prisoners to lose composure, scream, and act out. Many of these prisoners were then punished with solitary confinement. The solitary-confinement cells would be filled following the public executions.

Predictably, the prison conditions and labor system resulted in high rates of industrial work accidents and epidemics of paratyphoid (dehydration resulting from severe and prolonged diarrhea). The small number of women who came into the prison pregnant were forced to have injection-induced abortions.

*Kyo-hwa-so* No.1 also featured weekly self-criticism and propaganda — literally, "re-civilization" — sessions. Prisoners were required to memorize and recite Kim Il Sung's New Year's Day speech for that year. Those who could not do the memorization were punished. One man who refused to memorize and recite the speech was publicly executed. These "re-civilization training programs" included listening to radio broadcasts in which North Korea criticized the political imprisonment of student radicals and labor protesters in South Korea. These broadcasts struck the prisoners as odd, as the offenses for which the South Korean protesters were being jailed were capital offenses in North Korea.

Kyo-hwa-so No. 1 Kaechon



39.708 N
125.923 E

## WITNESS: JI Hae Nam, *Kyo-hwa-so* No. 1



JI Hae Nam was born in 1949 in Namun-ri, Hamhung City, South Hamgyong Province. At one point, she worked as a Korean Workers' Party propaganda cadre, visiting factories to explain party policy and exhort factory workers, sometimes through patriotic work songs, to meet their production quotas. But after the 13th Party Congress in 1989, her faith in the Party began to waver. A decade of hardship began shortly thereafter.

At the time, a North Korean TV show mocking former South Korean President PARK Chun Hee featured one of Park's concubines singing an apparently popular South Korean pop song, "Don't Cry for Me, Hongdo" (or, Younger Sister). Ji was taken with the song and its melody and memorized it. On a lunar calendar holiday coinciding with Christmas day, December 25, 1992, Ji and four other women had an evening song party in Hamjun-kun, South Hamgyong Province, at which Ji taught the song to the other women. Overheard by neighbors, reported to the authorities, and arrested for singing a South Korean song, Ji was taken first to the *In-min-bo-an-seong* (People's Safety Agency) jail in Hamjun-kun for fifteen days, and then to the *In-min-bo-an-seong* police jail in Myungchun-kun in North Hamgyong Province. During her pre-trial detention, she was beaten and sexually abused by a detention-facility guard. Mortified at her mistreatment by the young guard, who has in his early twenties, Ji tried to commit suicide by swallowing pieces of cement.

The other four women at the song party were sentenced to eight months of forced labor. During the investigation of Ji's role as the song leader, the charge of stealing food rations, technically falsifying documents to get more food rations than she should have, was added to the charge of disrupting the socialist order — "Article fifty-something," she recalls. She was sentenced to three years of rehabilitation-through-labor at the woman's prison *Kyo-hwa-so* No. 1 at Kaechon, South Pyong-an Province.

After serving two years and two months of her three-year sentence, in September 1995, Ji, along with fifty other "light crime" prisoners, was released on the occasion of the fiftieth anniversary of Korea's liberation from Japanese occupation. She returned to Hamjun-kun but, as an ex-convict, felt that doors were closed to her.  As the economy deteriorated, she was unable to make ends meet as a peddler and resorted to selling her blood at transfusion centers. Hungry and disillusioned about her future prospects, she fled to China in September 1998, but she was almost immediately caught by a trafficker and sold to a physically deformed Chinese man who locked her up as a "sex toy" for seven months before she was able to escape. She then made her way to Weihai, where she worked in a restaurant and saved what little money she could. She eventually teamed up with six other North Koreans in China and stole a boat to try to get to South Korea by sea, but the engine broke down. The boat filled with water on rough seas and had to be towed back to shore by Chinese fishermen. Shortly thereafter, Ji and her fellow Korean escapees stole another boat and again set out to sea, but this boat was intercepted by the authorities and the amateur sailors turned over to Chinese border guards.

Taken to the Tandong detention center in China, Ji was forcibly repatriated to North Korea and sent to the *bo-wi-bu* (National Security Agency) police *ka-mok* (jail) in

Sinuiju, where there were twenty-five women and thirty men — all *tal-bukza* ("escaped North persons"). While in this *bo-wi-bu* jail, she was beaten with broom sticks, forced to kneel for hours at a time, and made to do the "stand-up-sit-down" exercise to the point of collapse, usually after thirty to forty minutes. Some of the younger women were kept in solitary confinement and sexually abused, Ji reports. After a month, she was sent to the Sinuiju *jip-kyul-so* (detention center), but a week later, on December 25, 1999, she was released as part of a larger pardon for persons repatriated from China.

Fearing she would be constantly watched and possibly re-arrested, Ji made her way to Musan, and in January 2000, crossed the frozen Tumen River back into China. This time her luck had turned. She found work in a company managed by a South Korean. Then she met a South Korean pastor who assisted a group of North Korean refugees, including Ji, in making their way to South Korea. The group went from Weihai to Beijing to Kunming in southern China. Caught by the Chinese police near the Vietnam border, they successfully passed themselves off as Korean-Chinese and walked overnight over a mountain path into Vietnam. By train, by motorbike, and on foot they made their way down through Southeast Asia and on to Seoul, where they obtained asylum.

During her interview for this report, which lasted all afternoon in a human rights NGO office in Seoul, Ji spoke in rapid anger as she described the conditions of *Kyo-hwa-so* No. 1 at Kaechon. She laughed as she recounted her misadventures on the high seas in stolen, leaky boats that had almost no chance of actually crossing the West Sea (also called the Yellow Sea) to South Korea. And she fought back tears as she referred to the sexual harassments and violations she endured in custody and as a trafficked person. For the last question of the interview, the researcher asked Ji if she ever again sang the song, "Don't Cry for Me, Hongdo." Straightaway she replied, "Yes, and now without fear."

## TESTIMONY: *Kyo-hwa-so* No. 1, Kaechon, South Pyong-an Province

Surrounded by a 4-meter (13-foot) wall topped with barbed wire, *Kyo-hwa-so* No. 1 held roughly 1,000 women prisoners who made clothing and leather goods during Ji's imprisonment. (Shortly before her arrival, hundreds of women had been transferred to another prison, she was told by other inmates.) The prisoners were divided into nine work divisions and smaller work units. Two work divisions made shoes and leather bags. Men from another prison were brought in to prepare the leather. As the leather-work was the worst work, it was the repeat offenders and prison rule-breakers — some seventy to eighty women — who were assigned to the leather divisions. Ji's offense was essentially political, but many other prisoners had been convicted of theft, fraud, murder, adultery, and prostitution.

While most women worked in sewing lines, other work units were organized for cooking, construction, cleaning, maintenance, farming outside the prison compound, and a mobile "day-labor unit." Each work unit was given a production quota that required hard, fast work. Talking was not allowed on the sewing lines, and "on a daily basis," the women guards or wardens would kick or beat women prisoners who worked too slowly, in front of the other prisoners. Minor rule-breakers were given less desirable jobs or reduced rations. Worse offenders were placed in tiny punishment cells where they were unable to lie down or stand up.

Working hours were from eight in the morning until six in the evening, followed by

Kyo-hwa-so No. 1 Kaechon



hour-and-a-half unit-wide self-criticism sessions, both *saeng-hwal-chong-hwa* (daily-life criticism) and *saen-gho-bi-pan* (mutual criticism). There were incentives and rewards for the prisoners to spy and tattle on each other, and so the prisoners did. According to Ji, the theory of the prison was that with their strength and spirit broken by hard labor, the prisoners would repent through self-criticism and change their mentality.

The most salient characteristic of this prison was the inadequate food rations. Each day, prisoners were given a palm-sized ball of cornmeal and some cabbage-leaf soup. According to Ji, seventy percent of the prisoners suffered from malnutrition, and during her two years of imprisonment, a fifth of the prisoners — namely those without nearby families to bring them extra food — died of starvation and malnutrition-related disease.

### WITNESS: Former Prisoner #6, *Kyo-hwa-so* No. 77



Former Prisoner #6 was born in 1960 in South Pyong-an Province. While in the North Korean military, he was a small operative in a scheme of his military unit that diverted to personal gain the profit from goods that had been imported to North Korea from Japan and then re-exported to China. Dismissed from the army after almost a year of military detention, he was convicted by a civilian "People's Judiciary" in Dukchun and sentenced for two years to *Kyo-hwa-so* No. 77 near Danchun, South Hamgyong Province, a gold-mining labor camp where some 2,000 out of roughly 7,000 to 8,000 prisoners died of mining accidents, malnutrition, and malnutrition-related diseases during the two years Former Prisoner #6 was imprisoned there, in the late 1980s.

Former Prisoner #6 mined gold for three months and then spent six months in the prison "health clinic" before serving the remainder of his sentence working in the prison cafeteria. He was released in 1987. He later fled to China, where he lived for several years before arriving in South Korea in 2001.

### TESTIMONY: *Kyo-hwa-so* No. 77, Danchun, South Hamgyong Province

According to Former Prisoner #6, there was a large prison-labor *Kyo-hwa-so* No. 55 at Chunma, South Hamgyong Province, but that camp was overcrowded, so a number of prisoners there were transferred to *Kyo-hwa-so* No. 77, a *kyung jaebun* (criminal re-education prison-labor camp) located in the mountains between Daeheung and Geomtuk in North Hamgyong Province. During the time when Former Prisoner #6 was imprisoned, *Kyo-hwa-so* No. 77 held some 7,000 to 8,000 prisoners, all male, most of whom were serving three-year sentences.

Kyo-hwa-so No. 77 Danchun



The *kyo-hwa-so* was divided into units of 800 to 1,000 prisoners, and these units were divided into sub-units of 60 to 100 prisoners. In the unit of Former Prisoner #6, some 15 to 20 prisoners were persons imprisoned for going to China, but most were prisoners convicted of what would be criminal offenses in any country. About half of the prisoners who came into this unit were already malnourished and ill from below-subsistence-level food rations while under pre-trial and pre-sentence detention. At *Kyo-hwa-so* No. 77 the prisoners were fed daily only a small coffee-cup-sized ball of mixed corn, rice, and beans along with a watery salted-cabbage soup. (These below-subsistence-level food rations preceded the mid-1990s famine in North Korea.) The prisoners slept in wooden dormitories holding between 60 and 70 persons.

Most prisoners at *Kyo-hwa-so* No. 77 mined gold. Some of the mine-shafts dated back to the early days of the Japanese occupation of Korea in the early 1900s. Accessing the veins of mineable gold required descending and, later, ascending a wooden staircase 500 meters (1,640 feet) in length, using gas lanterns for light. Deaths from mining accidents were a daily occurrence, including multiple deaths resulting from the partial collapse of mineshafts.

Huge numbers of prisoners were so severely malnourished that after a short period of hard labor, they could no longer work in the mines and were sent to the clinic or "hospital" section of the prison camp. At times, this section would hold up to 1,000 prisoners. Some prisoners intentionally injured themselves to get out of the mines. Prisoners stayed at the clinic from one to six months, but the clinic was mostly a place to await death. During the detention of Former Prisoner #6, nearly a third of the prisoners died within their first month at the clinic. Sometimes, if a prisoner was near death, he would be released to die at home, in an effort to reduce the extremely high number of deaths under detention. Thirty to fifty new prisoners were brought in every week to keep the mine going.

The prisoners themselves considered *Kyo-hwa-so* No. 77 to be a death camp, in that they did not expect to live until the completion of their (typically) three-year sentences. Nonetheless, the sub-units had a lecture and self-criticism session once a week, on Saturday or Sunday before the evening meal, when prisoners would confess their wrong-doings and shortcomings. During these sessions, the entire sub-unit would stand except for the confessing prisoner, who would kneel in front of the group, facing the guards. Once every month there was a unit-wide criticism session to discuss production shortcomings.

There were public executions in front of the entire camp of persons caught trying to escape, steal from the prison warehouse, or inflict injuries on themselves. During public executions, the guards were very heavily armed.

## WITNESS: YOU Chun Sik, *Kyo-hwa-so* No. 22

YOU Chun Sik was born in November 1963 in Onsong, North Hamgyong Province. Following completion of his military service, in which he held the rank of platoon commander, he worked for a construction company in Onsong. His long string of encounters with the North Korean prison and detention system began in 1996.

After food distribution ceased at his place of employment, You went to Kangwan Province to buy fish to sell to Koreans in China. He made "good money" and also began buying personal effects and selling them in China. Caught by the North Korean police, he was sentenced in January 1996 to six months' hard labor at the Onsong *In-min-bo-an-seong* (People's Safety Agency) *ro-dong-dan-ryeon-dae* (labor-training camp) for not working at his designated workplace, for unauthorized buying and selling, and for an old assault they dredged up from his military record. (You thinks he actually would have been given a longer sentence if not for his military-service record.)

In May 1995, with one month left to go in his six-month sentence, You was given a temporary holiday release. But he became inebriated during holiday festivities and was



Kyo-hwa-so No. 22 Oro

41.738 N
129.722 E



Kyo-hwa-so No. 22 Oro

41.738 N
129.722 E

late returning to the labor-training camp. For this infraction, he was hung upside-down for three hours, and all of the other one-hundred-odd prisoners at the labor-training camp had to march past and hit him while he was hanging. Following his collective beating, You was taken to an *In-min-bo-an-seong* (People's Safety Agency) *ku-ryu-jang* (detention center) and then sent in a group of nine prisoners to *Kyo-hwa-so* No. 22 (called "two-two" by the prisoners) in Oro-kun, South Hamgyong Province, for a one-year prison term. All eight of the other prisoners in his entering group died of malnutrition and beatings from guards and other prisoners during You's year-long sentence.

Released from *Kyo-hwa-so* No. 22 in September 1997, You fled to China that October. He worked in Shenyang for a South Korean company until February 2000, when he was caught by Chinese police and held in Shenyang for six weeks and then in a detention center in the town of Dandong, near the North Korean border, for another month. The Dandong police turned him over to the Sinuiju *bo-wi-bu* (National Security Agency) police, who held him in a *ka-mok* (jail) for six weeks of interrogation. You was accused of working for a South Korean company; fearing execution, he initially denied the accusation.

While in the Sinuiju *ka-mok*, You was kicked, beaten, and, along with five or six other prisoners in his cell, made to sit motionless under a surveillance camera for the whole day, except during meals. If the prisoners moved, they were beaten on the fingers. If observed talking, they were forced to slap each other. Only a few of the guards allowed the prisoners to stretch. You described the sitting-motionless torture as being more painful than the beatings.

You reports that the majority of the Sinuiju *bo-wi-bu ka-mok* detainees were women, most of whom were later sent to detention facilities in their hometowns. While You was detained in Sinuiju in mid-2000, seven newly repatriated women were brought in, four of whom were pregnant and shortly after taken away. He later met one woman from this group in China; she told him that the four who had been taken away were given forced abortions.

You finally admitted to his jailers that he had worked in China for a South Korean-owned company. He also convinced them all that the other employees were Chinese or Korean-Chinese, which seemed to matter to his jailers. He was taken to Pyongyang *bo-wi-bu* (National Security Agency) center for additional interrogations, where, he reports, other imprisoned persons were high-ranking officials and where there was no torture. After enduring two weeks of interrogation in Pyongyang, he was sent to a National Security Agency detention facility in his hometown of Onsong for the month of August. He was then transferred to the Onsong *In-min-bo-an-seong* (People's Safety Agency) police jail for twenty days before being sent in October to the *ro-dong-dan-ryeon-dae* (labor-training camp) No. 55 in Youngkwang-kun, South Hamgyong Province, for a one-year sentence of hard labor.

You became so ill that in January 2001 he was released on temporary home sick-leave. Upon recovery, he was supposed to return to the labor-training camp to complete his term, but he crossed the Tumen River and fled to China instead. You recovered in Shenyang for two months and then made his way to Mongolia. He was caught by the Mongolian border police and held for three days without food, but was then released.

He went to Ulan Bator, and with the help of South Koreans at the consulate there, was able to board a plane to Seoul on May 20, 2001.

## TESTIMONY: *Kyo-hwa-so* No. 22, Oro-kun, South Hamgyong Province

Work in 1996 at *Kyo-hwa-so* No. 22, consisted mostly of carrying rocks to a nearby river and constructing stone embankments that would allow a hydro-electric station to generate electricity. Eight hundred to 1,000 men and up to 100 women labored there while serving unusually short (for *kyo-hwa-so* prisoners) sentences of one to two years.

As at other *kyo-hwa-so*, there was, You reports, a very high turnover rate at *Kyo-hwa-so* No. 22, owing to the high rate of deaths in detention. You entered prison in a group of nine prisoners. Within the year, he was the only one of the nine who had not died from malnutrition, forced labor, and beatings by guards and other prisoners. (The prisoners were organized to beat each other, most commonly by prison work-group or sub-group leaders, who would beat other prisoners if they worked too slowly or walked too slowly to or from their worksites.)

Prisoners were provided several spoonfuls a day of powdered corn mixed with wheat along with salted cabbage-leaf soup. Those who died of malnutrition were, mostly, prisoners whose families did not visit them to bring extra food. Of twenty persons in Cell No. 7 at the *kyo-hwa-so*, four died of malnutrition within a year. Other overcrowded cells held up to sixty or seventy prisoners, often with two persons sharing one blanket. The cells were categorized by offense or the number of convictions. Prisoners at *Kyo-hwa-so* No. 22 had been sentenced for theft, assault, fraud, gambling, or opium addiction. There were no public executions at *Kyo-hwa-so* No. 22 during You's year there, although there were suicides and attempted suicides by prisoners seeking to end their suffering.

## WITNESS: Former Prisoner #3, *Kyo-hwa-so* No. 3



Former Prisoner #3 was arrested as a young man for assault and battery. After what he described as a fair trial, he was convicted for a crime he admits he committed and was sentenced to ten years' imprisonment. He served from the early/middle 1980s to the early/middle 1990s at three separate prison facilities, including *Kyo-hwa-so* No. 8 at Yongdam, Kanwon Province; and *Kyo-hwa-so* No. 3 in Sinuiju, North Pyong-an Province.

At Yongdam *Kyo-hwa-so* No. 8, some 3,000 prisoners manufactured bicycles, but most of the prisoners were transferred to a *kwan-li-so* in Danchun, South Hangyong Province to mine and kiln-fire stones to be used in steel-making furnaces. At Danchun, prisoners died daily from the fumes emanating from the kilns and heated stones. After two years, when additional stockpiles of stones were no longer needed, many prisoners, including Former Prisoner #3, were transferred to a prison-labor camp in Sinuiju, *Kyo-hwa-so* No. 3, where the prisoners made clothes.

After his release from the Sinuiju *kyo-hwa-so* in the early/middle 1990s, Former Prisoner #3 carefully planned an escape from North Korea. He fled to China in 1998, slowly made his way down through Southeast Asia, and arrived in South Korea in August 2000.

Kyo-hwa-so No. 3 Sinuiju



40.1 N
124.5 E

## TESTIMONY: *Kyo-hwa-so* No. 3, Sinuiju, North Pyong-an Province

As of the early 1990s, some 2,500 male prisoners were being held in *Kyo-hwa-so* No. 3 in Sinuiju, North Pyong-an Province, a city on the North Korean border with China recently in the news as the cite of a future "free-enterprise zone." The inmates made prison uniforms and mined stones and gold. Some of the inmates were arrested for border crimes — visiting and/or smuggling goods to China. However, most were ordinary convicted criminals. Rations were meager: only some 450 grams (16 ounces) per day of rice mixed with beans. Many prisoners died in the winter from malnutrition, scabies and other skin diseases, and paratyphoid. Prisoners were beaten by guards. Other infractions and mistakes resulted in longer prison sentences. Those who attempted and failed to escape, or who initially succeeded in escaping but were caught, were brought back for public execution, after which their corpses would be displayed for a day.

## WITNESS: Former Prisoner #12, *Kyo-hwa-so* Hoeryong, North Hamgyong Province



Former Prisoner #12, a forty-three-year-old native of Chongjin, North Hamgyong Province, was a truck driver when he was involved in a fistfight in 1991. A day after the altercation, the other person involved died from injuries sustained during the fight. As a result, Former Prisoner #12 was tried, convicted, and sentenced to six to ten years imprisonment in a *ro-dong-kyo-hwa-so* (labor prison camp) located in a mountainous area roughly 40 kilometers (25 miles) from Hoeryong (sometimes also transliterated as Hwe Ryung) in North Hamgyong Province. Prisoners at the labor-training camp mined copper, logged, manufactured furniture, and did farming work. Because of his previous occupation, Former Prisoner #12 was made a truck driver and repairman, a prison job that provided much greater mobility within the prison camp than that afforded to most other prisoners.

Former Prisoner #12 did not protest his trial or conviction. While he had not intended to fatally injure the man he had fought, he admitted he had committed a crime for which he should be punished. He was imprisoned for four years, from 1991 to 1995. According to his testimony, so many prisoners died of malnutrition and related diseases in 1993 that prison officials allowed gravely ill prisoners home-leave in 1994 and 1995, to cut down on the number of deaths in detention. Former Prisoner #12's weight declined from 80 kilograms (176 pounds) in 1991 to 35 kilograms (77 pounds) in 1995, though he admits that, knowing of the sickness-release policy, he did not engage in the frantic search for anything edible that characterized most prisoners' camp experiences.

After returning to his home for two months to regain his strength, he fled to China where he lived among Korean-Chinese in Harbin for five years before going to South Korea by a dangerous ship route in 2000.

## TESTIMONY: *Kyo-hwa-so* Hoeryong, North Hamgyong Province

Hoeryong *kyo-hwa-so* is located in a mountainous area of North Hamgyong Province associated with the town of Hoeryong, even though it is some 40 kilometers (25 miles) away. Former Prisoner #12 used the term *ro-dong-kyo-hwa-so* when describing the camp, because the roughly 1,500 prisoners there were required to do hard labor: primarily copper-mining, but also logging and furniture-making. Convicts reportedly labored from five in the morning until five in the evening, mining not all that much copper but

Kyo-hwa-so No. 22
Hoeryong



42.7 N
129.8 E

suffering many accidents to get it. Every day after work there was a self-criticism session, which Former Prisoner #12 described as extremely petty, and at which time prisoners always had to find some mistake to confess.

Most prisoners at the camp were convicted criminals sentenced to anywhere from one to fifteen years, although in 1992, some "political prisoners" arrived. Some sixty prisoners shared a sleeping dormitory. The prison camp also had 1.5-meter by 1.5-meter (5-foot by 5-foot) "punishment cells," where scantily clad prisoners were placed on one-quarter food rations for one week at a time. Confinement in the tiny punishment cells was an excruciatingly painful form of torture.

Prisoners were also organized and compelled to beat other prisoners who committed various infractions. The highlight of prison-camp life was the rare occasion when prisoners would be taken outside the prison walls for exercise walks, at which time they were able to eat plants and grass. The most salient feature of Hoeryong *kyo-hwa-so* was its death rate. Below-subsistence-level food rations coupled with harsh conditions and hard labor resulted between 1991 and 1995 in the deaths of one-quarter to one-third of the inmates. So many prisoners died in 1993 that near-dead prisoners were allowed home-leave in 1994 and early 1995 to reduce the number of deaths in detention. Others were released in 1995 as part of an amnesty in honor of Kim Jong Il's birthday.

## WITNESS: Former Prisoner #19, *Kyo-hwa-so* No. 4



Former Prisoner #19 grew up near Danchun, North Hamgyong Province. In the mid-1990s, when North Korea's production/distribution system broke down and he was without employment or income, he set up a still to make and sell what he called "Chinese style" rice and corn liquor. Arrested in late 1996, he was tried, convicted, and sentenced to a six-year term at *Kyo-hwa-so* No. 4. After working for three months there at a limestone furnace, he contracted a lung disease and was transferred to the prison-camp clinic. In those three months, his weight had dropped nearly 30 kilograms (66 pounds). Believing that he would not survive his six-year sentence and observing that, to reduce the number of deaths in detention, extremely sick prisoners were being sent home to recuperate, he drank dirty water. He developed chronic diarrhea as a result and was given a temporary sick release. Away from the limestone furnace, his lungs recovered, and after regaining fifteen kilograms (33 pounds), he fled to China instead of returning to prison.

## TESTIMONY: *Kyo-hwa-so* No. 4, Samdeung-ri, Kangdong-kun, South Pyong-an Province

*Kyo-hwa-so* No. 4 is located in Samdeung-ri, Kangdong-kun, in South Pyong-an Province. During Former Prisoner #19's detention there, some 7,000 convicts mined limestone and made cement in a factory originally built by the Japanese during their occupation of Korea. The prison camp was roughly 2 kilometers (1.24 miles) long by 1.5 kilometers (0.93 miles) wide and was surrounded by a barbed-wire fence.

All of the prisoners at *Kyo-hwa-so* No. 4 were men, most of them sentenced to anywhere from five to twenty years. The prisoners considered their sentences a cruel hoax, as they did not expect to live long enough to serve their time. Some prisoners mined

Kyo-hwa-so No. 4 Kangdong



limestone in the adjacent mountain. Others crushed the rocks. Still others fired the lime in large kilns. Work started at seven in the morning and lasted until five in the evening, except in the crushing and heating units, where work often continued until ten at night. All aspects of the work were hard labor in dangerous conditions with prisoners frequently suffering chest ailments and lung diseases from limestone dust.

Once a week there was an evening criticism session in groups of up to 500 men where the prison officials would criticize the prisoner called to stand in front of the group of prisoners. There were also lectures on Kim Jong Il and his policies.

Infractions were punished with reduced rations, nominally extended sentences, and detainment in miniature punishment cells. During the eight months that Former Prisoner #19 was held at *Kyo-hwa-so* No. 4, there were eight public executions in the prison. He did not recall the particular offenses of these eight executed persons, though he did cite the four types of persons who would be executed at the prison camp: prisoners caught trying to escape; prisoners caught after they escaped; persons who committed crimes while on "sick leave"; and prisoners who had committed capital crimes elsewhere and were brought to *Kyo-hwa-so* No. 4 for execution.

Food rations consisted of a mere 50 grams (under 2 ounces) per meal of mixed corn and wheat, plus cabbage-leaf soup. Former Prisoner #19 weighed 76 kilograms (168 pounds) upon his entry into the *kyo-hwa-so*. After three months, his weight had plummeted to somewhere around 45 kilograms (99 pounds). He was sure that most prisoners weighed less than 50 kilograms (110 pounds).

Prisoners slept head to toe on wooden floors in groups of 50 to 100. The unsanitary living conditions — there was no bathing or changing of clothes, and Former Prisoner #19 says he was able to wash only his face two to three times a month — led to *Kyo-hwa-so* No. 4's particular idiosyncrasy: the cement dust in the prisoners clothing, commingled with dirt and sweat, would cause the tattered fabric to harden, resulting in skin abrasions and infections.

The most salient prison characteristic, however, was more common: exorbitantly high death rates. In Former Prisoner #19's eight months there, of the eighty persons in his work unit, three prisoners died in work accidents, ten died of malnutrition and disease, and twenty were sent home on "sick leave" in order to reduce the high numbers of deaths in detention.

*See page 55 for prisoner's sketch of Kyo-hwa-so No. 4 Kangdong.*

## WITNESS: Former Prisoner #28, *Kyo-hwa-so* No. 12



A young man in his early twenties from Chongjin City, North Hamgyung Province, Former Prisoner #28 has a straightforward story. As the food situation in North Korea deteriorated in the middle to late 1990s, he took to smuggling to stay alive and to provide food for the family with which he was living. Arrested in December 1997, he was held in a local jail for three months and then transferred to an *In-min-bo-an-seong* (People's Safety Agency) *ka-mok* (jail) in Onsong. He was held at the *ka-mok* for another eight months before being sen-

tenced to three years, including time served, to *Kyo-hwa-so* No. 12 at Jeonger-ri, North Hamgyong Province, for violating, he says, Penal Law 117, Article 2: illegally crossing the North Korea–China border and for illegally transporting money and goods.



Kyo-hwa-so No. 12
Jeonger-ri

42.2 N
129.4 E

Fortunately, Former Prisoner #28 was pardoned after serving only eight months, from December 1998 through July 1999. In August, he fled to China, making his way to Mongolia, where he joined a group of five North Koreans who made it to Seoul in October 2001.

## TESTIMONY: *Kyo-hwa-so* No. 12, Jeonger-ri, North Hamgyong Province

Sometimes also called Onsong-kun *kyo-hwa-so*, although it is not located there, *Kyo-hwa-so* No. 12 at Jeonger-ri holds some 1,300 to 1,500 men, who mine copper and iron, cut logs, make bricks, and farm. The most salient features of *Kyo-hwa-so* No. 12, according to Former Prisoner #28, were the deplorable conditions and the high rates of deaths in detention. Out of twenty-three other prisoners who entered on the same day as Former Prisoner #28, only two survived. The rest died within eight months of arrival, from hard labor and sub-subsistence food rations — small mixtures of corn and beans, with rice added only on holidays. Former Prisoner #28 believes that eight hundred prisoners died while he was there — so many, according to what another prisoner told him, that the guards had to burn the corpses. Former Prisoner #28 says he weighed 50 kilograms (110 pounds) prior to his arrest and only 30 kilograms (66 pounds) upon his release from *Kyo-hwa-so* No. 12.

There were no "self-criticism" sessions at *Kyo-hwa-so* No. 12, but each night the prisoners had to gather at the gates around nine in the evening, at which time the guards would order one of the prisoners to recite the prison rules. Rule-breakers were beaten. Former Prisoner #28 witnessed two public executions of other prisoners who had tried to escape.



### Kyo-hwa-so No. 4 Kangdong

## PART TWO

# DETENTION FACILITIES AND PUNISHMENTS FOR NORTH KOREANS FORCIBLY REPATRIATED FROM CHINA

## Introduction

The second part of this report examines testimony from former North Korean prisoners and detainees about the system of interrogation, detention, forced labor, and extreme punishment that Koreans who are arrested in China experience following their repatriation to the Democratic People's Republic of Korea (DPRK).

The system of severe repression that awaits North Koreans forcibly repatriated from China is, in some ways, a separate phenomenon from the lifetime and long-term imprisonments that characterize the *kwan-li-so* (political penal-labor colonies) and *kyo-hwa-so* (prison-labor camps). It is a shorter-term detention/punishment system, which includes *do-jip-kyul-so* (provincial detention centers) and *ro-dong-dan-ryeon-dae* (labor-training centers). However, it is related to the *kwan-li-so* and *kyo-hwa-so* in that it uses the same brutal forced-labor practices. The long-term imprisonment and short-term detention facilities are both characterized by below-subsistence-level food rations and very high levels of deaths in detention. And both, along with the police jails and interrogation centers that feed them, are administered by the *In-min-bo-an-seong* (People's Safety Agency) police, which runs the *kyo-hwa-so*, and the *Kuk-ga-bo-wi-bu* (National Security Agency police), which runs the *kwan-li-so*.

Most basically, the detention/punishment system for forcibly repatriated North Koreans is an outgrowth of the North Korean approach for dealing with petty criminals convicted of what would be considered, in other countries, misdemeanor offenses or petty infractions. The offenders are incarcerated in short-term provincial or sub-provincial detention facilities, where they are further punished with forced labor. However, many of the "minor" offenses in the DPRK would not normally be considered criminal elsewhere: leaving one's village or traveling within the country without authorization, not showing up at one's designated worksite, or leaving the country — a right guaranteed in the International Covenant on Civil and Political Rights (to which the DPRK is a State Party).[39]

Estimates of the number of North Koreans who fled famine conditions in the DPRK in the middle and late 1990s by crossing the border into China run as high as 200,000 to 300,000 persons — whole families searching for food, as well as individuals sent to seek work in order to send money back to the rest of their family. Once in China, North Koreans try to blend into communities of the two million or so ethnic Koreans, who have resided for centuries alongside the Han Chinese ethnic majority in the part of northeast China once known as Manchuria.

In addition to the ethnic Korean-Chinese, there are also large numbers of South Koreans working, studying, or traveling in northeast China, which is serviced by direct flights

---

[39] While the "right to leave" is an internationally recognized human right, there is no corresponding "right to enter" vis-à-vis another country, control over which remains within the sovereign power of states.

from Seoul: businessmen; students studying traditional medicine (among other subjects); tourists (Mount Paekdu, a famous mountain considered to be the source of Korean civilization, abuts the North Korea–China border); famine-relief project workers; and ministers and missionaries serving and proselytizing among the Korean populations in China. Also, South Korean TV, radio, movies, pop-music videos and recordings are all easily accessible in northeast China.

There is also a great deal of cross-border commerce between North Korea and China, some of which is officially organized by and through North Korean state enterprises or state import-export companies. As the North Korean production system broke down in the 1990s and people no longer were being paid at their assigned work places, large numbers of North Koreans took to buying and selling various goods across the border. Technically, private cross-border buying and selling by North Koreans is illegal.

Periodically, police in China sweep through areas where undocumented North Koreans work and reside, and arrest and deport the migrants and refugees. Some suspect that the frequency and intensity of these sweeps has intensified in recent years, following international publicity about the situation of North Koreans in China, including dramatic attempts by desperate North Koreans to seek asylum in various embassies and consulates there. Others, including some of the repatriated North Koreans caught in these sweeps, believe that the increase in arrests *preceded* the publicity and have been occasioned instead by Chinese desires to stem a Korean refugee flow and by North Korea's desire to limit contact between North Koreans and the South Koreans in China.

Foreign famine-relief workers on the Chinese side of the border have observed the Chinese police buses and vans transporting deportees to North Korea. But the buses and vans often have curtained windows, and an accurate count of the deportees, even when witnesses have observed the deportations, is not possible. Neither the number of forcibly repatriated Koreans nor trends over time can be confidently estimated.[40]

Though it is not presently possible to know the number of forcibly repatriated North Koreans, it is possible to know what happens to those who are repatriated. Having been exposed to the relative freedom and prosperity in China, and completely alienated by their brutal mistreatment after being handed back to the North Korean police, many of those who survive their mistreatment flee back to China upon their release from detention and recovery from detention-related illnesses and injuries. A small number of those North Koreans who have fled the DPRK a second, or even third, time have obtained asylum in South Korea, usually after a harrowing, months-long trek south through China and then further south through Southeast Asia, before flying to Seoul. Some defectors go through Mongolia or Hong Kong. The stories of some of these individuals are told on the following pages.

Most of these former detainees are recent arrivals in South Korea and still have family members in North Korea. For these reasons, those giving testimony must remain anony-

---

[40] For more information on the situation of North Koreans in China see "A Field Survey Report of the North Korean Refugees in China," Dr. Christine Y. Chang, The Commission to Help North Korean Refugees (CNKR), December 1999, Seoul (www.nk-refugees.or.kr), and "The Invisible Exodus: North Koreans in the People's Republic of China." Human Rights Watch report, (New York, N.Y.: Human Rights Watch) Vol. 14, No. 8 (E), November 2002.

mous, but their experiences can be simply summarized: Upon repatriation to North Korea they are detained in a jail or detention/interrogation facility. In Korean, a police jail is called a *ka-mok*. Both the regular police, the *In-min-bo-an-seong* (People's Safety Agency),[41] and the *Kuk-ga-bo-wi-bu* (National Security Agency) political police, have such jails in the provinces along the North Korea–China border.[42] Some of the former detainees use the word *ku-ryu-jang*, meaning a temporary detention place or facility, often inside a police station.[43]

Whether they took place in a *ku-ryu-jang* or *ka-mok*, and whether they were conducted by the *In-min-bo-an-seong* police or the *bo-wi-bu* police, the interrogations described by former prisoners all followed a pattern clearly outlined by Former Detainee #22, a young man originally from Kaesong. Essentially, the authorities ask: "Why did you go to China, where did you go, and what did you do in each place?" And then, more ominously: "Did you meet any South Koreans?" "Did you go to a Christian church?" "Did you watch or listen to South Korean TV or radio?" and "Were you trying to go to South Korea?"

All the former detainees interviewed for this report firmly believed that an affirmative answer to the latter questions would result in execution or their being sent to a *kwan-li-so* or *kyo-hwa-so*,[44] so they initially denied any contact with South Koreans or Christians while in China. Their denials were not considered credible by their interrogators, who attempted to starve and beat admissions out of the detainees. Some of the former prisoners interviewed for this report stuck to their denials; others, broken by hunger and torture, admitted that they had met South Koreans or gone to a Christian church service. One interviewee said she was in such pain that she begged her jailers to kill her to end her suffering.

Usually after several weeks of interrogation, the detainees were sent to short-term detention-labor facilities called in Korean *jip-kyul-so* and *ro-dong-dan-ryeon-dae*. None of the former detainees interviewed for this report mentioned any kind of trial or judicial process before being sent to these hard-labor detention/punishment facilities.

*Jip-kyul-so* literally translates as a "gathering place." A *do-jip-kyul-so* is a provincial detention center. In practice, these are short-term hard-labor detention facilities for those serving up to six month sentences. Several interviewees reported that both the regular police and the political police run *jip-kyul-so* detention centers for small-time or "small-crime" persons as well as for North Koreans forcibly repatriated from China. *Jip-kyul-so* are characterized by hard labor, such as construction work or brick-making, and sub-subsistence food rations, the combination of which causes large numbers of deaths in detention (even given the shortness of the sentences) and large numbers of "sick-releases" (the idea being that gravely ill prisoners will either die at home, thus reducing the number of deaths in detention, or recover at home before returning to the *jip-kyul-so* to complete their sentences).

---

[41] Before 1998, these police were called the *Sa-hoe-an-jeon-bu* Social Safety Agency.

[42] Generally speaking, the *Kuk-ga-bo-wi-bu* administer the *kwan-li-so*, and the *In-min-bo-an-seong* administer the *kyo-hwa-so*.

[43] Some North Koreans interviewed for this report used *ka-mok* and *ku-ryu-jang* more or less interchangeably, with *ku-ryu-jang* having a somewhat more generic connotation.

[44] Three of the former prisoners interviewed for the first part of this report were sent to a *kwan-li-so* or a *kyo-hwa-so*, following their post-repatriation interrogations.

*Ro-dong-dan-ryeon-dae* literally translates as "labor-training corp" or "labor-training camp," sometimes abbreviated in English by South Korean human rights activists as "LTC." The LTCs are even shorter-term *jip-kyul-so*, set up to accommodate the overflow from the established detention centers caused by the large numbers of Koreans forcibly repatriated from China. One interviewee described the LTCs as localized "feeder" facilities for the *jip-kyul-so*. Another interviewee described the LTCs as a "not-in-the-statute-books" response to the burgeoning numbers of North Koreans traveling without authorization, working at enterprises other than their assigned occupations at idled state production facilities, or fleeing to China in response to famine conditions in Korea. One interviewee stated that it was becoming the practice to have separate facilities for Koreans forcibly repatriated from China because the returnees were telling the common "light crime" criminals in the *jip-kyul-so* about the "freedom and prosperity" in China. The LTCs seem to be sub-provincial facilities, where various labor or production functions are not performed on-site, but where mobile forced-labor brigades spend nights. The LTC detainees are made to march rapidly, or jog slowly, it is variously said, to their various and changing worksites — chanting political slogans or singing what they describe as "silly songs" of praise to Kim Jong Il as they move along.

## Worst of All

Apart from the torture during interrogation, and the high levels of deaths in detention reported by the former detainees, repatriated pregnant North Koreans thrown into the interrogation-detention system face ethnically-motivated infanticide and forced abortions, a particularly reprehensible phenomena of repression described in more detail on the following pages.

All refugee accounts reported the same objective proclaimed by the North Korean prison and jail authorities for these atrocities: preventing women who became pregnant while in China from giving birth to "half-Chinese" babies, meaning babies that are half ethnic Han Chinese, China's majority ethnic group. Indeed, some of the North Korean women who fled to China had married or were trafficked to (sold, or provided for involuntary or quasi-voluntary "arranged marriages") ethnic Chinese men. Other North Korean women who fled to China had married or taken up with Korean-speaking citizens of China of Korean ethnic origin. But this potential distinction seemingly made no difference. North Korean women who were pregnant when they were repatriated were compelled to have abortions, or their babies were killed immediately after birth.

Eight eyewitnesses or persons with firsthand accounts of ethnic infanticide were interviewed for this report. The accounts of ethnic infanticide occur in only three places: Sinuiju, Onsong, and Chongjin. Sinuiju and Chongjin are large port cities in north North Korea on the west and east coasts, respectively. Little information is presently available on the extent to which this practice is carried out elsewhere along the North Korea–China border, except for Onsong. But Chongjin and Sinuiju are the main population centers from which the largest number of "second-time" North Korean escapees would come. And the stories are too similar in too many details to be coincidental.[45]

---

[45] The eyewitnesses of ethnic infanticide interviewed for this report are themselves former detainees who fled North Korea a second time and were granted asylum in Seoul. A Belgian NGO, Human Rights Without Frontiers, interviewed several former North Korean detainees still hiding in China and obtained testimony of baby-killing at Hoeryong (www.hrwf.net).

## WITNESSES AND TESTIMONY
## WITNESS: CHOI Yong Hwa, *Provincial Detention Center, South Sinuiju*



CHOI Yong Hwa is a shy and soft-spoken twenty-five-year-old woman from Hoeryong, North Hamgyong Province. She spent two months (May and June 2000) in the *do-jip-kyul-so* provincial detention center in South Sinuiju, North Pyong-an Province, across the North Korean border from Dandung, China.

Choi had lived with her father and younger brother while working in a distribution center, but as the food situation in North Korea deteriorated between 1996 and 1998, and as the country's distribution system broke down, she left that work to become a petty trader, mostly selling cuttlefish, in order to make enough money to provide food for her family. When the petty marketing did not generate enough money for food, she paid a trafficker 200 *won* to take her to China in 1998. She worked at a restaurant in Yanji, China, and then as a tour guide for visiting South Koreans in Dalian. Caught by Chinese police in Dalian, she was held for a month before being sent to Dandung, where she was turned over to North Korean police.

Interrogated by the *bo-wi-bu* (State Security Protection Agency) in Sinuiju, Choi convincingly denied meeting South Koreans in China. (She was also explicitly questioned about attending Christian churches in China.) Her interrogators threatened to send her to Jeonger-ri *kyo-hwa-so* in North Hamgyong Province, which she had heard about from a neighbor who had been sent there, but she ended up being sent to the *do-jip-kyul-so* provincial detention center in Sinuiju. After only ten days there, she became too ill to work, from malnutrition and exhaustion: she had been unable to sleep at night owing to infestations of maggots and lice in her sleeping quarters. Choi was released after serving two months, during which time two other detainees had died. Choi's jailers simply did not want another death in detention.

Upon release, after regaining her health, Choi crossed again into China and made her way to Dalian. She traveled west by train to Beijing, and on New Year's Day 2002, she took a train to Kunming. She was part of a group of five North Korean refugees who crossed into Myanmar (Burma) but were apprehended and turned over to the police in China, who fortunately released them after being persuaded that they were Korean-Chinese not North Koreans. After their release, they successfully made their way through Southeast Asia. Choi obtained asylum in South Korea in March of 2002 and was interviewed for this report in Seoul in August 2002.

South Sinuiju
Detention Center



40.077 N
124.440 E

## TESTIMONY: South Sinuiju *Do-jip-kyul-so* (Provincial Detention Center)

The South Sinuiju *do-jip-kyul-so* in North Pyong-an Province held roughly 100 detainees during Choi's detention, most of them between twenty and thirty years of age, more of them women than men. The facility was primarily for North Koreans repatriated from China who had successfully avoided contact with South Koreans. Two cells were for men and women accused of minor crimes, and four cells held repatriated persons. Detainees performed supervised agricultural and construction work at off-site loca-

tions. Their work day began between four-thirty and five in the morning and lasted until seven or eight at night, with half-hour breaks for breakfast, lunch, and dinner.

Meals consisted of dried corn, which the prisoners would wet, and salted radish-leaf soup. The inmates were also allowed to eat grass and other plants while working outside the detention center. Still, nourishment was insufficient. During Choi's two months in detention, two women who had been detained for three to four months died of malnutrition. Also during these two months, one female detainee was coerced into having sex with a guard.

Among the detainees were ten pregnant women, three of whom were in the eighth to ninth month of pregnancy. Choi and two other non-pregnant women were assigned to assist these three pregnant women, who were too weak to walk alone, in walking to a military hospital outside the detention center. The woman assisted by Choi was given a labor-inducing injection and shortly thereafter gave birth. While Choi watched in horror, the baby was suffocated with a wet towel in front of the mother, who passed out in distress. When the woman regained consciousness, both she and Choi were taken back to the detention center. The two other non-pregnant women who assisted the two other pregnant detainees told Choi that those newborns were also suffocated in front of the mothers. The explanation provided was that "no half-Han [Chinese] babies would be tolerated."

## WITNESS AND TESTIMONY: Former Detainee #24, Provincial Detention Center, South Sinuiju



Former Detainee #24 is a sixty-six-year-old grandmother from Chulan-kun, North Hamgyong Province. In 1997, her children were starving, so she fled to China with her husband, who was a former soldier, and five of her children. Two of her children were caught crossing the border, but the rest of the family lived in China for three years. Two of the children who made it with her to China were later caught and repatriated to North Korea, and her husband eventually died of natural causes. Afterward, she lived with her granddaughter in Yangji until they were apprehended by Chinese police while visiting Dandong.

Former Detainee #24 was eventually forcibly repatriated in a group of fifty North Koreans, some of whom were pregnant women, bound together by their wrists. They were taken, initially, for eighteen days to the Namindong *bo-wi-bu* (National Security Agency) police *ku-ryu-jang* in Sinuiju, who initially accused Former Detainee #24 of being corrupted by capitalism in China. She convinced them that she had gone to China only for food, so she was sent for one month to the *do-jip-kyul-so* in South Sinuiju run by the *In-min-bo-an-seong* (People's Safety Agency) police. Though she had heard that Kim Jong Il had recently said North Korean repatriates should not be treated harshly, there were beatings.

Detainees were fed the usual steamed corn, and as it was midsummer, most prisoners were sent out to work in the rice fields. This grandmother was too old and weak for such labor, and as she herself had had seven children, she was taken in the mornings to a nearby medical building to help care for the pregnant detainees. She helped deliver seven babies, some of which were full-term, some of which were injection-induced abortions. All of the babies were killed.

The first baby was born to a twenty-eight-year-old woman named Lim, who had been happily married to a Chinese man. The baby boy was born healthy and unusually large, owing to the mother's ability to eat well during pregnancy in China. Former Detainee #24 assisted in holding the baby's head during delivery and then cut the umbilical cord. But when she started to hold the baby and wrap him in a blanket, a guard grabbed the newborn by one leg and threw it in a large, plastic-lined box. A doctor explained that since North Korea was short on food, the country should not have to feed the children of foreign fathers. When the box was full of babies, Former Detainee #24 later learned, it was taken outside and buried.

She next helped deliver a baby to a woman named Kim, who also gave birth to a healthy full-term boy. As Former Detainee #24 caressed the baby, it tried to suckle her finger. The guard again came over and yelled at her to put the baby in the box. As she stood up, the guard slapped her, chipping her tooth. The third baby she delivered was premature — the size of an ear of corn — and the fourth baby was even smaller. She gently laid those babies in the box. The next day she delivered three more very premature babies and also put them in the box. The babies in the box gave her nightmares.

Two days later, the premature babies had died but the two full-term baby boys were still alive. Even though their skin had turned yellow and their mouths blue, they still blinked their eyes. The agent came by, and seeing that two of the babies in the box were not dead yet, stabbed them with forceps at a soft spot in their skulls. Former Detainee #24 says she then lost her self-control and started screaming at the agent, who kicked her so hard in the leg that she fainted. Deemed unsuitable for further hospital work, she was returned to the detention center until her release several weeks later.

Upon release, Former Detainee #24 returned to China but was again caught and this time repatriated to Hoeryong. Separated from her granddaughter, she became hysterical and started singing Christian hymns that she had learned in China, and ranting against Kim Jong Il for making Koreans leave their native villages while God took care of Korean people in China. Fortunately, her guards regarded her as a crazy old woman, not an enemy of the regime. Indeed, they took pity on her, even reuniting her with her granddaughter and helping the two of them to again cross the Tumen River into China. This time, she met some South Korean Christian relief workers who helped enable her and her granddaughter to make the trek through China to Southeast Asia. She arrived in South Korea in March 2001.

The interviewer had difficulty finding words to describe the sadness in this grandmothers' eyes and the anguish on her face as she recounted her experience as a midwife at the detention center in South Sinuiju.

*See satellite photograph of the South Sinuiju Detention Center on page 119.*

South Sinuiju
Detention Center



40.077 N
124.440 E

## WITNESS: Former Detainee #1, Nongpo Provincial Detention Center, Chongjin[46]



Former Detainee #1 was born in 1967 in Chongjin, North Hamgyong Province. He served ten years as a radio operator in the North Korean military. Upon discharge, he became a low-level courier in business transactions between North Korea and China. In 1997, he was arrested in Yanji, where he had gone to collect money owed in return for goods imported from Japan and re-exported to China without North Korean authorization. Turned over to the *bo-wi-bu* (National Security Agency) police at Musan, he was interrogated for a day and then turned over to the *In-min-bo-an-seong* (People's Safety Agency) police for a week of interrogation. He was then turned over again to the *bo-wi-bu* at Chongjin, who placed him in a police jail in Song Pyung district in Chongjin. There, for twenty days he was shackled and forced to kneel without moving whenever he was not undergoing additional interrogation sessions. During these multiple interrogations, Former Detainee #1 was questioned about listening to South Korean radio while in the military and accused of wanting to go to South Korea. He convincingly denied having listened to South Korean radio while in the North Korean military, even though he had. He completely denied allegations of espionage. And he did not disclose information about others involved in the unauthorized re-export scheme that the officials and staff of the state enterprise had organized.

Finally, Former Detainee #1 was sent to a *do-jip-kyul-so* (provincial detention center) at Nongpo. At one point, driven by hunger, he slipped away to his family home to get some food. Caught while trying to sneak back into the provincial detention center, he was beaten unconscious for having escaped. Emaciated from forced labor — making bricks — his legs became numb. He was unable to walk up or down stairs and unable to carry bricks. In fact, he reports that he was so "skin and bones" that he could not even sit. Unable to change clothes or bathe, he became covered with lice. As his jailers did not want him to die in custody, Former Detainee #1 was released in October after only two months in detention.

It took until May of the following year for Former Detainee #1 to recover movement in his legs. At that point, accompanied by his mother, he fled to China. They gradually made their way south through China and Southeast Asia, arriving in South Korea in March 2000. Interviewed for this report in August 2002, this former detainee still had scars on his shoulder and hip from the chemicals in the hot, newly fired bricks he was required to carry while in detention.

## TESTIMONY: Nongpo Provincial Detention Center, Chongjin

Nongpo, now sometimes also called Eunjung, is a sub-district of Song Pyung district in Chongjin, North Hamgyong Province. Nongpo held 120 detainees during Former Detainee #1's imprisonment: roughly seventy men and fifty women. Some inmates were single. Some were married couples, but the husbands and wives slept separately in the different men's and women's cells, where roughly twenty persons slept head-to-

Nongpo Detention Center



41.738 N
129.722 E

---

[46] Some former prisoners referred to this detention center as Nongpo, and some referred to it as Chongjin. Nongpo is a section of Chongjin City. Some former prisoners referred to it as a provincial detention center, and some referred to it as a detention center. The author has tried to preserve each reference according to the way in which each former prisoner referred to this facility. For ease of reference, each visual image of this facility is referred to as Nongpo Detention Center.

toe in small rooms. Conditions were highly unsanitary, with many detainees covered with lice.

Most of the women detainees were held for up to six months for having gone to China. Some of the men detainees were also held for going to China, but most of them were held for "selling" state property. Detainees were required to perform hard labor: brick-making from morning to evening, in addition to agricultural work (planting and harvesting crops). The harsh chemicals used in making bricks left the detainees with bruised and sore hands. The freshly fired bricks were heavy to lift and exhausting to carry. Rations were extremely meager: salty, watery cabbage-leaf soup and small cakes made of wheat chaff. Evenings were occupied with group self-criticism and silent, motionless self-reflection. A criticism session would not end until detainees proclaimed their own or someone else's wrongdoing. The detainees would make up wrongdoings to end the sessions.

A typical day started at five in the morning with a thirty-minute jog to an agricultural worksite for two hours of farming work followed by a half-hour breakfast. Detainees then made bricks until noon, when they were given a half-hour for lunch. Lunch was followed by repair and work preparation until one. Then came six-and-a-half more hours of brick-making followed by a half hour for dinner. Dinner was followed by a self-criticism session, which lasted from eight until ten and was sometimes followed by interrogations. The work was so hard, with slow workers beaten with shovels, that the detainees wanted to be transferred from the detention-labor facility to a "real prison," meaning a *kyo-hwa-so*.

Within his two months of detention at Nongpo, Former Detainee #1, witnessed, out of a total of 120 inmates, one public execution (a man who had sold cable in China), three deaths from malnutrition and related diseases, and one death from tetanus.

*See sketch of Nongpo Detention Center on page 69 and satellite photograph on page 120.*

## WITNESS: Former Detainee #8, Chongjin Detention Center



Former Detainee #8 is a thirty-three-year-old woman from Musan, North Hamgyong Province. She went to China in 1998 and married a Chinese citizen of ethnic Korean origin. Caught by Chinese police in May 2000, she was sent back to North Korea in June and interrogated by Onsong State Security Agency personnel, who asked her why and how many times she had left Korea and if she had met South Koreans or went to Christian churches while in China. Satisfied that she had done neither of these things, while threatening her with death if she went to China again, they sent her for two months detention at the Chongjin *jip-kyul-so*. Upon release, Former Detainee #8 nevertheless went back to China. Believing it was unsafe to remain with her Korean-Chinese husband, she decided to try to get to South Korea. Starting her journey in late October 2001, she reached Seoul in mid-2002, having traveled to southern China and then through Southeast Asia.

## TESTIMONY: Chongjin Detention Center, North Hamgyong Province

Located in North Hamgyong Province, this provincial detention center held roughly ninety detainees — some thirty men and some sixty women — nearly all of whom had

been repatriated from China. Detainees worked from six in the morning until seven in the evening on seasonal agricultural work or collecting firewood, on a diet of dried corn and radish-leaf soup. Detainees often worked for up to three months while waiting for local police to come to escort them back to their assigned places of residence.

According to Former Detainee #8, women at the Chongjin *jip-kyul-so* were not hit by guards but men were, though "only" with fists, not clubs. However, upon entry, the women were asked if they were pregnant. If less than three to four months pregnant, the women detainees were subjected to surgical abortions. If more than four months pregnant, female detainees were given labor-inducing injections, after which it was believed by Former Detainee #8 that the babies were killed. During Former Detainee #8's two months of detention, six women were forced to have abortions.

Reportedly, there was no interrogation at Chongjin *jip-kyul-so*. Instead there were nightly classes on North Korean rules and regulations, accompanied by nightime self-criticism sessions in groups of fifteen. If one member of the group of fifteen made some mistake or error during labor, or did something against the rules, the whole group would be punished.

## WITNESS AND TESTIMONY: Former Detainee #9: Onsong *Ro-dong-dan-ryeon-dae* (Labor-Training Camp) and Chongjin Provincial Detention Center



A thirty-eight-year-old native of Shinpo, South Hamgyong Province, Former Detainee #9 was desperate for work in 1998, so he went to China and spent two years in Yanji and almost a year in Harbin before being caught by the Chinese police in June 2000. Deported to Onsong, he was jailed for ten days, during which time he convincingly denied having met any South Korean Christians while in China, even though he had. He was sent to the Onsong *ro-dong-dan-ryeon-dae* while awaiting transfer to the Chongjin *jip-kyul-so*. While again being transferred by train to a detention center in South Hamgyong Province, he escaped from his guards. He fled to China and then made his way down through southern China to Southeast Asia before gaining asylum in South Korea in January 2002.

In July 2000, when Former Detainee #9 was detained at the Onsong labor-training camp, run by the Onsong *In-min-bo-an-seong* (People's Safety Agency) police, there were roughly seventy detainees: some forty repatriates from China and some thirty petty criminals. Detainees began work at half past four in the morning, cultivating crops. In the afternoons and evenings they did heavier labor — making bricks, sometimes until half past ten at night. At other times of the year, the detainees were sent to the mines, even though their detention was short-term while they waited to be transferred elsewhere.

After he was transferred to the *In-min-bo-an-seong* (People's Safety Agency) *do-jip-kyul-so* at Chongjin, Former Detainee #9's labor assignment in mid-2000 was additional agricultural work. There was no bathing, brushing of teeth, or changing of clothes. He was still wearing the same clothes he was wearing when arrested in China. Food rations were the usual small amounts of boiled mashed corn and salty radish-leaf soup. Farm animals, he says, ate better.

The detainee population at the Chongjin detention center at that time was made up of thirty to forty men and fifty to sixty women. The guards would force the detainees to hit each other, a practice that Former Detainee #9 believed was designed to allow the North Korean authorities to assure the Chinese that the police were not beating the prisoners. There were no deaths in detention during his brief stay at Chongjin, though he mentioned that the petty criminals there, who had been detained longer, complained that those who died at the center were not given proper burials. Former Detainee #9's biggest complaint regarded "the inhumane treatment of pregnant women." He saw a group of ten taken away for mandatory abortions, and the women were returned to hard labor the very next day.

## WITNESS AND TESTIMONY: Former Detainee #21, Onsong *Ku-ryu-jang* (Detention Facility)

 A thirty-eight-year-old native of Kangwong Province, Former Detainee #21 formerly worked at a state-run fertilizer factory. But production slowed and then stopped completely in 1997. Without work and running out of food, she and her husband fled to China in January 1999. They were caught by the Chinese police and repatriated to North Korea in August. She was held seven months for interrogation at the *In-min-bo-an-seong* (People's Safety Agency) police *ku-ryu-jang* at Namyang-ku, Onsong-kun, North Hamgyong Province.

At that time, the *In-min-bo-an-seong* jail at Onsong held about 130 detainees, forty to fifty of whom were women. Former Detainee #21's husband was put in a men's cell, and she was put in one of the women's cells. Her husband was beaten so badly that he confessed their desire to go to South Korea, after which time he died in detention from paratyphoid, a lice-borne disease that results in acute diarrhea, leading, if not treated, to dehydration and death. Her husband was left medically unattended for three days in men's Cell Block No. 8. She was beaten with sticks, and the police agents beat her head against cement walls until she screamed at them to get it over and kill her too.

According to Former Detainee #21, beatings were common and harsh. Detainees were beaten so badly that they confessed to things they had not done. Women were beaten on the fingertips. One woman who was very ill, near death, was made to stand up and sit down repeatedly until she collapsed and died. Among the fifteen women with Former Detainee #21 in Cell Block No. 2, there were two repatriated pregnant women: one, six months pregnant; the other, eight months. Both were taken out for abortions. Upon return, both women that their babies had been born alive and then were suffocated in vinyl cloth.

After seven months' detention at Onsong, Former Detainee #21 was transferred to Chongjin *bo-wi-bu jip-kyul-so* in Chongjin, where she was held for another three months. Following her release from Chongjin, she again fled to China, even more determined to seek asylum in South Korea.

## WITNESS AND TESTIMONY: Former Detainee #25, Onsong Detention Center and Nongpo Detention Center

 A young woman in her mid-thirties, Former Detainee #25 was born in Saetbyeol-kun, North Hamgyong Province. In April 1998, when the food shortage in North Korea became extremely severe where she was living, she went to China to make enough money to buy corn. A year later, she was caught and repatriated to North Korea. She was sent first to the *In-min-bo-an-seong* (People's Safety Agency) police *jip-kyul-so* provincial detention center for *wirl-gyong-ja* — "illegal border crossers" — at Onsong, North Hamgyong Province, for five weeks in the autumn of 1999, and then taken for the month of December to the Nongpo *jip-kyul-so* detention center in Chongjin City.

When she was released from Nongpo, a local police officer escorted her back to her hometown. She was made to promise not to go to China again, but since there was no food at home, she waded across the icy Tumen River on December 31, 1999. She forded the icy stream because there were too many guards at the spots where the river was frozen. She lived in China for two years before going by bus and on foot down through China and Southeast Asia. She arrived in Seoul in June of 2002.

### Onsong *Jip-kyul-so* (Detention Center), North Hamgyong Province

At Onsong, during the time of Former Detainee #25's detention, roughly 150 persons were held in two rooms. The detainees, who were assigned to make bricks, were told that they were not human beings but dogs and pigs. They were made to sing "silly songs" in honor of Kim Jong Il. Detainees were asked the usual question: had they met any South Koreans or Christians while in China? Two women confessed to having converted to Christianity while in China and were taken away by the police agents, who told the remaining women that the two Christian converts had been executed and that the rest of the women should consider themselves warned.

When she was first taken to Onsong, Former Detainee #25 thought she was looking at ghosts, the detainees were so skinny. She herself lost 5 kilograms (11 pounds) during the five weeks she was detained, being fed only half-bowls of corn soup.

### Nongpo *Jip-kyul-so* (Detention Center), Chongjin City

At the Nongpo *jip-kyul-so* in Chongjin, in December 1999, roughly 180 detainees were required to construct a fish farm outside the detention center. During the month that Former Detainee #25 was there, several detainees who had been arrested in China while seeking to enter Mongolia — presumed by North Korean officials, perhaps not incorrectly, as an attempt to reach South Korea rather than to work for food in China — were transferred. The Nongpo detainees were taken to *Kyo-hwa-so* No. 22, or "two-two," described in Part One. Another female prisoner, a former teacher who had also been in Mongolia, was beaten almost to death, and the next day was taken out either to die or else to be transferred to "two-two." A four-year-old boy, who was imprisoned with his mother, died of malnutrition.

According to Former Detainee #25, almost eighty percent of the detainees at Nongpo *jip-kyul-so* were women, ten to twelve of whom were pregnant. The women were told they would not be allowed to leave the detention center still carrying "children of betrayers" in their wombs.

**Nongpo Detention Center**



Former Detainee #25 observed that the pregnant women were denied food and water and were kicked in the stomach to induce bleeding. She saw several women taken away for abortion-inducing injections before they were brought back to Nongpo. Four babies were born in a room set aside for birthing. The babies were put in a wicker basket in an adjacent store-room, covered in vinyl cloth, and left to die.

## WITNESS: Former Detainee #26, Nongpo Detention Center



A native of Chongjin City, North Hamgyong Province, Former Detainee #26 is a mother of four and a grandmother of two. In the mid-1990s, her husband died of natural causes. As the family slowly ran out of money and food in the late 1990s, she sent two daughters to China for work, but they were caught by traffickers and sold to Korean-Chinese men. Former Detainee #26, along with her son and a grandchild, then went to China to try to rescue her daughters and reunite her family. She found her daughters in Wongchun and took them to Yangji, where they lived for a year and a half before being caught by the Chinese police in April 2002.

First repatriated to the Musan *jip-kyul-so*, this grandmother was sent next to the Onsong *bo-wi-bu* (National Security Agency) police jail. There, she was forced to kneel motionless for a day before being sent to the Onsong *bo-wi-bu ku-ryu-jang* (detention center) for "heavy interrogation." (She believes that a whole family together in China was deemed a more politicized desertion than a single family member in China trying to earn money to support the rest of the family back in North Korea.)

She was then transferred to the Nongpo *jip-kyul-so* detention center, where after a month, a guard pushed her to the ground, breaking one of her ribs. She was sent home for forty days of "sick leave" in order for her rib to heal. However, after thirty days on leave, in June, she again crossed the Tumen River to look for her remaining daughter, who had not been caught in April and had remained in China. Within the month, Former Detainee #26 was caught again and this time repatriated to Hoeryong *bo-wi-bu* jail, where she was made to sit motionless for six days. Her next destination was the Onsong Sambong-ku *bo-wi-bu* police station, where she was heavily interrogated and threatened with being sent to Oro No. 22 prison-labor camp. She begged and bribed the guards, who sent her instead to the *In-min-bo-an-seong* jail for a week of solitary confinement in a dark cell (without windows or lights). After becoming ill, she was given a sick release.

After a week at home, she again fled to China in August 2001, where she remained in hiding until December. This time her luck turned, when she met a Korean-American missionary in Yangji who helped her join a group of nine persons on the "underground" land-route. After traveling through Beijing and Kunming, the group made their way through Southeast Asia. In June 2002, she reached Seoul and obtained asylum.

**Nongpo Detention Center**



41.738 N
129.722 E

When interviewed for this report in Seoul in November 2002, Former Detainee #26, who had suffered so much and tried so hard to help her family avert starvation and keep them together, was accompanied by her young granddaughter. Former Detainee #26's daughter, the granddaughter's mother, had been located in China and assisted in joining another group of North Korean refugees on the long overland trek to Thailand.

Unfortunately, she was caught crossing the Vietnamese border and turned over to the Chinese police. As of September 2003, her whereabouts were still unknown.

## TESTIMONY: Nongpo Detention Center, Chongjin

According to Former Detainee #26, in May 2000, the Nongpo *jip-kyul-so* in Chongjin held roughly 75 men, 175 women, and a few orphans and teenagers. The women detainees were held in three rooms: one room for paratyphoid sufferers, one room for pregnant women, and the last room for 130 female prisoners, whose quarters were so cramped that there was not space for all of them to simultaneously lie down for sleep. Detainees were fed some 70–75 kernels of boiled corn per meal.

In May 2000, twenty-eight women among the detainees were from three to nine months pregnant. Former Detainee #26 saw three eight-month-old fetuses aborted and seven babies killed. Several women from Cell No. 1 (see sketch below and satellite photograph on page 120), including Former Detainee #26, were brought over to Cell No. 3 to help deliver the babies. When the babies were born, they were placed face down on the ground. Some babies died right away; others lay there breathing longer. If any babies were still alive after two days, the guards would smother them in wet vinyl. The babies lying on the ground could be seen by the women standing at the front of the other cells. The guards would say that the mothers had to see and hear the babies die because these babies were Chinese.



## PART THREE

# SUMMARY OF TORTURE AND INFANTICIDE INFORMATION PROVIDED BY FORMER PRISONERS AND DETAINEES INTERVIEWED FOR THIS REPORT

## I. Torture Summary

According to almost all of the former-prisoner testimony gathered for this report — from Ali Lamada's 1967 Sariwon prison testimony to the post-2000 testimonies of North Koreans forcibly repatriated from China — the practice of torture permeates the North Korean prison and detention system.

■ Former Detainee #1 was beaten unconscious for hunger-related rule infractions in 1997 at the Nongpo *jip-kyul-so* (detention center) in Chongjin City. He also reported that detainees there were beaten with shovels if they did not work fast enough.

■ Former Detainee #3 reported the use of an undersized punishment box at the Danchun prison camp in which camp rule-breakers were held for fifteen days, unable to stand-up or lie down. He also reported that beatings of the prisoners by guards were common.

■ LEE Young Kuk reported that he was subjected to motionless-kneeling and water torture and facial and shin beatings with rifle butts at the *Kuk-ga-bo-wi-bu* interrogation/detention facility in Pyongyang in 1994, leaving permanent damage in one ear, double vision in one eye, and his shins still bruised and discolored as of late 2002.

■ KANG Chol Hwan reported the existence of separate punishment cells within *Kwan-li-so* No. 15 Yodok, from which few prisoners returned alive.

■ Former Prisoner #6 reported that prisoners were beaten to death by prison work-unit leaders at Danchun *Kyo-hwa-so* No. 77 in North Hamgyong Province in the late 1980s.

■ AHN Myong Chol, a former guard, reported that all three of the *kwan-li-so* at which he worked had isolated detention facilities in which many prisoners died from mistreatment, and that at *Kwan-li-so* No. 22 there were so many deaths by beatings from guards that the guards were told to be less violent.

■ Former Detainee #8 reported that male prisoners were beaten by guards at the Chongjin *jip-kyul-so* in mid-2000.

■ Former Detainee #9 reported that detainees at the Onsong *ro-dong-dan-ryeon-dae* (labor-training camp) were compelled to beat each other.

■ KIM Sung Min reported that in 1997 at the Onsong *bo-wi-bu* (National Security Agency) detention center, his fingers were broken and he was kicked and beaten on the head and face until his ears, eyes, nose, and mouth bled.

■ RHYU Young Il saw, in 1997, that out of six persons in an adjacent cell in the *bo-wi-bu* interrogation facility where he was detained in Pyongyang, two were carried out on stretchers, two could walk only with the assistance of guards, and two could walk out by themselves. Detainees who moved while they were sup-

posed to be sitting motionless and silent for long periods were handcuffed from the upper bars of their cells with their feet off the floor. Detainees who talked when they were supposed to be sitting motionless and silent were compelled to slap and hit each other.

■ Former Prisoner #12 reported that at Hoeryong *kyo-hwa-so* in the early to middle 1990s, minor rule-breakers were beaten by their cellmates on the orders of the guards, and major rule-breakers were placed in a 1.5-meter-square (16.5-feet-square) punishment cell for a week or more.

■ LEE Min Bok reported being beaten "many times" on his fingernails and the back of his hands with a metal rod during interrogation at the Hyesan detention center in 1990. He also reported that at the Hyesan *In-min-bo-an-seong* (People's Safety Agency) detention facility, where he was subsequently held, prisoners were compelled to beat each other. Lee witnessed one prisoner, KIM Jae Chul, beaten to death.

■ Former Detainee #15 reported that he was beaten with chairs and sticks at both the Hoeryong and Onsong *In-min-bo-an-seong* jails in early 2002.

■ LEE Soon Ok reported that she experienced beatings, strappings, and water torture leading to loss of consciousness, and was held outside in freezing January weather at the Chongjin *In-min-bo-an-seong* pre-trial detention center in 1986. Her account of beatings and brutalities in the early to middle 1990s at Kaechon women's prison, *Kyo-hwa-so* No. 1, (in her prison memoirs) are too numerous to detail here.

■ JI Hae Nam confirmed the existence of miniature punishment cells at *Kyo-hwa-so* No. 1 and reported that beatings and kicking of women prisoners were a daily occurrence in the mid-1990s. She also reported beatings, during interrogation or for prison regulation infractions, in late 1999 at the Sinuiju *bo-wi-bu* jail, where she was required to kneel motionless, hit with broomsticks, and required to do stand-up/sit-down repetitions to the point of collapse, in her case in thirty to forty minutes.

■ KIM Yong reported that he was beaten at the *bo-wi-bu* police jail at Maram and was subjected to water torture and hung by his wrists in the *bo-wi-bu* police jail at Moonsu in 1993.

■ KIM Tae Jin reported that he was beaten, deprived of sleep, and made to kneel motionless for many hours at the *bo-wi-bu* police detention/interrogation facility in Chongjin in late 1998/early 1999.

■ YOU Chun Sik reported that he was kicked, beaten, and subjected to daylong motionless-sitting torture at the *bo-wi-bu* police jail in Sinuiju in 2000. He described the motionless-sitting as being more painful than the beatings.

■ Former Detainee #21 reported that she was beaten unconscious in mid-1999 at the *In-min-bo-an-seong* (People's Safety Agency) *ku-ryu-jang* (detention/interrogation facility) at Onsong, where detainees were beaten so badly that they confessed to doing things they had not done. Women were hit on their fingertips. She witnessed one very ill woman who was compelled to do stand-up/sit-down repetitions until she died.

- Former Detainee #22 reported that he was beaten with chairs at Onsong *bo-wi-bu* (State Security Agency) police jail in late 2001, and beaten even worse at the Chongjin *In-min-bo-an-seong* detention center in early 2002.

- Former Detainee #24 reported that there were beatings at the *bo-wi-bu* police jail in Sinuiju in January 2000.

- Former Detainee #25 reported that one woman, a former schoolteacher who had been caught in Mongolia and repatriated to China and North Korea, was beaten nearly to death at the Onsong *In-min-bo-an-seong* detention center in November 1999, and then taken away either to die or, if she recovered, for transfer to *Kyo-hwa-so* No. 22.

- Former Detainee #26 was made to kneel motionless at the Onsong *bo-wi-bu* police jail in June 2000 and was made to sit motionless for six days at the Hoeryong *bo-wi-bu* police jail in July 2001.

- Former Detainee #28 reported that prisoners were beaten to death at the *Kyo-hwa-so* No. 12 at Jeonger-ri in North Hamgyong Province in 1999.

## II. Ethnic Infanticide Summary

There are sporadic reports of forced abortions and baby killings at the *kwan-li-so*, where, except for a very few privileged couples, the prisoners were not allowed to have sex or children. There are also sporadic reports of forced abortion and baby killings at the *kwan-li-so*, where sex between prisoners is prohibited. And there are sporadic reports of killings of pregnant women who were raped or coerced into sex by prison guards. However, this report focuses on the forced abortions and baby killings directed against and inflicted on women forcibly repatriated from China, because of the ethnic and policy components of those atrocities.

- CHOI Yong Hwa assisted in the delivery of babies, three of whom were promptly killed, at the Sinuiju *do-jip-kyul-so* (provincial detention center) in mid-2000.

- Former Detainee #8 witnessed six forced abortions at Chongjin *do-jip-kyul-so* in mid-2000.

- Former Detainee #9 witnessed ten forced abortions at Onsong *ro-dong-dan-ryeon-dae* (labor-training camp) in mid-2000.

- YOU Chun Sik reported that four pregnant women at the *bo-wi-bu* (National Security Agency) police station in Sinuiju were subjected to forced abortions in mid-2000.

- Former Detainee #21 reported two baby killings at the Onsong *In-min-bo-an-seong* (People's Safety Agency) police station in late 1999.

- Former Detainee #24 helped deliver seven babies who were killed at the Backto-ri, South Sinuiju *In-min-bo-an-seong* police detention center in January 2000.

- Former Detainee #25 witnessed four babies killed at Nongpo *In-min-bo-an-seong* police detention center in Chongjin in late 1999, and another six pregnant women subjected to forced abortion.

- Former Detainee #26 witnessed three forced abortions and seven babies killed at the Nongpo *jip-kyul-so* (detention center), Chongjin City, in May 2000.

# PART FOUR

## RECOMMENDATIONS

### To the Democratic People's Republic of Korea

North Korea should proceed to implement, without further delay, the recommendations made to it by the U.N. Human Rights Committee in July 2001 (CCPR/CO/72/PRK) and by the U.N. Commission on Human Rights in April 2003 (E/CN.4/2003/L.31/Rev.1) reprinted in the appendices to this report.

### To the People's Republic of China

The People's Republic of China should stop repatriating North Koreans, even if it regards them as illegal immigrants (rather than *refugees sur place*, those individuals who, because of the person's own actions or as a result of circumstances that have developed in the country of origin during the person's absence, cannot safely return to that country).[47] Although it might have been the famine that drove North Koreans into China for food (or to find work to buy food for their families back home), the brutal interrogations, torture, and forced-labor detention systems and the dire punishments for those who are returned makes the refugees "political," until it can be independently verified that North Korean abuse of repatriated Koreans has ceased.

It would be preferable for China to allow the office of the U.N. High Commissioner for Refugees (UNHCR) access to North Koreans in China and for China to enable the UNHCR to extend its concern and care to those North Koreans who possess a well-founded fear of persecution if returned to their country of origin. But until China is prepared to take that step, it should simply ignore the North Koreans in northeast China, who are suffering from the food shortage and persecution. These North Koreans' needs can be tended to by humanitarian NGOs, until the food situation in North Korea stabilizes and its human rights situation has substantially improved.

### To the Republic of Korea

South Korea should (continue to) grant asylum to North Korean refugees who reach its embassies and consulates abroad.

South Korea should not exclude human rights matters from its otherwise multifaceted dialogue with North Korea; and should support international efforts to address the human rights situation in North Korea, such as the North Korea resolution at the U.N. Commission on Human Rights.

### To Other Member States of the International Community

Neighboring and other nation-states face a series of interlocking and unresolved disputes with North Korea. These include extremely serious security issues revolving around North Korea's nuclear weapons and missile programs, and the conventional military face-off at the DMZ separating North and South Korea. These disputes, inevitably, also involve humanitarian issues, such as North Korea's continuing need for international food aid to keep

---

[47] Office of the UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status, para. 94 and 95. (Geneva: United Nations, 1988).

renewed famine at bay, family-reunification visits between North and South Koreans, and accounting for South Korean and Japanese citizens previously kidnapped by North Korea.

If and when negotiations on the problem of North Korea's nuclear proliferation and other security issues should advance toward an agreement, the human rights situation in North Korea should also be addressed, particularly if North Korea would receive significant economic aid as part of the nuclear deal. That is to say, in any approach involving foreign aid and investment, considerable improvement in North Korea's human rights situation should be placed on the agenda.

In any arrangements involving foreign investment in extraction or production enterprises for export to world markets, care must be taken to prohibit the utilization of slave, forced, or prison labor, or the evolution of a situation where free labor from preferred workers is utilized in the export zones while production for domestic distribution and consumption is based on prison and forced labor. Access to foreign markets should be conditioned on respect for all core labor standards, including the prohibition of forced labor, that are established in the International Labor Organization (ILO) Declaration on Fundamental Principles and Rights at Work.

All intergovernmental contact with North Korea should include discussion toward the improvement of human rights conditions, particularly the verified abolition of political prisoner camps and detention centers and the release of those being held. Some repressive practices in North Korea could be ended rather easily. Other aspects may be more complicated. Emptying out the *kwan-li-so* may require, in part, an orderly departure program and some form of third-country resettlement for those whose treatment or condition is such as to preclude re-integration into North Korean society.[48]

### *An agreement that provides for economic assistance to North Korea should also mandate the following:*

1. North Korea should decriminalize the right to leave and should release all North Koreans who have been detained upon repatriation from China.

2. North Korea should release all those prisoners held in arbitrary detention in the *kwan-li-so* political penal-labor colonies, and invite the U.N. Working Group on Arbitrary Imprisonment, the International Committee of the Red Cross, Amnesty International, and/or Human Rights Watch to observe the closings through on-site visits to the locations of the former *kwan-li-so* to confirm that these political penal-labor colonies are no longer in operation.

---

[48] A recently formed group of former North Korean political prisoners has expressed the fear that increasing exposure of the officially denied *kwan-li-so*, along with increased pressure over North Korea's nuclear and missile programs, might lead the regime to "massacre the prisoners" in order to destroy evidence of the camps. These former prisoners have called for increased satellite reconnaissance of these camps. This report supports their appeal for increased and ongoing satellite monitoring of the camps along with the recommendation that any suspect activity be immediately reported to the U.N. Secretary-General, the U.N. High Commissioner for Human Rights, and the Presidents of the Security Council and General Assembly. The coordinates for camps pictured in this report are featured in the small maps in the margins of this report.

3. The brutal mistreatment of convicted prisoners in the *kyo-hwa-so* prison-labor facilities must end. The World Food Program (WFP) and humanitarian relief organizations should be invited to supply food aid to the prisons in order to alleviate the problem of virtually constant semi-starvation among prisoners and high levels of deaths in detention from combinations of forced labor and below-subsistence-level food rations.[49]

4. North Korea should initiate a dialogue with the International Labor Organization to bring the "reform-through-labor" in the *kyo-hwa-so* prison-labor facilities, *jip-kyul-so* detention centers, and *ro-dong-dan-ryeon-dae* labor-training camps into conformity with international standards against forced and slave labor.

5. North Korea should invite representatives from the Office of the U.N. High Commissioner for Human Rights, the Special Rapporteur on Torture, and the Working Group on Arbitrary Detention of the U.N. Commission on Human Rights in order to implement the recommendations to the DPRK from the U.N. Human Rights Committee and U.N. Commission on Human Rights.

---

[49] The U.N. Development Programme (UNDP) usually takes a dim view of U.N. agencies taking over what are clearly the responsibilities of Member States, such as feeding prisoners in state penal institutions. Nonetheless, to avert starvation and malnutrition-related disease, WFP provides foods to prisons in other countries and could do so in North Korea as well.

# APPENDIX A

U.N. Commission on Human Rights, Resolution on North Korea
15 April 2003
E/CN.4/2003/L.31/Rev.1

# UNITED NATIONS                                                        E

## Economic and Social Council

Distr.
LIMITED

E/CN.4/2003/L.31/Rev.1
15 April 2003

Original:  ENGLISH

COMMISSION ON HUMAN RIGHTS
Fifty-ninth session
Agenda item 9

## QUESTION OF THE VIOLATION OF HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS IN ANY PART OF THE WORLD

*Austria, Belgium, Bulgaria\*, Cyprus\*, Czech Republic\*, Denmark\*, Estonia\*, Finland\*, France, Germany, Greece\*, Hungary\*, Iceland\*, Ireland, Italy\*, Latvia\*, Lithuania\*, Luxembourg\*, Malta\*, Monaco\*, Netherlands\*, Poland, Portugal\*, Romania\*, Slovakia\*, Slovenia\*, Spain\*, Sweden and United Kingdom of Great Britain and Northern Ireland:  draft resolution*

**2003/…  Situation of human rights in the Democratic People's Republic of Korea**

*The Commission on Human Rights,*

*Reaffirming* that all States Members of the United Nations have the obligation to promote and protect human rights and fundamental freedoms and to implement the obligations they have assumed under the various international instruments,

*Mindful* that the Democratic People's Republic of Korea is a Party to the International Covenant on Civil and Political Rights and to the International Covenant on Economic, Social and Cultural Rights, the Convention on the Rights of the Child and the Convention on the Elimination of All Forms of Discrimination against Women,

GE.03-13364  (E)    150403

*Taking note* of the reports submitted by the Democratic People's Republic of Korea concerning the implementation of the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the

---

\*  In accordance with rule 69, paragraph 3, of the rules of procedure of the functional commissions of the Economic and Social Council.

Convention on the Rights of the Child and the Convention on the Elimination of All Forms of Discrimination against Women, and encourages the Democratic People's Republic of Korea to continue to submit its reports in a timely manner,

*Taking note* also of the concluding observations of the Committee on the Rights of the Child and the Human Rights Committee concerning the reports that the Democratic People's Republic of Korea has submitted to them,

*Expressing its deep concern* at the precarious humanitarian situation in the country, in particular the prevalence of infant malnutrition which, despite recent progress, still affects a significant percentage of children and their physical and mental development,

*Reaffirming* that it is the responsibility of the Government of the Democratic People's Republic of Korea to ensure the full enjoyment of all human rights and fundamental freedoms of its entire population,

*Underlining* the importance of the effective continuation of the process of rapprochement between the two Koreas and noting the recent progress in this respect,

*Desiring* to promote a constructive approach leading to concrete progress in the field of human rights,

1.  *Expresses its deep concern* about reports of systemic, widespread and grave violations of human rights in the Democratic People's Republic of Korea, including:

(a)  Torture and other cruel, inhuman or degrading treatment or punishment, public executions, imposition of the death penalty for political reasons, the existence of a large number of prison camps and the extensive use of forced labour, and lack of respect for the rights of persons deprived of their liberty;

(b)  All-pervasive and severe restrictions on the freedoms of thought, conscience, religion, opinion and expression, peaceful assembly and association and on access of everyone to information, and limitations imposed on every person who wishes to move freely within the country and travel abroad;

(c)  The mistreatment of and discrimination against disabled children whose particular needs are not sufficiently taken into consideration, while at the same time welcoming, in this regard, reports of the preparation of a law on physically disabled persons;

(d)  Continued violation of the human rights and fundamental freedoms of women;


2.  *Notes with regret* that the authorities of the Democratic People's Republic of Korea have not created the necessary conditions to permit the international community to verify these reports in an independent manner and calls upon the Government to respond to these reports and these concerns urgently, including:

(a)  By ratifying human rights instruments to which it is not yet a party, in particular the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the International Convention on the Elimination of All Forms of Racial Discrimination, and by implementing its obligations under the human rights instruments to which it is a party, namely the International Covenant on Economic, Social and Cultural Rights, in particular concerning the right of everyone to be free from hunger, the International Covenant on Civil and Political Rights, the Convention on the Elimination of All Forms of Discrimination against Women and the Convention on the Rights of the Child, ensuring that all necessary measures are undertaken to this end;

(b)  By providing all pertinent information concerning the above-mentioned issues;

(c)  By implementing the recommendations of the Committee on the Rights of the Child and the Human Rights Committee;

(d)    By refraining from sanctioning citizens of the Democratic People's Republic of Korea who have moved to other countries, in particular for humanitarian reasons, and refraining from treating their departure as treason leading to punishments of internment, inhuman or degrading treatment or the death penalty;

(e)    By cooperating with the United Nations system in the field of human rights and cooperating without restriction with the thematic procedures of the Commission on Human Rights relevant to the situation of the Democratic People's Republic of Korea, in particular the Special Rapporteur on the right to food, the Special Rapporteur on torture, the Special Rapporteur on religious intolerance, the Working Group on Arbitrary Detention, as well as the Working Group on Enforced or Involuntary Disappearances, and international human rights organizations;

(f)    By resolving, clearly and transparently, all the unresolved questions relating to the abduction of foreigners;

(g)    By adhering to internationally recognized labour standards;

3.    *Is also deeply concerned* about reports of a precarious humanitarian situation;

4.    *Calls upon* the authorities of the Democratic People's Republic of Korea to ensure that humanitarian organizations, in particular the United Nations agencies, have free and unimpeded access to all parts of the Democratic People's Republic of Korea in order for them to ensure that humanitarian assistance is delivered impartially on the basis of need, in accordance with humanitarian principles;

5.    *Requests* the international community to continue to urge the Government of the Democratic People's Republic of Korea to ensure that humanitarian assistance, especially food aid, destined for the people of the Democratic People's Republic of Korea is distributed in accordance with humanitarian principles and that representatives of international humanitarian actors are allowed to travel throughout the country to monitor this distribution, and to ensure the respect for the fundamental principles of asylum;

6.    *Requests* the United Nations High Commissioner for Human Rights to engage in a comprehensive dialogue with the authorities of the Democratic People's Republic of Korea with a view to establishing technical cooperation programmes in the field of human rights and to submit his findings and recommendations to the Commission at its sixtieth session;

7.    *Decides* to continue its consideration of this question at its sixtieth session under the same agenda item as a matter of high priority.

# APPENDIX B

Concluding Observations of the U.N. Human Rights Committee:
Democratic People's Republic of Korea
27 July 2001
CCPR/CO/72/PRK

## UNITED NATIONS

# CCPR

**International Covenent
on Civil and
Political Rights**

Distr.

GENERAL
CCPR/CO/72/PRK
27 August 2001

Original: ENGLISH

## Concluding Observations of the Human Rights Committee : Democratic People's Republic of Korea. 27/08/2001. CCPR/CO/72/PRK. (Concluding Observations/Comments)

**Convention Abbreviation:** CCPR
HUMAN RIGHTS COMMITTEE
Seventy-second session

CONSIDERATION OF REPORTS SUBMITTED BY STATES PARTIES
UNDER ARTICLE 40 OF THE COVENANT

Concluding observations of the Human Rights Committee
Democratic People's Republic of Korea

1. The Committee considered the second periodic report of the Democratic People's Republic of Korea (CCPR/C/PRK/2000/2) at its 1944th to 1946th meetings, held on 19 and 20 July 2001, and adopted the following concluding observations at its 1953rd meeting, held on 26 July 2001.

A. Introduction

2. The Committee welcomes the submission of the second periodic report, which contains detailed information on domestic legislation in the area of civil and political rights, and the opportunity to resume the dialogue with the State party after an interval of more than 17 years. The Committee welcomes the State party's decision to send a strong delegation from its capital, composed of representatives of various government authorities, for the examination of the second periodic report, and the readiness expressed by the delegation to continue the dialogue with the Committee after the examination of the report. The Committee is also pleased to note that the delegation of the State party recognized the importance of the Committee's task and intimated that the Committee could

expect more prompt reporting in the future. The Committee regrets, however, the considerable delay in the submission of the report, which was due in 1987. It regrets the lack of information on the human rights situation in practice, as well as the absence of facts and data on the implementation of the Covenant. As a result, a number of credible and substantiated allegations of violations of Covenant provisions which have been brought to the attention of the Committee could not be addressed effectively and the Committee found it difficult to determine whether individuals in the State party's territory and subject to its jurisdiction fully and effectively enjoy their fundamental rights under the Covenant.

### B. Positive aspects

3. The Committee appreciates the efforts undertaken by the State party to translate and make available texts of domestic legislation relevant to the examination of the second periodic report, which greatly facilitated the Committee's work.

4. The Committee welcomes the reduction of the number of criminal offences carrying the death penalty from 33 to 5, as well as the readiness, mentioned in the report and confirmed by the delegation, further to review the issue of capital punishment with a view to its abolition.

5. The Committee appreciates that the delegation acknowledged the need to improve the condition of human rights in several areas covered by the Covenant, notably the situation of women in the Democratic People's Republic of Korea; in that context, the Committee welcomes the ratification by the State party, in February 2001, of the Convention on the Elimination of All Forms of Discrimination against Women.

6. The Committee welcomes as a positive sign the fact that exchange visits between families from the State party and the Republic of Korea, however limited, have taken place on three occasions since the Pyongyang Declaration of 15 June 2000.

7. The Committee also appreciates the discontinuation of administrative internment in the State party.

### C. Subjects of concern and recommendations

8. The Committee remains concerned about constitutional and legislative provisions that seriously endanger the impartiality and independence of the judiciary, notably that the Central Court is accountable to the Supreme People's Assembly under article 162 of the Constitution. Furthermore, article 154 of the Constitution limits the tenure of judges to five years and article 129 of the Criminal Code subjects judges to criminal liability for handing down "unjust judgements". Given the roles assigned to the judiciary under articles 2 and 14, paragraph 1, of the Covenant, these legal provisions have an adverse impact on the protection of human rights guaranteed under the Covenant and endanger the independence of the judiciary required by article 14.1 of the Covenant.

The State party should take appropriate measures to ensure and protect the independence and impartiality of the judiciary at all levels.

9. The Committee has noted uncertainty about the status of the Covenant in the State party's internal legal framework. It notes that, pursuant to article 17 of the Treaty Law of December 1998, the Covenant has the same status as domestic law. However, doubts remain as to whether the Covenant would have primacy over domestic law if the latter

is in conflict with Covenant provisions. The State party is requested to provide information, in its next periodic report to the Committee, about the situation that would prevail in the event of a conflict between the Covenant and domestic law, including the Constitution. The Committee wishes to receive from the State party more precise information about the number of cases in which the Covenant has been in fact invoked before the domestic courts, and with what result.

10. The Committee is concerned that, in addition to judicial protection, there is no independent national institution for the promotion and protection of human rights. It considers that article 69 of the Constitution and the Law on Complaint and Petition granting every citizen the right to submit complaints about the encroachment of his or her rights is no substitute for such an independent monitoring body.

The State party should consider the establishment of a national human rights institution (art. 2 of the Covenant).

11. The Committee is further concerned about the limited number of human rights organizations in the Democratic People's Republic of Korea, and the limited access to the State party's territory that is accorded to human rights organizations, as reflected in the small number of international human rights non-governmental organizations that have been granted permission to visit the Democratic People's Republic of Korea over the past decade.

The State party should grant access to its territory to international human rights organizations and other international bodies on a regular basis at their request and ensure accessibility to indispensable information about the promotion and protection of human rights.

12. Given the State party's obligation, under article 6 of the Covenant, to protect the life of its citizens and to take measures to reduce infant mortality and increase life expectancy, the Committee remains seriously concerned about the lack of measures by the State party to deal with the food and nutrition situation in the Democratic People's Republic of Korea and the lack of measures to address, in cooperation with the international community, the causes and consequences of the drought and other natural disasters which seriously affected the country's population in the 1990s.

The Committee recalls paragraph 5 of its General Comment No. 6 on article 6 of the Covenant, adopted at its sixth session, which recommends that States parties "take all possible measures to reduce infant mortality and increase life expectancy, especially in adopting measures to eliminate malnutrition". The State party should provide the Committee with supplementary information on this issue.

13. The Committee takes note of the delegation's information that the death penalty has rarely been imposed and carried out in the past three years. While the Committee appreciates that the number of offences carrying the death penalty has been reduced to five, it remains seriously concerned that, of those five offences, as the report states, four are essentially political offences (arts. 44, 45, 47 and 52 of the Criminal Code), couched in terms so broad that the imposition of the death penalty may be subject to essentially subjective criteria, and not be confined to "the most serious crimes" only, as required under article 6, paragraph 2, of the Covenant. The Committee is also concerned at acknowledged and reported instances of public executions.

The State party should review and amend the above-mentioned articles of the Criminal Code to bring them into conformity with the requirements of article 6, paragraph 2, of the Covenant. The State party should refrain from any public executions. It is invited to work towards the declared goal of abolishing capital punishment.

14. The Committee considers that article 10 of the Criminal Code, under which punishment for an offence not provided for in the Code will be imposed in accordance with those provisions of the Code punishing offences similar in nature and gravity, is incompatible with the concept of "nullum crimen sine lege", enshrined in article 15 of the Covenant.

The State party should repeal article 10 of the Criminal Code.

15. The Committee is deeply concerned about consistent and substantiated allegations of violations, by law enforcement personnel, of article 7 of the Covenant, to which the delegation has not sufficiently responded. The information given by the delegation about the small number of complaints of ill-treatment in custody or detention (six complaints between 1998 and 2000) is difficult to accept as a reflection of the actual situation, in the light of the material available to the Committee, which suggests that the number of instances of ill-treatment and torture is significantly higher.

The State party should ensure that all instances of ill-treatment and of torture and other abuses committed by agents of the State are promptly considered and investigated by an independent body. The State party should institute a system of independent oversight of all places of detention and custody with a view to preventing any act of abuse of power by law enforcement personnel.

16. The Committee takes note of the information provided by the delegation on the conditions of detention in prisons of the Democratic People's Republic of Korea. The Committee nonetheless remains concerned about the many allegations of cruel, inhuman and degrading treatment and conditions and of inadequate medical care in reform institutions, prisons and prison camps, which appear to be in violation of articles 7 and 10 of the Covenant and of the Standard Minimum Rules for the Treatment of Prisoners.

The State party should take steps to improve conditions in the facilities referred to above and all other facilities for detention in the Democratic People's Republic of Korea. It must ensure that all persons deprived of their liberty are treated with humanity and with respect for the inherent dignity of the human person, as required by article 10 of the Covenant. The State party must ensure that sufficient food and appropriate and timely medical care are available to all detainees. The Committee strongly recommends that the State party allow for independent internal and international inspection of prisons, reform institutions and other places of detention or imprisonment.

17. Notwithstanding the explanations given by the delegation, the Committee continues to harbour serious doubts about the compatibility of the provisions of Chapter Two of the Labour Law of the Democratic People's Republic of Korea, especially articles 14 and 18 thereof, with the prohibition of forced labour contained in article 8, paragraph 3 (a), of the Covenant.

The State party should amend the above-mentioned provisions of the Labour Law so as to avoid any potential conflict with the provisions of article 8 of the Covenant.

18. While noting the delegation's explanations about the nature and purpose of pre-trial detention and about preliminary investigations tending to prolong the duration of pre-trial detention (see paragraph 65 of the report) , the Committee remains concerned about the compatibility of the State party's pre-trial detention practices and preliminary investigation procedures with article 9 of the Covenant. The duration of detention before a person is brought before a judge is manifestly incompatible with article 9, paragraph 3, of the Covenant.

The State party's next report should contain statistics on the number of persons held in pre-trial detention and on the duration of and reasons for such detention. The State party must ensure that anyone arrested or detained on a criminal charge is brought promptly before a judge. The State party must ensure that all of its practices are consistent with the provisions of article 9 of the Covenant and that detainees have access to counsel and are permitted to contact their families from the moment of apprehension.

19. The Committee has noted the State party's justification of the "traveller's certificate" which citizens of the Democratic People's Republic of Korea are required to obtain for travel within the country, but considers that such restrictions on domestic travel raise serious questions about their compatibility with article 12, paragraph 1, of the Covenant.

The State party should consider the elimination of the requirement of traveller's certificates.

20. In the Committee's opinion, the requirement, under the Immigration Law of the Democratic People's Republic of Korea, of administrative permission to travel abroad, and the requirement, for foreigners in the Democratic People's Republic of Korea, to obtain exit visas to leave the country, are incompatible with the provisions of article 12, paragraph 2, of the Covenant.

The State party should eliminate the requirement of administrative permission and an exit visa as a general rule and require them only in individual cases that can be justified in the light of the Covenant.

21. While noting that the expulsion of aliens is exercised "with great prudence" (para. 82 of the report), the Committee regrets that there is no law, or formal procedure, governing the expulsion of aliens from the territory of the Democratic People's Republic of Korea.

Before expelling an alien, the State party should provide him or her with sufficient safeguards and an effective remedy, in conformity with article 13 of the Covenant. The State party is urged to consider the adoption of legislation governing the expulsion of aliens, which should be consistent with the principle of non-refoulement.

22. The Committee notes with regret that the delegation was unable to provide up-to-date information about religious freedoms in the Democratic People's Republic of Korea. As only 40,000 citizens of the country (i.e., less than 0.2 per cent of the population), grouped into four religious communities, are said to be "believers", and in the light of information available to the Committee that religious practice is repressed or strongly discouraged in the Democratic People's Republic of Korea, the Committee is seriously concerned that the State party's practice in this respect does not meet the requirements of article 18 of the Covenant.

The State party is requested to provide the Committee with up-to-date information about the number of citizens of the Democratic People's Republic of Korea belonging to religious communities and the number of places of worship, as well as the practical measures taken by the authorities to guarantee the freedom of exercise of religious practice by the communities mentioned in paragraph 112 of the report.

23. The Committee is concerned that various provisions of the Press Law, and their frequent invocation, are difficult to reconcile with the provisions of article 19 of the Covenant. The Committee is concerned that the notion of "threat to the State security" may be used in such ways as to restrict freedom of expression. Also, the Committee is concerned that the permanent presence in the Democratic People's Republic of Korea of foreign media representatives is confined to journalists from three countries, and foreign newspapers and publications are not readily available to the public at large. Moreover, Democratic People's Republic of Korea journalists may not travel abroad freely.

The State party should specify the reasons that have led to the prohibition of certain publications and should refrain from measures that restrict the availability of foreign newspapers to the public. The State party is requested to relax restrictions on the travel abroad by Democratic People's Republic of Korea journalists and to avoid any use of the notion of "threat to the State security" that would repress freedom of expression, contrary to article 19.

24. The Committee has noted the delegation's statement that freedom of assembly is fully respected in the Democratic People's Republic of Korea. The Committee remains concerned, however, about restrictions on public meetings and demonstrations, including possible abuse of the requirements of the laws governing assembly.

The Committee requests the State party to provide additional information on the conditions for public assemblies and, in particular, to indicate whether and under what conditions the holding of a public assembly can be prevented and whether such a measure can be appealed.

25. The provisions of article 25 include the right of every citizen of a State party to have the right and the opportunity, without the restrictions mentioned in article 2 and without unreasonable restrictions, to take part in the conduct of public affairs, directly or through freely chosen representatives (art. 25 (a)), and to vote or be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the wish of the electors. The Committee has taken note of the delegation's explanation that, as there has been no popular manifestation of any desire to create new political parties, no regulation or legislation governing the creation and registration of political parties is currently envisaged. The Committee considers that this situation runs counter to the provisions of article 25 of the Covenant, as it may adversely affect the rights of citizens to participate in the conduct of public affairs through freely chosen representatives, as required by article 25.

The State party should refer to the Committee's General Comment 25 on article 25, adopted at its fifty-seventh session, as guidance in respect of the above issues, with a view to ensuring full compliance with the provisions of article 25.

26. While noting the delegation's statement that trafficking of women does not exist in the Democratic People's Republic of Korea, the Committee remains seriously concerned at the number of substantiated allegations about trafficking of women, in violation of article 8 of the Covenant, brought to its attention by non-governmental and other

sources, including the report of the Special Rapporteur on violence against women of the Commission on Human Rights.

The State party should investigate the above allegations further, in a spirit of cooperation, and report its findings to the Committee.

27. The Committee notes with concern the low level of representation of women at the more senior levels of the public sector, as well as the absence of any precise data on the representation of women in other sectors of the economy, including their level of responsibility.

The State party is requested to take measures to implement articles 3 and 26 of the Covenant by improving women's participation in the public sector workforce, especially in senior positions, and to provide the Committee with statistical data on the status of women, in particular as to the level of their responsibility and remuneration in the major economic sectors.

28. The State party should ensure that its second periodic report, and the present concluding observations, are disseminated widely.

29. The State party should indicate within one year, in accordance with rule 70, paragraph 5, of the Committee's rules of procedure, the measures it has taken or envisages to give effect to the Committee's recommendations contained in paragraphs 15, 22, 23, 24 and 26 of the present concluding observations.

30. The Committee requests that the information relating to its other recommendations and to the Covenant as a whole should be included in the third periodic report of the Democratic People's Republic of Korea, to be submitted by 1 January 2004.

Office of the United Nations High Commissioner for Human Rights
Geneva, Switzerland

# APPENDIX C

## International Labor Organization
## Declaration on Fundamental Principles and Rights at Work

International Labor Organization
Declaration on Fundamental Principles and Rights at Work

**ILO - Declaration on Fundamental Principles and Rights at Work**
**Declaration : Text Of Declaration**

ILO Declaration on Fundamental Principles and Rights at Work
86th Session, Geneva, June 1998

Whereas the ILO was founded in the conviction that social justice is essential to universal and lasting peace;

Whereas economic growth is essential but not sufficient to ensure equity, social progress and the eradication of poverty, confirming the need for the ILO to promote strong social policies, justice and democratic institutions;

Whereas the ILO should, now more than ever, draw upon all its standard-setting, technical cooperation and research resources in all its areas of competence, in particular employment, vocational training and working conditions, to ensure that, in the context of a global strategy for economic and social development, economic and social policies are mutually reinforcing components in order to create broad-based sustainable development;

Whereas the ILO should give special attention to the problems of persons with special social needs, particularly the unemployed and migrant workers, and mobilize and encourage international, regional and national efforts aimed at resolving their problems, and promote effective policies aimed at job creation;

Whereas, in seeking to maintain the link between social progress and economic growth, the guarantee of Fundamental Principles and Rights at Work is of particular significance in that it enables the persons concerned, to claim freely and on the basis of equality of opportunity, their fair share of the wealth which they have helped to generate, and to achieve fully their human potential;

Whereas the ILO is the constitutionally mandated international organization and the competent body to set and deal with international labour standards, and enjoys universal support and acknowledgement in promoting Fundamental Rights at Work as the expression of its constitutional principles;

Whereas it is urgent, in a situation of growing economic interdependence, to reaffirm the immutable nature of the Fundamental Principles and Rights embodied in the Constitution of the Organization and to promote their universal application;

# The International Labour Conference

1. Recalls:

   (a) that in freely joining the ILO, all Members have endorsed the principles and rights set out in its Constitution and in the Declaration of Philadelphia, and have undertaken to work towards attaining the overall objectives of the Organization to the best of their resources and fully in line with their specific circumstances;

   (b) that these principles and rights have been expressed and developed in the form of specific rights and obligations in Conventions recognized as fundamental both inside and outside the Organization.

2. Declares that all Members, even if they have not ratified the Conventions in question, have an obligation arising from the very fact of membership in the Organization to respect, to promote and to realize, in good faith and in accordance with the Constitution, the principles concerning the fundamental rights which are the subject of those Conventions, namely:

   (a) freedom of association and the effective recognition of the right to collective bargaining;

   (b) the elimination of all forms of forced or compulsory labour;

   (c) the effective abolition of child labour; and

   (d) the elimination of discrimination in respect of employment and occupation.

3. Recognizes the obligation on the Organization to assist its Members, in response to their established and expressed needs, in order to attain these objectives by making full use of its constitutional, operational and budgetary resources, including, by the mobilization of external resources and support, as well as by encouraging other international organizations with which the ILO has established relations, pursuant to article 12 of its Constitution, to support these efforts:

   (a) by offering technical cooperation and advisory services to promote the ratification and implementation of the fundamental Conventions;

   (b) by assisting those Members not yet in a position to ratify some or all of these Conventions in their efforts to respect, to promote and to realize the principles concerning fundamental rights which are the subject of these Conventions; and

   (c) by helping the Members in their efforts to create a climate for economic and social development.

4. Decides that, to give full effect to this Declaration, a promotional follow-up, which is meaningful and effective, shall be implemented in accordance with the measures specified in the annex hereto, which shall be considered as an integral part of this Declaration.

5. Stresses that labour standards should not be used for protectionist trade purposes, and that nothing in this Declaration and its follow-up shall be invoked or otherwise used for such purposes; in addition, the comparative advantage of any country should in no way be called into question by this Declaration and its follow-up.

# Satellite Imagery of the North Korean Gulag

*Matthew McKinzie, Natural Resources Defense Council*

The U.S. Committee for Human Rights in North Korea and the Natural Resources Defense Council (NRDC) recently obtained high-resolution, commercial satellite images of seven North Korean prisons and prison camps. These photographs date from the time period 2001 to 2003, and were obtained from the archives of the DigitalGlobe and Space Imaging corporations. DigitalGlobe donated their satellite imagery to the Committee, and NRDC produced the maps in this section of the report.

Commercial, high-resolution satellite imagery has only been publicly available as a research tool since late 1999, with the launch of the Denver-based Space Imaging Corporation's Ikonos satellite. The Ikonos satellite currently orbits the earth every 98 minutes at an altitude of 423 miles. Ikonos satellite images are typically photographed in strips 11 kilometers wide and with a resolution of one meter. Denver-based DigitalGlobe's QuickBird satellite was launched in 2001, and can achieve a remarkable resolution of 61 centimeters.

With meter and sub-meter resolution satellite imagery, objects such as buildings, forests, orchards, fields, fences, rivers, railways, trails, and roads are easily recognizable. Indeed, these photographs were shown to former North Koreans who were imprisoned in these places, and who were able to identify specific features in the photographs and to describe their purposes. Using the satellite imagery, interviews with former prisoners were conducted in Seoul, Washington, DC, and Los Angeles, and the derived annotations have been overlaid on the photographs reproduced in this section of the report.

Commercial, high-resolution satellite imagery, and the testimony of North Korean defectors who were exposed to the gulag, are revealing windows into this closed society. Annotated satellite images of five sites in the North Korean gulag offers a glimpse into the different sorts of work that prisoners are forced to perform. Activities at *Kwan-li-so* No. 15 "Yodok," for example, are largely concerned with food production. *Kwan-li-so* Nos. 14, 18, and 22 are mining camps. These sites are very large, consisting of several villages spread over more than a hundred square kilometers. The smaller sites — Kaechon, Nongpo and Sinuiju — have factories or workshops where prison laborers are forced to produce bricks, clothing, shoes, or other goods.

The satellite images presented in this report represent a fraction of the photographs of North Korea now in the archives of DigitalGlobe and Space Imaging. In the coming years, this tool will be used to understand and expose the human rights and humanitarian situation in this still-closed society, formerly known as the "Hermit Kingdom."



Selected North Korean Prison Camp Locations

**KWAN-LI-SO**
1. No. 14 Kaechon, S. Pyong-an
2. No. 15 Yodok, S. Hamgyong
3. No. 16 Hwasong, N. Hamgyong
4. No. 18 Bukchang, S. Pyong-an
5. No. 22 Haengyong or Hoeryong, N. Hamgyong
6. No. 25 Chongjin, N. Hamgyong

**KYO-HWA-SO**
7. Hoeryong, N. Hamgyong
8. No. 1 Kaechon, S. Pyong-an
9. No. 3 Simuiju, North Pyong-an
10. No. 4 Kangdong, S. Pyong-an
11. No. 8 Yongdam, Kangwon Province
12. No. 12 Jeonger-ri, N. Hamgyong
13. No. 22 Oro, S. Hamgyong
14. No. 77 Danchun, S. Hamgyong

Note: There are as many as 10-12 additional kyo-hwa-so forced-labor prison camps located primarily in the central and southern provinces of North Korea. With the exception of Kwan li so Nos. 18 and 25, those identified on this map are the locations only of the kwan-li-so and kyo-hwa-so labor camps of former prisoners interviewed in this report



Kwan-li-so No. 15 Yodok
Partial Overview

39.727 N
126.846 E

Ipsok River

Feature
1. Knup-ri District
2. Knup-ri District
3. Knup-ri District
4. Yongpyong-ri District
5. Yongpyong-ri District
6. Pyongchang-ri District
7. Limsan Valley
8. Prison Workers' Unit 4
   Village
9. Ipsok-ri District
10. Gold Mine Village

Satellite Image: Space Imaging Asia
Photographed November 25, 2001

USCA Case #13-7147 Document #1495112 Filed: 06/25/2014 Page 240 of 411



## Kwan-li-so No. 15 Yodok
### Knup-ri District

FEATURE
1. Confinement Cell
2. Threshing House
3. School for Guards' Children
4. Headquarter Office of Guards
5. SSPA Building
6. Limestone Mine
7. SSPA Guards' Houses

Satellite Image: Space Imaging Asia
Photographed November 25, 2001



Kwan-li-so No. 15 Yodok
Knup-ri District

FEATURE
1. Threshing House
2. Prison Workers' Unit 2 Village
3. Prison Workers' Unit 1 Village
4. SSPA Guards' Office
5. Threshing House
6. Public Execution Site
7. Unit 2 Workplace
8. Research Center for
   Revolutionary History of
   Kim Il Sung and Kim Jong Il

Satellite Image: Space Imaging Asia
Photographed November 25, 2001



Kwan-li-so No. 15 Yodok
Knup-ri District

FEATURE
1. Donsa Valley
2. Honey-Gathering Place
3. Where Kang Chol Hwan's Family Lived
4. SSPA Office
5. Workplace
6. Singles' Dorm
7. Burial Site for Dead Bodies
8. Unit 3 Bridge
9. Threshing House
10. Prison Workers' Unit 3 Village
11. Flour Mill
12. Pig-Breeding Farm

Satellite Image: Space Imaging Asia
Photographed November 25, 2001

USCA Case #11-7147 Document #1495112 Filed: 05/29/2014 Page 243 of 411



Kwan-li-so No. 15 Yodok
Yongpyong-ri District

FEATURE
1. Orchards
2. Orchards
3. Mine for Clay Mixed with Soft Stones

Satellite image: Space Imaging Asia
Photographed November 25, 2001



Kwan-li-so No. 15 Yodok
Yongpyong-ri District

FEATURE
1. Fish Farm
2. Threshing House

2

1

N

Satellite Image: Space Imaging Asia
Photographed November 25, 2001

USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 245 of 411

U.S. Committee for Human Rights in North Korea

Satellite Image: Space Imaging Asia
Photographed November 22, 2001

Kwan-li-so No. 15 Yodok
Pyongchang-ri District



Kwan-li-so No. 15 Yodok
Limsan Valley

2

FEATURE
1. Limsan Valley
2. Pasture for Goats and Lambs

1

N

Satellite Image: Space Imaging Asia
Photographed November 25, 2001

0   25   50   100
Meters



# Kwan-li-so No. 15 Yodok
## Prison Workers' Unit 4 Village

Prison Workers' Unit 4 Village

Satellite Image: Space Imaging Asia
Photographed November 25, 2001

U.S. Committee for Human Rights in North Korea



Kwan-li-so No. 15 Yodok
Ipsok-ri District

FEATURE
1. Threshing House
2. Ipsok-ri Village
3. Opium Poppy Farm

Satellite Image: Space Imaging Asia
Photographed November 25, 2001



Kwan-li-so No. 15 Yodok
Gold Mine Village

FEATURE
1. Sosu Valley
2. Gold Mine Village

1

2

N

Satellite Image: Space Imaging Asia
Photographed November 25, 2001



Taedong River

4th and 5th Divisions,
Kwan-li-so No. 18.

Kwan-li-so No. 18 Bukchang
Partial Overview

Kwan-li-so No. 14 Kaechon
Partial Overview

6th Division,
Kwan-li-so No. 18

Satellite Image: Space Imaging Asia
Photographed January 5, 2003

U.S. Committee for Human Rights in North Korea

USCA Case #13-7147      Document #1495112      Filed: 05/29/2014      Page 251 of 411



Kwan-li-so Number 18 Bukchang
6th Division

FEATURE
1. Pig Farm
2. Han Ryong Gang Mine Entrance
3. Food Distribution for Camp Management
4. Kim Yong's House for 3 Years ('96-'99)
5. Bo-wi-bu Police Building
6. The "Respect for Elders" Furniture Factory
7. Hospital
8. Farm Managers' Housing
9. Prisoner Housing

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

U.S. Committee for Human Rights in North Korea

USCA Case #13-7147      Document #1495112         Filed: 09/29/2014      Page 252 of 411



# Kwan-li-so No. 18 Bukchang
## 6th Division

**FEATURE**
1. Prisoner Housing (Families)
2. Single Prisoners' Dorm
3. Coal Trolley Repair Shop
   (Kim Yong's Work Site)
4. Carbonite Supply House
5. Mine Tunnel Entrance
6. Highest Official's Office
7. Mine Cable Head
8. Workers' Bath Site
9. Restaurant for High Officials
10. Bo-wi-bu Office
11. Railroad Loading Yard

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 253 of 411



Kwan-li-so Number 18 Bukchang
6th Division

FEATURE
1. Han Jae Gong Mine Entrance
2. Dynamite Warehouse

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

U.S. Committee for Human Rights in North Korea



Kwan-li-so Number 18 Bukchang
4th and 5th Divisions

FEATURE

1. Factory for Farming and Mining Tools
2. Cement Factory
3. Self Criticism at Night and Hard Labor Punishment
4. Kwan-li-so No. 18 Branch Office
5. Guards' Center
6. Security Department
7. Area for Garbage Fermentation
8. Guards' Family Housing
9. Soy Sauce Factory
10. Hospital for Accident Victims
11. Prisoner Housing
12. Prisoner Housing

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

U.S. Committee for Human Rights in North Korea

USCA Case #13-7147      Document #1495112         Filed: 05/29/2014      Page 255 of 411



# Kwan-li-so No. 18 Bukchang
## 4th and 5th Divisions

FEATURE
1. Housing for Former Ranking Officials
   Currently Sentenced for Three Years Imprisonment for Disloyalty
2. Bong Chang Gang Mine Entrance Tunnel
3. Boo Bul Gang (Tiger Creek) Mine Entrance
4. Prisoner Housing
5. Prisoner Housing

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

U.S. Committee for Human Rights in North Korea



# Kwan-li-so No. 18 Bukchang
## Periphery

**FEATURE**
1. Hospital
2. Elementary School for Prisoners' Children (Under Age 12)
3. Pig Farm (Formerly a Chicken Farm)

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

N

0   25   50   100   150
Meters

USCA Case #13-7147 Document #1495112 Filed: 05/29/2014 Page 257 of 411



Kwan-li-so No. 18 Bukchang

Periphery

FEATURE
1. Distillery
2. Former House of Kim Byung Hwa (Former Director of Bo-wi-bo (National Security Agency Police), Now a Guest House for VIPs

Satellite Image: Space Imaging Asia
Photographed January 8, 2003



Kwan-li-so No. 14 Kaechon and
No. 18 Bukchang

1

5

6

7

Kwan-li-so No. 18
Bukchang

Kwan-li-so No. 14
Kaechon

Taedong River

FEATURE
1. Mujin I Coal
   Mine Entrance
2. Prisoner Housing
3. Execution Site
4. Rifle Range
5. Hospice for Dying
   Prisoners
6. Guard Facilities
7. Guard Facilities

2

3

4

N

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

0  25  50    100    150    200
                              Meters



# Kwan-li-so No. 14 Kaechon
## Headquarters

FEATURE
1. Prisoner Housing
2. Pu-rok Mountain
3. Mujin II Coal Mine Entrance
   (Where Kim Yong Mined while
   Imprisoned at Camp No. 14)
4. Bo-wi-bu No. 14 Headquarters

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

U.S. Committee for Human Rights in North Korea



Kwan-li-so No. 14 Kaechon
Prisoner Housing

Prisoner Housing

Satellite Image: Space Imaging Asia
Photographed January 8, 2003

N

0    25    50    100    150
Meters

USCA Case #13-7147      Document #1495112        Filed: 05/29/2014      Page 261 of 411



Kwan-li-so No. 14 Kaechon
Prisoner Housing

Prisoner
Housing

Prisoner
Housing

Prisoner
Housing

Satellite Image: Space Imaging Asia
Photographed January 8, 2003



Kwan-li-so No. 22 Haengyong
Overview

42.536 N
129.935 E

FEATURE
1. North Section
2. Headquarters
3. South Section
4. Chungbong Mine

Satellite Images, DigitalGlobe (color), U.S. National Imagery
and Mapping Agency (black and white).
DigitalGlobe Photographed: April 28, 2002 (left) and May 21, 2002 (right)
Annotations: Far Eastern Economic Review

U.S. Committee for Human Rights in North Korea

USCA Case #13-7147      Document #1495112      Filed: 05/29/2014      Page 263 of 411



Kwan-li-so No. 22 Haengyong
North Section

FEATURE
1. Quarters for Prisoners with Families
2. Threshing House
3. Quarters for Prisoners with Families
4. Vegetable and Freight Depot
5. Furniture Factory
6. Quarters for Prisoners with Families

Satellite Image: DigitalGlobe
Photographed May 21, 2002
Annotations: Far Eastern Economic Review

U.S. Committee for Human Rights in North Korea



Kwan-li-so No. 22 Haengyong
South Section

FEATURE
1. Transport Depot
2. Food Factory
3. Pharmaceutical Factory
4. Slaughterhouse
5. Emergency Food Stores

Satellite Image: DigitalGlobe
Photographed May 21, 2002
Annotations: Far Eastern Economic Review

USCA Case #13-7147      Document #1495112        Filed: 05/29/2014      Page 265 of 411



Kwan-li-so No. 22 Haengyong
Headquarters

FEATURE
1. Kim Il Sung Memorial Hall
2. Theater
3. Weapons Store
4. Family Quarters for Prisoners
5. Propaganda Bureau
6. Supplies Depot
7. Guards' Quarters
8. Piggery
9. Greenhouses
10. Detention and Torture Center
11. Armory
12. Administration Offices
13. Guards' Restroom
14. Guards' Night Duty Room
15. Office of Camp Director
16. Camouflaged Anti-aircraft Guns
17. Quarters for Prisoners with Families
18. Threshing House

Satellite Image: DigitalGlobe
Photographed May 21, 2002
Annotations: Far Eastern Economic Review

U.S. Committee for Human Rights in North Korea

USCA Case #13-7147      Document #1495112      Filed: 05/29/2014      Page 266 of 411



# Kwan-li-so No. 22 Haengyong Chungbong Mine

**FEATURE**
1. Railway Station
2. Pithead
3. Security Bureau
4. Equipment Repair Shops
5. Single Prisoners' Quarters
6. Lumber Yard
7. Assembly Area
8. Meeting Hall
9. Explosives Depot
10. Coal-Loading Depot

Satellite Image: DigitalGlobe
Photographed April 29, 2002
Annotations: Far Eastern Economic Review

U.S. Committee for Human Rights in North Korea

USCA Case #13-7147      Document #1495132      Filed: 05/29/2014      Page 267 of 411



Kyo-hwa-so No. 1 Kaechon
Overview

39.708 N
125.923 E

FEATURE
1 Perimeter Wall
2 3-Story Dormitory for Prisoners
3 Supply Rooms Area
4 Leather and Rubber Workshops
5 Entry Gate
6 Shoe-making Units 1 and 2
7 Designing Unit
8 Cutting Unit
9 Repair Shop/Garage
10 Guard Towers
11 Guard Towers
12 Guard Towers

Satellite Image: DigitalGlobe
Photographed December 10, 2002

U.S. Committee for Human Rights in North Korea



South Sinuiju Detention Center
Overview

FEATURE
1. Provincial Police Hospital
2. Prison Cells
3. Dining Hall for Guards
4. Guards Room
5. Dining Hall for Detainees

40.077 N
124.440 E

Satellite Image: DigitalGlobe
Photographed April 30, 2002

U.S. Committee for Human Rights in North Korea

USCA Case #13-7147      Document #1495112       Filed: 05/29/2014      Page 269 of 411



Nongpo Detention Center, Chongjin City
Overview

U.S. Committee for Human Rights in North Korea

Satellite Image: DigitalGlobe
Photographed March 13, 2002

FEATURE
1. Back Gate
2. Back Yard where Prisoners Make Bricks
3. Toilet and Washing Stands
4. Piled-up Bricks
5. Prison Cells for Men (First Floor)
6. Prison Cells for Women (First Floor)
7. Brick-Making Machines
8. Dining Hall for Prisoners
9. Dining Hall for Prison Guards
10. Well
11. Carpentry Room
12. Guards Room
13. Front Gate
14. Storage Room
15. Parking Place

41.738 N
129.722 E

**U.S. Committee for Human Rights in North Korea**

1101 15th Street, NW, Suite 800

Washington, DC 20005 USA

Tel: (202) 467-4765

Fax: (202) 293-6042

Web: WWW.HRNK.ORG

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

-----------------------------------------------------------------X

HAN KIM
5511 Wooded Creek Drive
St. Charles, MO

                                    **Civil Action No.:** 09-648 (RWR) and

YONG SEOK KIM
5511 Wooded Creek Drive
St. Charles, MO

                        Plaintiffs,

            -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,
a.k.a. NORTH KOREA
c/o Foreign Minister, Pak Ui Chun
Ministry of Foreign Affairs
Jung song-dong, Central District
Pyong Yang, DRK

and

JOHN DOES 1-10.

                        Defendants.
-----------------------------------------------------------------X

1

000269

## DECLARATION OF ERNEST C. (CHUCK) DOWNS

I, Ernest C. (Chuck) Downs, of Washington, D.C., declare pursuant to 28 U.S.C. § 1746, as follows:

### A.  Professional Background

1.    I am a former senior official of the U. S. Department of Defense, whose career in defense and national security issues spans more than three decades.  I the author of *Over the Line: North Korea's Negotiating Strategy* (AEI Press, 1999), which explains how North Korea deals with other countries and continues to function as a state despite its rogue status.  A Korean (Hangul) version of *Over the Line* was published within months of the book's English publication and a Japanese version was published in 2002. The book established my reputation as a scholar with expertise regarding North Korea, and I have continued to conduct in-depth studies of the North Korean regime's behavior and practices since its publication.

2.    I spent the majority of my career in the Pentagon, as Deputy Director for Regional Affairs and Congressional Relations in the Pentagon's East Asia office.  In this capacity I was responsible for drafting the East Asia strategy documents of the Department of Defense and was awarded the Meritorious Service Medal (1996) and the Defense Civilian Service Medal (1993). As Assistant Director of the Office of Foreign Military Rights Affairs, I was responsible for a number of international negotiations with various countries, including the negotiation with the United Kingdom regarding military use of Diego Garcia and access arrangements in Singapore and Australia.

3.    I was selected to attend what was then considered the highest level training program for Federal employees, the Department of State's Senior Seminar training program at the Foreign Service Institute from 1989-1990.

2

000270

4.      Earlier, from 1980-1984, I served as  Chief of Policy Analysis in the Department of the Interior's Territorial and International Affairs office, where my duties included representing Interior in the Micronesian status negotiations and the negotiations for arrangements governing U.S. military use of Kwajalein Missile Range in the mid-Pacific.

5.      I was also the Associate Director of the Asian Studies Program at the American Enterprise Institute in Washington, D.C. from 1996-1998.

6.      I retired in June 2000 from the position of Senior Defense and Foreign Policy Advisor to the House Policy Committee of the U. S. House of Representatives and since that time have continued to work as an independent consultant on foreign policy matters. As a Senior Fellow at the National Institute for Public Policy, I chaired the North Korea Working Group, developing policy recommendations on North Korea for the Office of the Secretary of Defense. I have testified before Congress and have frequently appeared on PBS's Lehrer Newshour.  For two years I appeared frequently on MSNBC, with whom I was a consultant on international security policy.

7.       From 2001-2008, I served on the board of the United States Committee for Human Rights in North Korea.   In 2008, the Board asked me to take over the duties of Executive Director, managing the organization's publications on North Korea's human rights abuses.

8.      I have published numerous articles on foreign policy and defense issues, in the *New York Times*, the *Washington Post*, and the *Wall Street Journal*.   In addition to authoring *Over the Line*, I was the co-editor (with Ambassador James R. Lilley) of *Crisis in the Taiwan Strait* (NDU Press, 1997).

9.      I graduated with honors in political science from Williams College in 1972.

A copy of my curriculum vitae  is attached hereto as Appendix "A".

3

**B.     Nature of This Expert Witness Report**

10.    I have been asked by counsel for the plaintiffs in the case of <u>Kim et al. v.</u>
<u>Democratic People's Republic of Korea et al.,</u> to provide my professional opinion as to whether
the defendants in this action provided material support, resources, training, and oversight in the
abduction from China of Reverend Kim Dong Shik ("Reverend Kim") and in his subsequent
imprisonment, torture and death.

11.    My opinion as set forth below is based upon my academic studies, research and
publishing over the course of many years as an expert on Korean affairs.  I have obtained
information from interviews with political leaders and refugees, reviews of documents,
periodicals, credible news reports, discussions with reliable journalists, government publications,
and scholarly works, as well as from my own experience, working, living and traveling in the Far
East, particularly in South Korea.  In preparing this opinion, I have examined the complaint filed
by the plaintiffs against the defendants.

**C.     Background**

***North Korea's Abductions Have Roots from the Early Years of the Regime's Establishment***

12.    Since its inception in the mid-twentieth century, the DPRK has systematically
engaged in a carefully conceived policy of using force and deception to lure intellectuals
educated professionals and others deemed useful to North Korea, but these individuals were not
used for their skills—they were usually sent to hard labor or other services on behalf of the
regime.  Over sixty years, the regime has carried out a number of violent and duplicitous actions
to steal foreign citizens from their homes, lure unsuspecting innocents, and trap unfortunate
individuals into captivity in North Korea, with no regard for the wishes of the victims
themselves.

000272

13.     The tragic history of North Korea's forced abductions began in earnest during the Korean War (1950-1953).[1]   On June 28, 1950, three days into the war, the Korean Workers Party Military Committee issued an order to North Korean forces to abduct "Southern [Korean] political, economic, and socially prominent figures, reeducate them, and strengthen the military front line with them." [2]   Abductions of these people were not random acts of violence committed by individual soldiers; rather, they were based on the calculated directives of DPRK officials from the highest echelons of government, including Kim Il-Sung himself.   These directives provided a clear indication of the extent to which the DPRK would go to address its needs both to obtain human capital and to stifle opposition.

14.     In August 1950, United Nations forces defending the Republic of Korea had been pushed into a small area in the southeast corner of the Korean peninsula.   North Korean forces controlled the rest of the peninsula, including Seoul.   By the time United Nations forces eventually retook Seoul and the southern half of the peninsula, 82,959 of the  citizens in South Korea  had been forcefully abducted and taken deep into North Korea.[3]   A Soviet document recorded that the Worker's Party objective had been fulfilled, reporting that "the plan of transferring Seoul citizens to the North for their job placement to factories, coal mines and enterprises is being implemented in each related sector."[4] According to the Korean War Abductees Family Union (KWAFU), out of these over eighty thousand abductees, at least twenty

---

[1] Lee, Mi-Il. "North Korea: Human Rights Update and International Abduction Issues," (testimony given before the U.S. House of Representatives International Relations Committee, Washington, D.C., April 27, 2006) provides a good summary of the regime's efforts.

[2] The book *Okuryoko no Fuyu* (Lee, Te Ho. *Okuryouko no Fuyu* (Shakai Hyouron Sha, 1993), pages 28-32), states that on June 28, 1950, the KWP Military Committee developed "the policy to subsume Southern [Korean] political, economical, and socially prominent figures, re-educate them, and strengthen the military front line with them."

[3] *2010 White Paper on Human Rights in North Korea*, Korea Institute for National Unification, p.453.

[4] Historical Record Relating to North Korea, No. 16, "Regarding the Cooperation to the Plan of Moving Out Seoul Citizens," Gang-won-nae No. 3440, September 5, 1950.

000273

thousand were "politicians, academics, government ministers, and civil servants."[5] Yet they were not taken for their skills, they were taken to silence them and force them to perform life-threatening hard-labor.

### North Korean Espionage Operatives Forcibly Abducted Innocent Foreigners on Orders from Pyongyang

15.    With respect to the DPRK's decision to employ the methodology of abductions of foreigners to meet its ends, unfortunately little has changed over the past 60 years.  Despite its consistency in utilizing such means, due to the brutality and thick veil of secrecy of the DPRK regime we have learned about only a minute portion of the abductions which have occurred.  As an illustration of the extent to which the DPRK pursues a State policy of abducting foreign nationals, a sampling of incidents from a two year stretch in the mid-1970's which have become publicly known (from the reports of escaped victims, captured DPRK officials and even a highly unusual admission by the DPRK itself in 2002) is most enlightening.  These examples are:

A.    On the afternoon of November 15, 1977, 13-year old Megumi Yokota was walking home from badminton practice when she was seized by North Korean operatives, thrown into a car, and taken to a nearby ship.[6]  She was locked in a storage hold, where she wept, screamed, and clawed at the steel door for the entire forty-hour trip to North Korea.  When her abductors finally opened the door, they saw she had worn her fingernails completely off. [7]

---

[5] Lee, Mi-Il. "North Korea: Human Rights Update and International Abduction Issues," (Prepared statement given at the U.S. House of Representatives International Relations Committee, Washington, D.C., April 27, 2006), p. 52-53.
[6] Yokota, Sakie. *North Korea Kidnapped My Daughter*, (Vertical, Inc., 2009). p.7
[7] Ibid. p.117

000274

B.    Nineteen-year-old Hitomi Soga and her mother Miyoshi, age 46, were abducted on August 12, 1978, in their hometown of Sado City, Japan.  The two had stopped for ice cream on the way home from shopping when they were suddenly accosted by three men who quickly bound and gagged them.  Hitomi was put into a large black bag, thrown over one of her attacker's shoulders, and carried to a boat waiting on the nearby Kokufu River.  After traveling for over an hour, Hitomi Soga was transferred to a larger boat, where she was quickly taken below, into the hold of the ship.  The boat steamed for a full day before she was allowed on deck for a short time.  Her mother was nowhere to be seen, and there was nothing but open sea as far as her eyes could see.[8]

C.    On July 31, 1978, a 20-year-old college student Kaoru Hasuike and his girlfriend, Yukiko Okudo, were walking along the shore of Kashiwazaki City, Japan. The couple planned to watch the sunset on the beach at the end of a hot summer day. They walked to a secluded area, hoping to get away from the crowds. They noticed several suspicious men watching them nearby, but assumed they were visitors. One of the men walked up to the couple and asked if they had a light for his cigarette. The man suddenly struck Hasuike in the face, while two others rushed to tie his arms. Stunned, Hasuike was unable to respond before he was gagged and forced into a large bag. Okudo was quickly bound in the same way and shoved into another bag.[9] The two were left lying on the ground for some time, listening to their attackers standing guard. They were loaded into an inflatable boat that took them to a larger ship farther out at sea. Once they were onboard, Hasuike and Okudo were drugged by their captors and told that if they remained quiet, they would

---

[8] Jenkins, *To Tell the Truth* (Japanese Version), (Kadokawa Shoten: 2005), 110.
[9] This story is based on what the older brother Toru Hasuike heard from Kaoru Hasuike after he came back from North Korea in 2002. Hasuike, Toru. *Dakkan.* (Shinchousha, 2003), 79-87.

000275

not be harmed. Bruised and barely conscious, the couple stayed silent, watching the lights of Kashiwazaki City fade over the horizon.  Their next view of land came two days later when they arrived at the cold and unlit port of *Chongjin*, North Korea.[10]

D.     In 1978, a sixteen-year-old Kim Young-Nam was playing on the beach in Gunsan, South Korea, when he was abducted by North Korean operatives.  In 1997, a former North Korean spy named Kim Gwang-Hyeon admitted that he participated in Young-Nam's abduction.[11]

***Some Abductees Were Lured to North Korea with Fraudulent Promises of Business and Education Opportunities***

16.     Abductions have occurred not only by brute force, but have also been carried out with exceptional guile and cunning, many times under the false pretenses of lucrative business opportunities.

17.     In July of 1978, North Korean operatives posing as Japanese businessmen took four Lebanese women from Beirut.  Pretending they were on an official business trip to recruit new workers for Hitachi, the men held fake business interviews to select their targets. The women received phony offers of employment—they were told they would work in Tokyo or Hong Kong, would receive a monthly wage of $1,500 plus a signing bonus of $3,000 dollars, and were given airline tickets.  After a number of connections in their flights, they arrived in Pyongyang and realized that they had been abducted by North Korean operatives.[12]  Similarly, in

---

[10] Hasuike, Kaoru. *Hantou he Futatabi.* (Shincho Sha, 2009), 54.
[11] Lewis, Leo. "Boy Kidnapped by Regime 28 Years Ago Meets His Mother." The Times UK. 29 June 2006.
[12] "Kouan ni yoru Chousa no naka de Kitachousen kara no Kikansha Futari wa Supai Katsudou no Kunren wo Uketa" *El-Nahar* (Lebanese Newspaper, in Japanese translation). November 9, 1979.

1978, a Romanian artist living in Italy named Doina Bumbea was lured into going to an art exhibition in Hong Kong but was instead flown directly to North Korea.[13]

18.     In 1991, Chantal Sobkowicz, a French national of Polish heritage, was invited by the North Korean regime to translate a book titled "La Verité du Ministre" ("The Truth of the Minister").  When her official duties had been completed, she was informed by DPRK officials she was not allowed to leave North Korea.[14]

19.     A former North Korean operative revealed that during the 1980s and 1990s, North Korean operatives brought impressionable South Korean exchange students studying in Europe to North Korea by recruiting them with promise of attractive academic opportunities.  Identifying himself only as "Kim," this former operative worked in Copenhagen where he recruited these students to "use them as spies and ultimately overthrow the South Korean government from within South Korea."[15]  This operative took credit for having persuaded four such South Korean students to come to North Korea.[16]  He described how the four South Korean students were flown from Copenhagen's Kastrup Airport.  This location allowed Kim and his colleagues easily to meet the students, give them North Korean passports, and fly them to Moscow, East Berlin, or Beijing. Once the students arrived at these locations, they were transferred to flights to North Korea.[17]

---

[13] Jenkins, Charles. *To Tell the Truth,* (Kadokawa Shoten, 2005), 97.
[14] "Bukhanseo Chubangdoen Seongyosa Hangeuiseohan Bonae." Yonhap News. 24 April 1992.
[15] NHK news agency , *Yodo-go to Rachi*, (NHK Shuppan, 2004), 205, 303.
[16] Ibid. 303
[17] Ibid. 306.

000277

### D.        Watershed Event

20.      In spite of all of the brazen activities carried out over the years by DPRK, if it were not for the momentous Japan-DPRK Summit in 2002 between Prime Minister Junichiro Koizumi and Chairman Kim Jong-Il, most of the abduction cases might have been perpetually hidden from public view.   On September 17, 2002, "Supreme Leader" Kim Jong-Il admitted to Prime Minister Koizumi of Japan that North Korea had in fact engaged in the abduction of several Japanese citizens.   This marked the first time that any official acknowledgment - much less one from the "Supreme Leader" himself - about the DPRK use of abductions to further its goals.   Prime Minister Koizumi called the abduction issue "a vital matter directly linked to the lives and safety of the Japanese people," and issued the following statement after their meeting: "Chairman Kim Jong-Il honestly acknowledged that these were the work of persons affiliated with North Korea in the past and offered his apologies, expressing his regret.   He stated that he would ensure that no such incidents occur again in the future.   I intend to arrange for meetings with family members of those surviving and to do my utmost to realize their return to Japan based on their will."[18]   Kim Jong-Il's personal involvement in directing a policy of foreign abductions has long been known; he has been involved in systematically planning and executing the DPRK's abduction policy, and he even met two abductees upon their arrival in North Korea. Despite the unprecedented nature of the 2002 Summit and Prime Minister's Koizumi's trip to North Korea in general, it is remembered primarily for Kim's startling admission of guilt and apology for his government's systematic abduction of foreign citizens.

---

[18]

Ministry of Foreign Affairs of Japan (MOFA), "Opening Statement by Prime Minister Junichiro Koizumi at the Press Conference on the Outcome of His Visit to North Korea," September 17, 2002. Available at http://www.mofa.go.jp/region/asia-paci/n_korea/pmv0209/press html.

000278

21.     After the 2002 Summit many Asian experts asked what had caused this incredible

reversal by the DPRK.  I strongly believe that various factors were at play, but that  the relentless

efforts of victims' family members and their supporters finally caught up with the repressive

regime.  Even the smallest scraps of information or witness testimony, pieced together over time,

had an important impact on pressuring Kim Jong-Il to admit that North Korea had been involved

in organized abductions of foreign civilians.[19]  Due to the of the power of uncovered facts and

perseverance of  family members and human rights groups, Kim Jong-Il was compelled to admit

a small part of North Korea's decades-old policy and carrying out of systematic abductions

against innocent foreign nationals.   As a direct result of this admission and of Prime Minister

Koizumi's continued involvement in this issue, Hitomi Soga (abducted in 1978 with her mother

Miyoshi) was repatriated to Japan, though the DPRK vehemently denied that Miyoshi had also

been abducted and her whereabouts unfortunately to date have not been determined.

22.     As part of ongoing negotiations for the release of the victims' family members

still presumed to be held in North Korea, Koizumi visited Pyongyang again in May 2004.  In

addition to returning to Japan with eight family members being held in North Korea, Koizumi

requested that Pyongyang restart investigations into the fate of the eight abductees who were

reported to have died and the two Japanese citizens whom Pyongyang claimed never entered the

country. While the family members were finally released to visit Japan, Pyongyang never

conducted a credible investigation into the cases of those whom it claimed had died.   North

Korea also denied that other abductees had entered North Korea, notwithstanding evidence to the

contrary.  It is believed that Pyongyang deliberately fabricated the circumstances of the deaths of

---

[19] Ibid., pp.180-185

000279

certain abductees in order to undermine the testimony of several escaped victims and North Korean operatives who had defected.

### E.     U.S. Perspective

23.     United States citizens have themselves on various occasions been the abduction targets of the North Korean regime. In 1968, in a shocking display of its brazenness, the DPRK captured 83 U.S. Navy personnel of the U.S.S. Pueblo, and detained and tortured them for 11 months before releasing them into U.S. custody. One of the naval officers abducted was killed while being held by North Korea.[20]     Furthermore, several U.S. Army deserters who did not realize the brutality of the DPRK regime and who defected to North Korea were imprisoned there for many years. One of these deserters, Charles Jenkins, recalled that he was harshly interrogated, imprisoned, monitored constantly (including having his premises bugged) and violently beaten on several occasions over the course of seven years by a fellow deserter at the direction of a DPRK instructor. And recently, two female American journalists were abducted by the DPRK while shooting a film of North Korea from the Chinese side of the border. The DPRK asserted that it "detained" the journalists after they crossed into North Korea, but given its history it is more likely that the journalists were abducted from the Chinese side of the border and brought against their will into North Korea.

24.     One of the more visible instances of a forced abduction by the DPRK in recent memory is the case of Reverend Kim. His abduction from China in 2000 by DPRK intelligence agents and his subsequent torture and death received a significant amount of attention likely due

---

[20] *Id.* at art. 6. The treatment of these U.S. sailors violated the Geneva Conventions, which protect prisoner of war and military members of one country who are captured by the military members of another country during times of conflict. *See* Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 75 U.N.T.S. 135. The DPRK was not a party to the ICCPR in 1968.

000280

to contrasts involved - a beloved community pastor leaving the comfort of his home in the United States to immerse himself in  humanitarian work assisting North Korean refugees near the Sino-North Korean border.  While Reverend Kim's abduction raised an outcry back in the United States and elsewhere, the outcry would have been even more fiercely amplified had he not simply suddenly vanished into thin air (and most people not known for some time what had occurred to him).   After refusing to cooperate by turning informant and renouncing his faith, Reverend Kim was sent to a penal labor camp where he was tortured and starved; it is reported that he died a year after his kidnapping due to malnutrition and lingering damage from his torture.

25.    Members of Congress have undertaken to investigate the DPRK policy of foreign abductions and have issued various resolutions regarding this issue.  For example, on June 12, 2002, the House of Representatives issued a resolution urging the governments of the United States, South Korea and China to seek a full accounting from the DPRK regarding the whereabouts of Reverend Kim.[21]   And on May 26, 2005 and again on July 12, 2005, the Committee on International Relations of the 109th Congress issued resolutions[22] condemning the DPRK's use of abductions and demanding the return of individuals being held in North Korea.  A subsequent hearing by the Subcommittee on Asia and the Pacific of the House of Representatives dated April 27, 2006[23] also shed light on the DPRK's systematic use of abductions.  And of special note to Reverend Kim is a rather unusual letter dated January 8, 2005 signed by a Illinois Congressional Delegation, including then-United States Senator from Illinois Barack Obama, to

---

[21] 107th Congress,  H. Con. Res. 213, Concurrent Resolution, June 12, 2002, attached hereto as Exhibit A.

[22] 109th Congress, H. Con. Res. 168, Concurrent Resolution, May 26, 2005, attached hereto as Exhibit B, and 109th Congress, H. Con. Res 168, Concurrent Resolution, July 12, 2005, attached hereto as Exhibit C.

[23] 109th Congress, "North Korea: Human Rights Update and International Abduction Issues", Joint Hearing before the Subcommittee on Asia and the Pacific and the Subcommittee on Africa, Global Human Rights and International Operations of the Committee on International Relations of the House of Representatives, April 27, 2006, attached hereto as Exhibit D.

000281

North Korean U.S. ambassador Pak Gil Yon, which specifically requested that North Korea forthwith investigate the circumstances of Reverend Kim's abduction and fate, and stated that its signatories would not support the removal of the DPRK from the State Department's list of State Sponsors of Terrorism until the whereabouts of Reverend Kim was made known.[24]  This letter was followed by a subsequent correspondence from Senator Henry Hyde in his capacity of the Chairman of the Illinois  Congressional Delegation, dated November 4, 2005, after the Delegation had returned from a trip to Japan.[25]

26.    A recently declassified internal State Department cable dated February 3, 2000, from representatives stationed in Seoul communicating with headquarters in Washington, D.C., states that a local Chinese paper reported that Chinese investigators had "strong evidence" that Reverend Kim was kidnapped from China by North Korean agents who had crossed over into China in late December to plan the abduction.[26]  The cable - authored a mere two weeks after Reverend Kim's abduction - further reported that ten people were involved in Reverend Kim's kidnapping, including a couple posing as North Korean defectors, and that Reverend Kim was held hostage in China for three days before being transported into North Korea by his captors.

## F.    Legal Considerations

### North Korea's Actions Have Violated International Conventions

27.    The U.N. Charter provides that all states shall "refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state" and prohibits states from "intervene[ing] in matters which are essentially within the

---

[24] Letter to Ambassador Pak Gil Yon from the Illinois Congressional Delegation, January 28, 2005, attached hereto as Exhibit E.
[25] Letter to Ambassador Pak Gil Yon from Chairman Henry Hyde of the Illinois Congressional Delegation, November 4, 2005, attached hereto as Exhibit F.
[26] State Department cable, February 3, 2000, attached hereto as Exhibit G.

domestic jurisdiction of any state."[27]   Nevertheless, the DPRK has routinely entered the territory

of other sovereign nations and forcibly abducted the nationals of another state, in clear violation

of both of these principles.   The U.N. Charter further requires that all members take action, in

cooperation with the U.N., to protect and promote human rights and fundamental freedoms for

all people, an obligation of which the DPRK's abduction policy obviously snubs. [28]

28.     Perhaps the DPRK's most striking international legal violations are those of the

International Covenant on Civil and Political Rights ("ICCPR").[29]   The ICCPR, a multilateral

U.N. treaty to which the DPRK acceded in 1981, enshrines what are considered fundamental

civil and political freedoms. [30]   The ICCPR sets out certain fundamental standards of human

rights which signatories are obligated to respect.   These include prohibitions on torture, forced

labor and arbitrary detention; the provision of fair judicial process; freedom from arbitrary

detention; freedom of movement, expression and religion; and the protection of privacy, children

and families.[31]   Many of the rights under the ICCPR are also considered customary international

---

[27] U.N. Charter, *supra*, note 5, art. 2(4), 2(7). Article 2(1) of the U.N. Charter codifies the concept of sovereign equality. The DPRK was admitted as a U.N. member-state on September 17, 1991, and is a signatory to the U.N. Charter, which is itself an international treaty.  Among the U.N. Charter Principles that are particularly relevant to this discussion are: Principle 1: "The Organization is based on the principle of the sovereign equality of all its Members;" and Principle 4 "All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations.

[28] U.N. Charter, *supra*, note 5, art. 56.

[29] The DPRK's abduction practice also violates the domestic laws of North Korea and the countries from which foreign nationals are abducted.  However, these domestic laws are not the focus of this analysis.

[30] The DPRK attempted to withdraw from the ICCPR in 1997; however, the U.N. refused to acknowledge the withdrawal stating that the ICCPR provides no mechanism for withdrawal.  *See* United Nations Treaty Collection, Status    of    Treaties,    ch.    IV,    no.    4,    Status    of    ICCPR,    *available    at* http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-4&chapter=4&lang=en    (last    visited July 11, 2010).

[31] The following ICCPR articles are particularly relevant to this discussion:  Article 6, The right to life; Article 8, The right to be free from servitude and forced labor; Article 9, The rights to liberty and security of person; to be free from and able to challenge arbitrary arrest or detention; Article 10, The right to humane treatment when detained; Article 12, The right to freedom of movement; Article 14, The rights to due process and fair trial; Article 17, The right to privacy; Article 18, Freedom of thought, conscience, and religion; Article 19, Freedom of opinion and expression; Article 22, The right to freedom of association; Article 23, The right to freedom of marriage.  ICCPR, *supra*, note 6.

law and some of them—such as the rights to due process and freedom from torture—are considered *jus cogens* or nonderogable rights, meaning they cannot be derogated from even in times of war.[32]

29.     In 2001, the DPRK acceded to the International Convention Against the Taking of Hostages ("ICATH"), which prohibits "seizing or detaining another person in order to compel a third party, namely a State, to do or abstain from doing something as an explicit or implicit condition for release of the hostage."[33]   Under this Convention, there is a legal distinction between the taking of a hostage and the indefinite detention of such person.  The DPRK has, in the past, forcefully pursued a policy of abducting individuals in order to gain leverage in diplomatic negotiations with foreign powers or otherwise to pursue it goals.[34]   However, the most widely known instances of hostage-taking on the part of the DPRK occurred prior to the DPRK's accession to this Convention in 2001.  Because the DPRK cannot be held to have violated this treaty based upon its actions prior to acceding to this convention, this treaty is not likely applicable in the context of most North Korean abductions.

***North Korea has Also Violated Customary International Norms***

30.     North Korea's practice of abducting foreign nationals, and indefinitely and secretly detaining them, also violates numerous customary legal principles, including the civil and political rights of individuals to be free from arbitrary detention and afforded fair judicial process, not to mention the sovereignty and territorial integrity of the nations from which victims have been abducted.  One source of customary international law is the Universal Declaration of

---

[32] *See, e.g.,* Restatement (Third) of the Foreign Relations Law of the United States (1987), § 702, § 702 cmt. n.  *See also R. v. Evans and others, ex parte Pinochet* (no. 3), [1999] 2 All E.R. 97, 6 BHRC 24, at 153 (H.L.) (appeal taken from Q.B.) (U.K.).; 11 Louis-Philippe F. Rouillard, *Misinterpreting the Prohibition of Torture Under International Law*, 21 Am. U. Int'l L. Rev. 9, 22 (2005); James Thuo Gathii, *Torture, Extraterritoriality, Terrorism, and International Law*, 67 Alb. L. Rev. 335, 341 (2003).

[33] ICATH, *supra*, note 8, art. 1(1).

[34] *See*, *supra*, Chapter 3, pp. 17-21.

Human Rights ("UDHR"), which was adopted by the U.N. General Assembly in 1948 in the wake of World War II and the Holocaust.

31.     By its own terms, the UDHR represents "a common standard of achievement for all peoples and all nations."[35]  While not a binding international agreement, the UDHR is largely considered to represent a statement of the most fundamental freedoms and rights, considered customary international law.  Like the ICCPR, the UDHR sets forth many important individual human rights, such as the right to liberty, and freedoms from arbitrary detention and compulsory labor.[36]  The UDHR is considered part of the "International Bill of Rights"—an informal title which denotes the significance of the rights enshrined in this document. The vast majority of these rights exist irrespective of the documents in which they are encapsulated, and are customary international law.  As such, North Korea is obligated to recognize and protect these rights, even where it has not explicitly consented to such obligations.  Nonetheless, North Korea has explicitly consented to most of the rights enshrined in the UDHR through its joining the United Nations and through its accession to treaties such as the ICCPR and the ICESCR and that its activities continue to represent a blatant violation of these principles.

## G.     Conclusions

32.     Since its inception, North Korea has employed brutal measures to fulfill its self-serving political agenda; namely to maintain an iron grip on power and in the process brutally crush any dissent.   The measures employed by the DPRK represent a blatant snub to international law and accepted conventions of behavior by the international community.  The

---

[35] UDHR, *supra*, note 9, at Preamble.

[36] *Id.*  The most relevant UDHR rights and protections include: Article 3: life, liberty and security of person; Article 9: freedom from arbitrary detention; Article 12: freedom from arbitrary interference with privacy, family, and home life; Article 13: freedom of movement/freedom to leave any country; Article 16: free and full consent of spouses to marriage; Article 20: compelled association; Article 23: free choice of employment, and just and favorable conditions; and Article 27: free participation in cultural life.  *See id.*

000285

DPRK's widespread human rights abuses are widely considered to be among the most horrific perpetuated across the globe today.

33.     In my extensive research on North Korea, I have found it to be both difficult and rare to find firm, direct proof of the DPRK's criminal activities, given the methods it employs to ensure secrecy.  A surprising exception was the admission of Chairman Kim Jong-Il in 2002, which for the first time validated years of uncorroborated eyewitness testimony from former victims and defected prisoner guards and other DPRK officials.  While I cannot know for certain how Reverend Kim ultimately died as a result of his incarceration by the DPRK,  what is clear is that  he was abducted by DPRK agents from China and forcibly brought to North Korea, after which he was brutally tortured for several months and then never heard from again.

34.     I believe that credible information on his treatment in North Korea has been obtained from defectors and that in the future, his fate will be revealed by officials who were in a position to know how he was treated by agents and operatives of the North Korean regime.  That is the pattern of how people on the outside learn of what transpires inside North Korea.   In my opinion, a foreigner abducted by the DPRK for political purposes, such as Reverend Kim, after eleven years would still either still be languishing in a North Korean prison camp or would have already been killed.

35.     In consideration of the foregoing, and based upon my personal knowledge and research of the type reasonably relied upon by an expert in my field, it is my opinion that North Korea is directly responsible for the abduction, torture and death of Reverend Kim.  The claims as stated in the plaintiff's complaint are, in my expert opinion, valid and consistent with the facts.

000286

36.    I am providing this Declaration on behalf of the Kim Family plaintiffs without monetary compensation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the 5th day of April, 2011.

Ernest C. (Chuck) Downs

USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 290 of 411

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KIM, et al.,

        Plaintiffs,                        Civ. No. 09-648 (RWR)

        v.

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,

        Defendants.

### DECLARATION OF ROBERT TOLCHIN

**ROBERT J. TOLCHIN**, pursuant to 28 U.S.C. § 1746, declares and states as follows subject to the penalties for perjury of the United States of America:

1.      I am making this declaration to convey a State Department Country Report on Human Rights Practices for North Korea, dated March 31, 2003, a copy of which is annexed hereto.

Dated: New York, New York
      April 12, 2011

                                 Robert J. Tolchin

**U.S. DEPARTMENT OF STATE**

DIPLOMACY IN ACTION

Home » Under Secretary for Democracy and Global Affairs » Bureau of Democracy, Human Rights, and Labor » Releases »
Human Rights Reports » 2002 Country Reports on Human Rights Practices » East Asia and the Pacific » Korea, Democratic
People's Republic of

Subscribe to Updates

# Korea, Democratic People's Republic of

**Country Reports on Human Rights Practices**
Bureau of Democracy, Human Rights, and Labor
2002
March 31, 2003

The Democratic People's Republic of Korea (DPRK or North Korea) is a dictatorship under the absolute rule of Kim Jong Il, who has exercised unchallenged authority since his father Kim Il Sung died in 1994. He was named General Secretary of the Korean Workers' Party (KWP) in October 1997. In September 1998, the Supreme People's Assembly reconfirmed Kim Jong Il as Chairman of the National Defense Commission and declared that position the "highest office of state." The presidency was abolished, leaving the late Kim Il Sung as the DPRK's "eternal president." The Korean People's Army continued to displace the KWP as Kim Jong Il's chief instrument for making and implementing policy. The titular head of state is Kim Yong Nam, the President of the Presidium of the Supreme People's Assembly. Both Kim Il Sung and Kim Jong Il continue to be the objects of intense personality cults. The regime continues to emphasize "juche," a national ideology of self-reliance. The judiciary is not independent.

The Korean People's Army is the primary organization responsible for external security. It is assisted by a large military reserve force and several quasi-military organizations, including the Worker-Peasant Red Guards and the People's Security Force. These organizations also assisted the Ministry of Public Security (MPS) and the KWP in maintaining internal security. Members of the security forces committed serious human rights abuses.

The State directed all significant economic activity, and only government-controlled labor unions were permitted in this country of 22 million persons. Industry continued to operate at significantly reduced capacity, reflecting antiquated plant and equipment and severe shortages of inputs, due in part to the sharp decline in trade and aid that followed the collapse of the former Soviet Union and East European Communist governments. Efforts at recovery have been hampered by heavy military spending, which amounted to approximately one quarter of gross domestic product (GDP) before the economy went into decline and was probably an even larger share of national output during the year. The economy was also hampered by a lack of access to commercial lending stemming from the country's default on its foreign debt and its inability to obtain loans from international financial institutions. Rarely food self-sufficient, the country relied on international aid and trade to supplement domestic production, which has been hobbled by disastrous agricultural policies. From 1995 to 1997, famine caused internal dislocation and widespread malnutrition, and an estimated 1 to 2 million persons, or possibly as much as 10 percent of the population, died from starvation and related diseases.

Economic and political conditions have caused at least tens of thousands of persons to flee their homes. The Government continued to seek international food aid, produce "alternative foods," and take other steps to boost production. It permitted the spread of farmers' markets to compensate for the contraction of food supplied through the public distribution system. Food, clothing, and energy were rationed throughout the country. The U.N.'s World Food Program provided assistance to children and mothers, and the elderly. According to South Korean figures, North Korea's GDP began to grow slightly in 2000, but this was due largely to international aid and South Korean investment and followed years of steady decline during which GDP was estimated to have shrunk by half since 1993. In mid-year, North Korea raised wages and prices drastically and announced a shift in management methods towards granting managers more responsibility. However, these changes failed to have the desired impact on the country's economy, as inflation rose dramatically in the later months of the year. The creation of a Special Administrative Region (SAR) in Sinuiju was announced but encountered immediate difficulties; the Sinuiju SAR is planned as an autonomous region with its own legislative, administrative, and judicial systems, intended to specialize in light industries in line with the July economic reform measures.

The Government's human rights record remained poor, and it continued to commit numerous serious abuses. Citizens did not have the right peacefully to change their government, and the leadership viewed most international human rights norms, particularly individual rights, as illegitimate, alien, and subversive to the goals of the State and Party. There continued to be reports of extrajudicial killings and disappearances. Citizens were detained arbitrarily, and many were held as political prisoners. Prison conditions were harsh, and torture was reportedly common. Female prisoners underwent forced abortions, and in other cases babies reportedly were killed upon birth in prisons. The constitutional provisions for an independent judiciary and fair trials were not implemented in practice. The regime subjected its citizens to rigid controls over many aspects of their lives. A human rights dialogue initiated by the European Union in 2001 led to another exchange of views in June 2002 in

Pyongyang. But the Government did not acknowledge that international standards of human rights apply to North Korea. The Penal Code is Draconian, stipulating capital punishment and confiscation of assets for a wide variety of "crimes against the revolution," including defection, attempted defection, slander of the policies of the Party or State, listening to foreign broadcasts, writing "reactionary" letters, and possessing reactionary printed matter. Citizens were denied freedom of speech, the press, assembly, and association, and all forms of cultural and media activities were under the tight control of the Party. Little outside information reached the public except that which was approved and disseminated by the Government. The Government restricted freedom of religion, citizens' movement, and worker rights. There were reports of trafficking in women and young girls among refugees and workers crossing the border into China.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary and Unlawful Deprivation of Life

Defectors and refugees have reported that the regime executed political prisoners, opponents of the regime, some repatriated defectors, and others, reportedly including military officers suspected of espionage or of plotting against Kim Jong Il. Criminal law makes the death penalty mandatory for activities "in collusion with imperialists" aimed at "suppressing the national liberation struggle." Some prisoners were sentenced to death for such ill-defined "crimes" as "ideological divergence," "opposing socialism," and other "counterrevolutionary crimes." In some cases, executions reportedly were carried out at public meetings attended by workers, students, and school children. Executions also were carried out before assembled inmates at places of detention. Border guards reportedly had orders to shoot to kill potential defectors. Similarly, prison guards were under orders to shoot to kill those attempting escape in political concentration camps, according to defectors.

Defectors have reported that government officials prohibited live births in prison. Forced abortion and the killing of newborn babies reportedly were standard prison practices (see Section 1.c.).

Religious and human rights groups outside the country reported that some members of underground churches were killed because of their religious beliefs and suspected contacts with overseas evangelical groups operating across the Chinese border (see Section 2.c.).

Many prisoners reportedly have died from disease, starvation, or exposure (see Section 1.c.).

According to some humanitarian organizations, the Government has channeled international food and medical aid to the party elite, military personnel, and other persons viewed as loyal to the regime.

b. Disappearance

The Government reportedly was responsible for cases of disappearance. According to recent defector reports, individuals suspected of political crimes often were taken from their homes by state security officials late at night and sent directly, without trial, to camps for political prisoners. There are no restrictions on the ability of the Government to detain and imprison persons at will and to hold them incommunicado, without notifying detainees' relatives.

There also were long-standing reports of past government involvement in the kidnaping abroad of South Koreans, Japanese, and other foreign nationals. On September 17, Kim Jong Il admitted to Japanese Prime Minister Koizumi that the Government had abducted 13 Japanese citizens during the 1970s. According to Japanese government officials, these abductions took place between 1977 and 1983. Government spies used the identities of some of the victims, and some of the victims were forced to provide training in Japanese language and customs. The Government allowed five surviving victims to visit Japan in October for 1 week, but the victims have remained in Japan since that time. The Government alleged that the remaining 8 are deceased. There was speculation, not officially confirmed by the Japanese Government or the DPRK Government, that the DPRK Government has abducted many more Japanese residents over the years.

In November 1997, the South Korean Government arrested several alleged North Korean espionage agents. According to the South Korean Government�s report on its investigation, those arrested claimed that three South Korean high school students, missing since 1978, had been kidnaped by the North Korean Government and trained as espionage agents. The three were identified as Kim Young Nam, who disappeared from Son Yu beach, and Yi Myong U and Hong Kyun Pyo, both of whom disappeared from Hong To beach. According to those arrested, there were several other kidnapings in the late 1970s and early 1980s. The South Korean Government has compiled a list of 486 South Korean citizens, most of whom were fishermen, abducted since the 1950-53 Korean War.

In addition, several suspected cases in recent years of kidnaping, hostage-taking, and other acts of violence, apparently intended to intimidate ethnic Koreans living in China and Russia, have been reported. There were unconfirmed reports that in January 2000 North Korean agents kidnaped a South Korean citizen, Reverend Kim Dong Shik, in China and took him to North Korea. Despite the unprecedented admission to Prime Minister Koizumi, the Government continued to deny that it had been involved in kidnapings of other foreign nationals.

Numerous reports indicated that ordinary citizens were not allowed to mix with foreign nationals, and Amnesty International reported that a number of citizens who maintained friendships with foreigners have disappeared.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

000290

Torture is not banned by law. Methods of torture reportedly routinely used against political prisoners include
severe beatings, electric shock, prolonged periods of exposure, humiliations such as public nakedness, and
confinement to small "punishment cells," in which prisoners were unable to stand upright or lie down, where they
could be held for several weeks. According to defector reports, many prisoners died from torture, disease,
starvation, exposure, or a combination of these causes. The U.S. Committee for Human Rights in North Korea
claimed that approximately 400,000 persons died in prison since 1972.

Recent crackdowns in China on prostitution and forced marriages resulted in the deportation of thousands of
North Korean women, some of whom were pregnant, and many were imprisoned upon their return to the country.
There were reports that North Korean officials prohibited live births in prison and that a policy of forced abortion
was regularly implemented, particularly in those detention centers holding women repatriated from China. In
those cases where live births did occur, the babies reportedly were immediately killed. In addition, guards
sexually abused female prisoners.

Prison conditions were harsh; starvation and executions were common. Entire families, including children, were
imprisoned when one member of the family was accused of a crime. "Reeducation through labor" was a common
punishment, consisting of forced labor, such as logging and tending crops, under harsh conditions. Visitors to
the country observed prisoners being marched in leg irons, metal collars, or shackles. In some places of
detention, prisoners were given little or no food and, when they contracted illnesses, were denied medical care.
In one prison, clothing reportedly was issued only once in 3 years.

In June Lee Soon-ok, a woman who spent several years in a prison camps before fleeing first to China in 1994
and then to South Korea, testified before the U.S. Senate that the approximately 1,800 inmates in this particular
camp in those years typically worked 16 to 17 hours a day. Lee Soon-ok witnessed severe beatings and torture
involving water forced into a victim�s stomach with a rubber hose and pumped out by guards jumping on a board
placed across the victim�s abdomen, and reported that chemical and biological warfare experiments were
conducted on inmates by the army. Other defectors reported similar experiences. At Camp 22 in Haengyong,
approximately 50,000 prisoners worked under conditions that reportedly resulted in the death of 20 to 25 percent
of the prison population annually in the 1990s.

During the year, witnesses testified before the U.S. Congress about the treatment of persons held in prison
camps through the early 1990s. Some of these witnesses stated that prisoners held on the basis of their
religious beliefs generally were treated worse than other inmates (see Section 2.c).

The Government did not permit inspection of prisons by human rights monitors.

d. Arbitrary Arrest, Detention, or Exile

There are no restrictions on the ability of the Government to detain and imprison persons at will and to hold them
incommunicado.

Little information was available on criminal justice procedures and practices, and outside observation of the legal
system has been limited to show trials for traffic violations and other minor offenses.

Family members and other concerned persons reportedly found it virtually impossible to obtain information on
charges against or the length of sentences of detained persons. Judicial review of detentions did not exist in law
or in practice.

During the year, an estimated 200,000 persons were in detention for political reasons in camps in remote areas.
The Government denied the existence of prison camps for political prisoners, which are marked as military areas
to prevent access by the local population. In recent years, the Government reportedly reduced the total number
of prison camps from approximately 20 to less than 10, but the prison population was consolidated rather than
reduced. In addition to these camps for political prisoners, there reportedly were approximately 30 forced labor
and labor education camps in the country for ordinary criminals serving shorter terms. The Government did admit
that there were "education centers" for persons who "committed crimes by mistake." A defector who had been a
ranking official in the Ministry of Public Security stated that conditions in the camps for political prisoners were
extremely harsh and prisoners never emerged. In these camps, prisoners received little food and no medical
provisions. In the labor camps, however, prisoners could be "rehabilitated."

The Government is not known to use forced exile. However, the Government routinely used forced internal
resettlement and has relocated many tens of thousands of persons from Pyongyang to the countryside.
Although disabled veterans were treated well, other persons with physical disabilities, as well as those judged to
be politically unreliable, have been sent into internal exile. Often those relocated were selected on the basis of
family background. Nonetheless, there was some evidence that class background was less important than in the
past because of the regime's emphasis on the solidarity of the "popular masses" and united front efforts with
overseas Koreans. According to unconfirmed September 1997 foreign press reports, some 500 senior officials
were sent into internal exile.

e. Denial of Fair Public Trial

The Constitution states that courts are independent and that judicial proceedings are to be carried out in strict
accordance with the law; however, an independent judiciary did not exist in practice. Furthermore, individual
rights were not acknowledged. The Public Security Ministry dispensed with trials in political cases and referred
prisoners to the Ministry of State Security for punishment.

000291

Filed: 05/29/2014     Page 294 of 411

The Constitution contains elaborate procedural protections, requiring that cases should be heard in public except under some circumstances stipulated by law. The Constitution also states that the accused has the right to a defense, and when trials were held, the Government apparently assigned lawyers. However, reports indicated that defense lawyers were not considered representatives of the accused; rather, they were expected to help the court by persuading the accused to confess guilt. Some reports noted a distinction between those accused of political crimes and common criminals and stated that the Government afforded trials or lawyers only to the latter. The Government considered critics of the regime to be political criminals.

Numerous reports suggested that political offenses have in the past included such behavior as sitting on newspapers bearing Kim Il Sung's picture, or, in the case of a professor reportedly sentenced to work as a laborer, noting in class that Kim Il Sung had received little formal education. The KWP has a special regulation protecting the images of Kim Il Sung and Kim Jong Il. All citizens are required by this regulation to protect from damage any likeness of the two Kims. Beginning in the 1970s, the Ten Great Principles of Unique Ideology directed that anyone who tore or otherwise defaced a newspaper photo of either of the two Kims was a political criminal and should be punished as such. Defectors have reported families being punished because children had accidentally defaced photographs of one of the two Kims. Families were required to display pictures of the two leaders in their homes, and if local party officials found that the family had neglected its photos, the family could be forced to write self-criticisms throughout an entire year.

A foreigner hired to work on international broadcasts for the regime was imprisoned for 1 year without trial for criticizing the quality of the regime's foreign propaganda. He was then imprisoned for six more years (with trial) shortly after his release for claiming in a private conversation that his original imprisonment was unjust.

Common criminals were occasionally amnestied on the occasion of Kim Il Sung's or Kim Jong Il's birthday.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution provides for the inviolability of person and residence and the privacy of correspondence; however, the Government did not respect these provisions in practice. The regime subjected its citizens to rigid controls. The leadership viewed most international human rights norms, especially individual rights, as alien social concepts subversive to the goals of the State and Party. The Government relied upon an extensive, multilevel system of informers to identify critics and potential troublemakers. Whole communities sometimes were subjected to massive security checks. The possession of "reactionary material" and listening to foreign broadcasts were crimes that could subject the transgressor to harsh punishments. In some cases, entire families were punished for alleged political offenses committed by one member of the family, under a policy of "collective retribution." For example, defectors reported that families were punished because children had accidentally defaced photographs of one of the two Kims (see Section 1.e.).

The Government monitored correspondence and telephone conversations. Telephones essentially were restricted to domestic operation although some international service was available on a very restricted basis.

The Constitution provides for the right to petition. However, when an anonymous petition or complaint about state administration was submitted, the Ministries of State Security and Public Safety sought to identify the author through handwriting analysis. The suspected individual could be subjected to a thorough investigation and punishment.

Since the late 1950s the regime has divided society into three main classes: "core," "wavering," and "hostile." These three classes are further subdivided into subcategories based on perceived loyalty to the Party and the leadership. Security ratings are assigned to each individual; according to some estimates, nearly half of the population is designated as either "wavering" or "hostile." These loyalty ratings determine access to employment, higher education, place of residence, medical facilities, and certain stores. They also affect the severity of punishment in the case of legal infractions. While there were signs that this rigid system has been relaxed somewhat in recent years--for example, children of religious practitioners were no longer automatically barred from higher education--it remained a basic characteristic of KWP political control.

Citizens with relatives who fled to South Korea at the time of the Korean War still appeared to be classified as part of the "hostile class." This subcategory alone encompassed a significant percentage of the population. One defector estimated that those considered potentially hostile comprised 25 to 30 percent of the population; others placed the figure at closer to 20 percent. Members of this class still were subject to discrimination, although defectors reported that their treatment had improved greatly in recent years.

The authorities subjected citizens of all age groups and occupations to intensive political and ideological indoctrination. After Kim Il Sung's death, his cult of personality and the glorification of his family and the official juche ideology remained omnipresent, approaching the level of a state religion. The indoctrination was intended to ensure loyalty to the system and leadership, as well as conformity to the State's ideology and authority. The necessity for the intensification of such indoctrination repeatedly was stressed in the writings of Kim Jong Il, who attributed the collapse of the Soviet Union largely to insufficient ideological indoctrination, compounded by the entry of foreign influences.

Indoctrination was carried out systematically, not only through the mass media, but also in schools and through worker and neighborhood associations. Kim Jong Il has stated that ideological education must take precedence over academic education in the nation's schools, and he also called for the intensification of mandatory ideological study and discussion sessions for adult workers.

000292

Case 1:09-cr-00648-KMW-DCF Document Entry Prepared/Filed 05/29/2014　Page 295 of 411

Another aspect of the Government's indoctrination system is the use of mass marches, rallies, and staged performances, sometimes involving hundreds of thousands of persons. According to news reports, hundreds of thousands of citizens were mobilized to greet and perform for China's President, Jiang Zemin, when he visited North Korea in September 2001. In September 1998, celebrations of the 50th anniversary of the founding of the country included hours of carefully choreographed demonstration of mass adulation of the leadership, and in October 2000, similar celebrations of the 55th anniversary of the KWP reportedly involved more than 1 million persons.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and the press; however, the Government prohibited the exercise of these rights in practice. Articles of the Constitution that require citizens to follow "socialist norms of life" and to obey a "collective spirit" take precedence over individual political and civil liberties. The regime only permitted activities that supported its objectives.

The Government strictly curtailed freedom of speech. Authorities punished persons for criticizing the regime or its policies with imprisonment or "corrective labor." Persons reportedly have been placed under surveillance through their radio sets, and imprisoned and executed for statements made at home that were critical of the regime.

The Government attempted to control all information. Claiming that the country was under continuing threat of armed aggression, the Government carefully managed the visits of foreign journalists. On occasion, when it served its agenda, the Government allowed foreign media to cover some events. During the year, foreign journalists were allowed to cover an international marathon and the "Arirang" Festival. During the June 2000 inter-Korean summit and other events involving foreign leaders, groups of foreign journalists were permitted to accompany official delegations and to file reports, although they were strictly monitored. They were not allowed to talk to officials or to persons on the street, and those who arrived with cellular or satellite phones had them confiscated for the duration of their stay. In August 2000, the presidents of 46 South Korean newspaper and broadcast organizations, led by the South Korean Minister of Culture and Tourism, traveled to the country and met with Kim Jong Il. Foreign journalists also were allowed to report on the Korean Peninsula Energy Development Organization (KEDO) light-water reactor groundbreaking at Kumho in 1997 and the concrete-pouring ceremony in August 2002. Although more foreign journalists were allowed into the country, the Government still maintained strict control over the movements of foreign visitors.

Domestic media censorship was enforced strictly, and no deviation from the official government line was tolerated. The regime prohibited listening to foreign media broadcasts except by the political elite, and violators were subject to severe punishment. Radios and television sets received only domestic programming; radios obtained from abroad were required to be submitted for alteration to operate in a similar manner. CNN television broadcasts were only available in a Pyongyang hotel frequented by foreigners. Private telephone lines operated on an internal system that prevents making and receiving international calls; international phone lines were available only under very restricted circumstances. Some deluxe hotels in Pyongyang offered Internet service for foreign visitors. For citizens, Internet access was limited to high-ranking officials who specialized in science and technology fields. This access was provided via international telephone lines to a provider in China.

The Government severely restricted academic freedom and controlled artistic and academic works. Visitors reported that one of the primary functions of plays, movies, operas, children's performances, and books was to contribute to the cult of personality surrounding Kim Il Sung and Kim Jong Il. The Government reached an agreement with the PRC-based Yanbian University of Science and Technology to allow a branch institution to be set up in Pyongyang to be run jointly by the Government and the University. This would be the first semiprivate educational institution in the country.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly: however, the Government did not respect this provision in practice. The Government prohibited any public meetings without authorization.

The Constitution provides for freedom of association; however, the Government did not respect this provision in practice. There were no known organizations other than those created by the Government. Professional associations existed primarily to facilitate government monitoring and control over the organizations' members.

c. Freedom of Religion

The Constitution provides for "freedom of religious belief"; however, in practice the Government discouraged organized religious activity except that which was supervised by officially recognized groups. In 1992 a constitutional change authorized religious gatherings, provided for "the right to build buildings for religious use," and deleted a clause about freedom of antireligious propaganda. The Constitution also stipulates that religion "should not be used for purposes of dragging in foreign powers or endangering public security." Genuine religious freedom did not exist.

Several government-sponsored religious organizations served as interlocutors with foreign church groups and

international organizations. Foreigners who met representatives of these organizations believed that some were genuinely religious but noted that others appeared to know little about religious dogma, liturgy, or teaching.

The number of religious believers was unknown but has been estimated by the media and religious groups at 10,000 Protestants, 10,000 Buddhists, and 4,000 Catholics, in addition to an undetermined number of persons belonging to underground Christian churches. Some sources estimated that as many as 500 informal Christian congregations were active during the year. In its July 30 report to the U.N. Human Rights Committee, the Government reported the existence of 500 "family worship centers," an apparent reference to these congregations. Some reports indicated that such "house churches" have been increasingly tolerated so long as they do not openly proselytize or have contact with foreign missionaries. The Chondogyo Young Friends Party, a government-sponsored group based on a traditional Korean religious movement, also remained in existence.

Most of the 300 Buddhist temples were regarded as cultural relics, but in some of them religious activity was permitted. Buddhist scriptures that had been carved on 80,000 wooden blocks and kept at an historic temple were translated and published. Since 1988 two Protestant churches under lay leadership and a Roman Catholic church (without a priest) have opened in Pyongyang. Several schools for religious education existed, including 3-year religious colleges for training Protestant and Buddhist clergy. A religious studies program also was established at Kim Il Sung University in 1989; its graduates usually go on to work in the foreign trade sector. It was not known whether any Catholic priests remained in the country. In July 2000, Seoul Archbishop Nicholas Jin-Suk Cheong, appointed by the Pope as Apostolic Administrator of Pyongyang, was quoted as stating that while there were 50 priests in the country in the 1940s, it was not known if any were still alive.

Hundreds of religious figures have visited the country in recent years, including papal representatives and religious delegations from South Korea, the United States, and other countries. Overseas religious relief organizations have been active in responding to the country's food crisis. Although some foreigners who visited the country stated that church activity appeared staged, others believed that church services were genuine, although sermons contained both religious and political content supportive of the regime.

Persons engaging in religious proselytizing could be arrested and subjected to harsh penalties, including imprisonment and prolonged detention without charge. The regime appeared to have cracked down on unauthorized religious groups in recent years, particularly on persons who proselytized or who had ties to overseas evangelical groups operating across the border with China. The Government appeared concerned about religiously based South Korean relief and refugee assistance efforts along the northeast border with China becoming entwined with political goals, including opposition to the regime. Some repatriated defectors who had established contacts with religiously based South Korean groups were reportedly executed.

Religious and human rights groups outside the country continued to provide numerous, unconfirmed reports that thousands of members of underground churches were beaten, arrested, detained in prison camps, or killed because of their religious beliefs. One unconfirmed report stated that approximately 400 Christians were executed during 2001. These reports could not be confirmed or disproved because of the effectiveness of the Government's continued ban on outside observers. Nonetheless, the collective weight of anecdotal evidence of harsh treatment of unauthorized religious activity lent credence to such reports.

Little was known about the actual life of religious persons in the country. Members of government-recognized religious groups did not appear to suffer discrimination; in fact, some reports claimed they had been mobilized by the regime. Persons whose parents were believers but who themselves were nonpracticing were able to rise to at least the midlevels of the bureaucracy in recent years. Such individuals, as a category, suffered broad discrimination in the past. However, the regime continued to view religious believers belonging to underground congregations or with ties to evangelical groups in North China as subversive elements.

The Government dealt harshly with all opponents, including those engaging in religious practices deemed unacceptable to the regime. During the year, witnesses testified before the U.S. Congress about the treatment of persons held in prison camps through the early 1990s. Some of these witnesses stated that prisoners held on the basis of their religious beliefs generally were treated worse than other inmates. One witness, a former prison guard, testified that those believing in God were regarded as insane, since authorities taught that "all religions are opiates." He recounted an instance in which a woman was kicked repeatedly and left with her injuries unattended for days because a guard overheard her praying for a child who was being beaten.

For a more detailed discussion see the **2002 International Religious Freedom Report.**

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides for the "freedom to reside in or travel to any place"; however, the Government did not respect these rights in practice. In the past, the regime has controlled strictly internal travel, requiring a travel pass for any movement outside one's home village. These passes were granted only for official travel or attendance at a relative's wedding or funeral. Long delays in obtaining the necessary permit often resulted in denial of the right to travel even for these limited purposes. In recent years, it appeared that the internal controls on travel have eased significantly. Due to the worsening food conditions in the country, the Government at times took a benign approach to those who violated internal travel rules, allowing citizens to leave their villages to search for food, and there were reports of large-scale movement of persons across the country in search of food.

000294

Only members of a very small elite had vehicles for personal use. The regime tightly controlled access to civilian aircraft, trains, buses, food, and fuel.

The Government strictly controlled permission to reside in, or even to enter, Pyongyang, where food supplies, housing, health, and general living conditions were much better than in the rest of the country.

The regime issued exit visas for foreign travel only to officials and trusted artists, athletes, academics, and religious figures. It did not allow emigration. Following the collapse of Soviet Communism, the regime recalled several thousand students from overseas, but recently has again allowed small numbers of students to study abroad.

Since the mid-1990s, there have been numerous reports of a steady increase in the substantial number of North Korean refugees arriving in China from which some proceeded to Hong Kong, Vietnam, and other Asian countries. While thousands crossed into China during the year, many returned to North Korea after securing food.

According to the Penal Code, defection and attempted defection (including the attempt to gain entry to a foreign embassy for the purpose of seeking political asylum) are capital crimes. According to many unconfirmed reports, some would-be refugees who were returned involuntarily have been executed (see Section 1.a.), while others faced harsh prison terms upon repatriation. Some migrants stated that DPRK border guards received orders to shoot to kill persons attempting to cross the border into China, although some border crossings for family visits and trade were permitted. The regime also reportedly retaliated against the relatives of some of those who managed to leave the country.

During the year, deportations of North Koreans from China increased. While the Chinese Government has long maintained that there were only a few hundred North Korean refugees in China, many observers estimated that since 1994 there have been at least tens of thousands, and perhaps a few hundred thousand refugees in China. Most crossed the border clandestinely in small groups to seek food, shelter, and work. Some settled semi-permanently in Northeastern China, while others traveled back and forth across the border. Since 2000 the Chinese government sought out and forcibly repatriated large numbers of these persons, whom authorities regarded as illegal economic migrants. The Chinese government also allowed North Korean security forces to operate within China to track down refugees.

During the year, approximately 130 North Koreans were allowed to travel to South Korea after seeking refuge in foreign missions in China. In response to these high-profile incidents, both China and North Korea tightened border controls, and border crossings declined significantly late in the year.

North Korean workers and refugees living in Russia also suffered serious human rights abuses. There were about 6,000 DPRK workers in North Korean-run camps in the Russian Far East engaged in farming, mining, and construction; these workers were selected by the Government to work in Russia. Conditions in these camps were harsh, food was scarce, and discipline was severe. In the past, there were allegations that discipline included physical torture such as placing wooden logs between the knees of offenders, after which they were forced to sit down, causing them excruciating pain. In recent years, offenders have been sent back to the DPRK for punishment due to the increased scrutiny that the labor camps have been under since Russian and foreign media began reporting on the conditions there in the early 1990s.

Other North Koreans in Russia included those who were sent to work in Russia but refused to return to the DPRK and those who fled into Russia from the DPRK. Under a secret protocol, the Public Security Service reportedly was allowed to work inside Russia until 1993 to track down workers who fled the camps. Since 1993 many of these defectors have been engaged in business in the Russian Far East.

Many North Koreans in Russia faced severe hardship due to their lack of any identification. Workers arriving in Russia usually had their passport and other identification confiscated by North Korean border guards.

The Government reportedly has tried to prevent persons from staying in Russia by using diplomatic channels to influence Russian authorities and international organizations. In a number of cases, North Korean authorities reportedly told Russian authorities that a particular North Korean who had applied for asylum in Russia or elsewhere was a criminal offender in North Korea. An extradition treaty signed by both countries in 1957 requires that persons with criminal records be returned to their country.

From 1959 to 1982, 93,000 Korean residents of Japan, including 6,637 Japanese wives, voluntarily repatriated to North Korea. Despite DPRK assurances that the wives, more than a third of whom still had Japanese citizenship, would be allowed to visit Japan every 2 or 3 years, none were permitted to do so until 1997. Many had not been heard from, and their relatives and friends in Japan were unsuccessful in their efforts to gain information about their condition and whereabouts. The DPRK Government and the Japanese Government held a series of bilateral meetings in Beijing in the second half of 1997, during which the DPRK Government agreed to allow some Japanese wives resident in the DPRK to visit Japan. The first such visit occurred in November 1997 when 15 Japanese wives arrived for a 1-week visit. An additional 12 Japanese wives visited for 1 week in early 1998. However, in June 1999 the DPRK Government cancelled a visit by Japanese wives to Japan, citing "artificial hurdles and inhuman acts on the Japanese side." The visits resumed after the Japanese Government and the DPRK Government restarted normalization talks in April 2000. A group of 16 Japanese wives visited Japan in September 2000; however, no visits took place during 2002.

000295

In September 2001, the wife of a former Japanese Red Army hijacker, being held by the North Koreans, was allowed to testify about the group in Japan.

Although the Government has permitted an increasing number of overseas Koreans to visit their relatives in North Korea over the past decade, most requests for such visits were denied. In August and December 2000, and in February 2001, the DPRK and the Republic of Korea sent delegations of members of separated families to each other's capitals for family reunion meetings. However, the meetings generally were of limited duration and certain topics were barred from discussion. A fourth reunion was scheduled for October 2001; however, the Government cancelled the meetings citing South Korea's nation-wide security alert issued after September 11, 2001. During the year, the fourth reunion was held, followed by a fifth, and initial discussions began regarding establishing a permanent reunion center in Mt. Kumgang, North Korea.

Although more foreign journalists, diplomats, and representatives of humanitarian organizations were allowed into the country, the Government maintained strict control over the movements of foreign visitors. For example, journalists accompanying one visiting foreign dignitary were not allowed to visit a department store or a train station; they were not allowed to talk to officials or to persons on the street. Those who arrived with cellular or satellite phones had them confiscated for the duration of their stay.

In August 2001, the Government allowed over 300 South Korean citizens to visit the country to participate in Liberation Day festivities; this was reportedly the largest South Korean delegation ever to visit the country. In May another group of 250, from South Korea's Cheju Island, visited the country. Their movements were strictly controlled. International humanitarian relief workers also faced substantial restrictions on their movements within the country (see Section 4).

Reports, primarily from refugees, indicated that the Government routinely used forced resettlement, particularly for those deemed politically unreliable and the physically handicapped.

Although a member of the United Nations, the country did not participate in international refugee forums. The Government had no known policy or provision for refugees, asylees, or first asylum.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

Citizens have no right or mechanisms to change their leadership or government peacefully. The political system was dominated by the Korean Workers' Party and Korean People's Army, with Kim I Sung's heir, Kim Jong Il, in control. Very little reliable information was available on intraregime politics following Kim I Sung's death. The legislature, the Supreme People's Assembly (SPA), which meets only a few days per year, served only to rubber-stamp resolutions presented to it by the party leadership. In 1997 Kim Jong Il acceded to the position of General Secretary of the KWP. In 1998 the SPA reconfirmed Kim as the Chairman of the National Defense Commission and declared that position to be the "highest office of State." The Government adopted a "military first" policy that formalized and legitimated the growing power and influence of the military. The presidency was abolished, leaving the late Kim I Sung as the country's only President. The titular head of state is Kim Yong Nam, the President of the Presidium of the SPA.

The regime justified its dictatorship with arguments derived from concepts of collective consciousness and the superiority of the collective over the individual, appeals to nationalism, and citations of "the juche idea." The authorities emphasized that the core concept of juche is "the ability to act independently without regard to outside interference." Originally described as "a creative application of Marxism-Leninism" in the national context, juche is a malleable philosophy reinterpreted from time to time by the regime as its ideological needs change. It was used by the regime as a "spiritual" underpinning for its rule.

In an effort to give the appearance of democracy, the Government had created several "minority parties." Lacking grassroots organizations, they existed only as rosters of officials with token representation in the SPA. Their primary purpose appeared to be promoting government objectives abroad as touring parliamentarians. Free elections did not exist, and the regime criticized the concept of free elections and competition among political parties as an "artifact" of "capitalist decay."

Elections to the SPA and to provincial, city, and county assemblies are held irregularly. In 1998 SPA elections were held for the first time since 1990. According to the government-controlled media, over 99 percent of the voters participated to elect 100 percent of the candidates approved by the KWP. Results of previous SPA elections produced virtually identical outcomes. The vast majority of the KWP's estimated 3 million members worked to implement decrees formulated by the Party's small elite.

Women reportedly made up 20 percent of the membership of the SPA, but only approximately 4 percent of the membership of the Central Committee of the KWP.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Government did not permit any independent domestic organizations to monitor human rights conditions or to comment on violations of such rights. A North Korean Human Rights Committee, established in 1992, denied the existence of any human rights violations in the country.

The World Food Program (WFP) visited 163 of the country's 206 provinces during the year and completed a

000296

USCA Case #13-5113    Document #1495057    Filed: 05/29/2014    Page 299 of 411

nutrition. USDA, However, aid workers representing foreign governments and international organizations who provided substantial food aid, frequently were denied access to sites where this food was distributed, and thus were unable to verify that the aid consistently reached its intended recipients. Many foreign NGOs reported being charged large fees by Government officials to get visas for foreign staff, to set up offices, and to establish programs. There were reports of abduction of ethnic Korean aid workers by government officials; some victims were required to pay large fines to obtain their release.

In July 2001, a North Korean delegate reporting to the U.N. Human Rights Committee dismissed reports of human rights violations in the country as the propaganda of "egoistic" and "hostile forces" seeking to undermine the sovereignty of the country.

In 1996 a delegation from Amnesty International visited the country and discussed legal reforms and prisoner cases with senior government officials. The Government ignored requests for visits by other international human rights organizations, and none were known to have visited.

The Government has reestablished diplomatic ties with a number of countries that have sought to engage it on human rights. In June government officials discussed human rights with EU representatives. As was the case after June 2001 talks, no significant progress resulted. The DPRK participants in the talks told the EU that the Government had ratified all U.N. human rights instruments except those on torture and racial discrimination, which were "being examined."

In August 1997, the U.N. Subcommission on Prevention of Discrimination and Protection of Minorities adopted a resolution criticizing the Government for its human rights practices. The DPRK Government subsequently announced that it would withdraw from the International Covenant on Civil and Political Rights (ICCPR), calling the resolution an attack on its sovereignty. In October 1997, the U.N. Human Rights Committee issued a statement criticizing the attempt to withdraw from the ICCPR, noting that countries that had ratified the ICCPR could not withdraw from the covenant, and in August 1998, the Human Rights Committee readopted a resolution urging the DPRK Government to improve its human rights record. During the year, the Government submitted a report on human rights to the U.N. Human Rights Committee.

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The Constitution grants equal rights to all citizens. However, the Government denied its citizens most fundamental human rights in practice, and there was pervasive discrimination on the basis of social status.

Women

The Constitution states that "women hold equal social status and rights with men"; however, although women were represented proportionally in the labor force, few women had reached high levels of the Party or the Government. In many small factories, the work force was predominantly female. Like men, working-age women must work. They were thus required to leave their preschool children in the care of elderly relatives or in state nurseries. According to the Constitution, women with large families are to work shorter hours. There were reports of trafficking in women and young girls among North Koreans crossing the border into China (see Section 6.f.).

There was no information available on violence against women.

Children

Social norms reflect traditional, family-centered values in which children are cherished. The State provides compulsory education for all children until the age of 15. However, some children were denied educational opportunities and subjected to other punishments and disadvantages as a result of the loyalty classification system and the principle of "collective retribution" for the transgressions of their parents (see Section 1.f.).

Like others in society, children were the objects of intense political indoctrination; even mathematics textbooks propound party dogma. In addition, foreign visitors and academic sources reported that children from an early age were subjected to several hours a week of mandatory military training and indoctrination at their schools. School children sometimes were sent to work in factories or in the fields for short periods to assist in completing special projects or in meeting production goals.

The WFP reported feeding 4 million North Korean children during the year. In some remote provinces, many persons reportedly appeared to be suffering from long-term malnutrition. A nutrition survey carried out in 2000 by UNICEF and the WFP in the aftermath of flood disasters found that 16 percent of children under 7 years of age suffered from acute malnutrition and that 62 percent suffered from stunted growth. In 1997 a senior UNICEF official said that approximately 80,000 children in the country were in immediate danger of dying from hunger and disease; 800,000 more were suffering from malnutrition to a serious but lesser degree.

In practice children did not enjoy any more civil liberties than adults. The U.N. Committee on the Rights of the Child (UNCRC) has repeatedly expressed concern over de facto discrimination against children with disabilities and the insufficient measures taken by the state party to ensure that these children have effective access to health, education, and social services, and to facilitate their full integration into society.

In the fall of 1998, Doctors Without Borders (MSF) and Doctors of the World closed their offices in the country because the Government reportedly denied them access to a large population of sick and malnourished children.

MSF officials stated that they had evidence that orphaned and homeless children had been gathered into so

called "9-27 camps." These camps reportedly were established under a September 27, 1995 order from Kim Jong Il to "normalize" the country. Refugees who have escaped from the 9-27 camps into China have reported inhuman conditions. There have been reports that some of the 9-27 camps have been closed in recent years.

Information about societal or familial abuse of children was unavailable. There were reports of trafficking in young girls among persons crossing the border into China (see Section 6.f.).

Persons with Disabilities

Traditional social norms condone discrimination against persons with physical disabilities. Apart from veterans with disabilities, persons with disabilities almost never were seen within the city limits of Pyongyang, and several defectors and other former residents reported that persons with disabilities routinely were relocated to rural areas. Furthermore, some NGO reports claimed that these persons, along with some sick and elderly persons from the capital, were predominantly sent to the northeastern part of the country, where international food aid reportedly was no longer distributed by the Government. However, recent visitors to Pyongyang have reported seeing handicapped people on the streets of the capital. There are no legally mandated provisions for accessibility to buildings or government services for persons with disabilities.

Section 6 Worker Rights

a. The Right of Association

Nongovernmental labor unions did not exist. The KWP purported to represent the interests of all labor. There was a single labor organization, the General Federation of Trade Unions of Korea, which was affiliated with the formerly Soviet-controlled World Federation of Trade Unions. Operating under this umbrella, unions functioned on the classic "Stalinist model," with responsibility for mobilizing workers behind production goals and for providing health, education, cultural, and welfare facilities.

The country was not a member of, but had observer status with, the International Labor Organization.

b. The Right to Organize and Bargain Collectively

Workers have no right to organize or to bargain collectively. Government ministries set wages. The State assigned all jobs. Ideological purity was as important as professional competence in deciding who received a particular job, and foreign companies that have established joint ventures reported that all their employees had to be hired from lists submitted by the KWP. Factory and farm workers were organized into councils, which did have an impact on management decisions. Unions do not have the right to strike.

There is one free enterprise zone (FEZ) in the Rajin-Songbon area, and the creation of a Special Administrative Region in Sinuiju was announced. The same labor laws that applied in the rest of the country applied in the Rajin-Songbon FEZ, and it was believed that workers in the FEZ were carefully screened and selected. The Korean Peninsula Energy Development Organization (KEDO) negotiated in 1994 a separate protocol and service contracts for workers at the site of its light water nuclear reactor project. The government agency, which supplied the labor to KEDO, bargained on the workers' behalf (see Section 6.e.).

c. Prohibition of Forced or Bonded Labor

In its 2000 and 2001 reports to the U.N. Human Rights Committee, the Government claimed that its laws prohibit forced or bonded labor. However, the Government frequently mobilized the population for construction projects. Military conscripts routinely were used for this purpose as well. "Reformatory labor" and "reeducation through labor" were common punishments for political offenses. Forced labor, such as logging and tending crops, was common among prisoners. School children were assigned to factories or farms for short periods to help meet production goals (see Section 5).

The Constitution requires that all citizens of working age must work and "strictly observe labor discipline and working hours." The Penal Code provides for the death penalty for any individual who hinders the country's industry, trade, or the transport system by purposely failing to fulfill a specific duty. It also states that anyone failing to carry out an assigned task properly is subject to at least 5 years in prison (see Section 6.e.).

d. Status of Child Labor Practices and Minimum Age for Employment

According to the Constitution, the State prohibits work by children under the age of 16 years. There was no prohibition on forced labor by children, and school children were assigned to factories or farms for short periods to help meet production goals (see Section 6.c.).

e. Acceptable Conditions of Work

No data was available on the minimum wage in state-owned industries. Until the recent food crisis, wages and rations appeared to be adequate to support workers and their families at a subsistence level; however, in recent years that has no longer been the case. Wages were not the primary form of compensation since the State provided all educational and medical needs free of charge, and only token rent was charged. The minimum wage for workers in the FEZ was approximately $80 per month; in foreign-owned and joint venture enterprises outside the FEZ the minimum wage was reportedly close to $110 per month. It was not known what proportion of the

000298

foreign-paid wages went to the worker and what proportion remained with the State." KEDO, the international organization charged with implementation of a light-water reactor and other projects, concluded a protocol and a related memorandum of understanding concerning wages and other working conditions for citizens who work on KEDO projects. Unskilled laborers received approximately $110 per month while skilled laborers were paid slightly more depending on the nature of the work performed (see Section 6.b.).

The Constitution states that all working-age citizens must work and "strictly observe labor discipline and working hours." The Penal Code states that anyone who hampers the nation's industry, commerce, or transportation system by intentionally failing to carry out a specific assignment "while pretending to be functioning normally" is subject to the death penalty; it also states that anyone who "shoddily carries out" an assigned duty is subject to no less than 5 years' imprisonment.

Even persistent tardiness could be defined as "anti-Socialist wrecking" under these articles, although as a result of food shortages absenteeism reportedly became widespread as more time must be spent finding food. A government official described the labor force to an audience of foreign business executives by noting that "there are no riots, no strikes, and no differences of opinion" with management.

In 1994 the authorities reportedly adopted new labor regulations for enterprises involving foreign investments. The regulations on labor contracts set out provisions on the employment and dismissal of workers, technical training, workhours, rest periods, remuneration, labor protection, social security, fines for violations of regulations, and settlement of disputes.

The Constitution stipulates an 8-hour workday; however, several sources reported that most laborers worked from 12 to 16 hours daily when factories were operating. Some of this additional time appeared to include mandatory study of the writings of Kim Il Sung and Kim Jong Il. The Constitution provides all citizens with a "right to rest," including paid leave, holidays, and access to sanitariums and rest homes funded at public expense. Paid leave was provided on public holidays, but on some holidays some persons were required to participate in mass demonstrations involving extra hours of preparation.

Many worksites were hazardous, and the rate of industrial accidents was high. It was believed that workers did not have the right to remove themselves from hazardous working conditions.

f. Trafficking in Persons

There were no known laws specifically addressing the problem of trafficking in persons, and trafficking was a serious problem. There were widespread reports of trafficking in women and young girls among citizens crossing the border into China. Some were sold by their families or by kidnapers as wives to men in China. A network of smugglers reportedly facilitated this trafficking. Many such women, unable to speak Chinese, were held as virtual prisoners, and some were forced to work as prostitutes.

**Back to Top**

The Office of Electronic Information, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

000299

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
HAN KIM, <u>et al.</u>,             )
                                    )
          Plaintiffs,               )
                                    )
          v.                        )     Civil Action No. 09-648 (RWR)
                                    )
DEMOCRATIC PEOPLE'S REPUBLIC        )
of KOREA, <u>et al.</u>,            )
                                    )
          Defendants.               )
_____)

<u>MEMORANDUM ORDER</u>

Plaintiffs Han Kim and Yong Seok Kim bring this civil action under the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking damages against officials, employees and agents of defendant Democratic People's Republic of Korea ("DPRK") in connection with the January 16, 2000 abduction of Reverend Kim Dong Shik ("Reverend Kim"), who is Han's father and Yong's brother.  The plaintiffs allege that following his abduction, Reverend Kim was forcibly transferred to North Korea where he was repeatedly tortured by officials, employees and agents of DPRK.

As a jurisdictional statute, the FSIA permits courts to enter judgments of liability against foreign states only where a plaintiff produces satisfactory evidence that a foreign state's conduct falls within one of the enumerated exceptions to sovereign immunity.  28 U.S.C. § 1605A(a)(1).  Plaintiffs rely on the exception for torture, arguing that "[t]he evidence submitted

- 2 -

demonstrates that it is far more likely than not that Reverend

Kim suffered and continues to suffer the torture and brutal

conditions meted out to all 'enemies' of the DPRK unfortunate

enough to fall into the hands of the DPRK's security services."

(Pls.' Proposed Findings of Fact and Conclusions of Law at 42.)

Although plaintiffs proffer no direct evidence of torture, their

expert testimony and circumstantial evidence purport to establish

plaintiffs' entitlement to relief.

In <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294

F.3d 82 (D.C. Cir. 2002), the D.C. Circuit, considering the

sufficiency of allegations of torture on a motion to dismiss,

emphasized the high standard that the statutory definition of

torture imposes.[1]  The court reasoned that under the statutory

definition, "torture does not automatically result whenever

individuals in official custody are subjected even to direct

physical assault."  <u>Id.</u> at 93.  Rather, "[t]he critical issue is

the degree of pain and suffering that the alleged torturer

---

[1] The FSIA adopts the definition of torture contained in
section 3 of the Torture Victim Protection Act, namely "any act,
directed against an individual in the offender's custody or
physical control, by which severe pain or suffering (other than
pain or suffering arising only from or inherent in, or incidental
to, lawful sanctions), whether physical or mental, is
intentionally inflicted on that individual for such purposes as
obtaining from that individual or a third person information or a
confession, punishing that individual for an act that individual
or a third person has committed or is suspected of having
committed, intimidating or coercing that individual or a third
person, or for any reason based on discrimination of any kind."
28 U.S.C. § 1605A(h)(7) (citing 28 U.S.C. § 1350 note).

000301

- 3 -

intended to, and actually did, inflict upon the victim.  The more
intense, lasting, or heinous the agony, the more likely it is to
be torture." Id.  In light of this understanding, the court
found insufficient allegations that plaintiffs were held for
approximately three months in a political prison where they
allegedly "endured deplorable conditions while incarcerated,
including urine-soaked mattresses, a cramped cell with
substandard plumbing that they were forced to share with seven
other inmates, a lack of medical care, and inadequate food," and
further "were kicked, clubbed and beaten by prison guards, and
interrogated and subjected to physical, mental and verbal abuse."
Id. at 86 (internal quotations omitted).  The court found that
the "plaintiffs' complaint offer[ed] no useful details about the
nature of the kicking, clubbing, and beatings that plaintiffs
allegedly suffered," and "[a]s a result, there [was] no way to
determine from the present complaint the severity of plaintiffs'
alleged beatings -- including their frequency, duration, the
parts of the body at which they were aimed, and the weapons used
to carry them out -- in order to ensure that they satisfy the
TVPA's rigorous definition of torture." Id. at 93; see also
Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d
230 (D.C. Cir. 2003) (finding allegations of forcibly removing
passenger from ship, holding her incommunicado, and threatening
her with death did not constitute torture under FSIA).

- 4 -

The expert affidavits and accompanying material upon which the plaintiffs here rely refer to a wide variety of abuses to which people held in North Korean prison camps are subjected. For plaintiffs to establish their claim for a default judgment against a foreign state "by evidence [that is] satisfactory to the court[,]" 28 U.S.C. § 1608(e), the showing must satisfy the strict standards articulated in <u>Price</u> regarding useful details about the torture that Reverend Kim allegedly suffered and the severity of it.  In order to facilitate the jurisdictional inquiry into whether the plaintiffs' evidence "satisf[ies] the TVPA's rigorous definition of torture," <u>Price</u>, 294 F.3d at 93, the plaintiffs will be directed to supplement their proposed findings of fact and conclusions of law.  Accordingly, it is hereby

ORDERED that the plaintiffs file by October 1, 2012 a supplement providing further evidentiary support for their allegation of torture.

SIGNED this 17th day of August, 2012.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

000303

USCA Case #13-7147     Document #1495112      Filed: 05/29/2014     Page 306 of 411

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------------X

HAN KIM, *et al.,*

                    Plaintiffs,                  Civil Action No: 09-648 (RWR)

          -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, *et al.,*

                    Defendants.

-----------------------------------------------------------------X

**SUPPLEMENTAL DECLARATION OF ERNEST C. (CHUCK) DOWNS**

I, Ernest C. (Chuck) Downs, of Washington, D.C., declare pursuant to 28 U.S.C. § 1746, as follows:

**A.      Professional Background**

     1.     My professional background is set forth in my prior declaration, docketed on April 11, 2011 at Docket Number 30, paragraphs 1-9, in the above-captioned case. It is herein incorporated by reference.

**B.      Nature of this Expert Witness Report**

     2.     I have been asked by counsel for the plaintiffs in the case of *Kim et al. v. Democratic People's Republic of Korea et al.*, to provide this supplemental declaration of my professional opinion as to the likely status and health of Reverend Kim Dong Shik ("Reverend Kim").

     3.     My opinion as set forth below is based upon my academic studies, research and publishing over the course of many years as an expert on Korean affairs and my prior declaration

in this case. I have obtained information from interviews with political leaders and refugees, reviews of documents, periodicals, credible news reports, discussions with reliable journalists, government publications, and scholarly works, as well as from my own experience, working, living and traveling in the Far East, particularly in South Korea. In preparing this opinion, I have examined the complaint filed by the plaintiffs against the defendants, the plaintiffs' Proposed Findings of Fact, docketed on April 12, 2011 at Docket Number 43, and a draft of the plaintiffs' Revised Proposed Findings of Fact, which is yet to be docketed.

## C.    Background

4.      This supplemental declaration follows from my prior declaration and relies upon the background and sources described therein. (Docket Number 30, paragraphs 12-31.).

5.      It is particularly noteworthy that North Korea is exceptionally careful not to allow information about its political prisons or its abduction campaign to become public. Accordingly, the amount of information available in this case is extraordinary.

6.      As noted, there is no dead body to autopsy. And there are no pictures that conclusively show Reverend Kim being tortured by North Korean security personnel. However, there is a great deal of evidence available in this case that enables one knowledgeable about North Korea's prisons and its abduction campaign to reach a well-formed conclusion, with a great degree of confidence, about what likely happened to Reverend Kim. In reaching my conclusions, in addition to the resources and documents mentioned above, I particularly consider the following facts:

        a.   Reverend Kim worked to assist North Korean defectors, which certainly rendered him a valuable and important target to the government and ruling party of the Democratic People's Republic of Korea ("DPRK").

b.  Others who have assisted North Korean defectors have been abducted by DPRK and imprisoned in DPRK's political prisons.

c.  Reverend Kim was a Christian missionary who provided services as a missionary to North Koreans, which certainly rendered him a valuable and important target to the government and ruling party of the DPRK.

d.  Other Christian missionaries who have rendered services as missionaries to North Koreans have been abducted by DPRK and imprisoned in DPRK's political prisons.

e.  Death is a regular occurrence in North Korea's political prisons.

f.  Reverend Kim was abducted by North Korea.

g.  One of Reverend Kim's abductors has been imprisoned by South Korea in part for his role in the Reverend Kim abduction.

h.  Reverend Kim has not been seen or heard from outside of North Korea since January 16, 2000.

i.  Credible sources have reported that Reverend Kim died as a result of his torture and malnutrition.

j.  Reverend Kim was not known to be in poor health prior to his abduction and, based on what I know and have read about him, he appears to have been a relatively healthy person.

**D.**     **Conclusions**

7.     It is my expert opinion that Reverend Kim was killed by his North Korean captors. I am virtually certain that Reverend Kim's killing was motivated by political considerations. Prisoners in North Korea's political prisons do not often survive. That is

particularly so with regard to foreign prisoners who are alleged to have committed crimes against the North Korean regime, such as by assisting North Korean defectors. Indeed, the Government of North Korea has threatened to punish Americans worldwide with "grave consequences" for assisting North Korean defectors. Prisoners in North Korea's political prisons are forced to perform hard labor in terrible conditions, are offered inadequate food, medicine, and clothing, and are routinely subject to severe punishment that is often fatal. If Reverend Kim has managed to survive for over thirteen years in such conditions, it would be astonishing. There is also virtually no chance that Reverend Kim has been released from his prison and alive and well in North Korea.

8.     I am virtually certain that Reverend Kim has been subject to exceptionally painful, brutal, and outrageous treatment while in prison. There is essentially no chance that he has escaped brutal punishment. Punishment in North Korea's prisons is extracted against a prisoner for infractions of the rules of the camps, including proselytizing the Christian faith. Accordingly, it is exceptionally unlikely that any one prisoner—especially a committed Christian minister such as Reverend Kim—would be able to escape severe punishment.

9.     The brutal punishment that Reverend Kim was most probably subjected to includes severe beatings while in stress positions (such as while suspended from the ceiling), near-starvation, and forced physical exertion to the point of absolute physical exhaustion.

10.     I am aware of the testimony of approximately 1000 former North Korean prisoners who served time in North Korean prison camps. I do not know of any case in which the former prisoner was *not* subjected to torture while in the prison camp. There is a steady flow of testimony of former prisoners that describe the most severe types of torture. Some examples are provided in the attached Exhibit.

11.     Daily life in North Korea's political prisons is also exceptionally brutal. Prisoners are forced to labor daily for exceptionally long hours (almost invariably more than twelve hours consecutively, per day, and sometimes for over sixteen hours consecutively, per day) while starving, cold, and/or sick. Prisoners who do not meet production quotas or other unreasonable expectations placed upon them are subject to additional hard labor, less food, and exceptionally painful physical punishment. That threat of increasingly worse conditions compels prisoners to labor through unbearable pain and hunger. That labor is known to result in a great number of fatalities.

12.     Accordingly, it is very likely that Reverend Kim died as reported—from torture or malnutrition deliberately caused by his North Korean captors.

13.     In consideration of the foregoing, and based upon my personal knowledge and research of the type reasonably relied upon by an expert in my field, it is my opinion that Reverend Kim is dead and that his death resulted from torture and malnutrition deliberately caused by his North Korean captors. The claims, as stated in the plaintiff's complaint are, in my expert opinion, valid and consistent with the facts. The plaintiffs' Revised Proposed Findings of Fact are, in my expert opinion, valid and very likely accurately state the facts of this matter.

14.     I am providing this Declaration on behalf of the Kim Family plaintiffs without monetary compensation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 25ᵗʰ day of January, 2013.

Ernest C. (Chuck) Downs

EXHIBIT

Examples of Incidents of Torture in
North Korean Prisons

000309

USCA Case #13-7147 Document #1495112 Filed: 05/29/2014 Page 312 of 411

# THE HIDDEN GULAG

## SECOND EDITION

### The Lives and Voices of
### "Those Who Are Sent to the Mountains"

## David Hawk

**A Report by the Committee for Human Rights in North Korea**

000810

Copyright © 2012 by the Committee for Human Rights in North Korea

All rights reserved
Printed in the United States of America

ISBN: 0615623670

Library of Congress Control Number: 2012939299

# The Hidden Gulag
### Second Edition
### The Lives and Voices of
### "Those Who are Sent to the Mountains"

Committee for Human Rights in North Korea
1001 Connecticut Avenue, NW
Suite 435
Washington, DC 20036

riated at Onsong and delivered to the *Bo-wi-bu ku-ryu-jang* interrogation-detention facility.

There, he was held for 21 days in a very small cell; it was so crowded that the prisoners had to sleep on their sides squeezed against each other. During interrogation, he was asked the usual questions about meeting South Koreans or Christians in China, and required to write down his life history. When he was slow to answer interrogators' questions about his written history, he was beaten on the legs.

In March 2007 he was transferred to the Onsong *An-jeon-bu* interrogation-detention facility for one day. Then he was transferred to the Onsong *ro-dong-dan-ryeon-dae* mobile labor brigade for two days, where he was slapped and punched during additional interrogations. He was again transferred to the Chongjin provincial *do-jip-kyul-so* detention facility for about 20 days where he was again beaten with sticks and chairs before being transferred to his Musan hometown *An-jeon-bu* police station. His health, by this point, was so bad he was immediately put on trial, lest he die in detention. His "trial" lasted less than an hour, during which time his "lawyer" offered no defense, and in late April 2007, Former Detainee # 35 was sentenced to two years at the Musan *ro-dong-dan-ryeon-dae* mobile labor brigade.

Through the help of family friends, he escaped after 20 days and immediately again fled to China. He rejoined his wife, regained his health, and met up with his mother. She had also been caught by Chinese police and repatriated in 2004 whereupon, she was imprisoned for a year at the Oro *kyo-yang-so* prison for women, described on page 91.

Former Detainee # 35 drew sketches of the Musan Mobile labor brigade and the Musan *An-jeon-bu* police detention-interrogation facility.

# PART FIVE

# SUMMARY OF TORTURE AND INFANTICIDE INFORMATION

## Torture

According to almost all of the former prisoner testimony gathered for this report—from Ali Lamada's 1967 Sariwon prison testimony to the post-2000 testimonies of North Koreans forcibly repatriated from China—the practice of torture permeates the North Korean prison and detention system. Because it is so widespread and systematic, it clearly is not the work alone of sadistic elements, but reflects state policy intended to punish, degrade, intimidate and humiliate the prisoners in an effort to root out political disloyalty, connections to South Korea or belief in banned religions. At the same time, the practice of torture is intended to help amass widespread confessions that demonstrate threats to state security, thereby rationalizing or making essential constant vigilance, police presence and the use of torture. Notwithstanding, awareness that torture involves serious human rights transgressions has also led to the practice of requiring prisoners to discipline and beat other prisoners.

The following summary shows that torture is practiced in many prisons and detention facilities:

148

*David Hawk*

• Shin Dong-hyuk witnessed beatings of children at his primary "school" and saw his mother subjected to "kneeling motionless" punishments in the field for failing to meet work quotas. He himself was subjected to prolonged and systematic torture, including burnings and skin piercings, in an interrogation-punishment cell within *Kwan-li-so* Prison Camp No. 18. Also, he was required to sit in the front row to observe the public execution of his mother and brother, and his finger was cut off at the knuckle for an accidental error during his forced labor in a textile factory in Camp 18.

• Kim Yong reported that he was beaten at the *Bo-wi-bu* police jail at Maram and was subjected to water torture and hung by his wrists in the *Bo-wi-bu* police jail at Moonsu in 1993. Both jails are located in Pyongyang. He reports that his mother was beaten severely for being late in returning from gathering edible weeds just outside the gates of Camp No. 18.

• Kang Chol-hwan reported the existence of separate "punishment cells" within *Kwan-li-so* No. 15, Yodok, from which few prisoners returned alive.

• An Hyuk was subjected to sleep deprivation and "sitting motionless" torture for days at a time during the year-and-a-half he was detained at the Maram *Bo-wi-bu* police *ku-ryu-jang* interrogation-detention facility in the Yongsong section of Pyongyang, prior to being deported to Camp No. 15.

• Kim Tae-jin reported that he was beaten, deprived of sleep, and made to kneel motionless for many hours at the *Bo-wi-bu* police detention/interrogation facility in Chongjin in late 1998/early 1999, prior to being deported to Camp 15.

• Lee Young-kuk reported that he was subjected to motionless-kneeling and water torture and facial and shin beatings with rifle butts at a *Bo-wi-bu* interrogation/detention facility in Pyongyang in 1994, leaving permanent damage in one ear, double vision in one eye, and his shins permanently bruised and discolored.

• Former Prisoner # 27 had his front teeth knocked out from beatings administered at the Chongjin *Bo-wi-bu* police office following his repatriation at Onsong.

• Kim Eun-chol lost teeth and has permanent scars on his head, ears, and knees from beatings with wooden staves and rifle cleaning rods at the Musan *Bo-wi-bu* police detention facility.

• Jung Gwang-il lost teeth and has head scars from beatings with wooden staves. He was also subjected to prolonged food deprivation and "pigeon torture" with his arms pinned behind his back and attached to cell bars in ways that made it impossible either to stand up or sit down during his detention at the Hoeryong *Bo-wi-bu* police interrogation-detention facility.

• Former Prisoner # 28 was beaten in the face with rulers and books at a *bo-wi-bu* police interrogation facility in Pyongyang. She was also subjected to the "kneeling motionless" torture for days, causing her legs to swell painfully. This was alternated with being forced to do deep knee bends with her fingers outside the bars of the cell. When she could not continue the deep knee bends she was beaten on the fingers.

• Former Prisoner # 29 lost teeth to beatings while a teenage pupil at a school in *Kwan-li-so* Camp No. 18.

149

Committee for Human Rights in North Korea

USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 316 of 411

• Ahn Myong-chol, a former guard, reported that all three of the *kwan-li-so* at which he worked had isolated detention facilities in which many prisoners died from mistreatment, and that at *Kwan-li-so* No. 22 there were so many deaths by beatings from guards that the guards were told to be less violent.

• Former Prisoner # 37 was beaten at the Onsong *An-jeon-bu* police facility during his six month interrogation prior to being tried and sentenced to Chongo-ri *kyo-hwa-so* for smuggling food back and forth from China.

• Seo Jin was beaten so badly with wooden staves at the Onsong *Bo-wi-bu* interrogation center, and again at the Musan *Bo-wi-bu* interrogation center, that she could hardly walk. After transfer to the Musan *An-jeon-bu* detention facility, she was beaten by younger women guards when she objected to her third vaginal examination. And she was kicked on the legs and beaten on the back by guards at the Oro *Kyo-yang-so* penitentiary No. 55 when she did not keep up the required pace in her prison labor.

• Former Prisoner # 31 was whipped with a belt by male guards at the Onsong *Bo-wi-bu* interrogation facility, and severely beaten on her legs and back when, because of severe malnutrition, she was unable to maintain the pace of her prison labor.

• Bang Mi-sun was severely beaten on her legs with a wooden stave because she could not keep up with the work pace at the Musan *An-jeon-bu-run ro-dong-dan-ryeon-dae* mobile labor brigade owing to injuries she suffered while trafficked in China prior to her repatriation. Infection from this beating left her partially crippled. At the

Musan *An-jeon-bu* pre-trial detention *ku-ryu-jang*, she and other prisoners were required to sit motionless for days, with fellow detainees forced to beat other detainees who moved.

• Yoo Chun-sik was beaten while being hung upside down at the Onsong *An-jeon-bu* run mobile labor brigade. He was kicked, beaten and subjected to the sitting-motionless torture at the Sinuiju *Bo-wi-bu* interrogation-detention facility. Additionally, he witnessed beatings of other prisoners at *Kyo-hwa-so* No. 22.

• Ji Hae-nam confirmed the existence of grossly undersized punishment cells at *Kyo-hwa-so* No. 1 where detainees could not stand up or lie down and where beatings and kicking of women prisoners were a daily occurrence in the mid-1990s. She also reported beatings during interrogation or for prison regulation infractions that she experienced in late 1999 at the Sinuiju *Bo-wi-bu* interrogation-detention facility. She was forced to kneel motionless, was hit with broomsticks and required to do stand-up/sit-down positions to the point of collapse, in her case thirty to forty minutes.

• Lee Soon-ok reported that she experienced beatings, strappings, and water torture leading to loss of consciousness, and was held outside in freezing January weather at the Chongjin pre-trial detention center in 1986. The beatings and brutalities in the early-to mid-1990s at Kaechon women's prison, *Kyo-hwa-so* No. 1, recorded in her prison memoirs are too numerous to detail here.

• Following repatriation, Koh Jeon-mi was beaten so severely on the head at the North Pyongan province *Bo-wi-bu* detention facility that she was unconscious for ten days and required hospitalization.

150

*David Hawk*

• Following repatriation, Lee Yoo-keum was beaten at the Sinuiju *An-jeon-bu* detention facility.

• Following repatriation, Kim Myong-ho was hit and kicked at the Sinuiju *Bo-wi-bu* interrogation-detention facility and then subjected to even more extreme sitting-motionless torture during which he was hit on the fingers or knees if he moved even slightly.

• Following repatriation, Former Detainee # 34 lost a tooth from beatings on the face at the Hoeryong *Bo-wi-bu* interrogation-detention facility, though, like other former prisoners, he describes the sitting-motionless torture as much more painful.

• Former Detainee # 32 was hit in the face and kicked while kneeling at the Onsong *Bo-wi-bu* facility in March 2004.

• Lee Young-suk witnessed other detainees being beaten with thick staves at the Onsong *Bo-wi-bu* detention facility, though she herself was not beaten as she was detained along with her young child whom she was breast feeding.

• Former Detainee # 33 was hit in the face and kicked by Onsong *Bo-wi-bu* interrogators because she refused to identify North Korean border guards who had assisted her flight to China. She witnessed beatings of pregnant women for carrying "Chinese babies."

• Former Detainee # 1 was beaten unconscious for hunger-related rule infractions in 1997 at the Nongpo *jip-kyul-so* detention center in Chongjin City. He also reported that detainees there were beaten with shovels if they did not work fast enough.

• Former Detainee # 3 reported the use of an undersized punishment box at the Danchun prison camp in which camp rule-breakers were held for fifteen days, unable to stand up or lie down. He also reported that beatings of prisoners by guards were common.

• Former Prisoner #6 reported that prisoners were beaten to death by prison work unit leaders at Danchun *Kyo-hwa-so* No. 77 in North Hamgyong province.

• Former Detainee # 8 reported that male prisoners were beaten by guards at the Chongjin *jip-kyul-so* in mid-2000.

• Former Detainee # 9 reported that detainees at the Onsong *ro-dong-dan-ryeon-dae* mobile labor brigade were compelled to beat each other.

• Kim Sung-min reported that in 1997 at the Onsong *Bo-wi-bu* detention center, his fingers were broken and he was kicked and beaten on the head and face until his ears, eyes, nose, and mouth bled.

• Ryu Young-il saw, in 1997, that out of six persons in an adjacent cell in the *bo-wi-bu* interrogation facility where he was detained in Pyongyang, two were carried out on stretchers, two could walk only with the assistance of guards, and two could walk out by themselves. Detainees who moved while they were supposed to be sitting motionless and silent for long periods were handcuffed from the upper bars of their cells with their feet off the floor. Detainees who talked when they were supposed to be sitting motionless and silent were compelled to slap and hit each other.

151

000315

• Former Prisoner # 12 reported that at Hoery-ong *kyo-hwa-so* in the early to middle 1990s, minor rule-breakers were beaten by their cell-mates on the orders of the guards, and major rule-breakers were placed in a 4x4 foot punish-ment cell for a week or more.

• Lee Min-bok reported being beaten "many times" on his fingernails and the back of his hands with a metal rod during interrogation at the Hyesan detention center in 1990. He also reported that at the Hyesan *An-jeon-bu* detention facility, where he was subsequently held, prisoners were compelled to beat each other. Lee witnessed one prisoner, Kim Jae-chul, beaten to death.

• Former Detainee # 15 reported that he was beaten with chairs and sticks at both the Hoery-ong and Onsong *An-jeon-bu* detention facilities in early 2002.

• Former Detainee # 21 reported that she was beaten unconscious in mid-1999 at the *An-jeon-bu* detention/interrogation facility at Onsong, where detainees were beaten so badly that they confessed to doing things they had not done. Women were hit on their fingertips. She witnessed one very ill woman compelled to do stand-up/sit-down repetitions until she passed out and died.

• Former Detainee # 22 reported that he was beat-en with chairs at Onsong *Bo-wi-bu* police jail in late 2001 and beaten even worse at the Chongjin *An-jeon-bu* detention center in early 2002.

• Former Detainee # 24 reported that there were beatings at the *Bo-wi-bu* police jail in Sinuiju in January 2000.

• Former Detainee #25 reported that one woman, a former schoolteacher who had been caught in Mongolia and repatriated to China and North Korea, was beaten nearly to death at the Onsong *An-jeon-bu* detention center in November 1999 and then taken away either to die or, if she recovered, to be transferred to *Kyo-hwa-so* No. 22.

• Former Detainee # 26 was made to kneel motion-less at the Onsong *Bo-wi-bu* police jail in June 2000 and was made to sit motionless for six days at the Hoeryong *Bo-wi-bu* police jail in July 2001.

• Former Detainee # 28 reported that prisoners were beaten to death at the *Kyo-hwa-so* No. 12 at Chongo-ri in North Hamgyong province in 1999.[113]

## Racially Motivated Forced Abortion/ Infanticide

Former prisoners interviewed for this report provided testimony about forced abortions and killings of babies at the *kwan-li-so* political penal labor colonies, where, except for a very few privileged couples, the prisoners were not allowed to have sex or children. There are also reports of killings of pregnant women who had been raped or coerced into sex by prison guards. However, this report focuses on the forced abor-tions and infanticide against and inflicted on women forcibly repatriated from China because of the racial and policy components of these atrocities. The women impregnated by Chinese men were routinely punished and their babies

---

113  For additional information on torture, see, *North Korea: Repub-lic of Torture*, Citizen's Alliance for North Korean Human Rights, Seoul, 2007.

000316

USCA Case #13-7147     Document #1495112     Filed: 05/29/2014     Page 319 of 411



# ESCAPE
## FROM
# CAMP 14

One Man's Remarkable Odyssey
from North Korea to Freedom in the West

## BLAINE HARDEN

000317

# ESCAPE FROM CAMP 14

## ONE MAN'S REMARKABLE ODYSSEY FROM NORTH KOREA TO FREEDOM IN THE WEST

## BLAINE HARDEN

VIKING



**VIKING**
Published by the Penguin Group
Penguin Group (USA) Inc., 375 Hudson Street, New York, New York 10014, U.S.A. • Penguin
Group (Canada), 90 Eglinton Avenue East, Suite 700, Toronto, Ontario, Canada M4P 2Y3 • (a
division of Pearson Penguin Canada Inc.) • Penguin Books Ltd, 80 Strand, London WC2R 0RL,
England • Penguin Ireland, 25 St. Stephen's Green, Dublin 2, Ireland (a division of Penguin Books
Ltd) • Penguin Books Australia Ltd, 250 Camberwell Road, Camberwell, Victoria 3124, Austra-
lia • (a division of Pearson Australia Group Pty Ltd) • Penguin Books India Pvt Ltd, 11 Commu-
nity Centre, Panchsheel Park, New Delhi – 110 017, India • Penguin Group (NZ), 67 Apollo Drive,
Rosedale, Auckland 0632, New Zealand (a division of Pearson New Zealand Ltd) • Penguin Books
(South Africa) (Pty) Ltd, 24 Sturdee Avenue, Rosebank, Johannesburg 2196, South Africa

Penguin Books Ltd, Registered Offices:
80 Strand, London WC2R 0RL, England

First published in 2012 by Viking Penguin,
a member of Penguin Group (USA) Inc.

10  9  8  7  6  5  4  3  2  1

Copyright © Blaine Harden, 2012
All rights reserved

Photograph and drawing credits
Insert page 1 (top), 2 (bottom) (photo of government image), 3 (top and bottom)
(photos of paintings), 6 (top), 7 (top), 8: Photos by Blaine Harden
1 (bottom): Kyodo via AP Images
2 (top): Korean Central News Agency / Korea News Service via AP Images
4 and 5 (six drawings): From *Escape to the Outside World* by Shin Dong-hyuk,
    courtesy of the publisher, Database Center for North Korean Human Rights
6 (bottom): Jennifer Cho
7 (bottom): Courtesy of Lowell and Linda Dye

LIBRARY OF CONGRESS CATALOGING IN PUBLICATION DATA
Harden, Blaine.
Escape from Camp 14 : one man's remarkable odyssey from North Korea to freedom in the West
/ Blaine Harden.
    p.   cm.
Includes bibliographical references.
ISBN 978-0-670-02332-5
1. Shin, Dong-hyuk.  2. Political prisoners—Korea (North)—Biography.  3. Concentration
camps—Korea (North)  4. Forced labor—Korea (North)  5. Korea (North)—Social conditions.
I. Title.
HV9815.6.H37 2012
365'.45092—dc23
[B]
2011037555

Printed in the United States of America
Set in Warnock Pro with Foundry Gridnik
Designed by Daniel Lagin
Maps by Jeffrey L. Ward

No part of this book may be reproduced, scanned, or distributed in any printed or electronic form
without permission. Please do not participate in or encourage piracy of copyrighted materials in
violation of the author's rights. Purchase only authorized editions.

ALWAYS LEARNING                                                    PEARSON

*For North Koreans who re*

# CHAPTER 6

## THIS SON OF A BITCH WON'T DO

"**D**o you know why you are here?"

Shin knew what he had done; he had followed camp rules and stopped an escape.

But the officer did not know—or did not care—that Shin had been a dutiful informer.

"At dawn today, your mother and your brother were caught trying to escape. That's why you're here. Understand? Were you aware of this fact or not? How is it possible for you not to know that your mother and brother tried to run away? If you want to live, you should spit out the truth."

Confused and increasingly frightened, Shin found it difficult to speak. He was an informant. He could not understand why he was being interrogated as an accomplice.

Shin would eventually figure out that the night guard at the school had claimed all the credit for discovering the escape plan. In reporting to his superiors, he had not mentioned Shin's role.

But on that morning in the underground prison, Shin understood nothing. He was a bewildered thirteen-year-old. The officer with four

stars kept asking him about the whys, whens, an
escape plan. Shin was unable to say anything co

Finally, the officer pushed some papers acro

"In that case, bastard, read this and affix yo
bottom."

The document was a family rap sheet. It liste
crimes of Shin's father and of his father's eleven

The eldest brother, Shin Tae Sub, was listed
was a date: 1951, the second year of the Korean
Shin saw his uncle's crimes: disruption of public
and defection to the South. The same offenses
name of Shin's second oldest uncle.

It took Shin many months to understand wh
to see. The papers explained why his father's fam
in Camp 14.

The unforgivable crime Shin's father had com
brother of two young men who had fled south d
that razed much of the Korean Peninsula and
thousands of families. Shin's unforgivable crime
son. Shin's father had never explained any of thi

His father later told Shin about the day in
was taken away by security forces. Before dawn,
into a house owned by Shin's grandfather in Mu
Pyongan Province. It's a fertile farming area loc
miles north of Pyongyang. "Pack your things," th
They did not explain why the family was being a
were going. At daybreak, a truck showed up for
family traveled for an entire day (a distance of ab
mountain roads) before arriving at Camp 14.

R 6

OF A
N'T DO

you are here?"

what he had done; he had followed camp
d an escape.

er did not know—or did not care—that
rmer.

other and your brother were caught trying
here. Understand? Were you aware of this
for you not to know that your mother and
you want to live, you should spit out the

gly frightened, Shin found it difficult to
t. He could not understand why he was
mplice.

ture out that the night guard at the school
discovering the escape plan. In reporting
mentioned Shin's role.

e underground prison, Shin understood
thirteen-year-old. The officer with four

stars kept asking him about the whys, whens, and hows of his family's escape plan. Shin was unable to say anything coherent.

Finally, the officer pushed some papers across his desk.

"In that case, bastard, read this and affix your thumbprint at the bottom."

The document was a family rap sheet. It listed the names, ages, and crimes of Shin's father and of his father's eleven brothers.

The eldest brother, Shin Tae Sub, was listed first. Next to his name was a date: 1951, the second year of the Korean War. On the same line, Shin saw his uncle's crimes: disruption of public peace, acts of brutality, and defection to the South. The same offenses were listed beside the name of Shin's second oldest uncle.

It took Shin many months to understand what he had been allowed to see. The papers explained why his father's family had been locked up in Camp 14.

The unforgivable crime Shin's father had committed was being the brother of two young men who had fled south during a fratricidal war that razed much of the Korean Peninsula and divided hundreds of thousands of families. Shin's unforgivable crime was being his father's son. Shin's father had never explained any of this.

His father later told Shin about the day in 1965 when the family was taken away by security forces. Before dawn, they forced their way into a house owned by Shin's grandfather in Mundok County in South Pyongan Province. It's a fertile farming area located about thirty-five miles north of Pyongyang. "Pack your things," the armed men shouted. They did not explain why the family was being arrested or where they were going. At daybreak, a truck showed up for their belongings. The family traveled for an entire day (a distance of about forty-five miles on mountain roads) before arriving at Camp 14.

000321

USCA Case #13-7147        Document #1495112        Filed: 05/23/2014        Page 324 of 411

**BLAINE HARDEN**

———

As ordered, Shin put his thumbprint on the document.

Guards blindfolded him again, led him out of the interrogation room, and marched him down a corridor. When they pulled away the blindfold, Shin read the number "7" on a cell door. Guards pushed him inside and tossed him a prison uniform.

"Hey, son of a bitch, change into this."

The uniform fit a large adult. When Shin pulled it over his short, bony frame, he disappeared into what felt like a burlap sack.

Shin's cell was a concrete square, barely large enough for him to lie down. It had a toilet in the corner and a sink with running water. The lightbulb hanging from the ceiling was on when Shin entered the cell and it could not be turned off. Without windows, Shin could not distinguish night from day. There were two thin blankets on the floor. He was given nothing to eat and could not sleep.

He believes it was the next day when guards opened the door, blindfolded him, and led him to a second interrogation room, where two new officers were waiting. They ordered Shin to kneel and pressed him to explain why his family wanted to escape. What grudges did his mother harbor? What did he discuss with her? What were his brother's intentions?

Shin said he did not have answers to their questions.

"You haven't lived but a few years," one of the guards told Shin. "Just confess and go out and live. Would you like to die in here?"

"I . . . really don't know anything," he replied.

He was increasingly frightened, increasingly hungry, and still struggling to understand why the guards did not know he was the one who had tipped them off.

The guards sent him back to his cell.

On what seemed to be the morning of the third day, one of his

interrogators and three other guards ente[red] his ankles, tied a rope to a hook in the c[eiling?] down. Then they left and locked the door.

His feet almost touched the ceiling. H[is head was?] two feet above the floor. Reaching out wit[h his hands?] had left untied, Shin could not quite touch [...] swung around trying to right himself, but [...] and his ankles hurt. Eventually his legs w[...] with blood, ached more with each hour.

Guards did not return until evening. [...] again without a word. Food arrived in his [...] impossible to eat. He could not move his [...] the sharp steel edges of the shackles, wer[e...]

On the fourth day, the interrogators wore [...]

After being blindfolded and marched [...] in a dimly lighted room with a high ceiling [...] shop.

A chain dangled from a winch on the [...] held a hammer, ax, pliers, and clubs of va[rious?] wide shop table, Shin saw a large pair of pin[cers?] and carrying pieces of hot metal.

"How is it, being in this room?" one o[...]

Shin did not know what to say.

"I'll ask you just one more time," the ch[ief?] were your father, mother, and brother [planning to?] escape?"

"I really don't know," Shin replied.

"If you tell the truth right now, I'll s[...] Understand?"

000322

lbprint on the document.

again, led him out of the interrogation
a corridor. When they pulled away the
r "7" on a cell door. Guards pushed him
uniform.

e into this."

h. When Shin pulled it over his short,
o what felt like a burlap sack.

quare, barely large enough for him to lie
er and a sink with running water. The
ing was on when Shin entered the cell
Without windows, Shin could not dis-
ere two thin blankets on the floor. He
uld not sleep.

t day when guards opened the door,
a second interrogation room, where
ey ordered Shin to kneel and pressed
nted to escape. What grudges did his
tss with her? What were his brother's

wers to their questions.

years," one of the guards told Shin.
Would you like to die in here?"

ng," he replied.

ned, increasingly hungry, and still
guards did not know he was the one

is cell.

orning of the third day, one of his

interrogators and three other guards entered Shin's cell. They shackled his ankles, tied a rope to a hook in the ceiling, and hung him upside down. Then they left and locked the door—all without a word.

His feet almost touched the ceiling. His head was suspended about two feet above the floor. Reaching out with his hands, which the guards had left untied, Shin could not quite touch the floor. He squirmed and swung around trying to right himself, but could not. His neck cramped and his ankles hurt. Eventually his legs went numb. His head, flushed with blood, ached more with each hour.

Guards did not return until evening. They untied the boy and left, again without a word. Food arrived in his cell, but Shin found it almost impossible to eat. He could not move his fingers. His ankles, owing to the sharp steel edges of the shackles, were gouged and bleeding.

On the fourth day, the interrogators wore civilian clothes, not uniforms.

After being blindfolded and marched from his cell, Shin met him in a dimly lighted room with a high ceiling. It had the look of a machine shop.

A chain dangled from a winch on the ceiling. Hooks on the walls held a hammer, ax, pliers, and clubs of various shapes and sizes. On a wide shop table, Shin saw a large pair of pincers, a tool used for gripping and carrying pieces of hot metal.

"How is it, being in this room?" one of the interrogators asked.

Shin did not know what to say.

"I'll ask you just one more time," the chief interrogator said. "What were your father, mother, and brother planning to do after their escape?"

"I really don't know," Shin replied.

"If you tell the truth right now, I'll save you. If not, I'll kill you. Understand?"

000323

USCA Case #13-7147    Document #1495112        Filed: 05/29/2014     Page 326 of 411

**BLAINE HARDEN**

Shin remembers paralyzing confusion.

"I've been easy on you until now because you are a kid," the interrogator said. "Don't try my patience."

Again, Shin failed to reply.

"This son of a bitch won't do!" the chief interrogator shouted.

The chief's lieutenants surrounded Shin and pulled off his clothes. Shackles were locked around his ankles and tied to the chain that hung from the ceiling. The winch started up, pulling Shin off his feet. His head hit the floor with a thud. His hands were bound together with a rope that was threaded through a hook on the ceiling. When the trussing was done, his body formed a U, his face and feet toward the ceiling, his bare back toward the floor.

The chief interrogator shouted more questions. Shin remembers giving no coherent answers. The chief told one of his men to fetch something.

A tub full of burning charcoal was dragged beneath Shin. One of the interrogators used a bellows to stoke the coals. The winch lowered Shin toward the flames.

"Keep going until he talks," the chief said.

Shin, crazed with pain, smelling his burning flesh, twisted away from the heat. One of the guards grabbed a gaff hook from the wall and pierced the boy in the lower abdomen, holding him over the fire until he lost consciousness.

He awoke in his cell. Guards had dressed him in his ill-fitting prison outfit, which he'd soiled with excrement and urine. He had no idea how long he had lain unconscious on the floor. His lower back was blistered and sticky with discharge. The flesh around his ankles had been scraped away.

For two days, Shin managed to crawl around in his cell and to eat.

Guards brought him whole steame[d]
ridge and cabbage soup. But as h[e]
feverish, lost his appetite, and foun[d]

Seeing Shin curled up on the [ ]
the prison hallway, "That little ru[n]

Shin guesses ten days came an[d]
It took place in his cell because he [ ]
But he was no longer afraid. For the [ ]
himself.

"I was the one who reported t[h]

His interrogators didn't believ[e]
hurting Shin, they asked question[s]
in his mother's house and what he h[ ]
He begged his interrogators to tal[k]
could confirm the story.

They promised nothing and le[ft]

Shin's fever grew worse. Bliste[r]
cell smelled so bad that guards ref[ ]

After several days (though the [ ]
Shin was drifting in and out of del[ ]
and ordered two prisoners to go i[n]
him down the corridor to anothe[r]
There was another prisoner in the [ ]

Shin had been granted a repri[ ]
Shin would never see the school's [ ]

onfusion.

ow because you are a kid," the inter-
ce."

' the chief interrogator shouted.
nded Shin and pulled off his clothes.
nkles and tied to the chain that hung
ted up, pulling Shin off his feet. His
s hands were bound together with a
hook on the ceiling. When the truss-
' his face and feet toward the ceiling,

ed more questions. Shin remembers
' chief told one of his men to fetch

al was dragged beneath Shin. One of
o stoke the coals. The winch lowered

e chief said.

ling his burning flesh, twisted away
rabbed a gaff hook from the wall and
men, holding him over the fire until

l dressed him in his ill-fitting prison
ement and urine. He had no idea how
he floor. His lower back was blistered
h around his ankles had been scraped

to crawl around in his cell and to eat.

Guards brought him whole steamed ears of corn, along with corn por-
ridge and cabbage soup. But as his burns became infected, he grew
feverish, lost his appetite, and found it nearly impossible to move.

Seeing Shin curled up on the floor of his cell, a guard shouted in
the prison hallway, "That little runt is really tough."

Shin guesses ten days came and went before his final interrogation.
It took place in his cell because he was too weak to get up off the floor.
But he was no longer afraid. For the first time, he found words to defend
himself.

"I was the one who reported this," he said. "I did a good job."

His interrogators didn't believe him. But instead of threatening or
hurting Shin, they asked questions. He explained all that he had heard
in his mother's house and what he had said to the night guard at school.
He begged his interrogators to talk to Hong Sung Jo, the classmate who
could confirm the story.

They promised nothing and left his cell.

Shin's fever grew worse. Blisters on his back swelled with pus. His
cell smelled so bad that guards refused to step inside.

After several days (though the exact amount of time is unclear, as
Shin was drifting in and out of delirium), guards opened his cell door
and ordered two prisoners to go in. They picked him up and carried
him down the corridor to another cell. Guards locked Shin inside.
There was another prisoner in the cell.

Shin had been granted a reprieve. Hong had confirmed his story.
Shin would never see the school's night guard again.

000325

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


----------------------------------------------------------------- X

HAN KIM, *et al.*,

                Plaintiffs,

        -against-                  Civil Action No: 09-648 (RWR)


DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, *et al.*,

                Defendants.

----------------------------------------------------------------- X


## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM


Pursuant to this Court's Order of August 17, 2012 (dkt. #46) ("Order"), the Plaintiffs provide this supplemental memorandum in support of their allegation that officials, employees, and agents of the Defendants, acting within the scope of their office, tortured Reverend Kim Dong Shik ("Reverend Kim"). Following the Order, the Plaintiffs sought and obtained from their expert, Ernest C. (Chuck) Downs, a supplemental declaration that explicitly addresses Reverend Kim's likely treatment and fate in North Korea's prisons. That declaration, filed on January 27, 2013 (Dkt. #50), states, in pertinent part:

> 8.     I am virtually certain that Reverend Kim has been subject to exceptionally painful, brutal, and outrageous treatment while in prison. There is essentially no chance that he has escaped brutal punishment. Punishment in North Korea's prisons is extracted against a prisoner for infractions of the rules of the camps, including proselytizing the Christian faith. Accordingly, it is exceptionally unlikely that any one prisoner—

000326

especially a committed Christian minister such as Reverend Kim—would be able to escape severe punishment for any considerable amount of time.

9.    The brutal punishment that Reverend Kim was most probably subjected to includes severe beatings while in stress positions (such as while suspended from the ceiling), near-starvation, and forced physical exertion to the point of absolute physical exhaustion.

10.    I am aware of the testimony of approximately 1000 former North Korean prisoners who served time in North Korean prison camps. I do not know of any case in which the former prisoner was *not* subjected to torture while in the prison camp. There is a steady flow of testimony of former prisoners that describe the most severe types of torture. Some examples are provided in the attached Exhibit….

13.    [I]t is my opinion that Reverend Kim is dead and that his death resulted from torture and malnutrition deliberately caused by his North Korean captors.

Mr. Downs attached to his supplemental declaration an exhibit that details some of the horrific stories reported by former prisoners of North Korea's prison camps. (Dkt. #50-1). The Plaintiffs' (Revised) Proposed Findings of Facts and Conclusions of Law (Dkt. #52) ("Revised Findings") highlights pages four through eight of the Downs Exhibit (on pages 41-44 of the Revised Findings). Pages twelve through seventeen of the Downs Exhibit highlight one particularly upsetting account of torture in North Korea's prison camps. Plaintiffs have not summarized it because they find it to be particularly sobering. Accordingly, the Plaintiffs respectfully ask the Court to read that account as it was written. (*See* Dkt. #50-1, p. 12-17).

In addition, Plaintiffs have filed their Revised Findings. The Revised Findings incorporate Downs' supplemental declaration, highlight certain other testimony relating to torture (particularly the declaration of Do Hee-Youn (on page 49 of the Revised Findings)), and provides summaries of three of the Plaintiffs' pieces of documentary evidence (specifically, a report by Human Rights Watch and two reports

000327

by the U.S. Department of State (on pages 52-57 of the Revised Findings)). The Revised Findings also offer a more detailed analysis of the law governing extrajudicial killing and torture under the Foreign Sovereign Immunities Act and District of Columbia law (pages 61-66 of the Revised Findings). The Revised Findings further contain numerous other edits and a ten-page summary that are designed to make the document more accessible and helpful to the Court.

Plaintiffs believe that these additions are directly responsive to this Court's August 17, 2012 Order. If the Court deems necessary additional information or testimony, the Plaintiffs will be pleased to provided the same.

Dated:         February 1, 2013
               Brooklyn, New York

                                    Respectfully submitted,

                                    THE BERKMAN LAW OFFICE, LLC
                                    *Counsel for the Plaintiffs*


                                    by: ___/s/ Robert J. Tolchin_____
                                        Robert J. Tolchin
                                    111 Livingston Street Suite 1928
                                    Brooklyn, NY 11201
                                    (718) 855-3627
                                    rjt.berkman@gmail.com

Of counsel:
        Robert J. Tolchin
          (D.C. Bar #NY0088)
        Meir Katz
          (D.C. Bar # 995431)
          *pro hac vice (pending)*

000328

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


-------------------------------------------------------------------- X

HAN KIM, *et al.*,

               Plaintiffs,

          -against-                      Civil Action No: 09-648 (RWR)


DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, *et al.*,

               Defendants.

-------------------------------------------------------------------- X


**<u>SUPPLEMENTAL SUBMISSION OF NEW AUTHORITY</u>**


On February 1, 2013, the United Nations' Special Rapporteur on the Situation of Human Rights in the Democratic People's Republic of Korea released a report on behalf of the United Nations Human Rights Council. That report provides a comprehensive review of United Nations documentation and resolutions on the situation of human rights in North Korea since 2004. The first Annex to the report provides a thorough analysis of patterns of human rights violations in North Korea. Of particular significance to this litigation, pages 16-18 provide a detailed discussion on the observed pattern of "torture and inhuman treatment" in North Korea; pages 18-20 provide a detailed discussion on the observed pattern of "arbitrary detention" in North Korea; and pages 20-23 provide a detailed discussion on observations relating to North Korea's use of prison camps.

Plaintiffs' counsel only became aware of this report on February 5, 2013 and, therefore, could not include a discussion of it in the Plaintiffs' supplemental memorandum, which was due February 1, or the Plaintiffs (Revised) Proposed Findings of Facts and Conclusions of Law, which were filed contemporaneously.

A copy of the United Nations report (and its Annexes) appears in the attached exhibit.

Dated:       February 9, 2013
           Baltimore, Maryland

                                   Respectfully submitted,

                                   THE BERKMAN LAW OFFICE, LLC
                                   *Counsel for the Plaintiffs*

                                 by:    /s/ Meir Katz
                                    Meir Katz
                                      *Of counsel*

                                   Robert J. Tolchin
                                      (D.C. Bar # NY0088)
                                   Meir Katz
                                      *Pro hac vice*
                                      (D.C. Bar # 995431)
                                   111 Livingston Street Suite 1928
                                   Brooklyn, NY 11201
                                   (718) 855-3627
                                   MKatzLitigation@gmail.com

# EXHIBIT

Report of the United Nations' Special Rapporteur on the Situation of Human Rights in the Democratic People's Republic of Korea

United Nations



**General Assembly**

A/HRC/22/57

Distr.: General
1 February 2013

Original: English

**Human Rights Council**
**Twenty-second session**
Agenda item 4
**Human rights situations that require the Council's attention**

# Report of the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea, Marzuki Darusman<sup>*</sup>

*Summary*

    In his statement to the Third Committee of the General Assembly in November 2012, the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea called on Member States and the international community to undertake a comprehensive review of the many reports on the human rights situation in the Democratic People's Republic of Korea submitted under his mandate and by the Secretary-General over the past eight years to assess the underlying patterns and trends, and consider setting up a more detailed mechanism of inquiry. The present report provides a comprehensive review of United Nations documentation and resolutions on the situation of human rights in the Democratic People's Republic of Korea since 2004.

    In addition to a total of 22 reports by the Secretary-General and the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea since 2004, and 16 resolutions adopted by the General Assembly and its subsidiary organs, the report seeks to take stock of the documentation in connection to the Universal Periodic Review, the concluding observations of the human rights treaty bodies, and the opinions adopted by the Working Group on Arbitrary Detention and the Working Group on Enforced or Involuntary Disappearances in cases relating to the Democratic People's Republic of Korea in that time. The review has identified nine underlying patterns of violations that these various documents have focused on. A more detailed analysis of these patterns is presented in annex I to the report.

---

    <sup>*</sup> The annexes to the present report are being circulated as received, in their language of submission only.

Please recycle ♻

**A/HRC/22/57**

The report concludes with recommendations for the international community, including suggestions on some possible next steps and areas of focus for United Nations action on the situation of human rights in the Democratic People's Republic of Korea.  The report calls for the establishment of an inquiry mechanism with adequate resources to investigate and document grave, systematic and widespread violations of human rights in the Democratic People's Republic of Korea and to report to the Human Rights Council and the General Assembly, to examine the issue of accountability for such violations as well as crimes against humanity.

2

A/HRC/22/57

# Contents

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| I. | Introduction .......................................................................................... | 1–4 | 4 |
| II. | Patterns of violations documented by the United Nations ..................................... | 5–7 | 5 |
| III. | United Nations assessment of human rights violations in the Democratic People's Republic of Korea ........................................ | 8–16 | 6 |
| IV. | Impunity and non-cooperation with the United Nations ...................................... | 17–30 | 8 |
| V. | Conclusions and recommendations ........................................................ | 31–32 | 12 |

Annexes

| I. | Analysis of patterns of human rights violations in the Democratic People's Republic of Korea, documented by the United Nations through its reports and resolutions since 2004 ........................ | 13 |
|---|---|---|
|  | A.   Violation of the right to food ........................................................... | 13 |
|  | B.   Torture and inhuman treatment ....................................................... | 16 |
|  | C.   Arbitrary detention.................................................................. | 18 |
|  | D.   Prison camps ...................................................................... | 20 |
|  | E.   Discrimination ..................................................................... | 23 |
|  | F.   Violations of freedom of expression ................................................. | 26 |
|  | G.   Violations of the right to life ....................................................... | 28 |
|  | H.   Violations of freedom of movement ................................................. | 30 |
|  | I.   Enforced disappearances, including abduction of foreign nationals ..................... | 32 |
| II. | List of United Nations documents reviewed ................................................. | 35 |

000334

# I.   Introduction

1.      The mandate of the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea was established by the Commission on Human Rights pursuant to its resolution 2004/13, and has since been renewed annually. Pursuant to that resolution and subsequent resolutions of the General Assembly, the Special Rapporteur has submitted two reports every year: one to the Human Rights Council, and another to the General Assembly. In his most recent report to the General Assembly (A/67/370), the Special Rapporteur gave an overview of the current human rights situation in the Democratic People's Republic of Korea and human rights concerns such as severe restrictions on freedom of opinion and expression, the economic situation and its impact on economic, social and cultural rights, protection concerns for asylum seekers from the Democratic People's Republic of Korea, and trafficking.  On 2 November 2012, in his statement to the Third Committee of the General Assembly, the Special Rapporteur also highlighted his continuing concern over the abduction of foreign and Japanese nationals, on which there had unfortunately been no new developments.

2.      In that statement, the Special Rapporteur called on Member States and the international community to undertake a comprehensive review of the many reports on the human rights situation in the Democratic People's Republic of Korea submitted by his mandate and the Secretary-General over the years, to assess the underlying patterns and trends, and to consider setting up a more detailed mechanism of inquiry.  The present report provides a comprehensive review of United Nations documentation and resolutions on the situation of human rights in the Democratic People's Republic of Korea since 2004.  The report seeks to take stock of and evaluate the extent to which the United Nations entities have documented human rights violations occurring in the Democratic People's Republic of Korea since the inception of the mandate of the Special Rapporteur in 2004.[1] The report suggests some possible next steps and areas of focus for the United Nations action on human rights in the country.

3.      The review includes no fewer than 60 human rights-related documents including reports of the Secretary-General to the General Assembly; reports of the Special Rapporteur to the General Assembly and the Human Rights Council and its predecessor the Commission on Human Rights; resolutions adopted by these intergovernmental bodies; various reports associated with the universal periodic review of the Democratic People's Republic of Korea by the Human Rights Council; concluding observations and State reports to various treaty bodies, namely the Human Rights Committee, the Committee on Economic, Social and Cultural Rights, the Committee on the Elimination of Discrimination against Women, the Committee on the Rights of the Child; and documentation of cases taken up by the special-procedures mandate holders of the Human Rights Council such as the Working Group on Arbitrary Detention and the Working Group on Enforced and

---

[1]   Vitit Muntarbhorn served as Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea for six years, from 15 June 2004.  Marzuki Darusman took on the Special Rapporteur's mandate from 1 August 2010. For practical purposes, this report uses the term Special Rapporteur to refer to both mandate holders without distinction. However, for the sake of accuracy, the report indicates the document symbol or year of the Special Rapporteur's comments to allow the reader to identify to which mandate holder the information should be attributed.

Involuntary Disappearances; on the situation of human rights in the Democratic People's Republic of Korea.[2]

4.      A more detailed analysis of patterns of human rights violations documented by the United Nations through its reports and resolutions since 2004 is presented in annex I.

## II.    Patterns of violations documented by the United Nations

5.      The General Assembly and its subsidiary organs have adopted 16 resolutions since 2003.[3] A total of 22 reports by the Secretary-General and Special Rapporteur have been presented to the United Nations Member States since 2004. These documents underscore the long-term nature and broad pattern of grave human rights violations throughout the Democratic People's Republic of Korea, as well as the awareness of the situation by the United Nations and its Member States.

6.      A review of this documentation leads to the identification of nine key inter-linked issues or patterns of violations of human rights that the United Nations has focused on:

(a)      Violation of the right to food, in particular the effect of State-controlled food distribution policies on the nutritional status and health of the population and the restricted entry of international humanitarian aid to deal with the endemic food crisis;

(b)      Torture and other cruel, inhuman and degrading treatment or punishment, including inhuman conditions of detention;

(c)      Arbitrary detention, as a form of persecution and the criminalization of any behaviour deemed threatening or contrary to the official ideology of the Government, the lack of rule of law and the absence of due process or an independent judiciary;

(d)      Violations of human rights associated with prison camps;

(e)      Discrimination and the disproportionate or specific effect of human rights violations on vulnerable groups, in particular women, children, people living with disabilities and returnees.  Of particular concern is the fact that society is divided into three distinct groups classified according to their political allegiance to the Government. A person's place in this hierarchy determines the level of access that he or she will have to basic human rights, including access to food, health, education and freedom of movement;

(f)      Extensive violation of freedom of expression and other related freedoms;

(g)      Violation of the right to life, in particular the abusive application of the death penalty and the use of public executions;

(h)      Restrictions on freedom of movement and abusive treatment of citizens forcibly returned;

(i)      Enforced disappearances, including in the form of abductions of foreign nationals.

7.      These nine areas were identified by reviewing the issues on which the United Nations had expressed the most concern, and point to the existence of a systematic and

---

[2]  The review does not include the reports of the United Nations offices and specialized agencies, such as the Office for the Coordination of Humanitarian Affairs (OCHA), the World Food Programme (WFP), and the Food and Agricultural Organization (FAO), etc.

[3]  This includes three resolutions by the Commission on Human Rights from 2003 to 2005; five resolutions by the Human Rights Council from 2008 and eight resolutions by the General Assembly from 2006 to date.

000336

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 7 of 40
USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 339 of 411

A/HRC/22/57

widespread pattern of violations. A full description of the documentation of these nine patterns is presented in annex I to this report.  A varying amount of documentation is available on each of these violations, as information is difficult to obtain, due to the absence of independent monitors and media in the country, the restrictions on citizens leaving the country, and the refusal of the Government of the Democratic People's Republic of Korea to provide access or otherwise cooperate with the United Nations human rights mechanisms.  Concerns about reprisals, including against family members who remain in the country, also make it difficult for individual victims to come forward or agree to the publication of certain details. Nevertheless, the  regular, credible and consistent information which has been received – and the patterns to which they point -  highlight the need for a more systematic, comprehensive and well-resourced investigative mechanism than can be achieved by the current Special Rapporteur and his mandated support from the Office of the High Commissioner for Human Rights.  An inquiry mechanism could produce a more complete picture, quantify and qualify the violations in terms of international law, attribute responsibility to particular actors or perpetrators of these violations, and suggest effective courses of international action.

## III.   United Nations assessment of human rights violations in the Democratic People's Republic of Korea

8.     The United Nations has characterized many of the abuses committed in the Democratic People's Republic of Korea as grave violations of human rights, committed in a systematic and widespread manner.

9.     The General Assembly resolutions adopted between 2006 and 2012 on the Democratic People's Republic of Korea repeatedly expressed serious concern at the persisting reports of systematic, widespread and grave violations of civil, political, economic, social and cultural rights in the Democratic People's Republic of Korea, including torture, public executions, arbitrary detention, absence of due process and the rule of law, imposition of the death penalty for political and religious reasons, collective punishments and the existence of a large number of prison camps and extensive use of forced labour. From 2008 onwards, the General Assembly has strengthened its approach and expressed very serious concern about these violations.

10.    In its resolutions, the General Assembly also expressed its very serious concern at violations of economic and social rights leading to severe malnutrition and other health problems, as well as restriction on freedom of movement, as systematic and widespread. Moreover, the General Assembly decried violations affecting vulnerable groups, in particular women, children, persons living with disabilities and the citizens repatriated back to the Democratic People's Republic of Korea. The Commission on Human Rights also reflected these concerns in the resolutions it adopted from 2004. [4]

11.    Since 2009, the Human Rights Council has deplored the grave, widespread and systematic abuses in the Democratic People's Republic of Korea, in particular the use of torture and labour camps against political prisoners and repatriated citizens.  In 2012, the Human Rights Council went a step further, expressing deep concern about a "persisting deterioration" in the human rights situation in the country.[5]

12.    In 2012, for the first time, since the inception of the mandate of the Special Rapporteur, the Human Rights Council adopted its resolution on the Democratic People's

---

[4]  Commission on Human Rights resolutions 2004/13 and 2005/11
[5]  Human Rights Council resolution 19/13

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 8 of 40
USCA Case #13-7147      Document #1495112      Filed: 05/29/2014      Page 340 of 411

A/HRC/22/57

Republic of Korea, without a vote, reflecting the overwhelming and the steadily growing number of countries concerned about the human rights situation in the country.[6]  Also for the first time, on 20 December 2012, the General Assembly adopted its resolution on the Democratic People's Republic of Korea, without a vote, expressing its deep concern at the significant persistent deterioration of the human rights situation in the Democratic People's Republic of Korea despite the succession of leadership.[7]

13.     Both Special Rapporteurs who have held this mandate have recognized the systematic nature of the violations inflicted upon the population in the Democratic People's Republic of Korea.  In 2012, in his report to the General Assembly, the Special Rapporteur was "disconcerted by the recent declaration by Kim Jong Un that his first, second and third priorities were to strengthen the military" and noted that "slow economic growth coupled with a "military first" policy will be detrimental to the welfare of the people of the Democratic People's Republic of Korea".[8] The former Special Rapporteur had expressed similar concerns. In 2005, he underlined that "the non-democratic nature of the power base in the Democratic People's Republic of Korea impedes the enjoyment of human rights substantially, while the State-centric focus of the national authorities aimed at ensuring survival of the regime at the top under the umbrella of the so-called "collective" rights and national sovereignty, hampers the realization of human rights".[9]  In 2010, he noted, "the human rights situation in the Democratic People's Republic of Korea can be described as *sui generis* (in its own category), given the multiple particularities and anomalies that abound.  Simply put, there are many instances of human rights violations which are both harrowing and horrific".[10]

14.     Both Special Rapporteurs have also raised the question of whether crimes against humanity are being committed in the Democratic People's Republic of Korea. In 2007, the Special Rapporteur flagged a study that claimed that the "misdeeds of the authorities are tantamount to crimes against humanity, fulfilling the conditions of intent and widespread systematic attacks on civilian population".[11] He went on to suggest that beyond State responsibility, individual criminal responsibility "may ensue from the commission of crimes against humanity".[12] In 2008, the Special Rapporteur stated that "there may also be avenues for mobilizing action for individual criminal responsibility, inspired by the presence of the International Criminal Court, where the local system is unable or unwilling to act to make individuals accountable for individual crimes".[13] The Special Rapporteur concluded by affirming that "while much depends upon global-local political will to test the desire for transparency and responsibility ... it is important to underline the long-standing systematic natures of human rights transgressions in the country which are highly visible, substantial and exponential".[14]

---

[6]   In 2008 Human Rights Council resolution 7/15 was adopted with 22 votes in favour, 7 against and 18 abstentions; in 2009 resolution 10/16 was adopted with 26 votes in favour, 6 against and 15 abstentions; in 2010 resolution 13/14 was adopted with 28 votes in favour, 5 against and 13 abstentions; in 2011 resolution 16/8 was adopted with 30 votes in favour, 3 against and 11 abstentions.

[7]   General Assembly resolution 67/181.

[8]   A/67/370, para. 50.

[9]   A/60/306, para. 9.

[10]   A/HRC/13/47, para. 86.

[11]   A/HRC/4/15, para. 40 flagged a study entitled, "Failure to Protect: A Call for the UN Security Council to Act in North Korea", United States Committee for Human Rights in North Korea, Washington, 2006.

[12]   A/HRC/4/15, para. 41.

[13]   A/HRC/7/20, para. 45.

[14]   A/HRC/7/20, para 48.

000338

15.   In 2010, the Special Rapporteur stressed that "the international crime that would seem to be most closely related to the happenings in the country in question is "crimes against humanity".[15] He noted, "it is clear from six years of observing the human rights situation in the Democratic People's Republic of Korea that the abuses against the general population for which the authorities should be responsible are both egregious and endemic".[16]

16.   In 2012, the Special Rapporteur stressed that "under certain circumstances, widespread or systematic imprisonment or other severe deprivation of liberty in violation of international law may constitute crimes against humanity".[17]

## IV.   Impunity and non-cooperation with the United Nations

17.   For almost a decade, the General Assembly, the Secretary-General, the former Commission on Human Rights, the Human Rights Council, the Special Rapporteur and the human rights treaty bodies have consistently and repeatedly called on the authorities of the Democratic People's Republic of Korea to put an end to these violations and respect the human rights of all its citizens. In 2009, the Secretary-General noted that the Government of the Democratic People's Republic of Korea had not taken "significant steps to address persistent reports of systematic and widespread human rights violations or to provide safeguards for human rights".[18]

18.   The need for accountability has been reiterated and advanced by resolutions adopted by the United Nations, particularly those by the General Assembly. Since 2009, the General Assembly has strongly urged "the Government to address the issue of impunity and ensure that those responsible for violations of human rights are brought to justice before an independent judiciary".[19]

19.   Concerns about impunity have been exacerbated by intermittent cooperation of the Government of the Democratic People's Republic of Korea with the United Nations human rights machinery.  A notable example is that, on 23 August 1997, the Government of the Democratic People's Republic of Korea sent the Secretary-General a notification of withdrawal from the International Covenant on Civil and Political Rights, which the country acceded to on 14 September 1981.[20]  On 23 September 1997, in an aide-mémoire to the Government of the Democratic People's Republic of Korea, the Secretary-General stated his opinion that a withdrawal from the Covenant would not appear possible unless all States Parties to the Covenant agree with such a withdrawal.[21]  On 8 December 1997, the Human Rights Committee adopted the General Comment No. 26 on Continuity of Obligations under the International Covenant on Civil and Political Rights.  The Committee is firmly of the view that international law does not permit a State which has ratified or acceded or succeeded to the Covenant to denounce or withdraw from it.[22] Eventually, on 25

---

[15]   A/HRC/13/47, para. 60.

[16]   A/HRC/13/47, para. 8.

[17]   A/67/370, para. 38.

[18]   A/64/319, para. 4.

[19]   General Assembly resolutions 63/190,  64/175 and 66/174

[20]   United Nations Treaty Collection.  See http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-4&chapter=4&lang=en#8

[21]   The notification of withdrawal and the aide-mémoire were duly circulated to all States Parties under cover of C.N.467.1997.TREATIES-10 of 12 November 1997.

[22]   CCPR/C/21/Rev.1/Add.8/Rev.1: CCPR General Comment No. 26: Continuity of Obligations adopted at the Sixty-first Session of the Human Rights Committee, on 8 December 1997

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 10 of 40
USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 342 of 411

A/HRC/22/57

December 1999, the Democratic People's Republic of Korea submitted its second periodic report[23] to the Human Rights Committee covering in principle the period from 1984 to 1997, which was later considered by the Committee in July 2001 [24]

20.    Further, the Government of the Democratic People's Republic of Korea has refused to acknowledge or cooperate with the Special Rapporteur and has also consistently and categorically rejected the resolutions adopted by the former Commission on Human Rights, the Human Rights Council and the General Assembly on the situation of human rights in the country, since the establishment of the Special Rapporteur's mandate in 2004.  Most recently, on 20 December 2012, at the General Assembly, the representative of the Democratic People's Republic of Korea reportedly said, inter alia, that the Government had categorically rejected the resolution on the human rights situation in the Democratic People's Republic of Korea, as it had nothing to do with human rights in the country. Violations mentioned in the text had not been allowed to exist.  He reportedly also said the text was clearly propaganda for a fabricated human right situation and created pressure on the country's social system, which constituted interference in its internal affairs.  It was an act of political terrorism and showed double standards, and that any consideration of human rights must be carried out with the principles of objectivity under the Universal Periodic Review.  The main sponsors had worked to destabilize the country by picking on human rights issues.  While it had been adopted without a vote, it could not be interpreted as by consensus.[25]

21.    Also, since 2003 the Government of the Democratic People's Republic of Korea has rejected all offers for technical assistance from the Office of the United Nations High Commissioner for Human Rights (OHCHR).[26]

22.    Moreover, in December 2009, during the adoption of the universal periodic review (UPR) report[27] on the Democratic People's Republic of Korea, the Government failed to identify the recommendations that enjoyed its support. It is the first State to not accept any recommendation out of the 167 received. The delegation rejected 50 recommendations in the report of the Working Group and left 117 pending. For this reason, on 21 December 2010, the General Assembly expressed its serious concern at "the refusal of the Government of the Democratic People's Republic of Korea to articulate which recommendations enjoyed its support following its universal periodic review by the Human Rights Council, and regrets the lack of actions taken to date to implement the recommendations contained in the final outcome". [28]

23.    In 2008, the Special Rapporteur noted that "it is incumbent upon the national authorities and the international community to address the impunity factor which has enabled such violations to exist and persist for a long time".[29] In 2010, he expressly noted

---

[23]   CCPR/C/PRK/2000/2, para. 2.
[24]   CCPR/CO/72/PRK, para. 1.
[25]   A/67/PV.60;see news release at http://www.un.org/News/Press/docs/2012/ga11331.doc.htm.  See also summary records of the Third Committee, for example, A/C.3/67/SR/38; A/C.3/67/SR/45; A/C.3/67/SR/46.  See also notes verbales from the Permanent Mission of the Democratic People's Republic of Korea addressed to the President of the Human Rights Council (A/HRC/19/G/1; A/HRC/16/G/2; A/HRC/13/G/7; A/HRC/10/G/6; A/HRC/7/G/3; A/HRC/5/G/5).
[26]   See for example E/CN.4/2005/G/13: letter dated 28 February 2005 from the Permanent Representative of the Democratic People's Republic of Korea addressed to the High Commissioner for Human Rights rejecting offer of technical assistance
[27]   A/HRC/13/13, report of the Working Group on the Universal Periodic Review: Democratic People's Republic of Korea.
[28]   General Assembly resolution 65/225, para. 1 (c).
[29]   A/HRC/7/20, para. 43.

000340

that since the national authorities are "unable or unwilling to press for such accountability",[30] the international community could press for further accountability, whether in terms of State responsibility and/or individual criminal responsibility. In 2011, the Special Rapporteur reported, "the International Criminal Court began to examine whether the sinking of *Cheonan*, a Republic of Korea warship hit by a torpedo allegedly fired from a Democratic People's Republic of Korea submarine on 26 March 2010, resulting in the death of 46 persons, and the shelling of Yeonpyeong Island on the 23 November 2010, resulting in the killing of two civilians and injuring many others, would constitute war crimes under the jurisdiction of the court. The Court's consideration of the two incidents opens questions of accountability for other alleged crimes committed by the Democratic People's Republic of Korea, including the issue of abduction".[31]

24.     Of the options available to address the issue of impunity and accountability, the Special Rapporteur asked in 2010 "to what extent the International Criminal Court can be accessed for this purpose, on the basis of individual criminal responsibility and interrelated with the fact that the country in question is not a party to the Rome Statute of the International Criminal Court".[32] In 2010, the Special Rapporteur noted that the options also included "the possibility of the Security Council taking up the issue directly and of establishing a Commission of Inquiry on crimes against humanity".[33] He also invited the international community "to address impunity from different viewpoints, whether in terms of State responsibility and/or criminal responsibility, and to enable the totality of the United Nations system, especially the Security Council, and its affiliates, such as the International Criminal Court, to take measures to prevent egregious violations, protect people from victimization and provide effective redress".[34]

25.     The Special Rapporteur is of the view that many, if not all, of the nine patterns of violation, identified in this report may amount to crimes against humanity, committed as part of systematic and/or widespread attacks against civilian populations, under Article 7, paragraph 1, of the Rome Statute of the International Criminal Court, in particular, subparagraphs (a) murder; (c) enslavement; (e) imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law; (f) torture; (h) persecution against any identifiable group or collectivity on political and religious grounds; (i) enforced disappearance of persons; and (k) other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health.

26.     The right to be free from torture is a non-derogable right under article 7 of the International Covenant on Civil and Political Rights (ICCPR), to which the Democratic People's Republic of Korea is a State party.

27.     Similarly, peremptory international law places, enforced disappearance on the same legal footing as torture.  The Special Rapporteur notes that as enforced disappearance may constitute several different human rights violations such as freedom of movement; liberty and security of person; freedom from torture or cruel, inhuman, or degrading treatment; or even the right to life, the act contravenes several provisions of the ICCPR.  He also notes that enforced disappearances, including through the abduction of foreign nationals such as

---

[30]   A/HRC/13/47,  para. 58.
[31]   A/HRC/16/58, para. 14.  See also the International Criminal Court's Report on Preliminary Examination Activities, 2012, paras. 64-74 (http://www.icc-cpi.int/NR/rdonlyres/C433C462-7C4E-4358-8A72-8D99FD00E8CD/285209/OTP2012ReportonPreliminaryExaminations22Nov2012.pdf).
[32]   A/HRC/13/47, para. 59.
[33]   A/HRC/13/47, para. 58.
[34]   A/HRC/13/47, para. 89 (e).

000341

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 12 of 40
USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 344 of 411

A/HRC/22/57

the citizens of the Republic of Korea and Japan by the agents of the Democratic People's Republic of Korea, may amount to crimes against humanity under Article 7, paragraphs (1) (i) and (2) (i) of the Rome Statute to the extent that they form part of a systematic or widespread attack against a civilian population.  In this regard, it is worth emphasizing that enforced disappearances (whether they amount to crimes against humanity or not) constitute continuous acts that are ongoing as long as the fate of the victim is not clarified and on this ground already not affected by prescription.

28.     The Special Rapporteur is of the opinion that grave human rights violations in the prison camps (or) even the mere existence of such camps, with slave-like conditions for political prisoners, may qualify as crimes against humanity under Article 7, paragraph 1, of the Rome Statute, subparagraphs (c) enslavement, and (e) imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law.  He also notes that the particularly inhumane conditions and treatment to which detainees in political prison camps are exposed on an intentional basis could give raise to crimes against humanity, including on the basis of all of the specific acts cited in paragraph 25 above.

29.     On 3 April 2012, the International Coalition to Stop Crimes Against Humanity in North Korea (ICNK),[35] a coalition of some 40 international non-governmental organizations, submitted a petition[36] to the special-procedures mandate holders of the Human Rights Council on the use of labour camps for political prisoners and the pattern of human rights violation committed in these prison camps.  These were detailed extensively in a memorandum "The situation of detainees in Gulag System *(Kwan-li-so)* of the Democratic People's Republic of Korea". The Coalition recommended, inter alia, that the international community take effective measures to ameliorate the suffering of those 150,000 to 200,000 people imprisoned in those camps; and that the United Nations, acting through the General Assembly or Human Rights Council, initiate a commission of inquiry into the crimes against humanity being committed in the Democratic People's Republic of Korea for the purpose of holding the State and individual perpetrators to account for the ongoing commission of these crimes.  Based on that petition, on 3 October 2012, five mandate holders, namely the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea; the Special Rapporteur on extrajudicial, summary or arbitrary executions; the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment; the Working Group on Arbitrary Detention; and the Working Group on Enforced and Involuntary Disappearances sent a joint allegation letter to the Government of the Democratic People's Republic of Korea on the alleged use of labour camps for political prisoners.  At the time of writing, the mandate holders have not received any response from the Government.

30.     The Special Rapporteur is of the view that, in line with its commitment at the 2005 World Summit, the international community, through the United Nations, has the responsibility to use appropriate peaceful means to help to protect the population in the Democratic People's Republic of Korea from crimes against humanity.[37] As one of the minimum steps, and in line with the emerging practice with regard to other country situations where serious violations are being committed on a systematic or widespread basis, he considers that the international community has the responsibility to launch an independent and impartial international inquiry into a situation, where there are grounds to believe that crimes against humanity are being committed and the country concerned fails to carry out effective independent and impartial inquiries itself.  While usually not sufficient in and by itself to end crimes against humanity, increased scrutiny by

---

[35]   See http://www.stopnkcrimes.org/about_01.php.
[36]   See http://www.fidh.org/The-International-Coalition-to
[37]   General Assembly resolution 60/1, para. 139.

000342

A/HRC/22/57

international inquiry affords a measure of protection, especially when coupled with the prospect of future criminal investigations and the deterrent effect such a prospect may have on individual perpetrators.

## V.   Conclusions and recommendations

31.   **This review of United Nations documentation on the situation human rights in the Democratic People's Republic of Korea since 2004 points to the need for the establishment of an inquiry mechanism with adequate resources to investigate and more fully document the grave, systematic and widespread violations of human rights in the Democratic People's Republic of Korea and report to the Human Rights Council and the General Assembly. The inquiry should examine the issues of institutional and personal accountability for such violations, in particular where they amount to crimes against humanity, and make appropriate recommendations to the authorities of the Democratic People's Republic of Korea and international community for further action.  The inquiry would include:**

(a)   **More detailed analysis of the grave, widespread and systematic violations of human rights in the Democratic People's Republic of Korea identified in this report, through the collection and documentation of victims' testimonies and the accounts of survivors, witnesses and perpetrators;**

(b)   **More detailed documentation of the most egregious violations of human rights committed in the Democratic People's Republic of Korea, in particular closer examination of the widespread and systematic practice of torture and arbitrary detention, and the full range of violations committed in the prison camps, as well as the abduction of foreign nationals;**

(c)   **Closer examination of the issue of discrimination in the systemic denial and violation of basic human rights and fundamental freedoms, including access to food, restrictions on freedom of movement, freedom of expression, arbitrary arrest and torture;**

(d)   **A detailed examination and legal analysis of whether crimes against humanity are being perpetrated in the Democratic People's Republic of Korea, as well as violation against foreign national such as abductees; and**

(e)   **A closer examination of the issue of accountability in the Democratic People's Republic of Korea given the problem of pervasive impunity and almost a decade of non-cooperation by the Government with the United Nations human rights mechanisms.**

32.   **The Special Rapporteur also reiterates all recommendations previously made to the Government of the Democratic People's Republic of Korea in his reports to the Human Rights Council and the General Assembly.**

000343

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 14 of 40
USCA Case #13-7147      Document #1495112      Filed: 05/29/2014      Page 346 of 411

A/HRC/22/57

## Annexes

## Annex I

*[English only]*

### Analysis of patterns of human rights violations in the Democratic People's Republic of Korea, documented by the United Nations through its reports and resolutions since 2004

### A.   Violation of the right to food

1.     The right to food in the Democratic People's Republic of Korea is the human rights issue that has been extensively documented by the United Nations. The question of access to food, food distribution and humanitarian food assistance is dealt with in all resolutions of the Human Rights Council and the General Assembly and all reports by the Special Rapporteur and the Secretary-General.

2.     The Secretary-General has consistently highlighted his particular concern about the severity of the food situation the country is facing and its impact on the economic, social and cultural rights of the population.[1] A number of actors within the United Nations system have highlighted that even if the food shortage was caused by natural disasters, the root causes are due to the mismanagement on the part of the authorities. The Special Rapporteur noted, "Even where there are natural disasters afflicting the general population, the root causes are often man-made, and it is the regime in power which shares responsibility for this."[2] The Human Rights Council has expressed deep concern "at the continuing reports of systematic, widespread and grave violations of…economic, social and cultural rights in the Democratic People's Republic of Korea."[3]

3.     The Special Rapporteur stressed that the issue is not simply lack of food for the population, but rather the **manipulative control of food distribution by the regime**. He noted, "The authorities seek to control the food distribution process as a means of controlling the population and making them dependent on the regime."[4]

4.     In 2002, the Government took various measures to open the door to quasi-market activities (the new Economics Management Improvement Measures Policy), thus enabling the population to engage in the market system at a limited level, to produce, buy and sell their goods. The public distribution system (PDS) was seen as non-functional, and people were given additional wages to fend for themselves. In 2005, for fear of losing their grip on the population, the authorities started to impose the PDS again on the population and to prohibit market activities, despite the fact that the system was unable to respond effectively to the needs of the population.[5]

---

[1]   A/63/332, para 6
[2]   A/64/224, para 66
[3]   A/HRC/RES/7/15
[4]   A/64/224, para 66
[5]   A/64/224, para 16

000344

A/HRC/22/57

5.    Economic activities, particularly by women, were severely curtailed in the period of 2007-2008, when the authorities prohibited women under 40 years of age from trading; the age was subsequently raised to 49.[6]

6.    In 2008, it was reported that army personnel were forcing farmers to provide them with food, to the detriment of the latter's livelihood. The authorities were also reportedly subjecting markets to greater scrutiny and punishing traders in the pursuit of State control over the population.[7]

7.    At the end of 2008, the authorities planned to reduce the frequency of the trade at open markets to once a month. The authorities were also reportedly closing general markets and transforming them into farmers' markets, with a ban on rice sales.[8]

8.    In 2009, it was reported that small-lot and small-patch farming would be prohibited.[9]

9.    Moreover, the Special Rapporteur has stressed the discriminatory nature of food policies, noting the great disparity between access by the elite to food and other necessities and access by the rest of the population to the wherewithal of life. He has concluded that food aid is provided by the Government in violation of the principle of non-discrimination.[10] He has also stressed that the **excessive expenditure by the authorities on its defence sector**, based upon the country's "military-first" policy causes serious distortions in the national budget and its use of national resources.  The Special Rapporteur considers this a key impediment to the country's development process as well as the right to food and life and other rights.

10.    The Special Rapporteur has expressed particular concern **about those most vulnerable** to food insecurity, like children, pregnant and lactating women, the elderly and people with disabilities.  In 2004 an extensive food and nutrition survey carried out by United Nations agencies in cooperation with the Democratic People's Republic of Korea revealed that while the situation of children had improved on some fronts in regard to malnutrition, the situation of women had not improved: some one third of mothers were found to be malnourished and anaemic, which obviously affected children's malnutrition.[11]

11.    The United Nations has also consistently highlighted the problem of **access of humanitarian assistance.**[12] In 2004, the Government started to accept foreign food aid to alleviate the chronic situation. However, in 2005 and 2006, it tried to reduce that aid and the presence of international agencies working on the issue in an attempt to curb outside influence[13]. There was a further obstacle in July 2006 due to the missile tests launched by the Government in the face of global opposition. This event had a negative impact on the food situation of the country, since it caused various contributors of humanitarian aid to discontinue providing that aid.[14]

12.    Concurrently, matters became more complicated due to devastating floods that caused substantial damage and loss of lives in July and August 2006. These disasters

---

[6]   A/64/224, para 17
[7]   A/64/224, para 17
[8]   A/HRC/10/18, para 15; A/64/224, para 18
[9]   A/HRC/10/18, para 15
[10]   A/HRC/7/20, paras 15-23
[11]   A/60/306, para 38
[12]   See General Assembly Resolutions: A/RES/61/174, A/RES/62/167, A/RES/63/190, A/RES/64/175, A/RES/66/174; see also Human Rights Council resolutions: A/HRC/RES/10/16, A/HRC/RES/13/14, A/HRC/RES/16/8, A/HRC/RES/19/13
[13]   E/CN.4/2006/35 paras 4-5; A/61/349
[14]   A/61/349

14

pressured the authorities to reopen the country to outside aid.[15] Owing to this humanitarian crisis, some of the contributors of humanitarian aid changed their position and resumed provision of aid, particularly at the bilateral level. However, the Special Rapporteur noted that the World Food Programme (WFP) monitoring showed that progressive cuts had led to rations of 150 grams of cereals per person per day in June 2008, down from 450 grams in early 2008.[16]

13.     According to the Special Rapporteur, in 2009 the aid situation became more desperate.[17] Although in 2008, the offer by the United States of America of some 500,000 tons of food aid over a 12-month period was accepted by the country, and a group of United States (US) non-governmental organizations (NGOs) were permitted access to the country to help with the delivery, at the beginning of 2009, the country stopped accepting US aid and asked all the NGOs to leave. The Special Rapporteur noted that this was the result of "the authority's unease with the monitoring of the food aid process and the use of Korean interpreters from outside the country."[18]

14.     In 2009, the Secretary-General took note of a range of reports indicated that the authorities had blocked access to alternative sources of food by forbidding kitchen farming in private households and closing down markets where food items were traded. In 2009, the Secretary-General concluded that the Democratic People's Republic of Korea was **failing to fulfil its obligations under international human rights law to protect the right to adequate food**.[19]

15.     In March 2011, a United Nations survey found that more than six million vulnerable people urgently required international food assistance. In a report, released in November 2011, by the Food and Agriculture Organization (FAO) and WFP showed that many of the factors behind the shortage of food, including the adverse weather conditions, underdevelopment and structural problems, in the Democratic People's Republic of Korea had intensified.[20]

16.     Moreover, in December 2011, the General Assembly noted a deterioration of the situation and expressed its "very deep concern at the precarious humanitarian situation including a serious deterioration in the availability of and access to food, in the country, partly as a result of frequent natural disasters, compounded by structural weakness in agricultural production resulting in significant shortages of food, and the increasing State restrictions on the cultivation and trade in foodstuffs, as well as the prevalence of chronic and acute malnutrition, particularly among the most vulnerable groups, pregnant women, infants and the elderly, which, despite some progress, continues to affect the physical and mental development of a significant proportion of children."[21]

**Recommendations on the right to food**

17.     Since 2008, the Human Rights Council in its various resolutions has urged "the Government of the Democratic People's Republic of Korea to ensure safe and unhindered

---

[15]  E/CN.4/2006/35 paras 4-5; A/61/349.
[16]  A/63/332, para 30
[17]  A/64/224
[18]  A/64/224, para 13
[19]  A/64/319, para 8
[20]  A/HRC/19/65, para 23
[21]  A/RES/66/174, para 3

000346

access of humanitarian assistance that is delivered impartially on the basis of need, in accordance with humanitarian principles."[22]

18.     The Special Rapporteur emphasized that "the primary obligation to feed people lies with the State, which must take all measures necessary to rectify existing flaws in the production and distribution system that have contributed [to] the shortage of food." He also called on the Government to reduce military/defence expenditure and ensure equitable re-allocation of resources to respond effectively to the food crisis and other areas needing development. [23]

19.     The Special Rapporteur stressed that the human rights obligations of the Democratic People's Republic of Korea are in no sense contingent on the provisions of external humanitarian assistance by the international community, but merely an impetus for emergency response.[24]

20.     Finally, he further recognized that it is important to ensure such aid distribution reaches the neediest population and in line with the long-standing United Nations policy of "no access, no aid," which needs to be respected by all States receiving aid.[25]

## B.   Torture and inhuman treatment

21.     General Assembly resolutions adopted between 2006 and 2012 highlighted "torture and other cruel, inhuman or degrading treatment or punishment" among several systemic, widespread and grave violations of human rights in the Democratic People's Republic of Korea. Moreover, the General Assembly made specific reference to punishments inflicted on citizens of the Democratic People's Republic of Korea who have been repatriated from abroad, "such as treating their departure as treason, **leading to punishments of internment, torture, cruel, inhuman or degrading treatment** or the death penalty" (emphasis added). [26] The Human Rights Council deplored "the use of torture…against political prisoners and repatriated citizens of the Democratic People's Republic of Korea".[27]

22.     In 2007, the Special Rapporteur stressed that there are continuing reports of violence against the human person committed by State authorities, such as torture, public executions, and persecution of political dissidents.[28]

23.     In 2008, the Secretary-General expressed his serious concern at the fact that reports emanating from the country "continue to indicate trends of torture, inhumane conditions of detention, public execution, ill-treatment of refugees or asylum-seekers repatriated from abroad."[29] The same year, in his report to the General Assembly, the Special Rapporteur stated that an  "overhaul of the prison system is long overdue, and the harsh conditions imposed by the criminal justice system and related detention give rise to a plethora of abuses, including torture and cruel, inhuman and degrading treatment. The abuses are ubiquitous, and include degrading treatment of deceased persons."[30]

---

[22]  A/HRC/RES/10/16, A/HRC/RES/13/14, A/HRC/RES/16/8, A/HRC/RES/19/13
[23]  A/HRC/19/65, para 26
[24]  A/HRC/19/65, para 58
[25]  A/HRC/19/65, para 58
[26]  A/RES/60/173; A/RES/61/174; A/RES/62/167; A/RES/63/190; A/RES/64/175; A/RES/66/174
[27]  A/HRC/RES/10/16; A/HRC/RES/13/14; A/HRC/RES/16/8; A/HRC/RES/19/1
[28]  A/HRC/4/15
[29]  A/63/332; A/65/391.
[30]  A/63/322, para 31

000347

24.     In 2009, the Special Rapporteur highlighted that although torture is prohibited by law, it is extensively practised in the Democratic People's Republic of Korea.[31] He quoted from the White Paper on Human Rights in North Korea, a document[32] produced by the Korean Bar Association that documents violations, including cases of torture practised against women who are returned to the Democratic People's Republic of Korea: "Female repatriates suffer what is called 'pumping' torture, which is a common sexual torture to find money hidden inside a woman's vagina. Women who face this torture are stripped of their clothing, and their arms are tied behind their backs. Then they squat and stand repeatedly until they lose consciousness. It maximizes the sense of shame in women … Assault against pregnant women is also routinized, and wrapping the forcibly aborted baby's face with plastic to [induce] death is known [in] frequent occurrences."[33]

25.     In 2011, in his report to the Human Rights Council[34], the Special Rapporteur analysed the situation of human rights in detention and correctional facilities. He noted he had learned from various sources that human rights violations are committed in all correctional centres: "Correctional officers sometimes beat inmates, but it is understood that more often it is the inmates who would beat up other inmates upon instruction from the officers."[35]

26.     While in Japan on 25-28 January 2011 and the Republic of Korea on 22-26 November 2010, the Special Rapporteur heard some graphic stories of the conditions and treatment of the detainees in various camps in the Democratic People's Republic of Korea. He noted that "some of the most flagrant human rights violations, such as torture and detention without due process of law, are reported to be perpetrated in these camps."[36]

27.     The Secretary-General noted in 2012 that some reports also indicate the existence of prison camps where torture and execution are widespread.[37]

28.     A joint urgent appeal was sent on 24 February 2012 by the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, the Special Rapporteur on extrajudicial, summary or arbitrary executions and the Working Group on Arbitrary Detention, raising concerns about the arrest of a group of 31 citizens of the Democratic People's Republic of Korea in a neighbouring country and fears regarding their possible refoulement to the Democratic People's Republic of Korea. It had been alleged that, if repatriated, the individuals would be subjected to detention, torture and execution as illegal border crossers.[38]

**Recommendations on torture and inhuman treatment**

29.     During the Universal Periodic Review of the Democratic People's Republic of Korea in December 2009, several Member States recommended that the Government of the ratify the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and its Optional Protocol.[39] Moreover, in several of his reports, the Special

---

[31]   A/HRC/10/18, para 24
[32]   Kim Tae-Hoon, "Human rights for the socially marginalized class", in White Paper on Human Rights in North Korea, Korean Bar Association, p. 431
[33]   A/64/224, para 58
[34]   A/HRC/16/58
[35]   A/HRC/16/58, para 53
[36]   A/HRC/16/58. para 56
[37]   A/67/362, para 14
[38]   A/67/362, para 25
[39]   See for example A/65/391, para 43; and Universal Periodic Review documents [http://www.ohchr.org/EN/HRBodies/UPR/Pages/KPSession6.aspx]

17

Rapporteur called upon the Government to reform the prison system in order to prevent torture and to end public executions.[40]

## C.   Arbitrary detention

30.   In 2004 and 2005, the Commission on Human Rights identified arbitrary detention as part of a continuing pattern of "systemic, widespread and grave violations of human rights in the Democratic People's Republic of Korea."[41] General Assembly resolutions adopted between 2006 and 2012 highlighted, among several systemic, widespread and grave violations of human rights, "extrajudicial and arbitrary detention; the absence of due process and the rule of law, including fair trial guarantees and an independent judiciary," expressing its serious concern.

31.   In 2006, the Special Rapporteur stressed that the judicial system lacks independence and is heavily influenced by the regime in power. In addition to the opaque nature of the ordinary courts, there is a parallel quasi-penal regime which does not comply with rule of law guarantees such as judicial independence, natural justice, respect for the rights of the accused and access to lawyers.[42]

32.   Moreover, in 2009 the Special Rapporteur highlighted that "...judges are appointed by the State and operate under the direction of the Supreme People's Assembly. The jury system is based on two people who work with the courts (usually one judge at first instance) - not to ensure that the rights of the accused are upheld but to confirm the list of crimes presented at the trials and to confirm the conviction of the alleged wrongdoer. Anomalously, lawyers protect the State rather than their defendants. On-site open trials are also held, ostensibly to educate the public; in reality, they are an instrument to intimidate the public, without any regard for the defendant's right to a fair trial and the right to privacy."[43]

33.   In his 2009 report to the Human Rights Council, the Special Rapporteur qualified many punishments applied in the Democratic People's Republic of Korea as "totally unreasonable and abusive"[44]. The Special Rapporteur noted, for instance, "students are reported to have been sent to labour training (re-education and forced labour) for watching South Korean dramas. Citizens who fail to turn up for work allocated to them by the State are sent to labour camps. There is a wide variety of detention facilities ranging from political detention camps (kwanliso) for political crimes to correctional labour punishment in labour camps (kyohwaso) for other crimes."[45]

34.   The United Nations documentation has highlighted that a number of constitutional and legislative provisions seriously endanger the impartiality and independence of the judiciary in the Democratic People's Republic of Korea.  Moreover, some articles in the Criminal Code are either not in line with international standards or contain terms that are not defined or are vague, thus allowing scope for   misinterpretation and abuse by the State.

35.   In his 2007 report to the Human Rights Council,[46] the Special Rapporteur had noted that there are a large number of provisions concerning anti-State activities that give rise to

---

[40] A/62/264; A/64/224; A/HRC/10/18; A/HRC/13/47
[41] E/CN.4/RES/2004/13, para 13; E/CN.4/RES/2005/11, para 1
[42] A/61/349, para 15
[43] A/HRC/10/18, para 25
[44] A/HRC/10/18, para 23
[45] A/HRC/10/18, para 23
[46] A/HRC/4/15

concern due to their excessively broad scope and the way that the authorities might use such provisions to repress political dissent. He noted for instance that there are "14 types of anti-State, anti-people crimes; 16 types of crimes of disturbing the national defence system; 104 types of crimes of injuring the socialist economy; 26 types of crimes of injuring the socialist culture; 39 types of crimes of injuring administrative systems; and 20 types of crimes of harming socialist collective life. Several may be punished with the death sentence."[47]

36.     In 2012, the Special Rapporteur stressed that a number of provisions in the Criminal Code fall below the standard required to ensure that due process of law is maintained and the rights of people are respected; for instance, the definition of "labour training" and "training detention facilities" remains unclear; the possibility of a broad interpretation of the category of "political crime" remains; and elements such as "crimes by association" are maintained in several parts of the Criminal Code. Similar vague terms, such as "extremely grave crime" and "reform through labour", are contained in an addendum to the Criminal Code, which was adopted on 19 December 2007.[48] A number of provisions of the Criminal Code also stipulate punishment for acts that would not normally warrant criminal liability.[49] All these provisions can be the basis for arbitrary.

37.     One particularly worrying practice, widely documented by the United Nations, is detention due to **guilt by association**: when a person is punished for a political or ideological crime, members of his or her family are also punished. As early as 2005, the Special Rapporteur had denounced forms of collective punishment based upon 'guilt by association.' The Special Rapporteur noted that this practice "has both horizontal and vertical impact – horizontal in that it leads to the persecution of immediate family members and vertical in that it may lead to the stigmatization of subsequent generations, given that the authorities keep records of families as part of the iron grip on the population."[50]

38.     Political prison camps are another issue of serious concern.  In 2011, the Special Rapporteur stated that in Kwalinso 15 and Yodok camps, thousands of people are believed to be held by reason of "guilt by association." The majority of such people reportedly do not seem to know the reasons for their imprisonment or what crimes they are accused of. [51]

39.     Several United Nations reports also document the detention of the citizens of the Democratic People's Republic of Korea, who return to their country after deportation, including victims of trafficking, in violation of their rights.  In a joint urgent appeal by several Special Rapporteurs, it was stated that according to the information received, nationals of the Democratic People's Republic of Korea commit a criminal offence if they leave the country without official permission, punishable by up to two years in a labour training camp (*nodongdanryundae*) or a detention centre (*jipkyulso*), in grave cases up to three years. Defection to a foreign country or to the enemy in betrayal of the country and the people is also a criminal offence punishable by no less than five years of detention in a political labour camp (*kwanliso*) or a re-education labour camp *(kyohwaso).*[52] The 2012 report of the Special Rapporteur to the General Assembly notes that article 233 of the Criminal Code foresees up to five years of labour for anyone illegally crossing the border of

---

[47]  A/HRC/4/15, para 12
[48]  A/HRC/19/65, para 34
[49]  A/67/370, para 29
[50]  A/60/306, para 19
[51]  A/66/322, paras 60-63
[52]  E/CN.4/2006/52/Add.1, paras 62-65, joint urgent appeal sent by the Special Rapporteurs on the Independence of judges and lawyers; Freedom of religion or belief; Torture; Trafficking; Violence Against Women; and the Democratic People's Republic of Korea

000350

the Democratic People's Republic of Korea, which is in contravention to the right to freedom of movement.[53]

40.     The United Nations has clearly identified arbitrary detention as a widespread, systematic and grave form of abuse occurring in the Democratic People's Republic of Korea. Political prison camps are said to have as many as 200,000 prisoners and citizens are routinely imprisoned for acts that should not be punishable by law, including for leaving their own country.

**Recommendations on arbitrary detention**

41.     The Special Rapporteur has consistently called on the Government to release political prisoners, particularly those imprisoned for guilt by association.[54]

42.     The Special Rapporteur has called on the Democratic People's Republic of Korea to repeal provisions in its legislation that run counter to international standards, in particular within the Criminal Code.[55]

43.     The Special Rapporteur has recommended that the Democratic People's Republic of Korea guarantee personal security and freedoms by, among others, reforming the justice system, and abiding by the rule of law with safeguards for accused persons, fair trials, the development of an independent judiciary and checks and balances against abuses of power.[56]

44.     The General Assembly and the Human Rights Council have made repeated calls for the authorities of the Democratic People's Republic of Korea to stop subjecting returnees to the country to any kind of punishment, including detention.[57]

## D.   Prison camps

45.     Many United Nations entities have decried the use of prison camps in the Democratic People's Republic of Korea, ranging from the General Assembly and the Human Rights Council to the Secretary-General and the Special Rapporteur.

46.     The General Assembly, in its resolutions adopted between 2006 and 2012 on the Democratic People's Republic of Korea highlighted, among several **systemic, widespread and grave violations** of human rights, "the existence of a large number of prison camps and the extensive use of forced labour," expressing its serious concern.[58]

47.     The Commission on Human Rights and the Human Rights Council "expressed very serious concern" at the use of prison camps in their annual resolutions from 2003 to 2012.[59] In 2009, the Human Rights Council deplored the grave, widespread and systematic human rights abuses in the country and in particular the use of torture and labour camps for "political prisoners and repatriated citizens of the Democratic People's Republic of Korea."[60]

---

[53] A/67/370
[54] A/66/322, paras 62, 71
[55] A/67/370, para 68
[56] A/HRC/13/47, para 88 (b) (iv)
[57] A/RES/66/174; A/RES/65/225; A/RES/64/175; A/64/224, para 73(a) (ii); A/63/322, para 62(a) (ii); A/HRC/13/47, para. 88 (a) (iii)
[58] For example, A/RES/67/181; A/RES/66/174
[59] E/CN.4/RES/2003/10
[60] A/HRC/RES/10/16

000351

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 22 of 40
USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 354 of 411

A/HRC/22/57

48.     In 2007, the Special Rapporteur referred to the existence of a large variety of detention centres ranging from those for political dissidents to those for criminals, as well as re-education camps and forced labour camps. He noted the various denominations of these centres including gwanliso (political labour camp), gyohwaso (long-term prison labour camp), jipgyulso (detention facility) and rodongdanryundae (labour facility).[61]

49.     In 2009, the Special Rapporteur underlined his concern at the use of unreasonable and abusive punishments, and noted in his reports to the Human Rights Council and the General Assembly that there are allegations of public and secret executions in political detention camps.[62] In February 2010, the Special Rapporteur indicated that "different sources indicate a conglomeration of huge camps for political prisoners and their families, who are often held there in perpetuity." These included Kaechon, Yodok, Hwasong, Bukchang, Hoeryong, Chonjin are some of the camps of infamy.[63]

50.     In March 2010, the Special Rapporteur sent a letter to the Government of the Democratic People's Republic of Korea regarding conditions in six prison camps and detention centres for political detainees, raising concerns about allegations of forced labour and limited access to basic necessities, such food, shelter, clothing, sanitation and medical treatment. He noted the allegation that the camps hold a large number of persons who have been detained for expressing political opinions, defecting or engaging in acts against the Government, or who are family members of accused persons. In a letter dated 31 March 2010, the Government responded to the Special Rapporteur's communication by simply stating that it did not recognize his mandate. The Government also stated that since it believed that the communication was based on fabricated information, it saw no need to comment on its substance.[64]

51.     In his report to the Human Rights Council in 2011, the Special Rapporteur dealt with the question of detention centres and political prisons in the Democratic People's Republic of Korea.[65] In this report, he noted that apart from the official correctional centres, North Korea is reported to have been operating a number of "political concentration camps", collection centres and labour training camps. Political prisoners are incarcerated in what is known as "Kwanliso", operated by the Farm Guidance Bureau of the State Security Agency. He noted that these facilities are also often called "control districts" or "special district for dictatorial control" and that some of the most flagrant human rights violations, such as torture and detention without due process of law are reported to be perpetrated there.

52.     The Special Rapporteur further noted that references to such labour training camps can be found in some of legal instruments of the Democratic People's Republic of Korea (Article 18 of the Sentences and Decisions Enforcement Law, as amended on 9 November 1998, the revised Penal Code of 2004). This reinforced the Special Rapporteur's view that reforms need to take place both to end the use of such labour training camps and amend legislation to ensure it is aligned with international standards.[66]

53.     In his 2011 report to the General Assembly[67] the Special Rapporteur highlighted the fact that human rights groups have published satellite images of alleged political prison camps in the Democratic People's Republic of Korea. He noted that these images show four

---

[61]   A/HRC/4/15, para 13
[62]   A/HRC/10/18,  para 23; A/63/322, para 5; See also A/HRC/WG.6/6/PRK/2.
[63]   A/HRC/13/47, para 31
[64]   A/65/391, paras 33-34
[65]   A/HRC/16/58
[66]   A/HRC/16/58, para 55
[67]   A/66/322, paras 60-63

21

A/HRC/22/57

of the six camps occupying large land areas within vast wildernesses of the provinces of South Pyongan, South Hamkyung and North Hamkyung. He also explained that a comparison of the latest pictures with satellite imagery from 2001 reportedly indicates a significant increase in the scale of the camps. He stated that it is estimated that the network of political prisons in the Democratic People's Republic of Korea, some of which are believed to be in operation since 1950s, hold up to 200,000 people.

54.     The Special Rapporteur's report described some of the conditions under which prisoners are reportedly held: "Reports indicate that a room of about 50 square metres houses about 30-40 political prisoners under harsh conditions. It is alleged that in most camps, no clothing is provided and prisoners face harsh winters. Inmates are also expected to work long hours performing manual labour." [68]

55.     He further noted that in Kwanliso 15 and Yodok prison camps, thousands of people are believed to be held by reason of "guilt by association." The majority of such people reportedly do not seem to know the reasons for their imprisonment or what crimes they are accused of. [69] The Special Rapporteur had already noted in 2005 that "A very disconcerting practice is documented by various sources – collective punishment based upon 'guilt by association.' This means that if a person is punished for a political or ideological crime, members of his or her family are also punished.[70]

56.     At its sixty-third session in 2012, the Working Group on Arbitrary Detention adopted an opinion in the case of Shin SookJa, Oh Hae Won and Oh Kyu Won.[71] The three were allegedly detained in 1987 solely in response to the defection of Oh Kil Nam (husband of the former and father of the latter two). The three were allegedly held in Yodok political prison camp and later transferred to a camp near Pyongyang. In its opinion the Working Group stated that under certain circumstances "widespread or systematic imprisonment or other severe deprivation of liberty in violation of the fundamental rules of international law may constitute crimes against humanity."[72] The Working Group concluded that the continued detention of Shin SookJa, Oh Hae Won and Oh Kyu Won is in contravention to international law and arbitrary. It requested the Government to take the necessary steps to remedy the situation, which in its view, includes the immediate release from detention and an enforceable right to compensation for the prisoners.[73]

57.     In 2012, the Special Rapporteur mentioned the case of Shin SookJa, Oh Hae Won and Oh Kyu Won in his report to the General Assembly[74] stating that this is an example of citizens of the Democratic People's Republic of Korea held in prison camps for guilt by association.  He noted several disturbing reports from non-governmental organizations and other sources of widespread arbitrary detention and forced labour, without specific charges or due process and with gross violations of human rights.  He also observed that "under certain circumstances, widespread or systematic imprisonment or other severe deprivation of liberty in violation of international law **may constitute crimes against humanity**" (emphasis added).[75]

---

[68]   A/66/322, para 60
[69]   A/66/322, para 60
[70]   A/60/306, para 19
[71]   A/HRC/WGAD/2012/4
[72]   A/HRC/WGAD/2012/4, para 26
[73]   A/HRC/WGAD/2012/4, para 28
[74]   A/67/370, paras 31-38
[75]   A/67/370, para 38

22

**Recommendations on prison camps**

58.     In 2011, the Secretary-General urged the Democratic People's Republic of Korea to improve conditions in prisons and detention centres, and release political prisoners.[76] The Special Rapporteur also made similar calls and proposed "that the authorities begin the release of political prisoners starting with certain categories of prisoners, such as the elderly, those having medical conditions, long serving prisoners, women who have children and persons imprisoned due to guilt by association."[77]

## E.   Discrimination

59.     The United Nations reports and resolutions have documented several patterns of discrimination in the Democratic People's Republic of Korea, in particular:

        (a)     Division of society into three different groups of allegiance to the regime, which affects the citizen's level of enjoyment of human rights and fundamental freedoms, including access to food;

        (b)     Discrimination against women, children, the elderly and persons with disabilities, including the disproportionate effect of malnutrition on these populations and specific violations that individuals in each of these categories suffer; and

        (c)     Violations specifically affecting those who have been repatriated to the Democratic People's Republic of Korea and their families.

60.     Since 2005, the Special Rapporteur has highlighted that while the Constitution and other laws in the Democratic People's Republic of Korea enshrine the principle of non-discrimination, the practice is defective.[78] The Special Rapporteur notes that the Government **divides the population into three different groups**: those close to the regime (the core mass), the group in the middle (the basic mass), and those considered hostile to the regime (the complex mass).[79] He describes the way in which these divisions affect **people's access to basic rights and services**: "The first group is the ruling elite, which is well endowed with privileges, such as access to special schools and hospitals. They are allowed to own private phones and read foreign publications. The second is the majority of the population, such as farmers and workers. They are provided with food rations, although dwindling in recent years due to the Government's experimentation with the market economy and a reduction in the State-sponsored public distribution system. The third group is considered to be the enemies of the State and is persecuted accordingly. They include the landed class before the communist takeover of the country, public officials under Japanese rule, religious groups, and those who assisted South Korean forces during the Korean War (1950-1953). They are denied access to college education and are discriminated against in their access to basic necessities such as housing, medical care and education. Many land up in the prisons referred to below. While this practice may have been abolished in law, it seems to persist and is implied by the testimonies of those who leave the country in search of refuge elsewhere."[80]

61.     Another particularity of this division identified by the Special Rapporteur is the application of the policy of "**crime by association**" which also provides a basis for discrimination:"Political dissent is heavily punished and has an intergenerational impact;

---

[76]   A/66/343, para 74
[77]   A/66/322, para 62
[78]   A/60/306, para 20
[79]   A/60/306; A/HRC/7/20; A/HRC/10/18; A/64/224
[80]   A/HRC/7/20, para 24

000354

where the parents are seen as antithetical to the regime, the child and the rest of the family are also discriminated against in their access to school, hospitals and other necessities."[81]

62.     The 2008 reports of the Special Rapporteur to the Human Rights Council and the General Assembly specifically analyse patterns of **discrimination that affect development, access to food and other necessities, and particular sectors of society**. With reference to the right to food, the Special Rapporteur has stressed that "beyond the elite, the people are faced with a painful paradox: on the one hand, the social safety nets which the State offered in the past are now no longer reliable and they must seek other ways to fend for themselves; on the other hand, when they undertake various livelihood initiatives to supplement their income, the authorities clamp down on them for fear of losing their grip on the population."[82]

63.     In 2009, the Special Rapporteur dedicated part of his report to the General Assembly to the issue of "freedom from discrimination".  He noted that the discrimination that results from the stratification of society can be seen through the plight of several groups, and that food and other shortages have particularly taken their toll on women, with high malnutrition rates particularly recorded in pregnant women.[83]

64.     The General Assembly resolutions have reflected the concerns raised in these reports. For instance, resolution 66/174 expressed concern at the precarious humanitarian situation which is compounded by the "prevalence of chronic and acute malnutrition, particularly among the most vulnerable groups, pregnant women, infants and the elderly."[84]

65.     In its consideration of the State report of the Democratic People's Republic of Korea in 2005, the Committee on the Elimination of Discrimination Against Women (CEDAW) underscored that there is a difference between de jure and de facto **equality between men and women**. The Committee noted with concern the persistence of traditional and stereotyped assumptions and attitudes in respect of the roles and responsibilities of women and men, which are discriminatory against women and have a pronounced impact, particularly in the areas of education and employment as well as in other areas of their lives.  There is only limited access by women to key decision-making positions at the top, particularly in politics, the judiciary and the civil service. It is also concerned that in times of economic crisis, as in the current situation of the country, women's prescribed roles and lesser entitlement intensifies their hardship and amounts to compounded discrimination.[85]

66.     The concerns of CEDAW have been echoed by the Secretary-General and the Special Rapporteur in all their reports and have been reflected in numerous United Nations resolutions. Several resolutions express deep concern at the "continued violation of the human rights and fundamental freedoms of women, in particular **trafficking of women for prostitution or forced marriage**," as well as **forced abortions and gender based discrimination**.[86]

67.     In 2005, the Commission on Human Rights expressed deep concern about the continued violation of the women's rights, in particular the trafficking of women for prostitution or forced marriage, ethnically motivated forced abortions, including by

---

[81]   A/HRC/10/18, para 28
[82]   A/HRC/7/20, para 13; A/63/322, paras 9, 29, 45, 50
[83]   A/64/224,  paras 39-52
[84]   A/RES/66/174, para 3; See also A/RES/ 63/190; A/RES/64/175; A/RES/65/225; A/RES/66/174.
[85]   CEDAW/C/PRK/CO/1, paras 35, 45, 57; See also documents available at
       http://www.un.org/womenwatch/daw/cedaw/33sess.htm
[86]   E/CN.4/RES/2004/13, para 1(d); E/CN.4/RES/2005/11; A/RES/60/173; A/RES/61/174;
       A/RES/62/167; A/RES/63/190;, A/RES/64/175;A/RES/66/174; A/HRC/RES/13/14

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 26 of 40
USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 358 of 411

A/HRC/22/57

labour-inducing injection or natural delivery, as well as infanticide of children of repatriated mothers, including in police detention centres and labour-training camps."[87]

68.     In its 2006 and 2007 resolutions, the General Assembly expressed serious concerns at the "continuing violation of the human rights and fundamental freedoms of women, in particular the trafficking of women for the purpose of prostitution or forced marriage, forced abortions, and infanticide of children of repatriated mothers, including in police detention centres and camps."[88]

69.     Both CEDAW and the Special Rapporteur highlighted the impact that discrimination has on the issue of **violence against women**.[89] Both domestic and institutional violence, particularly in prisons and other closed institutions, is widespread in the Democratic People's Republic of Korea.  This affects in particular women who do not belong to the ruling elite and who are marginalized by the cloistered political system. As the Special Rapporteur stressed, the Penal Code, amended in 2004, contains certain provisions that deal with sexual violence. However, what is lacking in the Democratic People's Republic of Korea is specific legislation to deal with all forms of violence against women and accompanying prevention and protection measures for victims.[90]

70.     The Special Rapporteur has further added that there are prevailing cultural assumptions in the Democratic People's Republic of Korea that women are dependent on men, and it is expected that women will be obedient and passive.  As a result, women are more directly exposed to various types of cultural practices in the family that result in violence towards them. **There is also a perception that domestic violence is not a crime and that the State should not intervene in such private family matters**. Even when a witness or a victim of domestic violence presents a case of violence to the police, reportedly, it is often not acted upon.[91] The Special Rapporteur also reflects concerns about reports of public security agents and patrols physically assaulting women in marketplaces; but since these agents are Government personnel, victims are not in a position to appropriately report their abuses. In the absence of a proper complaint and accountability mechanism, women continue to be exposed to acts of violence which they have little choice but to endure.[92]

71.     The Secretary General, the Special Rapporteur, and the Committee on the Rights of the Child (CRC) noted that the principle of non-discrimination is not fully respected in practice, vis-à-vis children with disabilities, children living in institutions, and children who are in conflict with the law. Moreover, it has been highlighted that children also face discrimination on the basis of political or other opinion, social origin or other status, either of themselves or because of their parents.[93] The General Assembly in its 2011 and 2012 resolutions addressed the specific **vulnerability of children**, in particular the continued lack of access to basic economic, social and cultural rights. These resolutions point to the particular vulnerability of repatriated children, street children, children with disabilities, children whose parents are detained, children living in detention or in institutions or in

---

[87]  E/CN.4/RES/2005/11
[88]  A/RES/60/173, paras 1(b) (i), 1 (b) (iv);  A/RES/61/174, paras 1(b) (i), 1 (b) (iv), 1(b) (vii)
[89]  A/60/306; E/CN.4/2006/35; A/61/349; A/HRC/7/20; A/HRC/10/18, A/66/322
[90]  A/66/322, paras 52-59
[91]  A/66/322, paras 52-59
[92]  A/66/322, paras 52-59
[93]  A/64/319; CRC/C/PRK/CO/4, para 19; E/CN.4/2006/35, para 29. See also A/RES/64/175 and CRC
      documents at http://www2.ohchr.org/english/bodies/crc/crcs50.htm

000356

conflict with the law.[94] Several United Nations documents also point to discrimination against children of non-ethnic Korean origin and their mothers.[95]

72.    As early as 2003 the Commission on Human Rights expressed deep concern at the "mistreatment of and discrimination against disabled children". Since 2006 the General Assembly has consistently decried "continuing reports of violations of the human rights and fundamental freedoms of persons with disabilities, especially on the use of collective camps and of coercive measures that target the rights of persons with disabilities to decide freely and responsibly on the number and spacing of their children."[96]  Whereas in 2006 the Special Rapporteur noted "to date, the situation facing those with disabilities has presented a very disconcerting picture. It is reported that those with disabilities are sent away from the capital city, and particularly those with mental disabilities are detained in areas or camps known as 'Ward 49' with harsh and subhuman conditions."[97]

73.    Another group regularly referred to by the Special Rapporteur, the Secretary-General and numerous resolutions of the Commission on Human Rights, Human Rights Council and General Assembly are those **returned or repatriated to the Democratic People's Republic Korea and their families**. All reports and resolutions refer to the harsh punishments they suffer, the violations of their rights and the lack of respect for the principle of non-refoulement by neighbouring states.

**Recommendations on discrimination**

74.    During the Universal Periodic Review in 2009, several States recommended that the Democratic People's Republic of Korea ratify the International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) and the Convention on the Rights of Persons with Disabilities (CPRD).[98]

75.    Several Human Rights Council resolutions reaffirm the responsibility of the Government of the Democratic People's Republic of Korea to ensure the full enjoyment of all human rights and fundamental freedoms of its entire population.[99]

## F.    Violations of freedom of expression

76.    The United Nations has called upon the Democratic People's Republic of Korea to respect the right to freedom of opinion, expression and assembly of its citizens.

77.    Since 2006, the General Assembly has expressed "its very serious concern at ...all pervasive and severe restrictions on the freedoms of thought, conscience, religion, opinion and expression, peaceful assembly and association, and on equal access to information, by such means as the persecution of individuals exercising their freedom of opinion and expression, and their families."[100]

---

[94]   A/RES/64/175; A/RES/65/225
[95]   E/CN.4/2006/35, para 25; A/HRC/7/20, para 31; A/ 61/349, para 47
[96]   See for example A/RES/62/167.
[97]   E/CN/4/2006/35, para 33
[98]   A/HRC/13/13; Universal Periodic Review documents
       [http://www.ohchr.org/EN/HRBodies/UPR/Pages/KPSession6.aspx]
[99]   A/HRC/RES/13/14; A/HRC/RES/16/8; A/HRC/RES/19/13
[100]  A/RES/60/173; A/RES/61/174; A/RES/62/167; A/RES/63/190; A/RES/64/175; A/RES/66/174

26

78.     The Commission on Human Rights also echoed its concern about the same reported violations.[101]

79.     With regard to freedom of expression, the Special Rapporteur noted, in 2006, that there was no ostensible improvement during the year. The opaque and non-democratic nature of the State militates against the right to self-determination and the need for democracy in the country. Although the advent of technology and globalization has meant that some Democratic People's Republic of Korea nationals have more access to foreign information, there is still no genuine free access to information, since media and related information are State-controlled and it is illegal to listen to foreign radio, watch foreign TV or to own computers without official permission.[102]

80.     According to information received, in October 2006, the authorities threatened independent radio stations run by exiles and operated from another country. Another source indicates that the local police monitor sales of radios so as to ensure that they are pre-tuned to government stations and are sealed before they go on sale.[103]

81.     In 2009, the Special Rapporteur highlighted that the media is heavily controlled and censored, and forms the backbone of an enormous propaganda machine. Reading of books from the Republic of Korea is punishable as a crime of espionage. Chinese books are also prohibited. There is extensive wiretapping of telephones. Unless one belongs to the elite, it is forbidden to own computers and to use the Internet without official permission and it is prohibited to watch foreign videos. There are reports of official clamp-downs on compact discs, and surveillance teams of inspectors raid homes to see whether families are (illegally) watching or listening to foreign films and radio or television broadcasts. Such raids are particularly intense near the border with neighbouring countries. Radio and television sets are pre-tuned to Government programmes. People who were caught listening to foreign broadcasts were detained by the State authorities and sentenced to long prison terms.[104]

82.     In 2011, the Special Rapporteur underlined that the authorities in the country continue to impose severe restrictions on freedom of opinion, expression and assembly, despite constitutional guarantees of these rights.[105] He stressed that the provisions of the Press Law of the Democratic People's Republic of Korea are not in line with a State party's obligation under article 19 of the International Covenant on Civil and Political Rights. Article 48 of the Press Law, for instance, empowers the State to criminalize any statement, publication, news or article that is critical of the State or its organs. Furthermore, article 103 of the Penal Code of the Democratic People's Republic of Korea, as amended in 1999, stipulates that anyone seriously disturbing the social order shall be punished with up to 5 years of correctional labour and, in serious cases, their leaders shall be punished with up to 10 years of correctional labour. When the Democratic People's Republic of Korea further amended the Penal Code in April 2004, with the aim of including specific acts that would constitute such crimes, it included listening to broadcasts from the Republic of Korea; collecting, possessing and circulating printed matter from the Republic of Korea; and spreading unfounded rumours.[106]

83.     In 2011, the Special Rapporteur highlighted the fact that the availability of foreign newspapers to the public is highly restricted with independent national media, and severe restrictions on journalists' travel within the country and abroad. Restrictions placed on

---

[101]   E/CN.4/RES/2004/13; E/CN.4/RES/2005/11
[102]   E/CN.4/2006/35; A/60/306.
[103]   A/HRC/4/15, para 14
[104]   A/64/224, para 31
[105]   A/66/322, paras 48-51
[106]   A/66/322, para 49

000358

A/HRC/22/57

journalists and others who seek to exercise their freedom of expression and opinion are incompatible with provisions under paragraph 3 of article 19 of the International Covenant on Civil and Political Rights. State-controlled media have also been used to defame independent reporting through allegations attacking the integrity, morals and independence of journalists and media outlets. Complaints have been fabricated to discredit independent non-governmental organizations and journalists.[107]

84.    The Secretary-General also highlighted that the Government's control over the flow of information is strict and pervasive. The Democratic People's Republic of Korea's state news agency, the Korean Central News Agency, is the only source of information for all media outlets in the country.[108]

85.    In 2012, the Special Rapporteur underlined that due to ambiguous terms in the Criminal Code of the Democratic People's Republic of Korea, the State can impose severe restrictions on the enjoyment of freedom of opinion and expression. For instance, article 166 of the Code refers to punishment of a worker in the communications and broadcasting service sector who makes "irresponsible" communications or does not conduct broadcasting in a "normal manner", resulting in "serious consequences". The use of terms such as "normal manner", "serious consequences" and "irresponsible" leaves scope for the Government to suppress freedom of opinion and expression. It should be noted that the universal right to freedom of expression includes the right to receive and impart information. "Article 195 of the Code provides for punishments, including short-term labour, for a person who listens to broadcasts that are hostile to the Republic or collects, keeps or distributes enemy propaganda, which can be broadly interpreted to restrict people in the exercise of their right to freedom of opinion and expression or to allow the Government to place severe restrictions on independent media in the country."[109]

**Recommendations on freedom of expression**

86.    The Secretary-General urged the Government of the Democratic People's Republic of Korea to "to take decisive measures to respect the rights to freedom of thought, conscience and religion; assembly; and opinion and expression."[110] Furthermore, the Special Rapporteur, in concert with the statements made by the Secretary-General, also noted that "freedom of opinion and expression is an indispensable condition for the full development of society, and the realization of a number of rights. To this end, he calls on the Government to provide greater space for independent media, free access to the Internet."[111]

## G.    Violations of the right to life

87.    Over many years the General Assembly and the Commission on Human Rights have expressed their serious concern at the use of public executions and "imposition of the death penalty for political or religious reasons."[112] In 2001, the Human Rights Committee

---

[107]  A/66/322, para 50
[108]  A/66/343, para 13
[109]  A/67/370, para 26
[110]  A/67/362, para 57
[111]  A/66/322, para 65
[112]  E/CN.4/RES/2005/11; E/CN.4/RES/2004/13; E/CN.4/RES/2003/10; A/RES/66/174; A/RES/65/225; A/RES/64/175

28

recommended that the Democratic People's Republic of Korea refrain from public executions and work towards abolishing capital punishment.[113]

88.     In 2008, the Secretary-General informed the General Assembly that although their veracity could not be independently confirmed, "reports from a range of sources continue to cite a high number of public executions."[114] The same year the Special Rapporteur noted that he found the continuing use of public executions to intimidate the public particularly disquieting. In his 2009 report to the Human Rights Council he noted reports of public and secret executions in political detention camps. In 2010 in relation to political prisoners, the Special Rapporteur noted that the lives of inmates are lost too easily to hunger and slave labour, brutality and atrocity. There is, however, little detail in United Nations documentation describing instances of death in custody or as a consequence of torture.

89.     In relation to capital punishment, the Secretary-General noted in 2011 that the number of offences carrying the death penalty had been reduced from 33 to 5. However, he expressed concern at the fact that, of those five offences, four are essentially political offences (articles 44, 45, 47 and 52 of the Criminal Code) couched in terms so broad that the imposition of the death penalty may be subjective and arbitrary.[115]

90.     Moreover in 2012, the Special Rapporteur highlighted that on 19 December 2007, the Democratic People's Republic of Korea adopted a unique form of law, referred to as an "addendum to the Criminal Code for ordinary crimes," which has gone largely unnoticed by the international community and which expands the "crimes" for which the death penalty is applied. The Special Rapporteur notes that the addendum has functioned as a complement to the Penal Code, and carried the same weight as other provisions of the Criminal Code. The addendum comprises a total of 23 articles, of which 16 stipulate the death penalty for a number of crimes, 14 including smuggling and dealing in narcotics, seizing State property, currency counterfeiting and illicitly selling State resources. With the adoption of the addendum, the total number of crimes that carry the death penalty in the country stands at 22. Furthermore, the addendum contains a number of vague expressions, such as "the gravest cases" or "extremely serious cases," which leave room for arbitrary decisions by the authorities. The addendum permits the application of capital punishment for various crimes as long as the authorities are able to establish that the crime in question was "extremely serious" and falls under one of the 16 listed crimes.[116]

**Recommendations on the right to life**

91.     The General Assembly and Human Rights Council resolutions have consistently treated public executions and the application of the death penalty for political and religious reasons as a systematic, grave and widespread form of violation of human rights in the Democratic People's Republic of Korea.

92.     The Secretary-General and the Special Rapporteur have reiterated recommendations by the Human Rights Committee that the Democratic People's Republic of Korea end public executions and adopt a moratorium on the death penalty.[117]

93.     In 2011 the Special Rapporteur recommended that the Democratic People's Republic of Korea repeal provisions of law that run counter to international standards,

---

[113]   CCPR/CO/72/PRK, 27 August 2001, Concluding Observations of the Human Rights Committee, Democratic People's Republic of Korea.
[114]   A/63/332, para 5
[115]   A/66/343, para 17
[116]   A/HRC/19/65, para 36
[117]   A/HRC/10/18, para 80 (a) (iii); A/HRC/13/47, para 88 (a)(iii); A/66/343 para 74

000360

particularly drawing the attention to the provisions of the Criminal code and its addendum.[118]

## H.   Violations of freedom of movement

94.   The United Nations has consistently addressed reported violations of the right to freedom of movement occurring across the Democratic People's Republic of Korea, as well as of persons who cross or try to cross the border without a permit.

95.   Since 2006, the General Assembly has expressed "its very serious concern at … limitations imposed on every person who wishes to move freely within the country and travel abroad, including the punishment of those who leave or try to leave the country without permission, or their families as well as punishment of persons who are returned and at the "sanctions imposed on citizens of the Democratic People's Republic of Korea who have been repatriated from abroad, such as treating their departure as treason, leading to punishments of internment, torture, cruel, inhuman or degrading treatment or the death penalty."[119]

96.   The Democratic People's Republic of Korea has always had a strict policy on the movements of its people both internally and externally. Since its inception, the authorities have regulated migration stringently as an instrument of State control. Generally the population is not allowed to move freely within the country and people are only able to travel abroad with official permission. [120]

97.   In 2012 the Special Rapporteur summarized how the classification of the population on the basis of their loyalty to the Government affects the enjoyment of human rights, including freedom of movement. He noted that members of the "hostile" class face "the greatest number of restrictions and cannot live in Pyongyang or other major cities."[121]

98.   The Special Rapporteur noted that, for years, there has been a constant flow of people persecuted by the authorities fleeing the country clandestinely, without travel permits.[122] The food crisis of the mid-1990s and thereafter has also led to increased migration of people in search of food and other necessities across the border. There has thus been a persistent flow of people into neighbouring countries at times in search of food, employment and livelihood, at times escaping from persecution and oppression, at times for both reasons.[123]

99.   In 2012 the Special Rapporteur recognized, that while some people flee the country due to persecution, others leave for economic reasons.[124] However, he noted that whatever their motivation it is necessary to provide all individuals leaving the Democratic People's Republic of Korea with protection.  The Special Rapporteur observed that many of those leaving the Democratic People's Republic of Korea belong to what the Government considers the "hostile" class.  "In such cases, there are strong grounds for arguing that their departure is motivated by political persecution or due to their membership in a particular

---

[118]   A/HRC/19/65;  A/67/370
[119]   A/RES/60/173; A/RES/61/174; A/RES/62/167; A/RES/63/190; A/RES/64/175; A/RES/66/174
[120]   A/HRC/7/20, para 20
[121]   A/67/370, para 51
[122]   A/HRC/10/18, paras 34-35; A/61/349, paras 36, 61
[123]   A/HRC/10/18, para 35
[124]   A/67/370, para 59

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 32 of 40
USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 364 of 411

A/HRC/22/57

social group, two of the five conditions established by the Convention relating to the Status of Refugees."[125]

100.   The Special Rapporteur further argues that even if certain persons may not fit the definition of refugee when they leave the Democratic People's Republic of Korea, because the sole circumstance motivating their movement is economic hardship, they may become refugees *sur place* – because they have a valid fear of persecution upon return, given that leaving the country without authorization is a criminal offense.[126]

101.   In the Democratic People's republic of Korea, it is a criminal offence for citizens to leave the country without permission. Therefore, punishment facing citizens of the Democratic People's Republic of Korea who have been repatriated from abroad raises serious concern.

102.   On 18 November 2005, the Special Rapporteur sent a communication in connection with two groups of the Democratic People's Republic of Korea nationals who were deported back to their country by a neighbouring country against their will. The first group consisted of five women and two men who were deported on 29 September 2005, after having sought asylum in a foreign school in a neighbouring country. The second case related to a group of four women and one man who also sought asylum in a foreign school in a neighbouring country, who were returned to the Democratic People's Republic of Korea against their will in October 2005. The Special Rapporteur requested the Government of the Democratic People's Republic of Korea to provide him with information on the current whereabouts and status of the above-mentioned groups and expressed concern about their safety. He further urged the Government to abstain from punishing the returnees for having left without an exit visa and to ensure their safety. In its reply, the Government reiterated its position that it did not recognize the mandate of the Special Rapporteur and therefore did not wish to meet or communicate with the Special Rapporteur regarding human rights issues.[127]

103.   Several persons interviewed by the Special Rapporteur have had experience with forced return to the country of origin and the punishments inflicted. If those who had left the country were "first-timers" without political affiliations, they would be questioned upon return without necessarily being punished. If they had left several times and subsequently returned, punishments would be increased accordingly, beginning with re-education and forced labour. If they had had access to religious groups or non-governmental organizations in neighbouring countries, they would be punished severely, with long-term incarceration in political prisons for those seen as being antithetical to the regime in the country of origin.[128]

104.   The Special Rapporteur noted in his 2007 report that during certain periods, there has been a slight relaxation of the control imposed on migrants. Article 233 of the revised 2004 Penal Code defines 'border crossing' broadly as 'those going and coming across the border' instead of 'simple crossing' in the old Penal Code. Furthermore, the level of the mandatory sentence for the crime of 'illegal going and coming across the border' was reduced from three years to two years of 'labour training' punishment. Since two years of 'labour training' is equivalent to one year of 'correctional labour', the level of punishment was reduced from three years to one year of 'correctional labour.'"[129]

---

[125]   A/67/370, para 61
[126]   A/67/370, para 62
[127]   E/CN.4/2006/35, paras 36-40
[128]   A/HRC/4/15, para 23
[129]   A/HRC/4/15, para 21

000362

105.    However, the threat of punishment facing the repatriated citizens is ever-present. In March 2008, the Special Rapporteur on extrajudicial, summary or arbitrary executions together with the special Rapporteur on the right to food and the Special Rapporteur on the question of torture, sent a joint allegation letter regarding information received on the alleged public execution of 13 women and 2 men, who were reportedly accused of planning to cross over to a neighbouring country. It was alleged that this execution was designed to dissuade people from crossing illegally. The Government did not reply to this communication.[130]

106.    In each of his reports to the General Assembly the Secretary-General notes the concerns of the United Nations High Commissioner for Refugees (UNHCR) relating to the flow of Democratic People's Republic of Korea nationals seeking protection, including reports that women are being subjected to human trafficking and forced marriages and in some instances children born in such conditions have been deprived of the care of their mothers.[131]

**Recommendations on freedom of movement**

107.    Since 2005, the Special Rapporteur has called upon the Government to address the root causes of displacement, prevent persecution and victimization of those who are displaced, including when they return to their country of origin, and guarantee the right to freedom of movement without imposing sanctions on those who move without permission.[132]

108.    The General Assembly called upon the Government to ensure that citizens of the Democratic People's Republic of Korea expelled or returned to the Democratic People's Republic of Korea are able to "return in safety and dignity, are humanely treated and are not subjected to any kind of punishment."[133]

109.    As the Special Rapporteur underlined in 2007, "the preferred position is that those who left the country in search of refuge elsewhere should not be punished at all for having left the country without an exit visa. This would also help to fulfil the spirit of the country's 1998 Constitution whose article 75 states that "citizens shall have freedom of residence and travel."[134]

## I.    Enforced disappearances, including abduction of foreign nationals

110.    The United Nations, through many of its human rights mechanisms, has consistently documented and decried the crime of enforced disappearances in the Democratic People's Republic of Korea. Reports by the Secretary-General and the Special Rapporteur highlight the presence of long-existing cases of enforced disappearances, particularly in the form of abduction of foreign nationals, dating back to the Korean War. Since 2003, the Commission on Human Rights, followed by the Human Rights Council have repeatedly noted the existence and unresolved nature of the abduction of foreign nationals in each of their resolutions concerning North Korea. In a comprehensive list of widespread, systematic and grave human rights violations, the General Assembly's first resolution on North Korea in December 2005 (and those that followed) expressed its concern at the "unresolved

---

[130]    A/HRC/WG.6/6/PRK/2, para 20
[131]    A/67/362; A/66/343; A/65/391
[132]    See for example A/60/306.
[133]    A/RES/63/190; A/RES/64/175; A/RES/66/174
[134]    A/HRC/4/15, para 22

000363

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 34 of 40
USCA Case #13-7147   Document #1495112   Filed: 05/29/2014   Page 366 of 411

A/HRC/22/57

questions relating to the abduction of foreigners in the form of enforced disappearance."[135] From 2006 onwards the General Assembly qualified these abductions noting that they violated "the human rights of the nationals of other sovereign countries."[136]

111.    The Working Group on Enforced or Involuntary Disappearances (WGEID) was the first United Nations mechanism to address the issue of abduction of foreigners by the Government of the Democratic People's Republic of Korea, in particular cases of Japanese and Korean nationals. In total the Working Group on Enforced or Involuntary Disappearances has transmitted twelve cases to the Democratic People's Republic of Korea, all of which remain outstanding.[137] In addition to eight cases of disappeared Japanese nationals abducted in the 1970s and 1980s, another case of disappearance of a female national of the Republic of Korea on the border between China and the Democratic People's Republic of Korea was reported to have occurred in 2004. The remaining three cases were received by the WGEID during its November 2010-2011 reporting period and concern Korean nationals who allegedly disappeared on December 1969 after their Korean Airlines flight YS-11 was hijacked and diverted to Democratic People's Republic of Korea.[138]

112.    Regarding the cases of abduction of Japanese nationals, the government of the Democratic People's Republic of Korea responded to the WGEID by stating that it "had already provided the Government of Japan with detailed information on those persons."[139] In regards to the female national of South Korea, the Democratic People's Republic of Korea stated that after conducting an investigation into the matter, they had found that "neither that incident nor any similar act had occurred in the border area."[140] The WGEID responded that, because of unsatisfactory reports from the Democratic People's Republic of Korea, these cases would remain outstanding and hoped that the Democratic People's Republic of Korea would clarify them.[141]

113.    The greatest number of enforced disappearances possibly happened during and after the Korean War, which took place from 1950-1953. In his 2011 report to the Human Rights Council, the Special Rapporteur noted that the exact number of persons from the Republic of Korea by the Democratic People's Republic of Korea during the Korean War is not known.[142] However he noted that in March 2002, the Korean War Abductees Family Union (KWAFU) began compiling the existing "List of Korean War Abducted Persons." The list contains around 94,700 names of people abducted. As the Special Rapporteur noted in his report, "some 80.3 per cent of those abducted were either taken away from their home or near their homes, which indicates that these abductions were "carried out intentionally and in an organized manner".[143]

114.    The Special Rapporteur noted that since the war, 3,824 people have been reportedly abducted from the Republic of Korea, of which 3,310 have been returned after having been held for 6 months to a year. He has gathered information that an estimated 500 civilians abducted and 500 prisoners of war are currently being detained in the Democratic People's Republic of Korea, which denies the existence of such abductees. Countries such as Japan, Lebanon, and Thailand have reported such abductions. The Special Rapporteur noted that

---

[135] A/RES/60/173, para 1(b)(v)
[136] A/RES/61/174, para 1(b)(v)
[137] A/64/319, para 20
[138] A/HRC/19/58/Rev.1, paras 143-146
[139] A/62/318, para 18
[140] A/62/318, para 18
[141] A/62/318, para 20
[142] A/HRC/16/58, paras 18-25
[143] A/HRC/16/58, para 19

000364

of 17 identified abductees from Japan only 5 have been returned, with 12 cases still pending (some of which are being examined by the Working Group on Enforced and Involuntary Disappearances).[144]   In relation to the abduction issue the Special Rapporteur argues that "**international criminal liability of those responsible for abduction cannot be ruled out** (emphasis added)."[145]

115.    As documented by the WGEID, the Secretary-General and the Special Rapporteur, the Government of the Democratic People's Republic of Korea has failed to investigate enforced disappearances sufficiently, transparently, or independently, resulting in unsatisfactory results that have not clarified the cases of abducted persons.

**Recommendations on enforced disappearances**

116.    In its resolutions, the General Assembly has repeatedly called on the Democratic People's Republic of Korea to "urgently resolve these questions, including through existing channels in a transparent manner."[146] However, reiterated calls for the return of abductees by the Secretary-General, the Special Rapporteur and the General Assembly have been ignored by the Government of the Democratic People's Republic of Korea.[147]

---

[144]  A/HRC/16/58, para 20
[145]  A/HRC/16/58,  para 25
[146]  A/RES/66/174, para 2; A/RES/65/225; A/RES/64/175; A/RES/63/190
[147]  A/HRC/7/20; A/62/264; A/63/322; A/HRC/10/18; A/64/224;A/HRC/13/47; A/HRC/16/58; A/HRC/19/65, para 8

000365

Case 1:09-cv-00648-RWR   Document 54-1   Filed 02/09/13   Page 36 of 40
USCA Case #13-7147      Document #1495112      Filed: 05/29/2014      Page 368 of 411

A/HRC/22/57

## Annex II

*[English only]*

### List of United Nations documents reviewed[a]

#### Core documents

**General Assembly resolutions**

| | |
|---|---|
| A/RES/67/181: | adopted without a vote on 20 December 2012 |
| A/RES/66/174: | adopted with 123 votes in favour, 16 against, 51 abstentions and 3 non-votes, on 19 December 2011 |
| A/RES/65/225: | adopted with 106 votes in favour, 20 against, 57 abstentions and 9 non-votes, on 21 December 2010 |
| A/RES/64/175: | adopted with 99 votes in favour, 20 against, 63 abstentions and 10 non-votes, on 18 December 2009 |
| A/RES/63/190: | adopted with 94 votes in favour, 22 against, 63 abstentions and 13 non-votes, on 18 December 2008 |
| A/RES/62/167: | adopted with 101 votes in favour, 22 against, 59 abstentions and 10 non-votes, on 18 December 2007 |
| A/RES/61/174: | adopted with 99 votes in favour, 21 against, 56 abstentions and 16 non-votes, on 19 December 2006 |
| A/RES/60/173: | adopted with 88 votes in favour, 21 against, 60 abstentions and 22 non-votes, on 16 December 2005 |

**Human Rights Council resolutions**

| | |
|---|---|
| A/HRC/RES/19/13: | adopted without a vote on 22 March 2012 |
| A/HRC/RES/16/8: | adopted with 30 votes in favour, 3 against, and 11 abstentions, on 24 March 2011 |
| A/HRC/RES/13/14: | adopted with 28 votes in favour, 5 against, and 13 abstentions, on 25 March 2010 |
| A/HRC/RES/10/16: | adopted with 26 votes in favour, 6 against, and 15 abstentions, on 26 March 2009 |
| A/HRC/RES/7/15: | adopted with 22 votes in favour, 7 against, and 18 abstentions, on 27 March 2008 |

---

[a]  This may not be an exhaustive list of all United Nations documents that address the human rights situation in the Democratic People's Republic of Korea.

000366

A/HRC/22/57

**Commission on Human Rights resolutions**

E/CN.4/RES/2005/11:    adopted with 13 votes in favour, 9 against, and 14 abstentions,
on 14 April 2005

E/CN.4/RES/2004/13:    adopted with 29 votes in favour, 8 against, and 16 abstentions,
on 15 April 2004

E/CN.4/RES/2003/10:    adopted with 28 votes in favour, 10 against, and 14 abstentions,
on 16 April 2003

**Reports of the Secretary-General to the General Assembly**

A/67/362:          dated 13 September 2012

A/66/343:          dated 7 September 2011

A/65/391:          dated 24 September 2010

A/64/319:          dated 24 August 2009

A/64/319/Corr.1:   dated 15 October 2009

A/63/332:          dated 26 August 2008

A/62/318:          dated 4 September 2007

**Reports of the Special Rapporteur to the General Assembly**

A/67/370:    dated 13 September 2012, by Marzuki Darusman

A/66/322:    dated 24 August 2011, by Marzuki Darusman

A/65/364:    dated 14 September 2010, by Marzuki Darusman

A/64/224:    dated 4 August 2009, by Vitit Muntarbhorn

A/63/322:    dated 22 August 2008, by Vitit Muntarbhorn

A/62/264:    dated 15 August 2007, by Vitit Muntarbhorn

A/61/349:    dated 15 September 2006, by Vitit Muntarbhorn

A/60/306:    dated 29 August 2005, by Vitit Muntarbhorn

**Reports of the Special Rapporteur to the Human Rights Council**

A/HRC/19/65:    dated 13 February 2012, by Marzuki Darusman

A/HRC/16/58:    dated 21 February 2011, by Marzuki Darusman

A/HRC/13/47:    dated 17 February 2010, by Vitit Muntarbhorn

A/HRC/10/18:    dated 24 February 2009, by Vitit Muntarbhorn

A/HRC/7/20:     dated 15 February 2008, by Vitit Muntarbhorn

A/HRC/4/15:     dated 7 February 2007, by Vitit Muntarbhorn

000367

**Reports of the Special Rapporteur to the Commission on Human Rights**

E/CN.4/2006/35:     dated 23 January 2006, by Vitit Muntarbhorn

E/CN.4/2005/34:     dated 10 January 2005, by Vitit Muntarbhorn

**Universal Periodic Review**

A/HRC/13/13:                 Report of the Working Group, dated 4 January 2010

A/HRC/WG.6/6/PRK/1:         National Report, dated 27 August 2009

A/HRC/WG.6/6/PRK/2:         Compilation Report, dated 18 September 2009

A/HRC/WG.6/6/PRK/3:         Summary of stakeholders' submissions, dated 28 August 2009

A/HRC/WG.6/6/PRK/3/Corr.1:  Summary corrigendum, dated 23 November 2009

## Supplementary documents

**Treaty Bodies: Concluding Observations, State Reports and related documents**

*Human Rights Committee (CCPR)*

CCPR/CO/72/PRK:            Concluding Observations, 27 August 2001

CCPR/CO/72/PRK/Add.1:      Replies submitted by the Government, 5 August 2002

CCPR/C/PRK/2000/2:         State Party Report, 4 May 2000

CCPR/C/21/Rev.1/Add.8/Rev.1:  General Comment 26 adopted on 8 December 1997

*Committee on Economic, Social and Cultural Rights (CESCR)*

E/C.12/1/Add.95:   Concluding Observations, 12 December 2003

E/1990/6/Add.35:   State Party Report, 15 May 2002

*Committee on the Rights of the Child (CRC)*

CRC/C/PRK/CO/4:      Concluding Observations, 27 March 2009

CRC/C/PRK/Q/4/Add.1:  Written replies by the Government to the list of issues, 22 December 2008

CRC/C/PRK/Q/4:       List of issues to be taken up in connection with the fourth periodic report, 20 October 2008

CRC/C/PRK/4:         Consideration of State Party Report, 15 January 2008

CRC/C/15/Add.239:    Concluding Observations, 1 July 2004

CRC/C/Q/PRK/2:       List of issues to be taken up in connection with the consideration of the second periodic report, 13 February 2004

CRC/C/65/Add.24:     State Party Report, 5 November 2003

37

000368

*Committee on the Elimination of Discrimination against Women (CEDAW)*

| | |
|---|---|
| CEDAW/C/PRK/CO/1: | Concluding comments, 22 July 2005 |
| CEDAW/PSWG/2005/II/CRP.2/Add.3: | Responses to the list of issues and questions for consideration of the initial report, 15 April 2005 |
| CEDAW/PSWG/2005/II/CRP.1/Add.3: | List of issues and questions with regard to the consideration of periodic reports, 9 February 2005 |
| A/60/38 (SUPP): | CEDAW Report on 32nd and 33rd sessions, 2005 |
| CEDAW/C/PRK/1: | Initial Report of State Parties, 11 September 2002 |

**Special Procedures of the Human Rights Council**

*Working Group on Arbitrary Detention (WGAD)*

A/HRC/WGAD/2012/4:   Opinion No. 4/2012 adopted on 2 May 2012

*Working Group on Enforced and Involuntary Disappearances (WGEID)*

| | |
|---|---|
| A/HRC/19/58/Rev.1: | Annual Report 2011, 2 March 2012 |
| A/HRC/16/48: | Annual Report 2010, 26 January 2011 |
| A/HRC/13/31: | Annual Report 2009, 21 December 2009 |
| A/HRC/10/19: | Annual Report 2008, 25 February 2009 |
| A/HRC/7/2: | Annual Report 2007, 10 January 2008 |
| A/HRC/4/41: | Annual Report 2006, 25 January 2007 |
| E/CN.4/2006/56: | Annual Report 2005, 27 December 2005 |
| E/CN.4/2005/65: | Annual Report 2004, 23 December 2004 |
| E/CN.4/2004/58: | Annual Report 2003, 21 January 2004 |
| E/CN.4/2003/70: | Annual Report 2002, 21 January 2003 |

*Notes Verbales or letters from the Permanent Mission of the Democratic People's Republic of Korea addressed to the President of the Human Rights Council*

| | |
|---|---|
| A/HRC/19/G/1: | dated 1 February 2012 |
| A/HRC/16/G/2: | dated 20 January 2011 |
| A/HRC/13/G/7/Rev.1: | dated 21 January 2010 |
| A/HRC/10/G/6: | dated 29 January 2009 |
| A/HRC/7/G/3: | dated 30 January 2008 |
| A/HRC/5/G/11: | dated 18 June 2007 |
| A/HRC/5/G/5: | dated 8 June 2007 |

A/HRC/22/57

**Letter from the Permanent Representative of the Democratic People's Republic of Korea addressed to the High Commissioner for Human Rights**

E/CN.4/2005/G/13:          dated 28 February 2005

**Notes by the Secretariat**

E/CN.4/2006/32:          dated 25 January 2006

E/CN.4/2005/32:          dated 22 December 2004

A/59/316:          dated 1 September 2004

E/CN.4/2004/31:          dated 17 February 2004

_____

39

000370

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                  )
HAN KIM, et al.,                  )
                                  )
        Plaintiffs,               )
                                  )
        v.                        )        Civil Action No. 09-648 (RWR)
                                  )
DEMOCRATIC PEOPLE'S REPUBLIC      )
of KOREA, et al.,                 )
                                  )
        Defendants.               )
_____ )
```

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Han Kim ("Han") and Yong Seok Kim ("Yong") bring this civil action under the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), seeking damages against officials, employees and agents of defendant Democratic People's Republic of Korea ("DPRK") in connection with the January 16, 2000 abduction of Reverend Kim Dong Shik ("Reverend Kim"), who is Han's father and Yong's brother. Following his abduction, Reverend Kim was forcibly transferred to North Korea where the plaintiffs allege he was repeatedly tortured by officials, employees and agents of DPRK.

Plaintiffs filed suit and served DPRK following the requirements of 28 U.S.C. § 1608(a)-(b). DPRK failed to answer or otherwise respond to the complaint, and plaintiffs secured entry of default under Fed. R. Civ. P. 55(a). The plaintiffs then moved for default judgment and have submitted proposed

- 2 -

findings of fact, along with supporting declarations and
documentary evidence, and proposed conclusions of law.

The FSIA permits courts to exercise subject matter
jurisdiction and enter judgments of liability against foreign
states only where a plaintiff pleads and produces satisfactory
evidence that a foreign state's conduct falls within one of the
enumerated exceptions to sovereign immunity.  28 U.S.C.
§ 1605A(a), (c).  The plaintiffs here rely on the exception for
torture, arguing that "[t]he evidence submitted demonstrates that
it is far more likely than not that Reverend Kim suffered and
continues to suffer the torture and brutal conditions meted out
to all 'enemies' of the DPRK unfortunate enough to fall into the
hands of the DPRK's security services."  Pls.' Proposed Findings
of Facts and Conclusions of Law ("Pls.' Proposed Facts") at 42.
However, plaintiffs' evidence regarding DPRK's alleged treatment
of Reverend Kim appears insufficient to meet the high standard
recognized in this circuit that is set by the FSIA's definition
of torture.  Because the FSIA precludes jurisdiction over this
action against a foreign sovereign for conduct not shown by
satisfactory evidence to meet the high standard set for proof of
torture, the plaintiffs' motion for default judgment will be
denied but the case will be certified for an interlocutory
appeal.

- 3 -

DISCUSSION

I.    JURISDICTION AND LIABILITY UNDER THE FSIA

Before Congress amended the FSIA in 2008 to add the § 1605A(c) private right of action, the D.C. Circuit explained that at base, "[t]he FSIA is undoubtedly a jurisdictional statute which, in specified cases, eliminates foreign sovereign immunity and opens the door to subject matter jurisdiction in the federal courts." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 87 (D.C. Cir. 2002); see also Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1099 (D.C. Cir. 1982) ("[T]he absence of immunity is a condition to the presence of subject matter jurisdiction."). The door is opened only for cases that fall into one of the statute's specifically enumerated exceptions. Here, Han and Yong rely on the exception eliminating foreign sovereign immunity in cases "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, [or] extrajudicial killing, . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The FSIA imposes the additional jurisdictional requirements that the foreign state have been designated as a state sponsor of terrorism during a specified period, that the claimant or victim have been a United States national at the time

- 4 -

of the torture, and that the foreign state have been afforded a
reasonable opportunity to arbitrate the claim.  28 U.S.C.
§ 1605A(a)(2).  Section 1605A(c) provides the private right of
action for a U.S. citizen against such a foreign state for
personal injury or death caused by an act of torture engaged in
by the foreign state's officials acting in their official
capacity.  28 U.S.C. § 1605A(c).  In actions under this
provision, "a foreign state shall be vicariously liable for the
acts of its officers, employees, or agents."  Id.

Because plaintiffs must allege the elements of a claim under
§ 1605A(c) in order to meet the requirements for waiver of
foreign sovereign immunity, liability will exist whenever the
jurisdictional requirements of § 1605A(a) are proven.  See
Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 155
(D.D.C. 2010) ("[T]he § 1605A(c) cause of action is fulfilled by
demonstrating that the foreign sovereign performed acts described
in subsection (a)(1) of § 1605A, which addresses immunity and
subject matter jurisdiction. . . .  Although an analysis of a
foreign sovereign's potential immunity and liability should be
conducted separately, the elements of immunity and liability
under § 1605A(c) are essentially the same in that § 1605A(a)(1)
must be fulfilled to demonstrate that a plaintiff has a cause of
action."); see also Gates v. Syrian Arab Republic, 580 F. Supp.
2d 53, 64-69 (D.D.C. 2008) (explaining that § 1605A(c) provides a

- 5 -

private right of action where subject matter jurisdiction exists under § 1605A(a)).

The FSIA adopts the definition of torture contained in section 3 of the Torture Victims Protection Act ("TVPA"). 28 U.S.C. § 1605A(h)(7) (citing 28 U.S.C. § 1350 note). The TVPA defines torture as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

TVPA, Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992).

The amended complaint also alleges that Reverend Kim was "tortured to death by officers, employees and agents of defendant North Korea[,]" Am. Compl. ¶ 27, and that Reverend Kim's "murder" thus qualifies under 28 U.S.C. § 1605A as an extrajudicial killing, id. ¶ 33. The FSIA adopts the definition of extrajudicial killing contained in the TVPA: "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992).

- 6 -

Courts have found that extrajudicial killing occurs, for example, where a defendant deliberately kills individuals by a targeted or deliberate bombing, see, e.g., Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 150 (D.D.C. 2011); Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 74 (D.D.C. 2010), or deliberately assassinates or executes an individual, see Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 839-40 (D.C. Cir. 2009); Kilburn, 699 F. Supp. 2d at 152-53; Bakhtiar v. Islamic Republic of Iran, 571 F. Supp. 2d 27, 34 (D.D.C. 2008).  Here, plaintiffs have not alleged a targeted bombing or a deliberate execution.  Instead, by alleging that Reverend Kim was tortured to death and that this murder qualifies as an extrajudicial killing, the plaintiffs must show that North Korean agents deliberately killed Reverend Kim by torturing him.  Thus, the plaintiffs' extrajudicial killing claim relies squarely upon an adequate showing that Reverend Kim was tortured.

The D.C. Circuit has emphasized the high standard that the statutory definition of torture imposes.  In Price, an interlocutory appeal of a district court order rejecting Libya's claim of sovereign immunity in its motion to dismiss, the court of appeals considered the sufficiency of the complaint's allegations of torture.  The circuit's reasoning merits recounting in some detail:

- 7 -

The severity requirement is crucial to ensuring that
the conduct proscribed by the Convention and the TVPA
is sufficiently extreme and outrageous to warrant the
universal condemnation that the term 'torture' both
connotes and invokes . . . . [O]nly acts of a certain
gravity shall be considered to constitute torture
. . . . The term 'torture,' . . . is usually reserved
for extreme, deliberate and unusually cruel practices,
for example, sustained systematic beating, application
of electric currents to sensitive parts of the body,
and tying up or hanging in positions that cause extreme
pain . . . . The critical issue is the degree of pain
and suffering that the alleged torturer intended to,
and actually did, inflict upon the victim.  The more
intense, lasting, or heinous the agony, the more likely
it is to be torture . . . . [I]n order to constitute
torture, an act must be a deliberate and calculated act
of an extremely cruel and inhuman nature, specifically
intended to inflict excruciating and agonizing physical
or mental pain or suffering . . . . [T]orture does not
automatically result whenever individuals in official
custody are subjected even to direct physical assault.
Not all police brutality, not every instance of
excessive force used against prisoners, is torture
under the FSIA . . . . [I]t is especially important
for the courts to ensure that foreign states are not
stripped of their sovereign immunity unless they have
been charged with actual torture, and not mere police
brutality.

Price, 294 F.3d at 92-93 (internal quotations and citations

omitted).  In addition, for abuse to constitute torture it must

be inflicted intentionally, not merely incidentally.  Id. at 93

("In order to lose its sovereign immunity, a foreign state must

impose suffering cruelly and deliberately, rather than as the

unforeseen or unavoidable incident of some legitimate end.").

    In light of this meaning, the court found insufficient to

waive sovereign immunity allegations that plaintiffs were held

- 8 -

for approximately three months in a political prison where they
allegedly "endured deplorable conditions while incarcerated,
including urine-soaked mattresses, a cramped cell with
substandard plumbing that they were forced to share with seven
other inmates, a lack of medical care, and inadequate food," and
further "were kicked, clubbed and beaten by prison guards, and
interrogated and subjected to physical, mental and verbal abuse."
Id. at 86 (internal quotations omitted).  The Price court further
found the complaint inadequate because it "says virtually nothing
about the purpose of the alleged torture."  Id. at 94; see also
Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d
230, 234 (D.C. Cir. 2003) (finding allegations of forcibly
removing passenger from cruise ship, holding passenger
incommunicado and threatening her with death if she moved from
her quarters did not rise to the level of torture under the FSIA
and state a claim).

    Price considered the sufficiency of torture allegations when
the defendants moved to dismiss the complaint for lack of subject
matter jurisdiction.  Price's reasoning is equally instructive
for determining whether a plaintiff in a default proceeding has
established subject matter jurisdiction.  When a court reviews
unchallenged factual allegations on a motion to dismiss, the
allegations are assumed to be true for purposes of assessing

- 9 -

subject matter jurisdiction.  _Price_, 294 F.3d at 93.  Similarly,

for the purposes of examining subject matter jurisdiction on a

motion for entry of default under the FSIA, courts accept the

plaintiffs' factual allegations as true.  _Sisso v. Islamic_

_Republic of Iran_, 448 F. Supp. 2d 76, 81 & n.5 (D.D.C. 2006)

(reasoning on motion for entry of default in FSIA proceeding that

court was "preclude[d] . . . _at this stage of the litigation_ from

making factual findings that are inconsistent with the

allegations of the complaint" and explicitly accepted "all of

plaintiffs' factual allegations as true[.]").  However, to

establish subject matter jurisdiction, the allegations must be

sufficiently detailed.  At the pleadings stage, the _Price_ court

accordingly found inadequate the allegations before it, holding

that

> plaintiffs' complaint offers no useful details about
> the nature of the kicking, clubbing, and beatings that
> plaintiffs allegedly suffered.  As a result, there is
> no way to determine from the present complaint the
> severity of plaintiffs' alleged beatings -- including
> their frequency, duration, the parts of the body at
> which they were aimed, and the weapons used to carry
> them out -- in order to ensure that they satisfy the
> TVPA's rigorous definition of torture.

_Price_, 294 F.3d at 93.  Beyond the pleadings stage, plaintiffs

"have to prove the merits of their claims before they can obtain

a default _judgment_" and "the evidence they present will have to

provide support" for the theories of liability they allege.

- 10 -

<u>Sisso</u>, 448 F. Supp. 2d at 79 n.2.  It follows that plaintiffs
must provide sufficiently detailed proof of their allegations
that DPRK agents tortured Reverend Kim in order to ensure that
the conduct "satisf[ies] the TVPA's rigorous definition of
torture."  <u>Price</u>, 294 F.3d at 93.

II.  STANDARDS FOR DEFAULT JUDGMENT

Default judgment against a foreign state shall be entered
only where a plaintiff "establishes his claim or right to relief
by evidence that is satisfactory to the Court."  28 U.S.C.
§ 1608(e).  The "satisfactory to the court" standard is identical
to the standard for entering default judgment against the United
States under Fed. R. Civ. P. 55(d) (requiring claimant to
"establish[] a claim or right to relief by evidence that
satisfies the court").  <u>Hill v. Republic of Iraq</u>, 328 F.3d 680,
683 (D.C. Cir. 2003) (citing H.R. Rep. No. 94-1487, at 26
(1976)).  Neither standard, however, is easily defined.  <u>See
Smith ex rel. Smith v. Islamic Emirate of Afghanistan</u>, 262 F.
Supp. 2d 217, 223 (S.D.N.Y. 2003) (observing that "[t]he issue
appears to have defied definitive resolution largely because in
most cases the evidence of the defaulting defendant's liability
is quite compelling and thus the matter can be decided without a
more concise meaning of 'evidence satisfactory to the court'").
The D.C. Circuit has not addressed the question, and lower courts

- 11 -

have articulated varying rationales for what quantum of evidence is "satisfactory."

Some courts in FSIA default proceedings have found to be "satisfactory" evidence that they described as "clear and convincing." See, e.g., Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 16 (D.D.C. 2002) (finding jurisdictional facts "established by clear and convincing evidence, which would have been sufficient to establish a prima facie case in a contested proceeding"); Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 3 (D.D.C. 2001) (same).  But the reasoning of these cases suggests strongly -- and in some cases indicates explicitly -- that clear and convincing evidence was considered a sufficient, rather than a necessary, quantum of proof.  See, e.g., Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 269 (D.D.C. 2003) (concluding that "the plaintiffs have gone beyond the necessary burden of 'evidence satisfactory to the court' and have proven each element by clear and convincing evidence").

Other courts have drawn an analogy between the FSIA default standard and that for judgment as a matter of law, either after a jury trial or on summary judgment.  One court held that the FSIA default standard "call[s] for proof by evidence of a nature and quality sufficient to support summary judgment under Fed. R. Civ.

- 12 -

P. 56, namely, oral or written testimony under oath, made upon personal knowledge by witnesses competent to testify to the matters stated therein." Hill v. Republic of Iraq, 175 F. Supp. 2d 36, 38 n.4 (D.D.C. 2001) (referring to then-current Rule 56(e)).[1]  In Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 98 (D.D.C. 2002), the court considered the Hill standard, among others, but then purported to opt for the standard for judgment as a matter of law after a jury trial, set forth in Federal Rule of Civil Procedure 50(a), which the court described as "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." Id. at 98.[2]  Several subsequent courts, see, e.g., Gates, 580 F. Supp. 2d at 63, have adopted as the

---

[1] This case was reversed in part by Hill v. Republic of Iraq, 328 F.3d 680 (D.C. Cir. 2003).  The D.C. Circuit rejected the burden of proof on damages for default judgment that the district court articulated, but "did not address the question of the FSIA's plaintiff's burden on proof on liability."  Hill, 328 F.3d at 683-84.

[2] The Federal Rule of Civil Procedure 50(a) standard is more stringent than the Ungar court's formulation suggests.  Judgment as a matter of law against a party may be granted only if "the court finds that a reasonable jury would *not* have a legally sufficient evidentiary basis to find for the party on [an] issue."  Fed. R. Civ. P. 50(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (holding that the summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict").  In this light, the standards actually applied in Hill and Ungar are virtually identical.

- 13 -

standard that the plaintiffs must put forth a "legally sufficient *prima facie* case." <u>See, e.g.</u>, <u>Kilburn</u>, 699 F. Supp. 2d at 150.

Interpreting the "satisfactory to the court" standard to require a legally sufficient *prima facie* case best accounts for the posture of default proceedings under the FSIA.  Where the defendant has not participated in the proceedings and there has been no opportunity for discovery, plaintiffs cannot be expected to meet a typical standard for judgment as a matter of law.  However, the plaintiff's evidence must be rigorous enough to support the facts necessary for jurisdiction.

In FSIA default proceedings, "the court may accept as true the plaintiffs' uncontroverted evidence." <u>Wachsman v. Islamic Republic of Iran</u>, 603 F. Supp. 2d 148, 155 (D.D.C. 2009) (internal quotations omitted) (quoting <u>Elahi v. Islamic Republic of Iran</u>, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)); <u>see also</u> <u>Gates</u>, 580 F. Supp. 2d at 63 (same); <u>Alejandre v. Republic of Cuba</u>, 996 F. Supp. 1239, 1243 (S.D. Fla. 1997) (same).  The evidence provided, however, is subject to the Federal Rules of Evidence. <u>See, e.g.</u>, <u>Daliberti v. Republic of Iraq</u>, 146 F. Supp. 2d at 21 n.1 (D.D.C. 2001) (noting that "[i]n the absence of defense counsel, the Court used particular care to draw the . . . findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence").  Hearsay

- 14 -

evidence therefore is normally inadmissible because it lacks
sufficient indicia of reliability.  Expert witnesses, however,
may rely on hearsay evidence to reach their conclusions.  Fed. R.
Evid. 703.  Plaintiffs may present their evidence in the form of
affidavits or declarations, <u>see</u> <u>Campuzano</u>, 281 F. Supp. 2d at 268
(citing <u>Weinstein</u>, 184 F. Supp. 2d at 19), and an evidentiary
hearing is not required before a default judgment against a
foreign state is entered.  <u>See</u> <u>Ben-Rafael v. Islamic Republic of</u>
<u>Iran</u>, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

III. PLAINTIFFS' EVIDENCE

Plaintiffs have submitted their own declarations, as well as
declarations from family member Dani Butler, and from multiple
experts on North Korea.  Exhibits include congressional
resolutions relating to Reverend Kim's abduction, and press
materials, book excerpts and reports from human rights
organizations and the U.S. State Department about North Korea.
The plaintiffs rely in particular on the decision of a South
Korean court that tried and convicted a DPRK intelligence agent
for crimes including the abduction of Reverend Kim.  Plaintiffs
have provided a sworn English translation of that decision.  <u>See</u>
Declaration of J.D. Kim (certifying translation of Decision of
Seoul Joong Ang Ji Bang Court, Criminal Part 23 ("South Korean
court decision")).  The judgment of the South Korean court is a

- 15 -

proper subject of judicial notice under Federal Rule of Evidence
201 to establish the fact of foreign litigation and the resulting
actions of the foreign court. Fed. R. Evid. 201 (permitting
judicial notice of a fact that is not subject to reasonable
dispute because it can be accurately and readily determined from
sources whose accuracy cannot reasonably be questioned); see,
e.g., Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.,
154 F. Supp. 2d 682, 689 (S.D.N.Y. 2001) (taking judicial notice
of foreign court judgment); Luxpro Corp. v. Apple Inc., No. C 10-
03058 JSW, 2011 WL 1086027, at *3 (N.D. Cal. March 24, 2011)
(same). A declaration certifying under penalty of perjury that
the translation of the decision is true and correct accompanies
the decision and suffices to establish its accuracy. See 28
U.S.C. § 1746. Recited below, without an attempt to parse the
admissibility of all of it, is the evidence presented by the
plaintiffs.

North Korean refugees who were able to escape to China
would stay in secret safe-houses that non-governmental
organizations and religious humanitarian groups had established
or that Chinese locals in the area with ethnic Korean descent
would support. Report of Yoshikuni Yamamoto ("Yamamoto Decl.")
¶ 17. In response, the DPRK established a network of local
agents in China under DPRK's security services to abduct

- 16 -

defectors and the humanitarian workers who assisted them.  Id.
¶¶ 18, 23.  On September 17, 2002, DPRK leader Kim Jong-Il
admitted publicly to Prime Minister Koizumi of Japan that DPRK
security services had engaged in kidnapping Japanese citizens
between 1977 and 1983.  Declaration of Ernest C. Downs ("Downs
Decl.") ¶ 20.

    In 1993, Reverend Kim moved to China to work as a missionary
providing humanitarian and religious services to the families of
North Korean defectors and refugees who had fled across the Sino-
Korean border seeking asylum.  Yamamoto Decl. ¶ 20.  He had
previously worked with the Special Olympics in China and worked
to raise money for medical supplies for needy children.  He
learned of the plight of North Korean refugees and at once
committed himself to aid this disadvantaged community.
Declaration of Han Kim ("Han Decl.") ¶¶ 19, 21.  Reverend Kim set
up numerous refugee shelters and a school for expatriate North
Korean children and handicapped persons in the Chinese town of
Yanji.  He named the school the "School of Love."  Yamamoto Decl.
¶ 20.

    DPRK intelligence agent Hua was convicted on April 21, 2005
by a South Korean Court in Seoul, for his involvement in planning
and executing various abductions of civilians from China to North
Korea following the instructions of a senior DPRK intelligence

- 17 -

official.  South Korean court decision at 1.  One of the crimes

for which Hua was convicted was his direct involvement in

planning and carrying out the abduction of Reverend Kim.  Id. at

2.  Hua was sentenced to ten years imprisonment.  Id. at 1.  The

plaintiffs allege that agents prosecuted for abducting Reverend

Kim provided information concerning Reverend Kim's torture in

North Korea, and cite to the South Korean court decision for

support.  Pls.' Proposed Facts at 8; Revised Proposed Findings of

Facts and Conclusions of Law at 18.  However, the court decision

makes no reference to Reverend Kim being tortured in North Korea.

Members of the United States Congress have investigated the

DPRK policy of abducting foreigners and have issued various

resolutions regarding the issue.  On June 11, 2002, the House of

Representatives issued a resolution urging the governments of the

United States, South Korea and China to seek a full accounting

from the DPRK regarding the whereabouts of Reverend Kim.  Downs

Decl. ¶ 25, Ex. A.  On July 11, 2005, the House of

Representatives issued a resolution condemning the DPRK's use of

abductions and demanding the return of individuals being held in

North Korea.  Id. ¶ 25, Ex. C.  On January 28, 2005, an Illinois

congressional delegation, including then-United States Senator

Barack Obama, sent a letter to North Korean Ambassador to the

United Nations Pak Gil Yon, which specifically asked that North

- 18 -

Korea forthwith investigate the circumstances of Reverend Kim's abduction and fate, and which stated that its signatories would not support the removal of the DPRK from the State Department's list of State Sponsors of Terrorism until the whereabouts of Reverend Kim had been made known.  Id. ¶ 25, Ex. E.  This letter was followed by a letter from Representative Henry Hyde in his capacity as the Chairman of the House Committee on International Relations, dated November 4, 2005, after the Illinois congressional delegation had returned from a trip to Japan.  Id. ¶ 25, Ex. F.

A recently declassified internal State Department cable dated February 3, 2000, from representatives stationed in Seoul communicating with headquarters in Washington, D.C., states that a local Chinese paper reported that Chinese investigators had "strong evidence" that Reverend Kim was kidnapped from China by DPRK agents who had crossed over into China in late December to plan the abduction.  Id. ¶ 26, Ex. G.  The cable -- authored a mere two weeks after Reverend Kim's abduction -- further reported that ten people were involved in Reverend Kim's kidnapping, including a couple posing as North Korean defectors, and that Reverend Kim was held hostage in China before being transported into North Korea by his captors.  Id.  The State Department's 2003 country report on North Korea discusses North Korea's

- 19 -

responsibility for disappearances and refers to "unconfirmed
reports that in January 2000 North Korean agents kidnaped a South
Korean citizen, Reverend Kim Dong Shik, in China and took him to
North Korea." Decl. of Robert Tolchin, Dkt. No. 37 at 3.  The
State Department also recounts that North Korea engaged in
torture including "severe beatings, electric shock, prolonged
periods of exposure, humiliations such as public nakedness, and
confinement to small 'punishment cells[.]"  Id. at 4.  The report
describes harsh prison conditions in North Korea where
"starvation and executions were common" and former prisoners
reported severe beatings and "torture involving water forced into
a victim's stomach with a rubber hose and pumped out by guards
jumping on a board placed across the victim's abdomen[.]"  Id.  A
2009 State Department country report on human rights practices in
the DPRK states that the North Korean government was responsible
for disappearances and that "[i]n 2008 the media reported South
Korean missionary Kim Dong-shik had most likely died within a
year of his 2000 disappearance near the China-DPRK border."
Decl. of Robert Tolchin, Dkt. No. 38 at 3.  The 2009 report
reiterates the reported torture methods and the harsh conditions
of the prisons in North Korea.  Id. at 3-4.  However, the State
Department cable and reports do not provide any first-hand
accounts of Reverend Kim's treatment, or address the nature or

- 20 -

severity of any torture Reverend Kim suffered, or specify the frequency or duration of the acts of torture or the parts of the body at which they were aimed or any weapons used to carry them out.

Expert research on human rights abuses in North Korea has reported widespread and systematic repression by DPRK operatives of DPRK citizens and foreign nationals, specifically by means of forced abductions and confinement in *kwan-li-so*, or political penal-labor colonies.  The reports are based on first-hand accounts and satellite photography, among other data. Declaration of Professor David Hawk ("Hawk Decl.") ¶¶ 8-13. Professor David Hawk has expertise in human rights in North Korea, has published extensively on that issue, and has interviewed scores of former prisoners with first-hand accounts of treatment in North Korean camps.  He declared that prisoners of the penal colonies face harsh conditions and treatment, including below-subsistence food rations, back-breaking forced physical labor, brutal beatings, long-term solitary confinement, rape, and forced abortion.  Id. ¶¶ 14-19.  Prisoners are forced to perform labor twelve or more hours a day, seven days a week, and receive only enough food to be kept on the verge of starvation.  Id. ¶ 14.  Prisoners often endure "long-term solitary confinement in punishment cells which do not have enough

space for a person to completely lie down or stand up, causing
inmates to experience a loss of circulation and atrophy of legs,
and often leading to death within several weeks." Id. ¶ 15.
According to Hawk, "[a]ttempted escapees are automatically
executed and other 'major' rule-breakers are publicly executed by
hanging or firing squad in front of the assembled prisoners of
that section of the camp." Id. "Many inmates cannot withstand
the harsh conditions of their imprisonment and a significant
number die within a year of their arrival to the kwan-li-so.  A
large number of those who survive develop permanent disabilities
-- signs of premature aging, hunchbacks and other physical
deformities due to the brutal work conditions and cell sizes."
Id. ¶ 16.  Hawk stated that a defining characteristic of DPRK's
political penal-labor colonies is that "prisoners are not
formally arrested, charged (or even told of their offense), or
tried in any sort of judicial procedure." Id. ¶ 11.

Hawk said

> [w]hile I do not have any firsthand knowledge about
> Reverend Kim's case specifically, given my extensive
> experience with the DPRK and the manner in which
> abductees repatriated from China were usually treated,
> it is likely that [Reverend Kim] would have been
> initially held in a *ku-ryu-jang*, or a DPRK police
> detention and interrogation facility, before being
> transferred to a *kwan-li-so*.  It also seems likely to
> me that Reverend Kim, at a minimum, would have been
> subjected to the harsh treatment afforded to all of its
> prisoners.  But because Reverend Kim was such a
> valuable target of the DPRK and so much planning,

- 22 -

> effort and other resources had gone into his abduction,
> it is clear to me that Reverend Kim was subjected to
> additional brutality.

Id. ¶ 20.  Reports and concerns about Reverend Kim's treatment

have circulated widely enough that he would have been more likely

to be viewed by the DPRK as a high-value target warranting harsh

treatment.  Id.  Hawk "believe[s] that the various reports of

[Reverend Kim's] torture and eventual starvation, from the

accounts of other prisoners, are likely to be reliable and

accurately describe how Reverend Kim was treated by his captors

from the time he was abducted and incarcerated until his untimely

death."  Id.  Hawk does not detail from the reports the nature or

severity of the torture Reverend Kim suffered, or the frequency

or duration of the acts of torture or the parts of the body at

which they were aimed or any weapons used to carry them out.

Ernest C. Downs, a former senior official of the U.S.

Department of Defense who served from 2001 to 2008 on the board

of the United States Committee for Human Rights in North Korea,

stated that it is "clear . . . that [Reverend Kim] was abducted

by DPRK agents from China and forcibly brought to North Korea[.]"

Downs Decl. ¶ 33.  According to Downs, DPRK agents have

specifically abducted and imprisoned people who have assisted

North Korean defectors as well as Christian missionaries.

Supplemental Declaration of Ernest C. Downs ("Downs Supp. Decl.")

- 23 -

¶ 6(b)-(d).  Because Reverend Kim assisted North Korean defectors
and was a Christian missionary, he was likely a "valuable and
important target to the government and ruling party of the DPRK."
Id. ¶ 6(a)-(c).  Based on the testimony of other North Korean
prisoners, Downs states that prisoners are forced to labor for
more than twelve hours per day, sometimes sixteen hours, and the
failure to meet production quotas leads to "additional hard
labor, less food, and exceptionally painful physical punishment."
Downs Decl. ¶ 11; see also Downs Supp. Decl. ¶ 11.  Thus,
"[p]risoners in North Korea's political prisons do not often
survive."  Downs Supp. Decl. ¶ 7.  Downs states that he is aware
of the testimony of 1000 former North Korean prisoners and Downs
"does not know of any case in which the former prisoner was not
subjected to torture while in the prison camp."  Downs Supp.
Decl. ¶ 10.  Downs provides numerous examples from former
prisoners describing inmate mistreatment in DPRK prisons and
facilities.  In particular, Downs submits an excerpt from Hawk's
book The Hidden Gulag which recounts inmates who were subject to
burnings, skin piercing, water torture, being hung by wrists or
upside-down, sleep deprivation, food deprivation, facial and shin
beatings with rifle butts, whippings with belts, beatings in the
legs with a wooden stave, undersized punishment cells where
detainees could not stand up or lie down and placement in

- 24 -

punishment cells for a week or more.  Id., Ex. 1 at 148-52.
Downs also attaches an account of a prisoner who was hung by his
hands and feet, stabbed in the lower abdomen and held over a fire
until he lost consciousness.  Id., Ex. 2 at 57-58.

Downs also opines that "Reverend Kim's killing was motivated
by political considerations."  Downs Decl. ¶ 7.  In his opinion,
"a foreigner abducted by the DPRK for political purposes, such as
Reverend Kim, after eleven years would still either be
languishing in a North Korea prison camp or would have already
been killed."  Id. ¶ 34.  He "believe[s] that credible
information on [Reverend Kim's] treatment in North Korea has been
obtained from defectors."  Id.  He states that Reverend Kim
probably was subjected to "severe beatings while in stress
positions (such as while suspended from the ceiling), near
starvation, and forced physical exertion to the point of absolute
physical exhaustion."  Downs Supp. Decl. ¶ 9.  In addition, Downs
asserts that he is certain that "Reverend Kim has been subject to
exceptionally painful, brutal, and outrageous treatment while in
prison."  Id. ¶ 8.  Downs also states that "[c]redible sources
have reported that Reverend Kim died as a result of his torture
and malnutrition."  Id. ¶ 6(i).  Thus, Downs concludes that
Reverend Kim's "death resulted from torture and malnutrition
deliberately caused by his North Korean captors."  Id. ¶ 13.

- 25 -

Downs neither identifies the former prisoners, the defectors or other credible sources for these conclusions, nor reveals their basis of knowledge about Reverend Kim, nor says he has spoken with any of them.  Downs does not provide details from the credible information received concerning the severity of Reverend Kim's beatings, such as their frequency, duration, the parts of the body at which they were aimed, or the weapons used to carry them out.

Do Hee-Youn, a member of a South Korea-based human rights organization, heard "through the information net" that Reverend Kim died in North Korea as a result of torture and malnutrition in February 2001.  Declaration of Do Hee-Youn ("Do Hee-Youn Decl.") ¶ 13.  Yoshikuni Yamamoto, a researcher at a human rights organization in Washington, DC, stated generally that "it was reported" that Reverend Kim was tortured after refusing to collaborate and that he died in February 2001 and was buried in District 91 military training base in Sangwon-ri near Pyongyang.  Yamamoto Decl. ¶ 22.  Neither declaration supplied details about the nature of the reported torture.

Human Rights Watch released a 2007 report discussing the mistreatment of prisoners at detention facilities in North Korea.  This report states that

>     prisoners are subject to strip searches, verbal abuse
>     and threats, beatings, forced labor, and lack of food

- 26 -

and medicine, among other abuses.  Torture and other
cruel and inhuman treatment appears widespread and can
occur throughout the process of incarceration in North
Korea[.]

North Korea: Harsher Policies against Border-Crossers, Dkt. No.

35-1 at 8.  In particular, the report includes accounts from

former prisoners who state that the guards

would make [prisoners] sit down and stand up repeatedly
until [they] collapsed, or forced [them] to hang onto
cell bars or bang [their] heads onto cell bars. . . .
Guards beat people all the time -- they used sticks or
belts.  They also slapped or kicked inmates for
disobedience.

Id.  Similarly, the United Nations Special Rapporteur on the

situation of human rights in the DPRK released a report which

described what it called DPRK's record of torture and inhuman

treatment, arbitrary detention and use of prison camps.  Pls.'

Supp. Submission of New Auth., Ex. 1, Human Rights Council, Rep.

of the Special Rapporteur on the situation of human rights in the

DPRK, 22d Sess., U.N. Doc. A/HRC/22/57 (Feb. 1, 2013).  This

report stated that, in 2007, there were reports that DPRK

authorities engaged in "torture, public executions, and

persecution of political dissidents."  Id., Annex 1 ¶ 22.  In

2008, the Secretary-General stated that reports from DPRK

"continue to indicate trends of torture, inhumane conditions of

detention, public execution, ill-treatment of refugees" and the

Special Rapporteur stated that

- 27 -

> the harsh conditions imposed by the criminal justice
> system and related detention give rise to a plethora of
> abuses, including torture and cruel, inhuman and
> degrading treatment.  The abuses are ubiquitous, and
> include degrading treatment of deceased persons.

Id., Annex 1 ¶ 23.  The UN Special Rapporteur cites 2011 reports

which state that DPRK correctional officers beat inmates and that

torture was occurring at various camps in the DPRK.  Id., Annex 1

¶¶ 25-26.  In addition, "[t]he Secretary-General noted in 2012

that some reports also indicate the existence of prison camps

where torture and execution are widespread."  Id., Annex 1 ¶ 27.

The report identifies the political labor camps and states that

the Special Rapporteur has consistently expressed concern about

"unreasonable and abusive punishments" and "torture and detention

without due process of law" and the "harsh conditions" in the

camps where "no clothing is provided" and inmates are "expected

to work long hours performing manual labour."  Id., Annex 1

¶¶ 48-51, 54.  Neither report provides any first-hand knowledge

of Reverend Kim's mistreatment.  The reports do not detail the

frequency or duration of the acts of torture at the DPRK prison

camps.

Plaintiffs cite an excerpt from Melanie Kirkpatrick's 2012

book Escape from North Korea that states that Reverend Kim was

tortured and murdered by the North Koreans.  Pls.' Supp.

Submission of New Authority, Dkt. No. 55, Ex. 1 at 150-51.  The

- 28 -

excerpt states that Reverend Kim was transported to a political
prison camp and "[h]e appears to have been beaten and starved to
death after refusing to renounce his religion." Id. at 152.
Kirkpatrick also states that "according to [Reverend Kim's]
family, his remains are believed to be in People's Army Camp 91,
a garrison on the outskirts of Pyongyang." Id. (footnote
omitted).  Kirkpatrick reports as the source for these details
the plaintiffs' amended complaint and the filings docketed in
this case.  See Melanie Kirkpatrick, Escape from North Korea 329
n.20 (2012).  In any event, the Kirkpatrick excerpt does not
detail the nature or severity of the torture, or the frequency or
duration of the acts of torture or the parts of the body at which
they were aimed or any weapons used to carry them out.

IV.  JURISDICTION IN THIS CASE

Section 1605A(a)(2)(A)(i)(I) provides in relevant part that
a court shall hear a claim under § 1605A against a foreign state
if that state "was designated as a state sponsor of terrorism at
the time the [torture or extrajudicial killing] occurred, . . .
and . . . either remains so designated when the claim is filed
under this section or was so designated within the 6-month period
before the claim is filed under this section[.]"  North Korea was
designated as a state sponsor of terrorism in 1988.  See Notice,
Determination Pursuant to Section 6(j) of the Export

- 29 -

Administration Act of 1979; North Korea, 53 Fed. Reg. 3477-01
(Feb. 5, 1988).  North Korea's designation was rescinded on
October 11, 2008.  See Notice, Rescission of Determination
Regarding North Korea, 73 Fed. Reg. 63540-01 (Oct. 24, 2008).
Thus, North Korea remained designated as a state sponsor of
terrorism within the 6-month period before this action was filed
on April 8, 2009.

Section 1605A(a)(2)(A)(ii)(I) further requires that "the
claimant or the victim was, at the time the act . . . occurred
. . . a national of the United States."  An individual deemed to
owe a permanent allegiance to the United States and who actively
pursues U.S. citizenship can be held to be a "national of the
United States" in satisfaction of § 1605A(a)(2)(A)(ii)(I).  See,
e.g., Saludes v. Republica de Cuba, 577 F. Supp. 2d 1243, 1252
(S.D. Fla. 2008).  At the time of Reverend Kim's abduction,
plaintiff Yong Kim was a U.S. citizen and plaintiff Han Kim can
be deemed to have been a U.S. national.  He had lived in the U.S.
since 1992 and became a Permanent Resident owing a permanent
allegiance to the U.S.  In 1999, before his father's abduction,
he began the application process to become a naturalized American
citizen with the intention of remaining in this country.
Supplemental Declaration of Han Kim at 1-2.

- 30 -

For any "production of pain" to constitute torture under the TVPA definition, the act must be "purposive, and not merely haphazard . . . [or] the unforeseen or unavoidable incident of some legitimate end." Price, 294 F.3d at 93.  Plaintiffs' proffered evidence includes expert opinions, a type of evidence that courts have credited in FSIA default actions.  See Kilburn, 699 F. Supp. 2d at 143, 152.  Hawk asserts that DPRK's policy is to imprison "political prisoners and others deemed to be opponents of the DPRK regime" to "deter dissent in the larger population[.]"  Hawk Decl. ¶ 10.  Hawk and Downs state that Reverend Kim was targeted by DPRK because of his "humanitarian activities" and because he was a Christian missionary who assisted North Korean defectors.  Hawk Decl. ¶ 21; Downs Supp. Decl. ¶¶ 6(a)-(d), 7.  In particular, Downs states that he is "virtually certain that Reverend Kim's killing was motivated by political considerations."  Downs Supp. Decl. ¶ 7.  Hawk adds that in DPRK's penal camps, "prisoners are not formally arrested, charged (or even told of their offense), or tried in any sort of judicial procedure."  Hawk Decl. ¶ 11.  The South Korean court decision and the expert evidence reflect that Reverend Kim was abducted at the behest of DPRK security forces, not in accordance with any legitimate judicial or other process, due to Kim's religious work and assistance to North Korean refugees.

- 31 -

Therefore, the plaintiffs have sufficiently shown that any mistreatment of Reverend Kim was done purposefully.

However, the plaintiffs' submissions do not establish the severity of the treatment of Reverend Kim in particular, or that his treatment amounts to torture under the rigorous definition of that term adopted in the FSIA.  DPRK's failure to respond to the complaint or to respond to any of the congressional inquiries regarding Reverend Kim's fate, in part, obscures the precise details of Reverend Kim's treatment following his abduction by DPRK agents.  Moreover, the widely feared nature of DPRK repression appears to force those individuals who may know details about Reverend Kim's whereabouts and treatment to convey such information sparingly and anonymously.  See, e.g., Do Hee-Youn Decl. ¶ 2 (describing "network of individuals that have supplied . . . information concerning North Korean matters" and explaining "many of these individuals are kept confidential to ensure their safety from potential retribution against them by the North Korean government").  Unfortunately for plaintiffs, no D.C. Circuit opinion appears to allow such circumstances to lessen the plaintiffs' exacting burden of proof.

Here, the declarations of the plaintiffs and Butler reflect no actual knowledge of how Reverend Kim was treated in the DPRK.  The South Korean court decision convicted a DPRK agent of

Case 1:09-cv-00648-RWR  Document 56  Filed 06/14/13  Page 32 of 36
USCA Case #13-7147    Document #1495112    Filed: 05/29/2014    Page 404 of 411

- 32 -

abducting Reverend Kim, but does not refer to Reverend Kim being
tortured.  The congressional resolutions and correspondence
sought, but did not provide, details about Reverend Kim's
treatment.  The State Department reports discussing abuse in DPRK
prisons and media speculation that Revered Kim died provide no
first-hand accounts detailing his treatment.  The reports from
Human Rights Watch and the United Nations provide no first-hand
accounts of Reverend Kim's mistreatment and do not detail the
frequency or duration of the acts of torture at the prison camps.
The Kirkpatrick book excerpt recounts information docketed in
this case but adds no first-hand information about Reverend Kim's
treatment, or any details about the nature or severity of his
torture, or the frequency or duration of any acts of torture or
the parts of his body at which they were aimed or any weapons
used to carry them out.  Two of plaintiffs' declarants, Do Hee-
Youn and Yoshikuni Yamamoto, recounted hearsay reports that
Reverend Kim was tortured and died.  The declarants did not,
though, reveal the sources of the reports, specify their bases of
knowledge, or provide useful details about the nature and
severity of any torture.

   The experts in this case describe conditions at an
established and extensive system of penal colonies where the DPRK
regularly holds abductees and political prisoners, and opine that

- 33 -

reports from defectors stating that Reverend Kim was tortured and is either still in custody or has died as a result of his treatment are credible.  However, Hawk does not report that the prisoners he spoke with had personal knowledge of Reverend Kim's treatment.  Hawk also does not describe the nature or severity of the torture Revered Kim suffered, or the frequency or duration of acts of torture upon him or the parts of the body at which they were aimed or any weapons used to carry them out.  Likewise, Downs does not identify the sources he deems credible upon whom he based his opinion that Reverend Kim probably died as a result of deliberate torture and malnutrition.  He does not reveal their bases of knowledge about Reverend Kim or say whether he has spoken with them.  Nor does Downs provide details regarding the severity of Reverend Kim's beatings.  Price constrains us from employing discussion about the abuses generally in these camps to show that mistreatment of Reverend Kim occurred that rose to the level of torture under the TVPA.  As the plaintiffs have not satisfied the requirements of the FSIA, subject matter jurisdiction is lacking.

Although the plaintiffs have not provided sufficient evidence to support jurisdiction under the FSIA, a district court ruling on whether facts in a complaint adequately allege a basis for invoking the torture exception under the FSIA should be

- 34 -

immediately appealable.  See Price, 294 F.2d at 92 (allowing

Libya to immediately appeal a district court decision rejecting

Libya's argument that the facts alleged in the complaint do not

bring the case within an FSIA immunity exception).  Moreover,

this case qualifies for an interlocutory appeal under 28 U.S.C.

§ 1292(b).  That statute provides that an interlocutory appeal

may be certified to the court of appeals when

> a district judge . . . shall be of the opinion that
> such order involves a controlling question of law as to
> which there is substantial ground for difference of
> opinion and that an immediate appeal from the order may
> materially advance the ultimate termination of the
> litigation.

28 U.S.C. § 1292(b).  "Under § 1292(b), a controlling question of

law is one that would require reversal if decided incorrectly or

that could materially affect the course of litigation with

resulting savings of the court's or the parties' resources[]" and

"include[s] issues that would terminate an action if the district

court's order were reversed."  APCC Servs., Inc. v. Sprint

Communic'ns Co., L.P., 297 F. Supp. 2d 90, 95-96 (D.D.C. 2003)

(internal citations and quotation marks omitted).  Here, the

determination of subject matter jurisdiction qualifies as a

controlling question of law.  See id.  Also, there is "a

substantial ground for difference of opinion" about whether

plaintiffs have presented the requisite quantum of evidence to

show that Reverend Kim was tortured under the FSIA.  Cf. Doe v.

- 35 -

Qi, 349 F. Supp. 2d 1258, 1312-17 (N.D. Cal 2004) (discussing
Price and collecting cases applying the standard for sufficient
factual allegations to allege torture under the FSIA).  Finally,
"[w]hen there are substantial grounds for difference of opinion
as to a court's subject matter jurisdiction, courts regularly
hold that immediate appeal may 'materially advance the ultimate
termination of the litigation.'"  Al Maqaleh v. Gates, 620 F.
Supp. 2d 51, 55 (D.D.C. 2009).  Certification for an
interlocutory appeal in this case, then, is warranted.

### CONCLUSION AND ORDER

Subject matter jurisdiction over this action depends in part
upon an adequate demonstration that Reverend Kim was tortured
following his abduction.  Plaintiffs have not met to the court's
satisfaction the high standard recognized by this circuit under
the FSIA for showing that Reverend Kim was tortured.  Thus, the
court lacks subject matter jurisdiction over this action.  The
motion for default judgment will be denied, and the case will be
certified for interlocutory appeal on the issue of the requisite
quantum of evidence for sufficiently alleging torture under the
FSIA.  Accordingly, it is hereby

ORDERED that plaintiffs' motion [14] for default judgment
be, and hereby is, DENIED.  It is further

- 36 -

ORDERED that this case be, and hereby is, certified for immediate appeal under 28 U.S.C. § 1292(b) because it involves a controlling question of law as to which there is a substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of this litigation. It is further

ORDERED that all proceedings in this case be stayed upon the application of the plaintiffs for an interlocutory appeal under 28 U.S.C. § 1292(b) of the finding that the court lacks subject matter jurisdiction under the FSIA.

SIGNED this 14th day of June, 2013.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 13-8005**                                     **September Term, 2013**

1:09-cv-00648-RWR

**Filed On:** September 11, 2013

In re:  Han Kim and Yong Seok Kim,

       Petitioners

      **BEFORE:**    Tatel, Griffith, and Kavanaugh, Circuit Judges

### O R D E R

Upon consideration of the petition for permission to appeal under 28 U.S.C. § 1292(b), it is

**ORDERED** that the petition be denied without prejudice.  In holding that it lacked subject matter jurisdiction over the action, the district court's order is essentially a final decision, not an interlocutory order that is amenable to review under § 1292(b).  The questions presented by petitioners may be raised on appeal under 28 U.S.C. § 1291, upon the district court's entry of final judgment.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  Because no appeal has been allowed, no mandate will issue.

### Per Curiam

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                 )
HAN KIM, et al.,                 )
                                 )
         Plaintiffs,             )
                                 )
         v.                      )      Civil Action No. 09-648 (RWR)
                                 )
DEMOCRATIC PEOPLE'S REPUBLIC     )
of KOREA, et al.,                )
                                 )
         Defendants.             )
_____)
```

**ORDER**

In light of the per curiam order filed by the U.S. Court of Appeals for the D.C. Circuit on September 11, 2013 denying without prejudice the plaintiffs' petition for permission to appeal under 28 U.S.C. § 1292(b), it is hereby

ORDERED that, for the reasons expressed in this court's memorandum opinion and order filed on June 14, 2013, the complaint be, and hereby is, DISMISSED.  This is a final appealable order.

SIGNED this 11th day of September, 2013.


                        _____/s/_____
                        RICHARD W. ROBERTS
                        Chief Judge

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2014, I filed the foregoing using the ECF system.  The Defendant-Appellee, the Democratic People's Republic of Korea, made no appearance in the trial court, where the clerk entered default.  The Defendant-Appellee has also made no appearance in this Court.  Accordingly, and following a discussion with the office of the clerk of the court, no additional copies of the foregoing appendix are being served.

/s/ Asher Perlin _____
Asher Perlin